UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Antoine Jones                    )
241912                           )
1901 D St SE                     )
WDC 20003                        )
(Enter your full name, prison number
and address)

v.

SA Stephanie Yanta              )
Washington Field Office         )
Rachel Lieber, US Attorney      )
Jack Geise US Attorney          )
(Enter the full name and address(es),
if known, of defendant(s) in this
action)

Case: 1:07-cv-01172
Assigned To : Kennedy, Henry H.
Assign. Date : 6/29/2007
Description: PRO SE GEN. CIVIL

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Instructions for filing a Complaint by a Prisoner
Under the Civil Rights Act 42 U.S.C. §1983

This packet contains one copy of a complaint form and one copy of an application to proceed *in forma pauperis*. To start an action, you must file an original and one copy of this complaint form.

Your complaint must be clearly handwritten or typewritten and you must sign and declare under penalty of perjury that the facts are correct. If you need additional space to answer a question, you may use another blank page.

Your complaint can be brought in this Court only if one or more of the named defendants is located within the District of Columbia. Further, you must file a separate complaint for each claim that you have unless they are related to the same incident or problem. The law requires that you state only facts in your complaint.

You must supply a certified copy of your prison trust account, pursuant to the provisions of 28 U.S.C. §1915, effective April 26, 1996. The filing fee is $150.00.. If insufficient funds exist in your prison account at the time of filing your complaint, the court **must** assess, and when funds exist, collect an initial filing fee equal to 20 percent of the greater of:

**RECEIVED**

(1) the average monthly deposits to your prison account, or

(2) the average monthly balance of your prison account for the prior six-month period.

JUN 1 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Thereafter, you are required to make monthly payments of 20% of the preceding month's income. The agency having custody over you must forward payments from your account to the clerk of the court each time the amount in the account exceeds $10.00 until the filing fees are paid.

Therefore, before an assessment can be made regarding your ability to pay, you must submit a certified copy of your prison account for the prior six-month period.

When this form is completed, mail it and the copies to the Clerk of United States District Court for the District of Columbia, 333 Constitution Ave., NW, Washington, D.C. 20001.

I.    SUCCESSIVE CLAIMS

Pursuant to the Prison Litigation Reform Act of 1995, unless a prisoner claims to be in "imminent danger of serious physical injury," he or she may not file a civil action or pursue a civil appeal *in forma pauperis* "if the prisoner has, on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or they failed to state a claim upon which relief could be granted."

II.    PREVIOUS LAWSUITS

A.    Have you begun other lawsuits in state or federal court dealing with the same or similar facts involved in this action?    Yes ( ✓ )    No ( )

B.    Have you begun other lawsuits in state or federal court relating to your imprisonment? Yes ( ✓ )    No ( )

C.    If your answer to A or B is Yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

1.    Parties to this previous lawsuit.

Plaintiffs: Antoine Jones

Defendants: MRS RAcHel Lieber

2.    Court (if federal court, name the district; if state court, name the county)
District of columbia

3.    Docket number Havent Receive

4.    Name of judge to whom case was assigned: Havent Receive

5. Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?) _Havent Receive civil Action Number yet_

6. Approximate date of filing lawsuit: _April 2007_

7. Approximate date of disposition: _Havent receive civil Action number_

## III. PLACE OF CONFINEMENT

_DC Jail 1901 DSt SE WDC_

A. Is there a prisoner grievance procedure in this institution? Yes ( ✓ ) No ( )
If your answer is Yes, go to Question III B. If your answer is No, skip Question III B,C and D and go to Question III E.

B. Did you present the facts relating to your complaint in the prisoner grievance procedure?
Yes ( ) No ( ✓ )

C. If your answer is Yes to Question III B;

   1. To whom and when did you complain? _N/A_

   2. Did you complain in writing? (Furnish copy of the complaint you made, if you have one.) Yes ( ) No ( ) _N/A_

   3. What, if any, response did you receive? (Furnish copy of response, if in writing.) _N/A_

   4. What happened as a result of your complaint? _N/A_

D. If your answer is No to Question III B, explain why not. _These issues pertaining to my arrest and an illigal search._

E. If there is no prison grievance procedure in the institution, did you complain to prison authorities? Yes ( ) No ( ✓ )

F. If your answer is Yes to Question III E;

_N/A_

1. To whom and when did you complain? _____ N I A _____

2. Did you complain in writing? (Furnish copy of the complaint you made, if you have one.) N I A

3. What, if any, response did you receive? (Furnish copy of response if in writing) N I A

4. What happened as a result of your complaint? N I A

## IV. PARTIES

In item A below, place your name and prison number in the first blank and your present address in the second blank. Do the same for additional plaintiffs, if any.

A. Name of Plaintiff: Antoine Jones 241 912
   Address: 1901 D St SE WDC 20003

In item B below, place the full name of the defendant(s) in the first blank, their official position in the second blank, their place of employment in the third blank and their address in the fourth blank. Do the same for additional defendants, if any.

B. Defendant: S.A. Stephanie Yanta is employed as
   FBI Agents at Federal Bureau Investigation
   Address: Washington Field House

   Defendant: Rachel Lieber is employed as
   District U.S. Attorney at District of Columbia
   Address: _____

   Defendant: Jack Geise is employed as
   District U.S. Attorney at District Attorney
   Address: _____

   Defendant: MPD Detective Norma Horne is employed
   as MPD, Safe Street Task Force at Safe Street Task Force
   Address: Washington Field Office

## V.    STATEMENT OF CLAIM

State here as briefly as possible the facts of your case.  Describe how each defendant is involved.  Include the names of other persons involved, dates and places.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach extra sheets if necessary.

See Attachment.complaint.

## VI.    RELIEF

State briefly exactly what you want the Court to do for you. I Am Requesting An Investigation And A Hearing on the matter of illigal wire TAP And misleading, And deceiving the Judge on the Text messages And AFFidavit. I am Asking For 10 million dollars For Damages. See attachment complaint.

Signed this 15th day of May 2007

_Antoine Jones_
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

6/15/07
(Date)

_Antoine Jones_
(Signature of Plaintiff)

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED
BEFORE ME THIS
NOTARY PUBLIC FOR THE DISTRICT
MY COMMISSION EXPIRES JULY
My Commission expires 7/31/08

JS-44
(Rev.1/05 DC)

1-
07-1172
HHK

**I (a) PLAINTIFFS**

Antoine Jones

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

Pro se (PR)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

**DEFENDANTS**

SA Stephanie Yanta, et al

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

A

Case: 1:07-cv-01172
Assigned To : Kennedy, Henry H.
Assign. Date : 6/29/2007
Description: PRO SE GEN. CIVIL

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)   FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A.  Antitrust**

☐ 410 Antitrust

**☐ B.  Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C.  Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D.  Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E.  General Civil (Other)  OR  ☒ F.  Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☒ 540 Mandamus & Other
☒ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.** *Habeas Corpus 2255*<br>☐ **530** Habeas Corpus-General<br>☐ **510** Motion/Vacate Sentence | ☐ **H.** *Employment Discrimination*<br>☐ **442** Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **I.** *FOIA/PRIV. ACT*<br>☐ **895** Freedom of Information Act<br>☐ **890** Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **J.** *Student Loan*<br>☐ **152** Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ **K.** *Labor/ERISA (non-employment)*<br>☐ **710** Fair Labor Standards Act<br>☐ **720** Labor/Mgmt. Relations<br>☐ **730** Labor/Mgmt. Reporting & Disclosure Act<br>☐ **740** Labor Railway Act<br>☐ **790** Other Labor Litigation<br>☐ **791** Empl. Ret. Inc. Security Act | ☐ **L.** *Other Civil Rights (non-employment)*<br>☐ **441** Voting (if not Voting Rights Act)<br>☐ **443** Housing/Accommodations<br>☐ **444** Welfare<br>☐ **440** Other Civil Rights<br>☐ **445** American w/Disabilities-Employment<br>☐ **446** Americans w/Disabilities-Other | ☐ **M.** *Contract*<br>☐ **110** Insurance<br>☐ **120** Marine<br>☐ **130** Miller Act<br>☐ **140** Negotiable Instrument<br>☐ **150** Recovery of Overpayment & Enforcement of Judgment<br>☐ **153** Recovery of Overpayment of Veteran's Benefits<br>☐ **160** Stockholder's Suits<br>☐ **190** Other Contracts<br>☐ **195** Contract Product Liability<br>☐ **196** Franchise | ☐ **N.** *Three-Judge Court*<br>☐ **441** Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ **1** Original Proceeding ☐ **2** Removed from State Court ☐ **3** Remanded from Appellate Court ☐ **4** Reinstated or Reopened ☐ **5** Transferred from another district (specify) ☐ **Multi district Litigation** ☐ **7** Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42:1983 (Prisoner civil rights)

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $** 10 Million    Check YES only if demanded in complaint   **JURY DEMAND:** ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☐ YES ☐ NO   If yes, please complete related case form.

**DATE**    **SIGNATURE OF ATTORNEY OF RECORD**

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

\forms\js-44.wpd

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Antoine Jones                                Jury Trial
241912
1901 D Street, SE
Washington, DC  20003
Plaintif


-V-                                          Civil Action No. _____


Defendants
Special Agent Stephanie E. Yanta, FBI
Detective Norma Horne, MPD DC
Rachel Lieber, US Attorney
Jack Geise, US Attorney


Complaint for violation of Civil Rights, U.S.C. 2520 Illegal Wiretap

USC2520
Illegal Wiretap
And
Illegal Use and Abuse of Text Messages

On September 2, 2005, Special Agent Stephanie E. Yanta, Federal Bureau of Investigation requested an application for an authorizing the interception of wire communication to and from mobile cellular telephone number 202-538-3946 (ESN010330005007579).

Special Agent Yanta also applied for a search warrant for computer networks maintained by electronic communication service provider Sprint Spectrum LP, and Cingular Wireless. Agent Yanta violated U.S.C. 2518, she also mislead, deceived and demonstrated reckless disregard for the truth (Frank v. Delaware).

There was no probable cause in the September 2, 2005 wiretap affidavit, the August 10, 2005 and August 18, 2005 text messages affidavits. Facts and evidence are enclosed. Refer to trial transcript, while Special Agent Yanta testified Friday, October 27, 2006, Monday, October 30, 2006 and November 2006. Also review the trial transcript of Tymira Hunter, Karissa Jones, Quentessa Broussard. See death certificate for Wallace Ward. Also note cell phone record from 202-583-3946, tainted pen register, and other facts and trial discovery highlighted in the enclosures. The trial transcripts along with the other discovery enclosed prove that Special Agent Yanta intentionally committed perjury, wrong doing, misleading, and deceived the courts.

Complaint #1: Agent Yanta, the FBI, and the DC MPD Safe Streets Task Force monitored and illegally eavesdropped on my personal, business and private conversations.

Complaint #2: Agent Yanta, the FBI, and the DC MPD Safe Streets Task Force did not minimize my personal, private and business calls pursuant to the provision of 18U.S.C. 2518.

Complaint #3: Agent Yanta illegally retrieved the text messages from cell phone 202-583-3946, used the text messages to mislead and deceive the Judge in the probable cause section in the September 2, 2005 wiretap affidavit. Agent Yanta made false statements, false conclusions and displayed reckless disregard for the truth.

Complaint #4: Agent Yanta's September 2, 2005 wiretap affidavit has no probable cause, no incriminating facts or evidence, only deception, perjury statements and false information.

Complaint #5: Wrongful arrest, slander, invasion of privacy, loss of consortium, depression and stress inflicted by the FBI, and MPD Safe Streets Task Force.

Complaint #6:  Ms. Rachel Lieber and Mr. Jack Geise both engaged in prosecutorial misconduct by allowing, encouraging and participating along with the FBI, MPD and ICE agents and detectives in deceiving the courts, manipulating the facts, and forging false documents, witness testimonies and statements throughout the trial.

activities; and (xi) the locations and items used in furtherance of those activities. In addition, there is probable cause to believe these wire communications will constitute admissible evidence of the above-described offenses.

10. The affiant believes that the wire communications concerning the above-described offenses will be obtained through the interception of communications to and from the target telephone; that such communications will be admissible evidence of the offenses; and that there is a reasonable likelihood that such evidence will enable law enforcement to interdict a shipment of cocaine or other illegal drugs and to ascertain the identities of, and prove beyond a reasonable doubt the guilt of, the participants in this illegal conspiracy.

## E. PERSONS LIKELY TO BE INTERCEPTED

11. The following persons are expected to be intercepted using the above-described telephone number in the commission of the alleged offenses:

(a) ANTOINE JONES, a/k/a ANTONIO JONES, a/k/a/ "TOINE" is a black male, born on February 25, 1960. He is described as 6'2" tall and approximately 220 pounds, with a Social Security Number of 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. JONES resides at 10870 Moore Street, Waldorf, Maryland, with a second address of 12221 Brandywine Road, Brandywine, Maryland. A search of FBI criminal history records for JONES (FBI# 901461KA2) revealed the following: 1994, District of Columbia, Conspiracy to Distribute 50 Grams or More of Cocaine Base, Possession with Intent to Distribute 50 Grams or More of Cocaine Base, and Possession with Intent to Distribute Cocaine, guilty, sentenced to ten years' imprisonment, placed on supervised release until April 25, 2007; 1989, District of Columbia, Carrying a Pistol Without a License and Disorderly Conduct, dismissed; 1991, Arlington, Virginia, Selling Cocaine, Guilty; 1993, District

of Columbia, Possession of an Unregistered Firearm and Possession with Intent to Distribute

Cocaine, dismissed.

(b) **LAWRENCE MAYNARD** is a black male, born on August 21, 1961. He is

described as approximately 6'2" tall and 240 pounds, with a Social Security Number of 579-92-

7661. MAYNARD resides at 7711 Greanleaf Road, Hyattsville, Maryland. A search of FBI

criminal history records for **MAYNARD** (FBI #512598TA1) revealed the following: 1993,

District of Columbia, Distribution of Cocaine, found not guilty.

(c) **NICHOLAS JONES**, a/k/a "TOBY" is a black male, born on July 3, 1964. He is

described as approximately 6'0" tall and 205 pounds, with a Social Security Number of 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.

JONES resides at 563 23rd Place, N.E., Washington, D.C. A search of FBI criminal history records

for **JONES** (FBI#899882DA1) revealed the following:  1985, District of Columbia, Carrying a

Pistol without a License, Possession with Intent to Distribute Cocaine, Receiving Stolen Property,

dismissed; 1985, District of Columbia, Possession with Intent to Distribute Cocaine, pled guilty to

Possession of Cocaine, sentenced to one year probation; 1987, Hyattsville, Maryland, Distribution

of Controlled Dangerous Substance Cocaine, dismissed; 1987, Baltimore, Maryland, Possession with

Intent to Distribute Cocaine, guilty, sentenced to five years' imprisonment, with all but one year

suspended; 1991, District of Columbia, Distribution of Heroin, guilty, sentenced to 7-21 years'

imprisonment; 2003, District of Columbia, Simple Assault, dismissed.

(d) **ANTHONY LAMONT KOONCE**, a/k/a "TONY, " a/k/a **LAMONT**, is described

as a black male, born March 27, 1972. He is approximately 5'8" tall and 165 pounds, with a Social

Security Number of 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. **KOONCE** resides at 1459 Ridge Place, S.E. Washington, D.C.,

with a second address of 2006 38th Street, S.E. #202, Washington, D.C., but is presently a resident

8

of a District of Columbia halfway house, as he awaits trial on narcotics trafficking charges in United States District Court for the District of Columbia. A search of FBI criminal history records for KOONCE (FBI# 331562MA3) revealed the following criminal history: 1990, Washington, D.C., Controlled Substances Act Violation, Cocaine, dismissed; 1991, District of Columbia, Fugitive from Justice, dismissed; 1991, District of Columbia, Carrying a Pistol without a License, dismissed; 1991, District of Columbia, Possession with Intent to Distribute Cocaine, pled guilty to Attempted Possession with Intent to Distribute Cocaine, sentenced to two years' probation, revoked in 1993, sentenced to 15-45 months' incarceration; 1993, District of Columbia, Possession of PCP, guilty, sentenced to 60 days' incarceration; 1995, District of Columbia, Escape from Institution, guilty, sentenced to 4-12 months' incarceration; 2002, District of Columbia, Assault with a Dangerous Weapon, Bat, dismissed; 2002, District of Columbia, Simple Assault, dismissed; 2003, District of Columbia, Simple Assault, dismissed; 2005, District of Columbia, Simple Assault, dismissed; 2005, District of Columbia, Possession with Intent to Distribute Five Grams or More of Cocaine Base, Possession with Intent to Distribute Heroin, Possession of Marijuana, currently pending in the United States District Court for the District of Columbia.

(e) DERRICK GORDON is a black male born on April 10, 1977. He is described as approximately 5'8" tall and 150 pounds, with a Social Security Number of 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. GORDON resides at 4748 Benning Road, S.E., Apartment 202, Washington, D.C. A search of FBI criminal history records for GORDON (FBI# 528127EB5) revealed the following criminal history: 1987, District of Columbia, Possession with Intent to Distribute Marijuana, Possession of an Unregistered Firearm, Unlawful Possession of Ammunition, dismissed; 1997, District of Columbia, Possession of Marijuana, dismissed; 1997, District of Columbia, Possession with Intent to Distribute Marijuana,

9

dismissed; 1997, District of Columbia, Possession of Marijuana, dismissed; 1999, District of Columbia, Unauthorized Use of a Motor Vehicle, Driver, dismissed.

(f) **BRADFORD WADDELL** is a black male born on March 8, 1964. He is described as approximately 5'9" tall and 195 pounds, with a Social Security Number of 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. WADDELL is believed to reside at 3920 Brooklyn Drive, Baltimore, Maryland. A search of FBI criminal history records for **WADDELL** (FBI# 549643CA1) revealed the following criminal history: 1984, District of Columbia, Unlawful Possession of Ammunition, Possession of PCP, dismissed; 1985, District of Columbia, Possession with Intent to Distribute PCP, pleaded guilty to Possession of PCP, sentenced to three years' probation; 1998, Anne Arundel County, Maryland, Second Degree Assault, Resisting Arrest, plead guilty to Disorderly Conduct in Public, sentenced to 60 days' incarceration, suspended, with nine months' probation; 1995, Prince Georges County, Maryland, 4th Degree Burglary, dismissed; 1995, Prince Georges County, Maryland, Disorderly Conduct and Resisting Arrest, dismissed; 1985, Charles County, Maryland, Possession of Controlled Dangerous Substance, PCP, with Intent to Distribute, Possession CDS Marijuana, with Intent to Distribute, Possession CDS Cocaine, with Intent to Distribute, pled guilty to Possession CDS PCP with Intent to Distribute, and sentenced to three years' incarceration.

(g) **ANNETTE BIGESBY** is a black female born on February 11, 1962. She is described as approximately 5'4" tall and 155 pounds, with a Social Security Number of 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. BIGESBY resides at 11018 Spring Lake Drive, Mitchellville, Maryland. A search of FBI criminal history records for **BIGESBY** (FBI#895031V9) revealed the following: 1982, District of Columbia, Robbery, dismissed; 1992, District of Columbia, Possession with Intent to Distribute Marijuana and Possession with Intent to Distribute Heroin, dismissed; 1983, District of Columbia, Robbery (Two

10

counts), pled guilty to Attempted Robbery, sentenced to two-six years' incarceration; 1985, District of Columbia, Petit Larceny, guilty, sentenced to one year of incarceration, suspended, four years' probation, probation revoked, 1987; 1986, District of Columbia, Armed Robbery, dismissed; 1987, District of Columbia, Attempted Distribution of Marijuana, guilty, sentenced to one year of incarceration, suspended, 12 months probation; 1987, District of Columbia, Bail Reform Act violation, guilty, 12 months' probation; 1987, District of Columbia, Shoplifting, guilty, sentenced to 20 days' incarceration; 1988, District of Columbia, Attempted Possession of Cocaine, guilty, sentenced to 120 days' incarceration, suspended, two years' probation, probation revoked 1989; 1990, District of Columbia, Distribution of Cocaine, Guilty, sentenced to three-nine years' incarceration, suspended, two years' probation; 1990, District of Columbia, Distribution of Cocaine, dismissed; 1997, District of Columbia, Simple Assault, dismissed; 2004, District of Columbia, Possession with Intent to Distribute Heroin, dismissed; 1995, Prince Georges County, Maryland, Battery (Deadly Weapon), dismissed; 1986, Prince Georges County, Maryland, Theft (misdemeanor), guilty; sentence not recorded; 1987, Maryland, Shoplifting, guilty, sentenced to one month of incarceration; 1985, Alexandria, Virginia, Concealment (misdemeanor), guilty, sentence not recorded; 1986, Arlington, Virginia, Shoplifting, guilty, sentenced to one week of incarceration; 1999, Ohio, Conveyance of Weapons and Attempted Drug Abuse, guilty, sentenced to 180 days' incarceration, suspended all but 30 days, with one year of probation.

(h) **DONALD ADRIAN HUNTER a/k/a TERRY SAMUEL,** is a black male born on August 9, 1964. He is described as approximately 5'11' tall, weighing approximately 165 pounds with a Social Security Number 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. **HUNTER** is believed to reside at 3202 Curtis Drive, Apartment # 708, Temple Hills, Maryland. A search of FBI criminal history records for **HUNTER**

11

(FBI# 347990CA2) revealed the following criminal history: 1984, District of Columbia, Taking Property Without Right, Second Degree Theft, dismissed; 1987, District of Columbia, Attempted Distribution of Cocaine, sentenced to 20 months to five years of incarceration, execution of sentence suspended; 1987, District of Columbia, Possession of Cocaine, sentenced to 14 days' incarceration, 1987, District of Columbia, Simple Assault, found not guilty; 1990, District of Columbia, United States District Court, pled guilty to Conspiracy to Possess with Intent to Distribute Cocaine, sentenced to 121 months' incarceration, eight years' supervised release; and Assault with a Deadly Weapon, sentenced to 120 months' incarcerations and eight years' supervised release; supervised release revoked 2000, sentenced to 18 months' incarceration; 2000, District of Columbia, Robbery, Possession of a Firearm During a Crime of Violence, dismissed, 2001; Prince George's County, Possession With Intent to Distribute a Controlled Substance, dismissed; 2002, District of Columbia, Disorderly Conduct, dismissed, Reckless Driving, sentenced to three months', incarceration, Violating a Drug Free Zone, dismissed; 2005, District of Columbia Superior Court, Possession with Intent to Distribute Heroin, currently pending.

(i) **ADRIAN JACKSON** is a black male, born July 11, 1978. He is described as 5'8" tall and 185 pounds, with a Social Security Number of 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. **JACKSON** is believed to reside at 2627 Bowen Road, S.E., Apartment 102, Washington, D.C. A search of FBI criminal history records for **JACKSON** (FBI# 941681FB3) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Carrying a Handgun in Maryland in 2004; in addition, he has a pending case for Carrying a Pistol without a License in the District of Columbia, for which he was indicted in December, 2004.

12

(j) **DIANE BUSHROD**, a/k/a, **DIANE SMITH** is a black female, believed to be born on February 25, 1960, with a second listed date of birth of February 25, 1962. She is described as 5'9" and tall 250 pounds, with a Social Security Number of 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. **BUSHROD** is believed to reside at 3430 21st Street, S.E., Washington, D.C., but the address listed on her driver's license is 3103 Sherman Avenue, N.W., Washington, D.C. A search of FBI criminal history records for **BUSHROD** (FBI# 379746CA3) revealed that she has arrests for narcotics violations, and that her most recent conviction is for Attempted Distribution of Marijuana in 1988.

(k) **TERRENCE DIXON** a/k/a **NIMROD BABYLON**, is a black male born on January 16, 1979. He is described as 5'8" tall and 120 pounds, and uses Social Security Numbers 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 and 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. **DIXON** is believed to reside at 1220 North Scott Street, apartment 202, Arlington, Virginia. A search of FBI criminal history records for **DIXON** (FBI # 872752DB8) revealed that he has arrests for sexual assault, kidnaping and weapons offenses. In January 1999, he was convicted in the District of Columbia of Possession with Intent to Distribute Cocaine While Armed, Carrying a Pistol Without a License, and Unlawful Possession of Ammunition for which he was sentenced to terms of incarceration of three to nine years, 20 to 60 months and one year respectively.

(l) **KIRK R. CARTER** is a black male born on April 9, 1963. He is described as 5'8" tall and 160 pounds, and uses Social Security Number 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. **CARTER** is believed to reside at 2504 Pomeroy Road, S.E., Apartment 402, Washington, D.C. A search of FBI criminal history records (FBI# 362520DA9) revealed that **CARTER** has a 1990 conviction in United States District Court for the District of Columbia for Conspiracy to Distribute Cocaine, for which he was sentenced to a term of incarceration of 135 months. He also has two other federal court narcotics trafficking

13

cases, which appear to have been consolidated with the 1990 Conspiracy case. In addition, he has a 2004, Possession of Marijuana case, for which he was given Diversion, in lieu of a criminal conviction.

(m) **TWANDA CAMPBELL** is a female born on January 27, 1967, with a Social Security Number of 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. She is believed to reside at 5412 D Street, S.E., Washington, D.C., although the cellular telephone subscribed to in her name lists an address of 3920 Brooklyn Avenue, Baltimore, Maryland. Investigation revealed no additional information regarding **CAMPBELL**.

(n) **DAMIEN LOMERT BROUSSARD**, is a black male born on February 15, 1975. He is described as 6 feet tall and 145 pounds, with a Social Security Number of 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, and additional Social Security Numbers of 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, and 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. **BROUSSARD**'s address is unknown at this time, and his last-known mailing address is P.O. Box 16927, Lake Charles, Louisiana.[1] A search of FBI criminal history records (FBI# 485536RA9) revealed that **BROUSSARD** has had at least seven arrests for Cocaine and Marijuana Distribution, and related offenses, in Lake Charles, Louisiana, dating back to 1992, with at least one conviction for Felony Possession of Cocaine, for which he is on probation until 2008.

(o) **TYMIRA HUNTER** is a black female, born on February 19, 1973. She is described as 5'3" tall and 137 pounds, with a Social Security Number of 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.[2] **HUNTER** is believed to reside at 1238 D Street, N.E., Washington, D.C. A search of FBI criminal history records (FBI#

---

[1]    **BROUSSARD** has a relative named **QUENTESA BROUSSARD**, who resides at 432 Longfellow Street, N.W., Washington, D.C. As set forth more fully *infra*, investigators believe that **DAMIEN BROUSSARD** is using a cellular telephone in the name of **QUENTESA BROUSSARD**, to engage in narcotics-trafficking activity with **ANTOINE JONES**.

[2]    At this time, investigators know of no relationship between **TYMIRA HUNTER** and **DONALD HUNTER**, a/k/a **TERRY SAMUEL**.

14

821196RA8) revealed that HUNTER has arrests for Unauthorized Use of a Motor Vehicle and Theft II, and a conviction in 1997 for Assault with a Dangerous Weapon, Knife, in the District of Columbia, and a pending case in Hyattsville, Maryland, charging her with Seconds Degree Assault, Disorderly Conduct, and related charges.

(p) WALLACE WARD is a black male, born December 15, 1960. He is described as 6'2" tall and 335 pounds, with a Social Security Number of 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. WARD is believed to reside at 4734 Rollingdale Way, Capitol Heights, Maryland. A search of FBI criminal history records (FBI# 286555WA8) revealed that WARD was convicted in 1995 in federal court in Maryland of Conspiracy to Commit Food Stamp Fraud.

(q) FNU, LNU, a/k/a/ KARISA JONES is believed to be a fictitious person, as investigators could find no information of any kind regarding this individual.

(r) NITA WORLEY is believed to be GENNELL ANITA WORLEY, born on August 22, 1972. While no current address information is available for WORLEY, a search of F.B.I. criminal history records (FBI# 455656HB8), revealed that WORLEY has a conviction for Felony Larceny in Arlington, Virginia.

## F. PRIOR APPLICATIONS

12. On July 6, 2005, July 7, 2005, July 21, 2005, August 1, 2005, August 4, 2005, and August 26, 2005, I caused the records of the FBI, and the DEA to be searched, and on the basis of those searches, I have learned the following: On June 16, 1997, the Honorable Paul L. Friedman, United States District Judge of the United States District Court for the District of Columbia, issued an order in Miscellaneous Case Number 97-166, authorizing the interception of wire communications to and from a telephone used by ANNETTE BIGESBY. Interceptions began on

PERSONS LIKELY TO BE INTERCEPTED BY THE FBI

TARGET LIST

1.  Antoine Jones – Defendant, Owner. Club Levels.

2.  Lawrence Maynard – Close friend of Antoine Jones for over twenty years.
    Met while working at the together at a hotel in Washington, DC in the early
    eighties. Manager, FTN Delivery (trucking and furniture delivery and storage
    services) and the Operational Manager of Club Levels.

3.  Nicholas Jones – long time friend of Antoine Jones. A promoter for the club
    and club events and he also worked part-time Assistant Manager, Club Levels.

4.  Anthony Lamont Koonce – A person unknown to the defendant (never seen or
    heard of him until now), The FBI agents tried to get this man to say he knew
    me. The agents went as far as to threaten to transfer his minor charge over
    from Superior Court to District Court if he didn't say he knew me. Well, he
    refused and true to their threat, his case was transferred to District Court.
    Confidential Source-3 (CS-3) stated in his 302 that someone he believes from
    Club Levels was giving Anthony Koonce narcotics. Anthony Koonce could
    only testify that he does not know me, and he does not know anyone
    associated with Level Entertainment (Club Levels management).

5.  Derrick Gordon – my nephew who was also employed at the club. He was a
    passenger in the minivan that was stopped by Durham, NC police.

6.  Bradford Waddell – I have known the Waddell family since the mid-seventies.
    I am very close to Bradford and his older brothers. He frequently partied at
    the club, attended and sold tickets for club events on a regular basis.

7.  Annette Bigesby – A friend and business associate who helped me with
    employment when I was released from prison. Ms. Bigesby also had parties
    and sponsored large events at the club. She was one of the first promoters and
    sponsors of the club when it first opened.

8.  Donald Hunter – A promoter who also sponsored events at the club. Mr.
    Hunter agreed to testify for the government after he got arrested for

possession of cocaine, heroin and a gun. He also had numerous other charges pending prior to this particular arrest. Mr. Hunter made the accusation that he got drugs from Antoine Jones. After a lengthy questioning and cross examination, Mr. Hunter's story changed so many times. It was clear that he perjured himself and the government decided it was in their best interest to dismiss that count against Mr. Jones altogether from the indictment.

9.  Adrian Jackson – Partner with Antoine Jones in Levels Entertainment, Inc. Mr. Jackson was also charged in the indictment and went to trial with Antoine Jones, et al. Mr. Jackson was acquitted of all charges.

10. Diane Bushrod – A long time friend for over twenty years. Ms. Bushrod and I grew up in DC and we were both employees of DC Recreation from our teenage years. We both worked our way from summer worker to manager and eventually, area supervisor. Ms. Bushrod organized many of the Recreation Department events. She also promoted many Lesbian-Gay events at Levels nightclub. Ms. Bushrod also promoted events at Kilis nightclub. She and I became associates with Kilis nightclub as a result of our collaboration with the many band producers that we knew throughout the city. In addition, we sponsored and supported many events with MPD, the Mayor and many charity events.

11. Kirk R. Carter – A friend who I have known for years. He is a promoter who promoted events and sold tickets for events at Levels. Mr. Carter was severed from the first trial. The government alleged that five phone conversations between me and Mr. Carter were drug related. Even without Kirk Carter having any representation at the trial, I was still acquitted of all counts involving phone calls with Mr. Carter. The only remaining issue was John Adams' statements. However, during the trial all of the attorneys impeached Mr. Adams therefore rendering his statements mute.

12. Twanda Campbell - I don't know this woman and have never heard of her before. She is totally unknown to me and not associated with Levels Entertainment.

15

13.     Damien Lomert Broussard – This is the brother of on of the bartenders at Levels, Quentessa Broussard. Agent Stephanie Yanta tried to deceive the judge by using Damien Broussard's criminal background information and link it to Quentessa's cell phone. In trial, Quentessa Broussard testified that her brother Damien was never tied to Levels, never worked there and to her knowledge does not know and has never known Antoine Jones. Further, Damien Broussard has been in jail in Louisiana since September 2004 and has not been in D.C. since sometime in 1993.

14.     Tymira Hunter – A promoter (Couzins Promotions) who sponsored a party at Levels nightclub. Ms. Hunter was a female associate of Lawrence Maynard and a frequent patron of Levels nightclub.

15.     Terrence Dixon, aka Nimrod Babylon – This person is unknown to me. He became a target by calling my cell phone once (a call that lasted 8 seconds).

16.     Wallace Ward – This target died in July 2005. He was the uncle of Collette Watson a female associate that I know and worked at the club. Ms. Watson was the owner of the cell phone cited in Agent Yanta's September 2, 2005 affidavit. Collette Watson regularly sent sexually seductive text messages to Antoine Jones and Lawrence Maynard. The judge would not allow the defense to discuss Wallace Ward or submit the death certificate into record at trial.

17.     Karissa Jones – A bartender at Levels nightclub. Karissa Jones regularly sent text messages to Lawrence Maynard regarding club business and bar supplies.

18.     Nita Worley – A bartender at Levels nightclub. Nita Worley regularly sent text messages to Lawrence Maynard regarding club business and bar supplies.

**49**

```
1   tape all the time.  He can't do it that way.
2           Let's try to be professional.  Thank you.  Okay.
3       (Open court.)
4       THE COURT:   Sir, we are going to have to pass now.
5           Okay, good afternoon, ma'am.  Do you mind coming up
6   here?
7   (Tymira Hunter sworn by clerk at 3:04 p.m.)
8       MR. BALAREZO:   Your Honor, at this point we're calling
9   Tymira Hunter.
10      THE COURT:   Good afternoon, ma'am.
11  BY MR. BALAREZO:
12  Q.   Could you please spell your name for the record?
13  A.   Tymira Hunter, T-Y-M-I-R-A, H-U-N-T-E-R.
14  Q.   Miss Hunter, I'm sorry for the mispronunciation.
15       Can you tell us where you live now, not a specific address,
16  just generally, what area do you live in?
17  A.   Hyattsville, Maryland.
18  Q.   And how far did you go in school?
19  A.   Eleventh grade.
20  Q.   And what school was that?
21  A.   Northwestern.
22  Q.   Are you currently employed?
23  A.   Yes I am.
24  Q.   What do you do for a living?
25  A.   I work for D.C. Housing Authority in the executive
```

*very Important*

**50**

```
1   director's office, office assistant.
2   Q.   And how long have you been there?
3   A.   A year and-a-half.
4   Q.   Miss Hunter, do you know who I am?
5   A.   Yes.
6   Q.   And what is your understanding of who I am?
7   A.   An attorney for Antoine Jones.
8   Q.   And did I ask you to come to court today and testify?
9   A.   Yes.
10  Q.   You said I'm the attorney for Antoine Jones, do you know
11  Antoine Jones?
12  A.   Like a friend.
13  Q.   Do you know who he is?
14  A.   Yes, I do.
15  Q.   What type of relationship do you have with Antoine Jones or
16  did you have with Antoine Jones?
17  A.   We didn't have a relationship.  I rented a club called Club
18  Levels.
19  Q.   Did you also work at that club?
20  A.   No, sir.
21  Q.   And do you know somebody by the name of Lawrence Maynard?
22  A.   Yes.
23  Q.   And how do you know Mr. Maynard?
24  A.   From -- he was the one that showed us the club, and we
25  signed the contract with him.
```

*Very Important*

**51**

```
1   Q.   I missed the first part of what you said.
2   A.   We met with Lawrence.  That's the person that we talked to
3   to rent the club, you know, see the club and everything.
4   Q.   At some point, did you and Mr. Maynard have any type of
5   relationship?
6   A.   Friendship.
7   Q.   Okay.  And have you and I had an opportunity to speak prior
8   to today?
9   A.   A couple of times here.
10  Q.   And --
11      THE COURT:   Couple of times what?
12      THE WITNESS:   Here, when I had to come here, yes,
13  ma'am.
14      THE COURT:   In the courthouse, okay.
15  BY MR. BALAREZO:
16  Q.   When you and I spoke, did I tell you what the subject
17  matter of your testimony was going to be here today?
18  A.   You was telling me about my phone.
19  Q.   Did I at any point tell you what you had to say when you
20  got here on the stand?
21  A.   No.
22  Q.   Did I say anything else to you besides show you some
23  documents and ask you some questions about those documents?
24  A.   No, you didn't.
25  Q.   Miss Hunter, I'm going to show you what has previously been
```

*very Important*

**52**

```
1   marked -- and this is only for the witness -- as Jones 4.
2       THE COURT:   Okay.  This is not in evidence, ladies and
3   gentlemen.  There has been reference to it, and it's not going
4   into evidence.
5   BY MR. BALAREZO:
6   Q.   Do you see that document?
7   A.   Yes.
8   Q.   Now, did I show you this document prior to your testimony
9   here?
10  A.   No.
11  Q.   Are you sure?
12  A.   Have you showed me this paper?
13  Q.   This document.  Well, let me move away from the document
14  for right now.
15       Did I ask you specifically --
16      THE COURT:   Don't ask her what you asked her, just ask
17  your question.
18  BY MR. BALAREZO:
19  Q.   Did you -- did you and Mr. Maynard ever have any text
20  message communications?
21  A.   Yes, we did.
22  Q.   Okay.  Back in the time of August of 2005, do you remember
23  what phone you were using?
24  A.   My Nextel.
25  Q.   Do you remember what the phone number was?
```

*very Important*

63

1  A.  No.
2  Q.  I'm going to show you page 15 of this document.
3     Do you see this number that's listed here?
4  A.  Yes.
5  Q.  Does that refresh your recollection as to what your phone
6  number was at that time?
7  A.  Yes.
8  Q.  And what was your phone number at the time?
9  A.  (301)536-0913.
10 Q.  And is that the phone number that was associated with the
11 phone with which you sent text messages to Mr. Maynard and
12 received messages from him?
13 A.  Yes.
14 Q.  Did there come a time when you received a text message from
15 Mr. Maynard, quote, "My man is working with a big monster, back
16 up working with a monster with a smiley face at the end of it"?
17 A.  Say that again.
18 Q.  Did there come a time when the phone number that -- or the
19 phone that you were using, the one that you just mentioned
20 received a text message from Mr. Maynard which stated, quote,
21    "My man is working with a big monster, back up working with
22 a monster and with a smiley face at the end of it"?
23 A.  Yes, I do remember --
24 Q.  Okay.
25 A.  -- the text message.

*VERY IMPORTANT*

64

1  Q.  And can you tell us what that text message meant to you?
2  A.  I took it as him talking about --
3     MS. LIEBER:  Objection.  Speculation as to what it
4  meant.
5     THE COURT:  What did you understand?
6     THE WITNESS:  I didn't see the text message.  My
7  boyfriend approached me with the phone saying, "Why is this guy
8  saying he's working with a monster?  What is this about?  What
9  is he talking about?"
10    I didn't have the phone -- he had my phone.
11    THE COURT:  And what's your question now?
12 BY MR. BALAREZO:
13 Q.  What was your understanding of what "monster" referred to?
14 A.  His penis.
15    THE COURT:  His what?
16    THE WITNESS:  His penis.
17 BY MR. BALAREZO:
18 Q.  And had you and Mr. Maynard, prior to your receiving this
19 message, had he -- had you heard Mr. Maynard ever use the word
20 "monster" in reference to his penis?
21 A.  Yes.
22 Q.  And if I were to tell you that based on this document
23 that --
24    MS. LIEBER:  Objection.
25    THE COURT:  I think so.  Sustained.  You're not going

*very IMPORTANT*

65

1  to tell her anything.
2  BY MR. BALAREZO:
3  Q.  Did you know that the government considered you a target?
4     MS. LIEBER:  Objection.
5     THE COURT:  Sustained.  No, sir.  Sustained.  She's
6  here to tell you -- do you have any other questions?  She's
7  answered about the text message.
8     MR. BALAREZO:  Well, I need to know what I can ask,
9  Your Honor.  May we approach?
10    THE COURT:  You have to ask -- she doesn't know
11 anything about anything to do with this investigation.  If she
12 does, I am unaware of it.
13    So is there anything else that she knows about that
14 is -- that she would know about?
15 BY MR. BALAREZO:
16 Q.  Miss Hunter, did you ever text message Lawrence Maynard in
17 reference to any narcotics transactions?
18 A.  No, sir.
19 Q.  Did you ever text message Lawrence Maynard or Antoine Jones
20 in reference to obtaining any kind of narcotics from either one
21 of them?
22 A.  No, sir.
23    MR. BALAREZO:  I have nothing else, Your Honor.
24    THE COURT:  Cross.
25

66

                    CROSS-EXAMINATION
1  BY MS. LIEBER:
2  Q.  Good afternoon, ma'am.
3  A.  Hi.
4  Q.  Just a few quick questions for you.
5     You mentioned that you had an event at Club Levels; is that
6  right?
7  A.  Yes, ma'am.
8  Q.  About when was that event?
9  A.  It was August the 28th, I think.
10 Q.  Of what year?
11 A.  2005.
12    THE COURT:  Okay.  Having a little trouble hearing
13 you, sorry.  You had an event, okay.
14 BY MS. LIEBER:
15 Q.  And what kind of event was it that you had?
16 A.  It was a party with my mom, my sister, and my cousin.  We
17 put it together; it's a celebration.  We usually have cabarets
18 at different places, and we just chose Levels to have a party
19 there.
20 Q.  Okay.  So this was something -- just so I understand, you
21 approached Mr. Maynard and asked if you could host a party at
22 Levels; is that right?
23 A.  We called.
24 Q.  I'm sorry?
25

*VERY IMPORTANT*

57

```
1    A.  We called.
2    Q.  Okay.  You called.
3    A.  We talked to him on the phone, and he told us to come over
4    and see the club.
5    Q.  Okay.  So had you ever even been inside Club Levels before
6    that?
7    A.  No, ma'am.
8    Q.  When you used the club for your -- the party that you had
9    with your family members, did you actually pay a rental fee, or
10   how did that work exactly?
11   A.  We had to go over a contract, and they had to tell us what
12   we had to pay for, like, for security and stuff like that,
13   different things.  And then we had to pay the fee for renting
14   the club.
15   Q.  So you actually paid a certain amount of money to Levels or
16   to Mr. Maynard to use the space to host your private party?
17   A.  Yes, ma'am.
18        MR. BALAREZO:  Your Honor, I do object to this.  It's
19   entirely beyond the scope of direct.
20        THE COURT:  Overruled.  But let's finish it up,
21   please.
22        MS. LIEBER:  Sure.
23   BY MS. LIEBER:
24   Q.  So you hosted a private party at Levels; is that right?
25   A.  Yes.
```

58

```
1    Q.  And you signed a contract to do that?
2    A.  Yes.
3    Q.  Okay.  And who actually provided the bartenders and that
4    kind of thing for the party?
5    A.  Came with the club.
6    Q.  But then did you provide the security?
7    A.  No, ma'am.  It came with the club.
8    Q.  Was all that sort of included -- to your understanding, was
9    all that included in the money you paid, the rental fee?
10   A.  Yes, ma'am.
11   Q.  Okay.  And then did you sell tickets to your private party?
12   A.  No.
13   Q.  Did anyone sell tickets --
14        MR. BALAREZO:  Objection.
15        THE WITNESS:  Oh, we did, yes.  We did sell tickets to
16   the party.
17        MR. BALAREZO:  Objection withdrawn.
18        THE COURT:  It's withdrawn.
19   BY MS. LIEBER:
20   Q.  Who sold those tickets?
21   A.  Myself, my sister, my mom, and my cousin.
22   Q.  Okay.  Thank you.
23        MS. LIEBER:  I have nothing further.
24        THE COURT:  Anything else?
25
```

59

```
1              REDIRECT EXAMINATION
2    BY MR. BALAREZO:
3    Q.  Miss Hunter, besides your knowledge of the party that you
4    had at Levels, do you have any idea of how any other parties at
5    Levels worked?
6    A.  No.
7    Q.  Thank you.
8        MR. BALAREZO:  Nothing else, Your Honor.
9        THE COURT:  Thank you very much.  I know you're not
10   feeling very well.  We really appreciate your testimony.
11       Okay.  Call your next witness, please.
12       MR. BALAREZO:  I think I'm going to call Ms. Jones, if
13   she's available.
14       THE COURT:  No, no, no.  I'm sorry.
15       MS. LIEBER:  Karissa Jones, I believe, Your Honor.
16       THE COURT:  Oh, okay.
17       Mr. Norris, do you have much for this witness?
18       MR. NORRIS:  Probably a little bit, not much.
19       THE COURT:  Okay.
20       ( 3:16 p.m. )
21       THE COURT:  Good afternoon.  Have a seat if you would,
22   please, and we will swear you in.
23   KARISSA JONES, DEFENDANT JONES WITNESS, SWORN
24              DIRECT EXAMINATION
25   BY MR. BALAREZO:
```

60

```
1    Q.  Good afternoon, ma'am.  Could you please give us your name
2    and spell your name for the record?
3    A.  Karissa, K-A-R-I-S-S-A, last name Jones, J-O-N-E-S.
4    Q.  Miss Jones, I hate to ask, but how old are you?
5    A.  Twenty-five.
6    Q.  And where do you currently reside, just generally not a
7    specific address?
8    A.  Largo, Maryland.
9    Q.  And are you currently employed?
10   A.  Yes.
11   Q.  And what are you employed as?
12   A.  An auditor.
13   Q.  With, in what field?
14   A.  Accounting, auditing.
15   Q.  Does that particular occupation that you have, did it cause
16   you to get any sort of clearance?
17   A.  Yes.
18   Q.  What type of clearances do you have with respect to your
19   job?
20   A.  I have a top secret.
21       THE COURT:  Top secret?
22       THE WITNESS:  Yes.
23       THE COURT:  Who do you work for?  I'm sorry.
24       THE WITNESS:  United States Army Audit Agency.
25   BY MR. BALAREZO:
```

61

1  Q.  And that's where you are currently employed?
2  A.  Yes.  Have been since 2003.
3  Q.  Can you tell us a little bit about your education?  How far
4  did you get in school?
5  A.  I'm currently working on my masters in business
6  administration.
7  Q.  Where is that?
8  A.  University of Phoenix.
9         THE COURT:  University, I'm sorry?
10        THE WITNESS:  Phoenix.
11 BY MR. BALAREZO:
12 Q.  I'm going to take you back to the period around 2005, that
13 year generally.  Where were you living, generally, in that
14 time?
15 A.  Largo, Maryland.
16 Q.  Is it at the same place that you are living now?
17 A.  Yes.
18 Q.  And where were you working at that time?
19 A.  Still with my full-time current employer, Army Audit, and
20 part-time as a bartender at Club Levels.
21 Q.  Back in 2005, were you in any way hiding or going incognito
22 or anything like that?
23 A.  No.
24        MISS LIEBER:  Objection.
25        THE COURT:  Overruled.

62

1  BY MR. BALAREZO:
2  Q.  What's your answer?
3  A.  No.
4  Q.  Are you aware of who I am?
5  A.  Yes.
6  Q.  And have you and I spoken previously?
7  A.  Yes.
8  Q.  And what have you and I spoken previously about?
9         THE COURT:  One second, please.  I'm sorry.
10 BY MR. BALAREZO:
11 Q.  Just generally what have you and I spoken about?
12 A.  This court case.
13 Q.  Now, Miss Jones, do you know Antoine Jones?
14 A.  Yes.
15 Q.  And how long have you known Antoine Jones?
16 A.  During the six months I was employed at Club Levels.
17 Q.  Tell me when were you employed at Club Levels?
18 A.  From April of '05 to October of '05.
19 Q.  And can you tell us, what — you said you were employed at
20 Club Levels.  What was your relationship with Mr. Jones?
21 A.  I was his employee as a bartender.
22 Q.  And when you were employed there from April of '05 to
23 October — you said?
24 A.  Yes.
25 Q.  — what were your duties?

63

1  A.  Come in, set up the bar, serve customers that came in on
2  certain nights that had special events, cleaned up the bar and
3  left.
4  Q.  Let me ask you this.  I should have asked you this first.
5  What was your job title?
6  A.  Bartender.
7  Q.  And those were your duties as a bartender?
8  A.  Yes.
9  Q.  And while you were working at Levels, were you still
10 working at the army?
11 A.  Yes.
12 Q.  At your current job?
13 A.  Yes.
14 Q.  Is it fair to say that Levels was a part-time job?
15 A.  Yes.
16 Q.  Now, during those six months or so that you worked there,
17 how often would you work?
18 A.  Anywhere from three or four nights a week.
19 Q.  And can you tell us, if you know, approximately how many
20 bars were within the club?
21 A.  There are a total of four bars in the club but only three
22 were open at a time.
23 Q.  And would you, would you work at one or all of them on any
24 given night?
25 A.  Oh, one.

64

1  Q.  And is this club, was it open every day of the week?
2  A.  No.
3  Q.  Do you recall?
4  A.  No.
5  Q.  When was it open during the time that you worked there?
6  A.  Thursday through Sunday.
7  Q.  And what nights would you work?
8  A.  Thursday through Sunday.
9  Q.  So that's four nights.  I guess that makes sense.
10        And during the time that you were there, were you able to
11 see whether or not there were any events, whether or not there
12 were any acts as in bands, that kind of thing?
13 A.  Yes.
14 Q.  How often would that take place at the club?
15 A.  Probably three out of the four nights.
16 Q.  Are you familiar with the band called Backyard?
17 A.  Yes.
18 Q.  How often did they play at the club?
19 A.  One night a week.
20 Q.  Was that every week that you were there?
21 A.  Yes.
22 Q.  And I believe there was another band called TCB?
23 A.  Yes.  One night a week.
24 Q.  Same thing?
25 A.  Yes.

65

1    Q.   What night would they play?
2    A.   Started off at Sundays and then they switched to Thursday
3    nights, I believe.
4    Q.   And would these two bands, would they play on the same
5    nights or would they play on separate nights?
6    A.   Separate nights.
7    Q.   From your vantage point as a bartender on those nights, how
8    would you describe the crowd when those bands were playing?
9    Was it a small crowd, a big crowd?
10   A.   Large crowds.
11   Q.   And when you say large, any estimate as to how many people?
12   A.   Anywhere from 100 to probably 300, I guess.
13   Q.   Okay.  And do you know what the maximum allowed in the club
14   was?  Do you have any idea?
15   A.   No.
16   Q.   Okay.  And during those nights when these bands played, can
17   you tell us whether or not there was a lot of traffic at the
18   bar?
19   A.   Yes.
20   Q.   Okay.  By traffic I mean customers at the bar?
21   A.   Yes.
22   Q.   All right.  And on an average night, can you tell us
23   approximately how much your bar, the one that you were working
24   at, was bringing in?
25   A.   I rotated bars each night I worked.  But I can say the main

66

1    bar, which is in the back, could bring in anywhere from 1,000
2    to probably 3,000.
3    Q.   And that's just one of the four bars?
4    A.   Yes.
5    Q.   Okay.  And I think that you said that only three out of the
6    four were open at any one time?
7    A.   Yes.
8    Q.   Do you have any idea what the other bars were making around
9    that time?
10   A.   The red room could probably pull in $500.  The VIP could
11   probably pull in up to $1,500.
12   Q.   And that was more or less an average, is that fair to say?
13   A.   Yes.
14   Q.   So you said the one room -- which one was the one that
15   could bring in up to $3,000?
16   A.   That's the main bar, the biggest one.
17   Q.   And the VIP room?
18   A.   Up to 15.
19   Q.   And the red room was up to five; right?
20   A.   Yes.
21   Q.   So that's 3,000, 1,500 and 500.  If my math is correct,
22   that's about $5,000?
23   A.   Yes.
24   Q.   From your experience as working as a bartender there, was
25   the bulk of that money, was it in credit card receipts, was it

67

1    in cash, was it in gold?
2    A.   All cash.
3    Q.   All cash?
4    A.   Yes.
5    Q.   Did you guys accept credit cards at all?
6    A.   No.
7    Q.   Did you have any responsibility for depositing the money?
8    A.   No.
9    Q.   Where did your responsibility with the money end?
10   A.   At the end of the night -- we did the cashiering actions
11   with the customer and we put the money in the drawer.  And that
12   was it.  At the end of the night, one of the managers would
13   come and pull the cash out report from the register and took
14   the money.  And that's all we saw of it.
15   Q.   When you say one of the managers, who were one of the
16   managers that you were talking about?
17   A.   Adrian or Lawrence.
18        THE COURT:   Adrian Jackson?
19        THE WITNESS:   Adrian Jackson or Lawrence Maynard.
20   BY MR. BALAREZO:
21   Q.   Do you see Mr. Jackson in the courtroom at all?
22   A.   Yes.
23   Q.   And where do you see him?  Can you identify him by clothing
24   he is wearing?
25   A.   A brown suit, tan, brown suit.

68

1        THE COURT:   Let the record reflect she has identified
2    Mr. Jackson.
3    BY MR. BALAREZO:
4    Q.   You said Mr. Maynard was the other gentleman?
5    A.   Yes.
6    Q.   Just for the record, do you see Mr. Jones in the courtroom?
7    You may want to stand up.
8    A.   Yes.
9    Q.   Is that the Mr. Jones you were talking about?
10   A.   Yes.
11   Q.   So after you gave the money from the bar to either Maynard
12   or Jackson -- well, did you ever give it to Jones?
13   A.   No.
14   Q.   After you gave it to Jackson or Maynard, do you know what
15   happened with that money?
16   A.   No.
17   Q.   Do you know whether it was ever deposited?
18   A.   No.
19   Q.   Do you know whether it was reported as income?
20   A.   No.
21   Q.   Now going back to the events at the club.  You said it was
22   generally open four nights a week?
23   A.   Yes.
24   Q.   Thursday through Sunday.  At least two of those nights were
25   bands that were playing?

**69**

1　A.　Yes.
2　Q.　The other two nights, what would happen generally?
3　A.　Either cabarets or it was a buck night, which is basically
4　a lesbian night.
5　Q.　Lesbian night at the club?
6　A.　Yes.
7　Q.　And was that a weekly thing?
8　A.　Yes.
9　Q.　And did that happen more or less every week that were you
10　there during those six months?
11　A.　Yes.
12　Q.　Would there be crowds for that?
13　A.　Yes.
14　Q.　How would you describe the crowds for the lesbian night?
15　A.　Medium.
16　Q.　Medium, what is that?  In number of people if you can
17　estimate?
18　A.　Probably 50 to 100.
19　Q.　Would those 50 to 100 people, would they drink?
20　A.　Yes.
21　Q.　Were they also paying cash at the bars?
22　A.　Yes.
23　Q.　And would the same procedure that you follow with the band
24　nights did you follow with the buck night?
25　A.　Yes.

**70**

1　Q.　And that fourth night, what would generally happen on that
2　fourth night?
3　A.　Might have been poetry night or a cabaret.
4　Q.　Were there ever any special events, not a band or not a
5　regular band on not a buck night?
6　A.　Yes.
7　Q.　Okay.  What type of special events took place at the club?
8　A.　Cabarets, poetry -- what I want to say?  The proper word is
9　not jokes, but comedy.
10　Q.　Was there ever what you call an open mike night?
11　A.　Yes, there was.
12　Q.　What's an open mike night?
13　A.　When you have either poets or whoever come across on the
14　street who have write spoken word and just get on the mike,
15　and, you know, it's just a crowd of people and they just recite
16　what they made, their own works.
17　Q.　Were there any go-go acts or cabarets -- well, you said
18　cabarets already.  How about jazz or oldies, any type of
19　specific acts for that other night?
20　A.　There might have been an oldies night but I didn't work
21　that one.
22　Q.　Now, Miss Jones, I'm going to show you what's previously
23　been marked for identification as Jones Exhibit Number 4.  Do
24　you see that, ma'am?
25　A.　Yes.



**71**

1　Q.　Have you seen this document before?
2　A.　Yes.
3　Q.　Okay.  And when did you see this document before?
4　A.　This morning.
5　Q.　Did you have a chance to look through it?
6　A.　On the section that mentioned my name.
7　Q.　Okay.  And you said your name is mentioned here?
8　A.　Yes.
9　Q.　Point you to page 4 of that document.  Do you see your name
10　mentioned there?
11　A.　Yes.
12　Q.　And what section is your name mentioned on?
13　　　MISS LIEBER:　Objection.
14　　　THE COURT:　Sustained. She is not reading in the
15　document. Ask her the question if you want to about the phone.
16　BY MR. BALAREZO:
17　Q.　Ma'am, back in 2005, did you have a cell phone?
18　A.　Yes.
19　Q.　Do you recall what number you were using at that time?
20　A.　(202) 528-3405.
21　Q.　And during that time were you using that cell phone to send
22　text messages to anyone at the nightclub?
23　A.　Yes.
24　Q.　And who would you text?
25　A.　Lawrence Maynard.

**73**

1　Q.　During that time, specifically in August of '05, did you
2　ever send a text message to Lawrence Maynard and --
3　　　MR. BALAREZO:　Your Honor, may I show her the docum
4　so she can see the text?
5　　　THE COURT:　No.  You can just ask her what the text
6　is.  You don't need to show it to her unless you don't want to
7　say it out loud.
8　　　MR. BALAREZO:　That's the whole point, Your Honor.
9　BY MR. BALAREZO:
10　Q.　Did you ever send a message to Mr. Maynard which said 2,
11　the number 2, cokes and Maliba PLS cash, dollar sign, for Cash
12　Money?
13　A.　Yes.
14　Q.　Do you remember sending that message?
15　A.　Yes.
16　Q.　Okay.  What, with respect to that particular message when
17　you said 2 cokes, what did "cokes" refer to?
18　A.　To two, two-liter bottles of Coca-Cola.
19　　　THE COURT:　Two what?
20　　　THE WITNESS:　Two, two-liter bottles of Coca-Cola.
21　BY MR. BALAREZO:
22　Q.　And why were you texting Lawrence Maynard about Coca-Cola?
23　A.　Because Lawrence was the one that had a key to the liquor
24　room.  And I believe no one in their right mind would call
25　someone on a cell phone in a club where they're playing loud

Very Important                    Very Important

73

```
 1   music. Text was the easiest form of communication.
 2   Q.  Would you normally communicate with Mr. Maynard in that
 3   fashion?
 4   A.  Yes.
 5   Q.  With respect to the same message, Malibu. What does Malibu
 6   refer to?
 7   A.  Malibu coconut rum.
 8   Q.  And what is that?  Is that something you sold --
 9             THE COURT:  Rum, she said.
10             MR. BALAREZO:  Thank you, Your Honor.
11             THE COURT:  I thought maybe you didn't hear her.
12   BY MR. BALAREZO:
13   Q.  Is that something that you sold at the bar?
14   A.  Yes.
15   Q.  And this Cash Money, KA, dollar sign, H, money. What did
16   that refer to?
17   A.  Nickname, my nickname.
18   Q.  And is that -- when did you use that nickname?
19   A.  All the time, since 2003. Got it from my full-time job.
20   Q.  And at around that same time do you remember sending
21   Mr. Maynard a suspicious text message which said, need a can
22   opener, Cash Money?
23             MISS LIEBER:  Objection.
24             THE COURT:  Sustained. Sustained.
25   BY MR. BALAREZO:
```

*very Important*

74

```
 1   Q.  Do you remember that message?
 2   A.  Yes.
 3   Q.  Tell the jury --
 4             THE COURT:  Strike the word "suspicious."
 5             MR. BALAREZO:  I'll reask.
 6   BY MR. BALAREZO:
 7   Q.  Do you remember sending a message, need a can opener, Cash
 8   Money?
 9   A.  Yes.
10   Q.  If you can tell the jury what is a can opener?
11   A.  A can opener to open up a can of pineapple juice.
12   Q.  And Cash Money?
13   A.  Nickname.
14   Q.  Let me ask you this. At least with respect to those
15   particular text messages, were you communicating with Lawrence
16   Maynard for the purposes of obtaining narcotics from him?
17   A.  No.
18   Q.  Did you ever text message or communicate with Lawrence
19   Maynard for the purposes of obtaining narcotics from him?
20   A.  No.
21   Q.  Did you ever text message Antoine Jones for the purpose of
22   obtaining narcotics from him?
23   A.  No.
24   Q.  And with respect to those particular text messages that we
25   have described, did any, have any law enforcement agents ever
```

*VERI IMPORtANT*

75

```
 1   asked you anything about those two messages?
 2             MISS LIEBER:  Objection.
 3             THE COURT:  No. She can answer that.
 4             THE WITNESS:  No.
 5   BY MR. BALAREZO:
 6   Q.  The agent who is sitting right there?
 7             THE COURT:  She just answered.
 8   BY MR. BALAREZO:
 9   Q.  No one, specifically that agent?
10   A.  No.
11   Q.  Have you ever been arrested or charged with respect to
12   those messages?
13             MISS LIEBER:  Objection.
14             THE COURT:  Sustained.
15             MR. BALAREZO:  I have nothing else, Your Honor.
16             THE COURT:  Okay. Mr. Norris has a few questions for
17   you.
18             MR. NORRIS:  Thank you, Your Honor.
19                      CROSS-EXAMINATION
20   BY MR. NORRIS:
21   Q.  Good afternoon, Miss Jones.
22   A.  Good afternoon.
23   Q.  Miss Jones, can I ask you some questions with respect to my
24   client Mr. Adrian Jackson?
25   A.  Yes.
```

76

```
 1   Q.  Now you mentioned Adrian Jackson on your direct testimony;
 2   is that correct?
 3   A.  Yes.
 4   Q.  As one of the managers who would collect your cash drawer
 5   at the end of an evening; is that correct?
 6   A.  Yes.
 7   Q.  Could you tell the ladies and gentlemen what Mr. Jackson's
 8   position was at the club?
 9   A.  Co-owner.
10   Q.  Okay. And what sort of duties or things did you see him
11   doing at the club as a co-owner?  You mentioned picking up
12   money was one; is that correct?
13   A.  Picked up money. If he was available, he would go get
14   liquor for us out the liquor cabinet. He would go get ice.
15   That's about it that I can say.
16   Q.  Was there ever a schedule made up for what nights you would
17   work or what night other people --
18   A.  Yes.
19   Q.  Did you see those schedules.
20   A.  Yes.
21   Q.  Do you know who made those schedules up?
22   A.  Shanice.
23             THE COURT:  What's her last name, do you know?
24             THE WITNESS:  I don't know.
25             THE COURT:  Okay. Shanice.
```

77

BY MR. NORRIS:

1  Q. Now, how often would you see Mr. Jackson?

2  A. Probably almost every night I worked.

3  Q. Was that for the entire April to October time frame?

4  A. Yes.

5  Q. Okay. And is it fair to say that while you were on duty,

6  once you got set up and got the bar going, did you pretty much

7  stay at whatever bar you were assigned at for any given

8  evening?

9  A. Yes.

10 Q. And how often would your shifts be? When would you open

11 the bar and when would you close the bar?

12 A. The bar would officially open at anywhere from 10:30 to

13 11:00 p.m. And it would close down on Thursday, last call

14 would be at quarter to 2:00. Thursday and Sunday is a quarter

15 to 2:00. Friday and Saturday would be a quarter to 3:00.

16 Q. So 1:45 or 2:45?

17 A. Yes.

18 Q. And you mentioned a number of events that took place at

19 Club Levels while you were there, cabarets, comedy events,

20 poetry, open mikes, and then occasions when there were live

21 bands playing; is that correct?

22 A. Yes.

23 Q. Did you ever, were you aware of how those events were

24 promoted or how word got out about those?

78

1  A. Flyers.

2  Q. And did you ever see flyers for various events?

3  A. Yes.

4  Q. And did some of these events, were tickets sold for

5  admission, if you know?

6  A. No.

7  Q. For any of the events?

8  A. Not to my knowledge.

9  Q. Did you have anything to do with the front door or any of

10 that?

11 A. No.

12 Q. Okay. And one of the events you mentioned, buck night,

13 lesbian night?

14 A. Yes.

15 Q. You mentioned 50 to 100 people, kind of a medium crowd on

16 that night?

17 A. Yes.

18 Q. I'm curious, more women or more men?

19 A. All men.

20     MR. NORRIS:    Just curious. Thank you.

21     THE COURT:    Anybody else?

22     MR. McDANIEL:    No, thank you, Your Honor.

23     MR. ACREE:    No, Your Honor.

24     THE COURT:    Anything?

25     MISS LIEBER:    Yes. Just briefly. Thank you.

79

1            CROSS-EXAMINATION

2  Q. Good afternoon, Miss Jones.

3  A. Good afternoon.

4      THE COURT:    I'm sorry. Mr. Geise, do you have a

5  moment just to talk with Mr. Seltzer outside or not?

6      MR. GEISE:    For Mr. Seltzer, always, Your Honor.

7      THE COURT:    All right. I don't want to keep him

8  forever. And then Mr. Balarezo can talk to him.

9  BY MISS LIEBER:

10 Q. Hi, how are you?

11 A. Good.

12 Q. I just want to talk to you a little bit about the time that

13 you worked at Club Levels. You said that you worked generally

14 four nights a week; is that right?

15 A. That was the max, yes.

16 Q. Sometimes was it fewer that four nights a week?

17 A. Yes.

18 Q. And that was because sometimes there was more, there were

19 more events at the club some weeks than others; is that right?

20 A. Yes.

21 Q. Okay. So TCB and Backyard were sort of the regular sort of

22 house bands; is that right, for Levels?

23 A. Yes.

24 Q. And did they — for instance, did TCB play every single

25 week when you worked there?

80

1  A. Yes, unless they had a special event somewhere else.

2  Q. Okay. So sometimes even though they were sort of the house

3  band, they would have maybe a bigger — well, maybe not

4  bigger — but another event someplace else, meaning that they

5  wouldn't actually play that night at Levels; is that right?

6  A. Yes.

7  Q. Not very often but sometimes?

8  A. Yeah.

9  Q. And you mentioned that it was Backyard and TCB. During the

10 time that you were there did the Lissen Band ever play at

11 Levels?

12     MR. McDANIEL:    Objection, Your Honor. Beyond the

13 scope.

14     THE COURT:    Overruled. Go ahead.

15     THE WITNESS:    They did play but I did not work that

16 night.

17 BY MISS LIEBER:

18 Q. Okay. Do you remember how many times they played?

19 A. To my knowledge, one.

20 Q. And you were there from April through October; is that

21 right?

22 A. Yes.

23 Q. And if you know, if you can remember, do you remember

24 generally when that was, if it was sort of at the beginning of

25 your time there, middle, end, any way to remember?

81

1    A. It was towards the end. I want to say it was for like the
2 Redskins, Cowboys game, promoting that.
3    Q. Okay. And there actually was on September 19th the big
4 Redskins, Cowboys football extravaganza; right?
5    A. Uh-huh.
6    Q. Is that yes?
7    A. Yes.
8    Q. You didn't work that night?
9    A. I didn't work.
10   Q. Okay. Now, you said that when you worked there were fairly
11 significant crowds there; is that right?
12   A. Yes.
13   Q. Okay. But you didn't work there every night; is that
14 right?
15   A. I tried to stay between Thursday and Sunday because of my
16 full-time job.
17   Q. Okay. Fair enough. But on the nights that you worked, you
18 said that Levels was taking in anywhere between 3 and $5,000 a
19 night; is that right?
20   A. Yes.
21   Q. That's from the bar sales?
22   A. Yes.
23   Q. At the end of the night either Mr. Maynard or Mr. Jackson
24 would come collect the money and what they did with it you
25 don't know?

82

1    A. Right.
2    Q. But Mr. Jones didn't come get the money?
3    A. No,
4    Q. You worked on, I'm sorry, Saturdays generally; is that
5 right?
6    A. Yes.
7         MISS LIEBER:   And if I may just have Your Honor's
8 indulgence for one minute to get something from Mr. Jones.
9 BY MISS LIEBER:
10   Q. Ma'am, I just want to show you, if I may, this is an item
11 Your Honor, taken from Defendant Jones' Exhibit 18-A. This is
12 a flyer, I think -- well, is this a flyer?
13   A. Yes.
14   Q. Okay. Do you recognize that flyer? Have you ever seen
15 that one before?
16   A. No. But I want to say, if this is October 1st --
17   Q. Let me do this. Let me flip it over. That might help you
18 too. Sorry. Do you recognize that? Birthday celebration for
19 Kiesha, Peanut and Taneisha (phonetic)?
20   A. No.
21   Q. You don't recognize that at all?
22   A. No.
23   Q. Did you work an event on October 1st, which was a Saturday,
24 at a birthday party for Kiesha, Peanut and Taneisha? Ring any
25 bells?

83

1    A. I honestly can't remember, because October was like the
2 last month that I started working. And it was like the
3 beginning of the week, that was my last week there.
4    Q. And that was going to be my next question. But you were
5 still employed by Club Levels on October 1st, 2005; right?
6    A. Yes.
7    Q. You just don't have any specific memory of this event?
8    A. No.
9    Q. Now, you have seen flyers like this one before; is that
10 right?
11   A. Yes.
12   Q. Okay. Is this, is this a private party or was this one of
13 your open events like an open cabaret?
14        MR. BALAREZO:   Objection.
15        THE COURT:   I don't think she can answer that.
16 BY MISS LIEBER:
17   Q. Do you even know if you were there that night?
18   A. No.
19   Q. Now, you say this was the beginning of your last week of
20 work at Club Levels; is that right?
21   A. Yes.
22   Q. Okay. And it's true -- I'm sorry, one other question.
23 Regardless of that particular flyer, were there times that
24 Mr. Jackson or Mr. Jones or Mr. Maynard, someone in the
25 management, rented out Club Levels to private functions?

84

1    A. Yes.
2    Q. Okay. Did you sometimes bartender in those functions as
3 well?
4    A. For the cabarets, yes. That's the only ones I can really
5 say.
6    Q. Okay.
7    A. Birthday parties or bachelor parties, no, I didn't.
8    Q. If you know, can you tell us how is a cabaret rented out
9 different from a bachelor party or birthday party? Just tell
10 us sort how -- if you know?
11   A. To my knowledge it would be the same way.
12   Q. Okay. Are they both private events? When you say
13 cabarets, can someone rent out Club Levels and just throw a
14 cabaret?
15   A. Yes.
16   Q. Some of those you worked; is that right?
17   A. Yes.
18   Q. But, for instance, somebody's private birthday party, you
19 wouldn't necessarily work?
20   A. Not unless I was on the schedule.
21   Q. Okay. Now, end of September into October of 2005, towards
22 the time that you stopped working there, business was slowing
23 down a little bit, is that fair to say?
24   A. I guess.
25   Q. Okay.

85

1    THE COURT: Well, don't guess. If you know or –
2    THE WITNESS: I don't know.
3    THE COURT: Observation.
4    BY MISS LIEBER:
5    Q. Ma'am, you testified that generally on average the bars
6    would take in between 3 and $5,000 a night when were you there?
7    A. Yes.
8    Q. And I'm only going to ask you about when you were there.
9    When you were there in late September, say mid-September, late
10   September and into October of 2005, the bars weren't still
11   making $5,000 a night; is that right?
12   A. No.
13   Q. Okay. They were making less than that?
14   A. Yes.
15   Q. Okay. When did you actually stop working at Levels?
16   THE COURT: I'm sorry.
17   BY MISS LIEBER:
18   Q. I'm sorry. When was the, when did you stop working at
19   Levels?
20   A. October, it was around the second weekend of October
21   because I had to go out of town for my full-time job.
22   Q. Okay.
23   A. So I stopped coming to work right before I went out of
24   town.
25   Q. And did you just stop coming to work?

86

1    A. I just stopped coming to work.
2    Q. Did you ever tell anybody you were going to stop coming to
3    work?
4    A. No.
5    Q. Okay. When you got paid by Club Levels, how did you get
6    paid, in cash or in a check or how did that work?
7    A. At first it was cash and then every now and then it became
8    a paycheck.
9    Q. And when you say every now and then?
10   A. It wasn't consistent.
11   Q. Why wasn't it consistent?
12   MR. BALAREZO: Objection. If you know.
13   THE COURT: Only if you know.
14   THE WITNESS: I don't know.
15   BY MISS LIEBER:
16   Q. Did you ever express your sort of displeasure with the fact
17   that you weren't getting paid consistently for working there?
18   A. All the time.
19   Q. Is that, in fact, why you decided you were sort of done
20   with this because they weren't actually paying you when you
21   worked?
22   A. Yes.
23   MISS LIEBER: Court's indulgence.
24   Thank you, Miss Jones. I appreciate it.
25   THE COURT: Anything else?

87

1    REDIRECT EXAMINATION
2    BY MR. BALAREZO:
3    Q. Miss Jones, you said that you worked about four nights a
4    week. Was the club closed the other three nights?
5    A. Yes.
6    Q. Was that every – the entire time that were you there, was
7    the club closed on those three nights?
8    A. To my knowledge, yes.
9    Q. Did you ever go to the club and see that it was closed or
10   how did you find that out?
11   A. Find out that they were closed?
12   Q. Yes.
13   MISS LIEBER: Objection to hearsay, I don't know.
14   THE COURT: Overruled. How did –
15   THE WITNESS: Basically by the bar schedule.
16   BY MR. BALAREZO:
17   Q. Okay. And I should have asked you this before. Are you
18   any relation to Antoine Jones?
19   A. No.
20   Q. And do you know towards the end of your employ at the club,
21   did you know that Mr. Jones was trying to sell the nightclub?
22   MISS LIEBER: Objection. Beyond the scope.
23   THE COURT: I would think so. But overruled. Let's
24   hear.
25   THE WITNESS: No.

88

1    BY MR. BALAREZO:
2    Q. You weren't aware of that?
3    A. No.
4    Q. And Miss Lieber showed you this. You said you had no
5    recollection of that event; is that true?
6    A. Correct.
7    Q. Let me show you what's part of that same Exhibit 18-A. Do
8    you see that?
9    A. Yes.
10   Q. Do you have any recollection of this event on Saturday,
11   September 3rd? And I will flip it over.
12   A. Yes.
13   Q. Did you work that night?
14   A. Yes.
15   Q. And can you describe the crowd?
16   A. As in numbers?
17   Q. Was it a small crowd, big crowd?
18   A. Big crowd.
19   Q. Okay. And typically – well, you have indicated that was
20   a, a cabaret. Do you know whether or not somebody rented the
21   place out or that was a cabaret that the club put on? Do you
22   have any idea?
23   A. I don't know.
24   Q. Let me show you this for September 10, the following week.
25   Does that look familiar to you or do you remember that event?

89

1  A.  It looks familiar, yes.
2  Q.  Did you work that day?
3  A.  I believe so.
4  Q.  Do you recall what the crowd was like that for that event?
5  A.  Bigger, for Backyard.
6  Q.  Bigger than the one for the cabaret that I just showed you?
7  A.  That I don't know.
8  Q.  But it was a big crowd?
9  A.  Yes.
10  Q.  September the 19th?
11  A.  I did not work that night. That's a Monday. I definitely
12  did not work.
13  Q.  Okay. So you don't know --
14  A.  From what I have heard from the other --
15      THE COURT:  No, no, that's okay. She didn't work that
16  night.
17      THE WITNESS:  I didn't work.
18  BY MR. BALAREZO:
19  Q.  You just said that the club was always closed the other
20  three nights?
21  A.  Yes.
22  Q.  This event is for what day?
23  A.  That's a Monday. That's a special event.
24  Q.  Do you know if that event took place?
25  A.  Yes, it did.

90

1  Q.  And this further event on Tuesday, September 27th, did you
2  work that night?
3  A.  No.
4  Q.  Do you know if this event took place on Tuesday?
5  A.  Yes, it did.
6  Q.  And that was one of the nights also that you said normally
7  is closed, though?
8  A.  Yes.
9      MR. BALAREZO:  I have nothing else, Your Honor.
10      THE COURT:  Okay. Thanks. You may step down.
11      (Witness excused.)
12      THE COURT:  Do we have one short witness? I believe
13  there was --
14      MR. BALAREZO:  Your Honor, it will probably be about
15  the same length.
16      THE COURT:  That's fine, let's do it. It's one more
17  woman here. We don't want to keep her until tomorrow if we can
18  help it.
19      MR. BALAREZO:  Thank you.
20      THE COURT:  Everybody okay?
21      THE JUROR:  Yes.
22      THE COURT:  Did I hear a no?
23      THE JUROR:  Your Honor, would you mind if I use the
24  rest room?
25      THE COURT:  No. Go ahead. We will take a very short

91

1  recess. If anybody else would like to step out.
2      (Jury exits courtroom at 3:48 p.m.)
3      THE COURT:  Is the witness out there?
4  Can I see counsel at the beach here a minute?
5      (Bench conference.)
6      THE COURT:  Jensen Barber is coming in a minute for
7  the other gentleman. I was just going to tell you to go talk
8  to Jensen Barber if he's there.
9      (Open court.)
10      THE COURT:  Mr. Balarezo, they are taking a quick
11  break, just real quick. Do you mind talking to Mr. Seltzer for
12  this minute?
13      MR. BALAREZO:  Sure.
14      THE COURT:  Ten or 15 minutes for the witness is fine.
15  Do you have many questions?
16      MR. NORRIS:  No. About the same as last time.
17      MR. BALAREZO:  Are we going to go longer than you
18  implied, Your Honor --
19      THE COURT:  Well, we are going to finish this one last
20  witness. A juror that needed a break. Would you talk to
21  Mr. Seltzer for a minute.
22      (Brief recess.)
23      THE COURT:  Come on up.
24      (Bench conference.)
25      MISS LIEBER:  At this brief break a marshal alerted me

92

1  to the fact that the next witness came in and sat down in the
2  courtroom and called that gentleman over who had been seated in
3  the courtroom the entire time.
4      THE COURT:  What are you talking about?
5      MISS LIEBER:  The next witness.
6      THE COURT:  A woman?
7      MISS LIEBER:  Quintessa Broussard. Yes. When
8  Mr. Balarezo brought her into the courtroom, she sat down in a
9  row. She then summoned the other gentleman that we were just
10  talking about to come sit beside her. He came and sat beside
11  her. And they started talking. I don't know that he is
12  reporting to her about everything he just observed from the
13  prior witness, but I think it's worth at least putting on the
14  record and inquiring about whether or not that's the case.
15      THE COURT:  Was this gentleman here for more than a
16  few minutes?
17      MR. BALAREZO:  I know he came in with her to the court.
18  He is a friend of hers. He came in to watch.
19      THE COURT:  What makes you think he was here much
20  before she arrived?
21      MISS LIEBER:  The marshal told me he was in the
22  courtroom during the previous witness' testimony. And this
23  young woman came in and sat down next to him -- or sat down and
24  summoned him over.
25      THE COURT:  Who is he, by the way?

93

```
1      MR. BALAREZO:  I don't know his name.  He came with
2  her.
3      MR. NORRIS:  I'm confused, Your Honor.  Does the
4  government have a problem with witnesses talking to one
5  another?
6      THE COURT:  I don't know.  Let's just get over with
7  it.  Thank you.  All right.  We are going to proceed.  If you
8  want to ask her what she learned about prior testimony, I'll do
9  the same thing I did for him.
10     (Open court.)
11     THE COURT:  Bring in your recalcitrant person so she
12 doesn't have to sit here.
13     MR. BALAREZO:  I'm just trying to avoid it.
14     THE COURT:  All right.  Then bring in your potential
15 witness, so we can send her home.  And then ask Ms. Broussard
16 and any other members of the public to come back in the
17 courtroom.
18     MR. BALAREZO:  Should I bring her back in?
19     THE COURT:  Yes.  Absolutely.  She's going to take the
20 stand.
21     Good afternoon, Miss Gilmore.  How are you?
22     MISS GILMORE:  I'm well.
23     THE COURT:  I'm Judge Huvelle.  We are not going to be
24 able to get to you today because of the time.  I apologize.  I
25 hope you have not been waiting here too long.  We need you to
```

94

```
1  come tomorrow morning at 9:30.  Would you promise to be here?
2      MISS GILMORE:  Yes.
3      THE COURT:  Otherwise, I have this whole row of
4  gentlemen and one female, U.S. marshals, who will come to get
5  you.
6      MISS GILMORE:  I will be here tomorrow.
7      THE COURT:  All right.  See you at 9:30.  Thank you.
8  Have a good evening.
9      I just heard four and three.  Is that going to be
10 enough to carry us through tomorrow?  You have Miss Gilmore,
11 makes one more.  And we need to resolve the other two
12 witnesses.
13     MR. BALAREZO:  Your Honor, with respect to Denise
14 Jones, I hadn't expected to call her until later until I get a
15 chance to go through those documents, so probably next week
16 sometime.
17     THE COURT:  And the witness, Mr. Gordon, who
18 Mr. Barber will talk to, we can --
19     Mr. Barber, are you available tomorrow to resolve the
20 issue after you have a chance to get up to -- it's not a lot of
21 information.
22     MR. BARBER:  Your Honor, I can be.  I'm going to leave
23 tonight to go out to Richmond.  I have an argument to go before
24 the Fourth Circuit tomorrow morning and then I will be back.
25     THE COURT:  All right.  Well, we can take it up first
```

95

```
1  thing in the afternoon.
2      Let's bring out the jury.
3      Ma'am, do you mind taking the stand.
4      (Jury present at 4:01 p.m.)
5      THE COURT:  Okay.
6  QUINTESSA BROUSSARD, DEFENDANT JONES WITNESS, SWORN
7              DIRECT EXAMINATION
8  BY MR. BALAREZO:
9  Q.  Good afternoon, ma'am.  Could you please state your name
10 and spell it for us?
11 A.  Quintessa, Q-U-I-N-T-E-S-S-A, Broussard, B-R-O-U-S-S-A-R-D.
12 Q.  And, Miss Broussard, just generally where do you reside
13 now?
14 A.  In Clinton, Maryland.
15 Q.  Could you tell us a little bit about your education, how
16 far you have gotten in school?
17 A.  Yes.  Some college at Howard University.
18 Q.  And are you currently employed?
19 A.  Yes.
20 Q.  What do you do?
21 A.  I'm customer service rep.
22 Q.  Is that a local company?
23 A.  Yes.  I work for a staffing agency.
24     THE COURT:  I'm sorry?
25     THE WITNESS:  It's for Ablest Staffing.
```

96

```
1  BY MR. BALAREZO:
2  Q.  With respect to that particular job, is there any sort of
3  clearance that you obtained?
4  A.  No.
5  Q.  Now, have you and I had an opportunity to speak prior to
6  today?
7  A.  Yes.
8  Q.  And do you know who I am?
9  A.  Yes.
10 Q.  And what do you understand that I am, or who do you
11 understand that I am, not what?
12 A.  You are the lawyer that's representing Antoine Jones.
13 Q.  And do you know Mr. Jones?
14 A.  Yes.
15 Q.  Do you see him in the courtroom?
16 A.  Yes.
17 Q.  And where do you see him?
18     THE COURT:  Okay.  He just stood up.
19 BY MR. BALAREZO:
20 Q.  And how do you know Mr. Jones?
21 A.  He was the owner at the Club Levels.
22 Q.  And what -- did you have any relationship with the Club
23 Levels?
24 A.  I was a bartender.
25 Q.  And when were you a bartender at that club, from when to
```

97

1  when?
2  A.  From May of '05 until around July of '05.
3  Q.  And was that your primary job or was that a part-time job?
4  A.  That was my primary job.
5  Q.  And how often would you work at the nightclub?
6  A.  Three to five nights a week.
7  Q.  And which nights would those be generally?
8  A.  Well, Saturday -- Monday, Wednesday, Thursday, Saturday,
9  sometimes Friday.
10  Q.  And were those general -- excuse me -- your routine days
11  that you worked at the club?
12  A.  Yes.
13  Q.  And you were a bartender you said?
14  A.  Yes.
15  Q.  During your time there, those two months or so when you
16  worked those days, did you have an opportunity to see whether
17  or not the club had any events, any promotions, any parties,
18  anything of that nature?
19  A.  Yes.
20  Q.  Okay.  And can you describe generally what types of events,
21  promotions would happen at the club?
22  A.  Yes.  There were go-go bands and maybe like a singles night
23  on Mondays, mingle Monday.  It was just different nights, but
24  basically go-go bands.
25  Q.  Are you aware whether or not every day of the week had a

98

1  specific type of event that happened?
2  A.  Yes, there were events on specific days, I just don't
3  remember.
4  Q.  Have you ever heard of a band called TCB?
5  A.  Yes.
6  Q.  Do you know if they ever played at the club?
7  A.  Yes.
8  Q.  When did they play at the club?
9  A.  They played there two nights a week.  I believe it was
10  Friday and Sunday.
11  Q.  Okay.  And do you know of a band called Backyard?
12  A.  Yes.
13  Q.  And do you know when they played at the club?
14  A.  I believe it was Fridays.
15  Q.  Did you work normally when those bands played?
16  A.  Yes.
17  Q.  How would you describe the crowd, the business basically on
18  those nights?
19  A.  Crowded, packed.
20  Q.  And by crowded, packed, what are you talking about?  How
21  many people if you can estimate?
22     Let me strike that.  Let me ask you this.  Was the Levels
23  Nightclub, was it a large club or a small club?
24  A.  It was pretty large.
25  Q.  When you say crowded, packed, what do you mean?

99

1  A.  Mean crowded, packed, you could barely walk in if you were
2  trying to get through the crowd.
3  Q.  And those nights that you worked when it was like that, did
4  you have an opportunity to deal with money from customers, that
5  kind of thing?
6  A.  Yes.
7  Q.  And do you have a sense of how much the bar that you were
8  working at was bringing in on those nights?
9  A.  Probably between 1,000 and 1,500.
10  Q.  And how many bars are there at Levels?
11  A.  Three.
12  Q.  Did you work at any particular bar or did you rotate
13  amongst those three?
14  A.  I rotated.
15  Q.  And that $1,500 amount that you mentioned, is that an
16  average for all three or for each individual bar?
17  A.  It was for the one that I worked at, which was mainly the
18  back bar.  There was another smaller bar that made maybe $500.
19  It didn't make as much.  And then there was the bar at the top.
20  And that one made probably the same amount as the other bar,
21  around a thousand.
22  Q.  Was there a VIP room that had a bar?
23  A.  Yes.
24  Q.  Was that one of those that you are talking about or was
25  that a fourth bar?

100

1  A.  Actually that's the fourth bar.
2  Q.  Did you ever work at the VIP bar?
3  A.  Yes.
4  Q.  Do you have a sense as to normally whether or not that bar
5  made more money than the other bars?
6  A.  Yes, it did.
7  Q.  So now, were you aware that some of the special events that
8  happened at the club like the bands, those things, were tickets
9  ever sold that you know of?
10  A.  I don't know.
11  Q.  Were you ever involved in selling tickets?
12  A.  No.
13  Q.  What was your only responsibility at the nightclub?
14  A.  Bartending.
15  Q.  Now, do you know an individual -- well, you said you know
16  Antoine Jones.  Do you know a Lawrence Maynard?
17  A.  Yes.
18  Q.  And who is Lawrence Maynard in your mind?
19  A.  A manager.
20  Q.  And do you know someone by the name of Adrian Jackson?
21  A.  Yes.
22  Q.  What was his role, if any, with Levels?
23  A.  Manager.
24  Q.  When you completed work on any given night at a bar, what
25  would you do with the money?

101

```
1    A.  Adrian would come to the bar and close the draw out and run
2    the receipts and count the money.
3    Q.  Let me ask you this.  Was the money that was made on any
4    given night from the bar would that be credit card receipts,
5    personal checks, cash?
6    A.  Cash.
7    Q.  Was it always cash?
8    A.  Yes.
9    Q.  Once you turned the money over to either Mr. Jackson or
10   Mr. Maynard, do you know what happened to the money?
11   A.  No.
12   Q.  Did you ever deposit it yourself in a bank?
13   A.  No.
14   Q.  Do you have any idea what happened to it?
15   A.  Huh-uh.
16   Q.  Now, how would you describe your relationship with
17   Mr. Jones, with Antoine Jones?
18   A.  I mean it was a good relationship.  He was my boss.
19   Q.  Your boss.  Are you, were you friends with him or are you
20   friends with him?
21   A.  No.
22   Q.  Did you guys ever associate or socialize outside of work?
23   A.  No.
24   Q.  Now, let me ask you, do you have a, do you know someone by
25   the name of Damien Broussard?
```

*VERY IMPORTANT*

102

```
1    A.  Yes.
2    Q.  Who was Damien Broussard?
3    A.  My brother.
4    Q.  And can you tell us, where is Damien Broussard today?
5    A.  He is in Franklin Detention Center in Winnsboro, Louisiana.
6    Q.  And do you know how long Mr. Broussard has been in that
7    detention center?
8            MISS LIEBER:   Objection.
9            THE COURT:   No, I think date wise is relevant.
10           How long has he been locked up in Louisiana?
11           THE WITNESS:   He's been locked up since September of
12   '04,
13   BY MR. BALAREZO:
14   Q.  September of '04?
15   A.  Yes.
16   Q.  Do you have, do you have any knowledge as to when the last
17   time he was in the District of Columbia?
18   A.  Maybe it was around '93.
19   Q.  Okay.  1993?
20   A.  Yes.
21   Q.  Do you know if your brother Damien was ever at Levels
22   Nightclub?
23   A.  No, he wasn't.
24   Q.  Do you know if your brother Damien Broussard knows Antoine
25   Jones?
```

*VERY IMPORTANT*

103

```
1    A.  No, he doesn't.
2    Q.  Do you know -- back in the period of May, June, July of
3    2005, did have you a cell phone that you regularly used?
4    A.  Yes.
5    Q.  And do you remember what number that was?
6    A.  I think it was (301) 768-8644.
7    Q.  Does the number 768-8466 ring a bell?
8    A.  8466, yes.
9    Q.  Was that the number that you used?
10   A.  Yes.
11   Q.  Did you ever use that phone to text anybody?
12   A.  Yes.
13   Q.  Did you ever use it to text Antoine Jones?
14   A.  Yes.
15   Q.  Do you specifically recall back in May of 2005 sending
16   Antoine Jones a text message which said, quote, need ones,
17   unquote?
18   A.  Yes.
19   Q.  And do you remember sending that?
20   A.  Yes.
21   Q.  Can you tell us what you were talking about when you sent
22   him a message that said need ones?
23   A.  Needed change, one dollar bills.
24   Q.  And what was that for?
25   A.  For the bar.
```

*VERY IMPORTANT*

104

```
1    Q.  Do you recall sending him a text message sometime in June
2    of '05, quote, need ones bad?
3    A.  Yes.
4    Q.  And do you recall what that message was about?
5    A.  Change for the bar, one dollar bills for the bar.
6    Q.  And in June of 2005, a little bit after that, do you recall
7    sending a message to Mr. Jones, quote, need the number 2, talk
8    to you tonight please.  Are you coming in?
9    A.  Yes.
10   Q.  And can you tell us what that was all about?
11   A.  Yes.  I wanted to find out if he could advance my paycheck.
12   Q.  Was that something that normally happened or have you done
13   that before?
14   A.  No.  That was my first time.
15   Q.  So you were just asking him?
16   A.  Yes.
17   Q.  And sometime thereafter, about four days later on July 1st,
18   do you recall sending Mr. Jones a text message which said,
19   quote, have your package, will see you tonight at work if
20   that's okay?
21   A.  Yes.
22   Q.  And can you tell the jury what you were referring to when
23   you sent him that particular message?
24   A.  That was in reference to the first message.  He did give me
25   the advance.  And I had the money to pay him back.
```

*VERY IMPORTANT*

105

1  Q.  So when you mentioned the word "package," what did that
2  refer to?
3  A.  That was just me giving him his money back.
4  Q.  And with respect to will see, letter C, the number U, will
5  CU, the number 2, night.  Do you recall writing it in that
6  fashion?
7  A.  Yes.
8  Q.  Did you normally write words abbreviated like that?
9  A.  Yes.
10 Q.  Did the number 2, did that mean anything?
11 A.  No.
12 Q.  Did it refer, for example, to two kilos of coke?
13 A.  No.
14 Q.  Did it refer to anything beyond what you said?
15 A.  No.
16 Q.  Have you at any time sent a text message or communicated
17 with Antoine Jones for the purposes of attempting to purchase
18 kilograms of cocaine from Mr. Jones?
19 A.  No.
20 Q.  Have you ever had those types of communications with
21 Lawrence Maynard?
22 A.  No.
23 Q.  Have you ever had that type of communications with anyone
24 associated with Levels Night Club?
25 A.  No.

*very important*

106

1  Q.  Sometime after you sent those text messages, did -- well,
2  after sending those text messages, were you ever contacted by
3  anyone from law enforcement with respect to the meaning of
4  those text messages?
5  A.  Not until recently.
6  Q.  And when was that?
7  A.  That was when I spoke with Investigator Glick in reference
8  to, well, when I was subpoenaed to be here.
9        THE COURT:  But he is --
10       MR. BALAREZO:  If I could --
11 BY MR. BALAREZO:
12 Q.  Are you aware that Mr. Glick is an investigator for me?
13 A.  Yes.
14 Q.  I'm not law enforcement.
15 A.  Oh, I'm sorry.  No, no.  Other than that, no.
16 Q.  Specifically has the lady sitting here at the end, Agent
17 Yanta, have you ever been contacted by her or anyone from the
18 FBI --
19 A.  No.
20 Q.  -- ICE, Immigration and Customs Enforcement, DEA, any
21 government agency?
22 A.  No.
23       MR. BALAREZO:  Nothing else for Miss Broussard, Your
24 Honor.
25       THE COURT:  Mr. Norris?

*very important*

107

1        MR. NORRIS:  No questions, Your Honor.
2        MR. McDANIEL:  No, Your Honor.
3        MR. ACREE:  No, Your Honor.
4        THE COURT:  Miss Lieber?
5                CROSS-EXAMINATION
6  BY MISS LIEBER:
7  Q.  Good afternoon, ma'am.
8  A.  Hello.
9  Q.  Just so I'm clear, you worked for two or three months
10 between May and July of '05; is that correct?
11 A.  Yes.
12 Q.  And then you stopped working completely at Levels?
13 A.  Yes.
14 Q.  Did you ever come back and bar tend, sort of guest bar tend
15 or anything like that?
16 A.  No.
17 Q.  Did you ever go back to Levels after you stopped working
18 there?
19 A.  No.
20 Q.  So you were never in the club in, say, September and
21 October of 2004; is that correct?
22 A.  Correct.
23 Q.  So you don't have any idea how many people were going to
24 events during that time?
25 A.  No.

108

1  Q.  Okay.  In the time that you were there, you saw Mr. Jones
2  and Mr. Jackson a fair amount, is that fair to say?
3  A.  Yes.
4  Q.  Okay.  You saw them together a lot, in fact?
5  A.  Sometimes.
6  Q.  Okay.  Because they both sort of owned and managed that
7  club; is that right?
8  A.  Yes.
9  Q.  Okay.  And they were pretty hands on kind of managers?
10 A.  Pretty much.
11       MISS LIEBER:  Okay.  That's all I have.  Thank you
12 very much, ma'am.
13               REDIRECT EXAMINATION
14 BY MR. BALAREZO:
15 Q.  Miss Broussard, while you were at the club was there ever a
16 guest bartender night?
17 A.  No.
18       MR. BALAREZO:  Nothing else, Your Honor.
19       THE COURT:  Okay.  Thank you.
20       Thank you.  You are excused.
21       (Witness excused)
22       THE COURT:  Ladies and gentlemen it's now a quarter
23 past.  I have to be at a panel meeting.  I remind you please do
24 not discuss the case.  Have a good evening.  See you back
25 tomorrow.  Breakfast and then 9:30 we will begin.  We are

109

1  moving right along very quickly.  Do not discuss the case.
2  Have a good evening.  Thank you.
3          Thank you very much, ladies and gentlemen.  Good
4  night.
5          (Jury out at 4:15 p.m.)
6          THE COURT:  Marshals, you seem to have an effect on
7  all our witnesses.  They take one look at this and then they
8  say they'll be here right on time.
9          The government and Mr. Balarezo, would you kindly meet
10  with Mr. Barber and Mr. Seltzer.  Let us figure out a time.
11  You are saying I shouldn't take up the issue of Miss Jones
12  tomorrow?
13          MR. BALAREZO:  I hadn't planned on calling her, Your
14  Honor.
15          THE COURT:  Well, it's not a question -- is
16  Mr. Seltzer available?
17          Mr. Barber, what time would you be available to
18  address the issue of Mr. Gordon?
19          MR. BARBER:  You are speaking of tomorrow, Your Honor?
20          THE COURT:  Yes.
21          MR. BARBER:  I don't know what order we are going to
22  be called tomorrow.  I could be back here, I would figure, 1:30
23  or so.
24          THE COURT:  All right.  Okay.  Well, the government
25  and Mr. Balarezo will be available to you to talk about

110

1  Mr. Gordon.  Mr. Gordon happens to be here.  I would suggest
2  that we tell Mr. Gordon and Mr. Barber to return here.  They
3  will be able to -- I don't know that there are any documents
4  that he needs to see.  I know Mr. Seltzer --
5          MR. BALAREZO:  Well, there are some reports that might
6  be helpful.
7          THE COURT:  Reports.  Okay.  Well, they will make it
8  available.  Sir, why don't we plan on asking you and the
9  witness to return here 3:30 p.m.
10          MISS LIEBER:  Tomorrow?
11          THE COURT:  Yes.
12          MISS LIEBER:  Sure.
13          THE COURT:  So we will know.  If he gets to testify,
14  it won't be until Monday anyway, one way or another.  I don't
15  know whether he wants to assert his Fifth.  I have no idea.
16  But we can take it up, if you are ready, at 3:30 tomorrow.
17  They will be available to talk to you momentarily.
18          Mr. Acree and Mr. McDaniel, you are providing at least
19  seven witnesses.  Has the government been given all the
20  information they need?
21          MR. McDANIEL:  Yes, Your Honor.
22          MR. ACREE:  I was just going to say, Your Honor, it's
23  been a little bit difficult for me, because I didn't know
24  exactly when I would need my witnesses.  I might be able to get
25  more than that tomorrow.  But I don't know yet.  But the only

111

1  thing can I do is try to give them the information as soon as I
2  get it.  So, I just wanted to let the Court know.
3          THE COURT:  Well, if they haven't been able to use it,
4  the people are going to have to be inconvenienced to come back.
5          MR. ACREE:  I understand.
6          THE COURT:  If I were you, you can always E-mail them
7  as soon as you know something.
8          Seven witnesses won't carry us through the day, plus
9  Gilmore is eight.
10          Mr. Balarezo, do you have anybody else tomorrow other
11  than the two people who are in --
12          MR. BALAREZO:  Miss Gilmore.  She will probably be
13  longer than these but not greatly.
14          THE COURT:  Okay.  The two that are in the limbo area
15  with counsel, we will, they won't be brought in -- they won't
16  testify tomorrow no matter what.
17          MR. BALAREZO:  Your Honor, I --
18          THE COURT:  I'm just trying to figure out whether we
19  have enough.
20          MR. BALAREZO:  I may call agent, Detective Horne.
21          THE COURT:  Fine.  Okay.  She is here, we know that.
22          MISS LIEBER:  I don't know that she was going to be
23  here tomorrow, Detective Horne.  I can make sure that she is.
24  She is not here every day unless we think she might testify.
25          MR. BALAREZO:  Your Honor, I guess it's not an issue.

112

1  I just intended to play some calls if --
2          THE COURT:  You can play calls.
3          MR. BALAREZO:  If I can just play them, I don't need
4  her then.
5          THE COURT:  It's a basic rule of evidence.  You don't
6  need the detective or a special agent for that.  Okay.
7          MISS LIEBER:  The only other request I have is if
8  there is any documents, any pictures, any Rule 16 discovery
9  that they intend to use with these witnesses tomorrow, I would
10  like a chance to take a look at it.
11          THE COURT:  Mr. McDaniel, reverse discovery is being
12  invoked.
13          Anything else before we leave?
14          MR. GEISE:  Reverse discovery was invoked a while ago,
15  but you know how it goes.
16          THE COURT:  Right.  But they are going to give it to
17  you.
18          MISS LIEBER:  And I would just note that, for
19  instance, Mr. Balarezo handed me at some point today a stack of
20  flyers and tickets -- I'm sorry, four bundles of flyers and
21  tickets, most of which I have been able to get through sort of
22  at breaks.  But I'm going to object to most of them, I'm
23  telling everybody right now.  And I'd like the chance to review
24  the rest of them.
25          THE COURT:  Who are they coming in through?

113

1    MR. BALAREZO:  Miss Gilmore.
2    THE COURT:  Are they for the relevant dates?
3    MR. BALAREZO:  They are for dates of the conspiracy.
4  Remember, Your Honor, when I questioned Detective Horne
5  initially about the four that are in evidence?  Number one, I
6  gave the government the pack that day and they looked at them,
7  whatever.
8    But the reason is the Court limited me to just those
9  four dates.  And I think that the other flyers that I have
10  given Miss Lieber should come in because they are relevant
11  dates of the conspiracy.
12    THE COURT:  Okay.  We will take it up tomorrow.  It's
13  hardly going to shape the trial one way or another.
14    What is it, Mr. McDaniel?
15    MR. McDANIEL:  Just one of my witnesses is going to be
16  coming tomorrow in the afternoon at 2:20.  The other three will
17  be here in the morning.
18    THE COURT:  Mr. Seltzer, for scheduling purposes,
19  Mr. Jones' lawyers does not want to call his wife tomorrow.  We
20  are happy to try to resolve this.  But if we can be more
21  accommodating time wise.  I just as soon take it up tomorrow.
22    Mr. Balarezo, I'm sorry, we are trying to deal with
23  your witnesses.  Do you want Miss Jones and Mr. Seltzer to come
24  back here tomorrow at 3:00?
25    MR. BALAREZO:  I guess, Your Honor, to resolve the

114

1  issue.
2    THE COURT:  If at all possible we would ask that --
3  can you return at 3:00 or not?
4    MR. SELTZER:  I believe so.
5    THE COURT:  Fine.  All right.
6    Mr. Barber, we will see you at 3:00 or 3:30 tomorrow.
7  The counsel are available to fill you in now.
8    Any problems with the jury instructions I got to know
9  by Monday morning.
10    (The proceedings were adjourned at 4:23 p.m.)

115

C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| S.A. STEPHANIE YANTA | | | | |
|   By Ms. Lieber | 10 | | | |
|   By Mr. Balarezo | | 16 | | |
| DETECTIVE NORMA HORNE | | | | |
|   By Ms. Lieber | 18 | | | |
|   By Mr. Norris | | 34 | | |
| TYMIRA HUNTER | | | | |
|   By Mr. Balarezo | 49 | | 59 | |
|   By Ms. Lieber | | 56 | | |
| KARISSA JONES | | | | |
|   By Mr. Balarezo | 60 | | | |
|   By Mr. Norris | | 75 | | |
|   By Miss Lieber | | | | |
| QUINTESSA BROUSSARD | | | | |
|   By Mr. Balarezo | 95 | | | |
|   By Miss Lieber | | 107 | | |

EXHIBITS

116

| | RECEIVED |
|---|---|
| Government's Misc-4 | 18 |
| Government's Misc-17 | 12 |
| Government's Misc-18 | 13 |
| Government's Misc-19 | 14 |
| Government's Misc-20 | 16 |
| Government's Misc-21 | 34 |

117

CERTIFICATE OF COURT REPORTER

I, ANNIE R. SHAW, certify that the foregoing is a
correct transcript from the record of proceedings in
the above matter.

Date:   2nd 1, 2006

Signature of Court Reporter

69

1 MR. NORRIS:  Your Honor, I have one.

2 THE COURT:  About the hoopty?

3 MR. NORRIS:  Not about the hoopty, no.  As they do

4 say, Your Honor, a car is a car, and that's a fact, but a deuce

5 and a quarter ain't no Cadillac.

6 THE COURT:  Is that all you have to say?  Sit down.

7 MR. NORRIS:  No, I have some more.

8 RECROSS-EXAMINATION

9 BY MR. NORRIS:

10 Q.  You mentioned that your husband had a buyer for the club,

11 and your intention was that you all would invest money from the

12 sale of the club in real estate; is that correct?

13 A.  That's correct.

14 Q.  And I believe you said you knew that Mr. Jackson was

15 partners with your husband in the club; is that correct?

16 A.  That's correct.

17 Q.  And did you have any knowledge about Mr. Jackson wanting to

18 use his profit from the sale of the club to invest in the real

19 estate that you talked about?

20 A.  He didn't discuss it with me, if that was his intention.

21 Q.  Okay.  Thank you.

22 MR. NORRIS:  That's all.

23 THE COURT:  Anything from the Government?

24 MS. LIEBER:  I don't think so, no.

25 THE COURT:  Thank you, Miss Jones.  You may step down.

70

1 Mr. Acree, are you ready with your calls?

2 MR. ACREE:  Yes --

3 THE COURT:  You're not ready?

4 MS. LIEBER:  I'm sorry.  It's the same problem.  It's

5 now gone to sleep, so I need a minute to get it booted up

6 again.

7 THE COURT:  Okay.  Ladies and gentlemen, while it

8 wakes up, you can take a break.  Ten minutes, please.

9 (Jury out at 3:17 p.m.)

10 THE COURT:  How long do you expect to be with the

11 agent, please?

12 MR. BALAREZO:  Your Honor, I probably have half-hour,

13 if that much.

14 THE COURT:  The rest of you, more than five minutes a

15 piece?

16 MR. ACREE:  Five or ten minutes.

17 MR. NORRIS:  Five or ten, Your Honor.

18 THE COURT:  Okay.  We might finish her, and that would

19 be it for them, and then whatever calls you have in rebuttal.

20 We might finish today, otherwise, they'll come in for a

21 half-hour tomorrow morning.  And then we will come in for the

22 legal stuff.

23 (Off the record at 3:18 p.m.)

24 (Resumed at 3:30 p.m.)

25 MR. BALAREZO:  Your Honor, one of the questions

*END OF MRS JONES TESTIMONY*

*Note: Judge Denied entry of evidence on WALLACE WARD DEATH CERTIFICATE ~ Prejudice*

71

1 regarding the September 2nd, the first wire affidavit that she

2 did, there are some allegations in there regarding text

3 communications between Mr. Jones and someone by the name of

4 Wallace Ward.  Specifically, the quotes are "Just between you

5 and me, get at me A.S.A.P.," and various other things.

6 And there are allegations that Mr. Jones had several

7 communications with this person and that the last one was on

8 August 22, 2005.  All I'm trying to do is -- this agent -- does

9 it matter if she's here at this point?

10 THE COURT:  Why don't you step out?

11 MR. BALAREZO:  I'd just like to have admitted, a

12 certified copy of the death certificate for Wallace Ward, which

13 indicates that he died on July 1, 2005, which would clearly be

14 prior to the time that these messages that are attributed to

15 him and Mr. Jones were made.

16 THE COURT:  You said he died in July '05.

17 MR. BALAREZO:  July 1, '05.

18 THE COURT:  When's the text message?

19 MR. BALAREZO:  The date of the last was August 22nd,

20 2005, almost two weeks later.

21 THE COURT:  Where is the affidavit?

22 MR. BALAREZO:  It's Jones Exhibit Number 4.  It's a

23 September 2nd affidavit, paragraph 27, page 25.

24 THE COURT:  What paragraph?

25 MR. BALAREZO:  Paragraph 27 and 28.  More relevant, I

72

1 guess, is 28, where it talks about Maynard's text messages

2 between the date of August 4th and August 10, 2005, between

3 Maynard and the phone listed to Mr. Ward, talking about the

4 monster again.

5 THE COURT:  Wait a minute.  The only thing --

6 listed is that Mr. Ward stated, "My man is back up and working

7 like a monster."

8 MR. BALAREZO:  Right.

9 THE COURT:  There is two messages on the fourth from

10 Maynard.  One is to Ward and one is to Maynard -- but, I don't

11 know.

12 And, again, Ward died when?

13 MR. BALAREZO:  July 1st, 2005.

14 THE COURT:  Let's see.

15 MS. LIEBER:  And a couple of things that I would say.

16 One, there is cross-examination on this ad nauseam.

17 There is no reason to go back now.  Secondly, this does not

18 impeach Special Agent Yanta.  All she said was the phone listed

19 to Wallace Ward sent the text message.  She didn't say Wallace

20 Ward himself sent the text message.

21 So as sad as it is for Mr. Ward and his family that he

22 was not with us in August of 2005, it is not relevant to

23 the credibility of Special Agent Yanta.

24 THE COURT:  Agreed.  Sustained.

25 MR. BALAREZO:  Well, Your Honor, it is because --

*VERY Important*
*WALLACE WARD - Cell phone of Collette Watson,*

65

1  Q.  Handwritten here?
2        You've never seen this before, have you?
3  A.  A few minutes ago when —
4  Q.  Well, before that?
5  A.  No, I don't recall it.
6  Q.  And do you know what vehicle this is for?  You can't tell?
7  I'll point your attention to —
8        THE COURT:  This is in evidence.  What is it?
9        THE WITNESS:  I'm guessing that's the Sequoia.  It
10 looks like the '03 Toyota.
11       THE COURT:  Don't guess.  It says Sequoia.
12       What do you want to ask her?
13 BY MR. BALAREZO:
14 Q.  And it has you and Mr. Jones as being registered; right?
15 A.  That's correct.
16 Q.  And does that mean that you and Mr. Jones owned it, or is
17 it just on the registration?  Who financed the car?
18 A.  My husband financed the car.
19 Q.  But both of your names were on the registration?
20 A.  Both our names were on the registration.
21 Q.  And, in fact, who — who was the lienholder?
22 A.  NASA Federal Credit Union.
23 Q.  Does that mean that you owed them money on the car?
24 A.  My husband did.
25 Q.  Okay.  And this last thing, regarding this letter that the

66

1  Government showed you, Miscellaneous 23, the letter from the
2  attorney?
3  A.  Yes.
4  Q.  Okay.  Your signature is on the back —
5  A.  Yes.
6  Q.  — you said; right?
7        And did you write this two-page letter?
8  A.  No, sir.
9  Q.  Did you consult with this attorney for the purposes of
10 getting your car back?
11 A.  Yes, I did.
12 Q.  Do you see what type of — you see what the type is; right,
13 the font of this document?
14 A.  Yes, I do.
15 Q.  Do you know what I'm talking about?
16 A.  Yes.
17 Q.  And do you see the back page?  I'll just put — do you see
18 that?
19 A.  Yes.
20 Q.  This back page being the page that you signed?
21 A.  Yes.
22 Q.  Is the font the same, or is it different from the other
23 pages?
24 A.  It's different.
25 Q.  Okay.  When you signed the letter, as you did here, or this

67

1  page, do you recall whether or not you had read this, the first
2  two pages of it yet?
3        THE COURT:  What does it say, the last page again?
4  BY MR. BALAREZO:
5  Q.  Did you understand my question?
6  A.  Yes, I understand your question.  I'm actually trying to
7  think back to the meeting in the office.  And it —
8  Q.  If you're thinking, can you do it quietly and then answer?
9  A.  Okay.
10 Q.  If you're thinking out loud, don't, please.
11       THE COURT:  Do you remember?  If you don't — do you
12 want to see the document?
13 BY MR. BALAREZO:
14 Q.  Do you want to see it up close?
15 A.  Okay.  What was the question again?
16 Q.  The question was, when you signed that last page —
17       MR. BALAREZO:  And, Your Honor, I'll put up on the
18 screen a copy of it, so the jury has it.
19 BY MR. BALAREZO:
20 Q.  When you signed this page, which you said is a different
21 font from the remainder of the letter, when your signed this,
22 had you read this part, the first two pages, did you have them
23 all at the same time?
24       Do you recall signing the letter?
25 A.  I'm going to have to assume.

68

1        THE COURT:  No, don't assume.
2        THE WITNESS:  I don't remember.
3  BY MR. BALAREZO:
4  Q.  You don't remember the circumstances?
5        THE WITNESS:  That's correct.
6        THE COURT:  Fine, okay.
7  BY MR. BALAREZO:
8  Q.  Was this one of those situations where your lawyer said,
9  "Here's the letter, sign it"?
10 A.  Yes.
11 Q.  And at that time when this letter was written, in January
12 the 2nd of '06, where was the Jeep?
13 A.  The FBI had the Jeep.
14 Q.  Where was the Sequoia?
15 A.  The FBI had the Sequoia.
16 Q.  Where was the box truck?
17 A.  I don't know.
18 Q.  Where was the hoopty Cadillac?
19 A.  Probably in the driveway.
20 Q.  And you couldn't drive it?
21 A.  Right.
22       MR. BALAREZO:  I have nothing else.
23       THE WITNESS:  Now, I do remember one more thing —
24       THE COURT:  There's nothing else pending.
25       Anything else?



26. In addition, while there was not a large number of text-messages with substantive content, of those, several were suspicious. First, there were four messages from (301) 768-8466, a telephone number listed to QUENTESA BROUSSARD, and believed to be used by her relative, DAMIEN BROUSSARD, who as noted in paragraph 11(n), has numerous narcotics-related arrests, and at least one conviction. On May 29, 2005, at 5:21 a.m., the telephone believed to be used by DAMIEN BROUSSARD sent a message to ANTOINE JONES saying: "Need ones." Then, on June 4, 2005, at approximately 5:36 a.m., the phone believed to be used by DAMIEN BROUSSARD sent a message to ANTOINE JONES, that appeared to be forwarded from another number, saying: "Need ones bad." Further, on June 27, 2005, at approximately 4:46 a.m., DAMIEN BROUSSARD sent a message stating: "Need 2 talk 2 u tonight please. R u coming in?" Finally, on July 1, 2005, at approximately 7:20 p.m., DAMIEN BROUSSARD sent a message stating: "Have your package, will c u 2nite at work if that's okay." During the same time frame as these text-messages, ANTOINE JONES called DAMIEN BROUSSARD's number on two occasions (date of last contact: July 1, 2005). Investigators believe that these messages are consistent with the encryption frequently used by narcotics traffickers in an effort to elude law enforcement, and are in fact related to DAMIEN BROUSSARD's repeated efforts to purchase kilograms of cocaine ("ones") from ANTOINE JONES in late June/early July, 2005. There is frequent activity on

*[handwritten: uncle Wallace Ward, he was deceased in ____ during the time collected test me and Lawrence.]*

MAYNARD's pen register with this number as well.

27. In addition, there was a suspicious series of text-messages to **ANTOINE JONES** from (301) 379-4141, which is listed to **WALLACE WARD**, 4734 Rollingdale Way, Capitol Heights, Maryland. First, on June 12, 2005, **WARD** sent the **target telephone** a test-message stating: "You should get at me as soon as u get a chance you will like me i promise check me out." This message is followed on June 13, 2005, by two text-messages from **WARD** to **ANTOINE JONES**, one minute apart, stating: "Just between me and u get at me asap," and "You should get at me as soon as you get a chance you wou." A review of the pen register data pertaining to the target telephone revealed that **ANTOINE JONES** called **WALLACE WARD** on at least four occasions during the pertinent pen register period (date last dialed: August 22, 2005). As set forth below, **WALLACE WARD** is the recipient of suspicious text-messages from **MAYNARD** as well. Investigators similarly believe that these are encoded messages from **WARD** to **ANTOINE JONES**, intended to alert **ANTOINE JONES** that **WARD** wished to purchase narcotics.

28. With respect to **MAYNARD's** text-messaging data, of the approximately 180 text-messages to and from (301) 613-6293, between the dates August 4, 2005, and August 10, 2005,[7] several contained similarly suspicious content, in particular, two text-messages on August 4, 2005, from MAYNARD to (301) 379-4141, the phone listed to **WARD**, stating: "My man is back up and working with a monster." In addition, **MAYNARD** sent a text-message to (301) 536-0913, a phone

---

[7]     Sprint Spectrum LP advised your affiant that, due to problems with their computer system, they were only able to supply text-messages for these dates.

I HEREBY CERTIFY THAT THE ATTACHED IS A TRUE COPY OF A
RECORD ON FILE IN THE DIVISION OF VITAL RECORDS

VALID ONLY
WITH
IMPRESSED
SEAL

DATE ISSUED:

NOV 2 2 2006

*Geneva D. Sparks*
STATE REGISTRAR OF VITAL RECORDS

**Please Type or Print in Black Indelible Ink. Ensure All Copies Are Legible.**

State of Maryland / Department of Health and Mental Hygiene
*Certificate of Death*

Reg. No. **2005  25121**

1- For State Registrar

| 1. Decedent's Name (First, Middle, Last) | 2. Date of Death | |
|---|---|---|
| Wallace    Nicholas    Ward | Month July Day 1 Year 2005 | 3:45p |

| 4a. Facility Name (If not institution, give street or number) | 4b. City, Town, or Location of Death | 4c. County of Death |
|---|---|---|
| Prince George Hospital | Cheverly | P.G. |

| 5. Social Security Number | 6. Sex | 7. Age (In yrs. last birthday) | If Under 1 Year Months Days | If Under 24 Hrs. Hours Min. | 8. Date of Birth | 9. Birthplace (State or Foreign Country) |
|---|---|---|---|---|---|---|
| UNKNOWN | 1☒M 2☐F | 44 Yrs. | | | December 15 1960 | Wash.D.C. |

Usual Residence of Decedent

| 10a. State | 10b. County | 10c. City, Town or Location | 10d. Inside City Limits |
|---|---|---|---|
| Md. | P.G. | Seat Pleasant | 1☐Yes 2☐N |

| 10e. Street and Number | 10f. Zip Code | 10g. Citizen of What Country? |
|---|---|---|
| 406-69th Place | 20743 | U.S.A. |

| 11. Marital Status | 12. Was Decedent Ever in U.S. Armed Forces? | 13. Was Decedent of Hispanic Origin? (Specify Yes or No- If Yes, specify Cuban, Mexican, Puerto Rican, etc.) | 14. Race - American Indian, Black, White, etc. |
|---|---|---|---|
| 1☒Never Married 2☐Married 3☐Widowed 4☐Divorced | 1☐Yes 2☒No If Yes, Give War or Dates: | 1☐Yes 2☒No   Specify: | Specify Black |

| 15. Decedent's Education (Give only highest grade completed) | 16a. Decedent's Usual Occupation (Give kind of work done during most of working life. DO NOT use retired) | 16b. Kind of Business/Industry |
|---|---|---|
| Elementary/Secondary (0-12) 12th  College (1-4 or 5+) | Chef | A.Ward Seasons |

| 17. Father's Name (First, Middle, Last) | 18. Mother's Name (First, Middle, Maiden Surname) |
|---|---|
| Warren N.Ward Sr. | Aurelia E.Ward |

| 19a. Informant's Name/Relationship (Type, Print) | 19b. Mailing Address (Street and Number or Rural Route Number, City or Town, State, Zip Code) |
|---|---|
| Aurelia E.Ward-Mother | 406-69Pl Seat Pleasant,Md.20743 |

| 20a. Method of Disposition | 20b. Place of Disposition (Name of cemetery, crematory or other place) | Date | 20c. Location - City or Town, State |
|---|---|---|---|
| 1☐Burial 2☐Cremation 3☐Removal from State 4☐Donation 5☐Other (Specify) | Harmony Park | 7-8-2005 | Landover,Md. |

| 21. Signature of Funeral Service Licensee | 22. Name and Address of Facility |
|---|---|
| ▶ *Janet C. Anderson* | Dunn & Sons 5635 Eads St,N.E. |

23a. Part I. Enter the disease, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line.

Immediate Cause (Final disease or condition resulting in death)   a. *Intracerebral Hemorrhage*

Sequentially list conditions, if any, leading to immediate cause. Enter Underlying Cause (Disease or injury that initiated events resulting in death) Last

Due to (or as a consequence of):
b. *Hypertension*

Due to (or as a consequence of):
c. _____

Due to (or as a consequence of):
d. _____

Approximate Interval Between Onset and Death

| IF FEMALE: 23b. Was decedent pregnant in the past 12 months? 1☐Yes 2☐No 9☐Unknown | 23c. If yes, outcome of pregnancy 1☐Live birth 2☐Fetal death 3☐Ectopic pregnancy 4☐Pregnant at time of death 5☐Other (specify) _____ 9☐Unknown | 23d. Date of delivery Month Day Year |
|---|---|---|

| Part II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. | 23e. Did tobacco use contribute to the cause of death? 1☐Yes 2☒No 3☐Probably 4☐Unknown |
|---|---|
| | 24a. Was an autopsy performed? 1☐Yes 2☒No | 24b. Were autopsy findings available prior to completion of cause of death? 1☐Yes 2☐No |

| 25. Was case referred to medical examiner? 1☒Yes 2☐No | 26. Place of Death (Check only one) Hospital: 1☒Inpatient 2☐ER/Outpatient 3☐DOA Other: 4☐Nursing Home 5☐Residence 6☐Other (Specify) |
|---|---|

| 27. Manner of Death 1☐Natural 5☐Pending Investigation | 28a. Date of Injury (Month, Day Year) | 28b. Time of Injury | 28c. Injury at Work? | 28d. Describe how injury occurred |
|---|---|---|---|---|



number listed to TYMIRA HUNTER,[8] 5623 30th Avenue, Hyattsville, Maryland, on August 5, 2005, with similar content: "My man is working with a big monster – back up working with a monster." MAYNARD sent this same message to another telephone number, (301) 576-0913, registered to TYMIRA HUNTER, also on August 5, 2005: "What are you doing? - - - Back up working with a monster :-)." Finally, over the course of six minutes on August 6, 2005, MAYNARD sent a series of five text-messages to different telephone numbers, all with identical content: "Good Morning!!!" These messages are consistent with the report of CS-1, who indicated that ANTOINE JONES and MAYNARD frequently used codes – such as telling CS-1 that they wanted to meet it "in the morning for breakfast" – to indicate that the most recent shipment of cocaine had arrived, and was available for pickup. Given the close timing of these messages, on August 4-6, 2005, and their coincidence with the time frame in which investigators believe DONALD HUNTER purchased half a kilogram of cocaine from ANTOINE JONES, your affiant believes that these messages by MAYNARD are similarly intended to indicate to customers that ANTOINE JONES had received his latest shipment of cocaine, which was available for pickup.

29. Further, MAYNARD's telephone received two suspicious messages from (202) 528-3405, which is registered to KARISSA JONES, 11010 Mt. Lubenita Way, Upper Marlboro, Maryland, in the early morning hours of August 6, 2005, seemingly placing an "order": "2 cokes & malibu, pls. Ka$h Money," followed shortly thereafter by "Need a can opener!  Ka$h Money." Finally, in similar fashion, MAYNARD's telephone received a message from a Skytel.com pager, with the name NITA WORLEY in the message line, at approximately 10:15 p.m., on August 5,

---

[8]    At this point in the investigation, investigators know of no relation between TYMIRA HUNTER and DONALD HUNTER, a/k/a TERRY SAMUEL.

2005, stating: "I need ice 4 my beer." Investigators believe that these are similarly encoded narcotics-trafficking messages, by which the sender is indicating a desire to purchase a wholesale quantity of cocaine from ANTOINE JONES through his right-hand associate MAYNARD.

30. In addition, of the 94 calls between ANTOINE JONES, using the target telephone, and MAYNARD, from August 1-23, 2005, 43 took place within the first week of August, which is the week in which (a) MAYNARD sent and received this series of highly-suspicious, encoded text-messages, (b) HUNTER purchased half of a kilogram of cocaine from ANTOINE JONES, and (c)

Investigators believe that many of these conversations between MAYNARD and ANTOINE JONES during this period were related to the mechanics of the re-sale of the most recent multi-kilogram shipment of cocaine.

31. Investigators' belief that ANTOINE JONES and MAYNARD are selling wholesale quantities of cocaine to numerous customers in the greater Washington, D.C., area is confirmed by CS-1's report that he knew several individuals throughout the greater Washington, D.C. area who also were buying cocaine from ANTOINE JONES during the period during which CS-1 purchased cocaine from ANTOINE JONES because, as CS-1 described, ANTOINE JONES' prices were good; he usually charged CS-1 $20,000.00 per kilogram. On numerous occasions during 2004, CS-1 saw a number of persons known to it to be wholesale narcotics distributors at special events nights at ANTOINE JONES' club LEVELS, located at 1960 Montana Avenue, N.E., Washington, D.C.

I could then just as easily could have claimed to sell the narcotics to "new" customers unknown to Hunter. This was a golden opportunity for the government to make controlled buys from Jones, yet it failed to so in favor of seeking the more expedient wiretap. *Excellent* *[very important]*

g.    **text messages**

Having obtained a warrant for Jones' and Maynard's text messages, Agent Yanta mentions several of them in the September 2 Wiretap Affidavit and remarks on their "suspicious" nature. Agent Yanta is misleading in that she pulls several messages out of context and fails to mention that the large portion of Maynard's text messages are of a sexual nature. For example, Agent Yanta notes a text message from Maynard to number (301) 536-0913 on August 5, 2005, that stated "My man is working with a big monster back up working with a monster." (Id. at 26). Agent Yanta fails to note, however, that this message includes a "smiley face" at the end depicted as "):-)" and that other messages between Maynard number and that *[very good]* same number include: "thank you baby ." "You're a very good lover," (August 4, 2005, at 21:57:57); "how are you feeling?" (August 4, 2005, at 22:26:27); "You enjoy being teased and pleased" (August 5, 2005, at 06:07:49); "No is-your-wife a good [thank you baby]. You're a very good lov[er]" (August 5, 2005, at 06:10:13). (See Exhibit 5; Maynard's text messages).

As further evidence of drug activity, Agent Yanta further notes another series of messages between Maynard's telephone and number (301) 379-4141, purportedly registered to Wallace Ward. For example, on August 4, 2005, Maynard allegedly sent a text message to Wallace Ward again stating "My man is back up working with a monster." (September 2 Wiretap Affidavit at 25). Agent Yanta misleads once again because that particular message actually states "Back up working with a monster ):-)" with a smiley face and makes no mention of "my man." (See Exhibit 5; August 4, 2005, at 22:27:58. Additionally, other messages

between the two numbers at around the same time include: "I'm sleepy," (August 4, 2005, at

22:48:10); "That's why you should come let me finish you off" (August 4, 2005, at 23:09:27);

"so you can sleep well" (August 4, 2005, at 23:11:20) and "kisses." (August 5, 2005, at

00:46:47).

Had the government bothered to perform basic surveillance, it would have

discovered that Wallace Ward is a tall, large male and that Maynard was most likely not having a

"text message" romance with him. In fact, a cursory review of the text messages involving

Maynard around the same time as the messages highlighted by Agent Yanta clearly indicates that

Maynard was engaged in sexually-related texting with various women and not engaging in

narcotics related coded messages. For example, "Love you baby :-D" (August 5, 2005, at

08:16:13; the character ":-D" is related to a smiley face except that it is a face with a tongue

sticking out) "Morning honey! I just woke up, I had a gooood dream about us. Now I'm wet

and hot." (August 5, 2005; at 08:16:55); "Hmmmm . . . let me taste" (August 5, 2005, at

08:18:41); "Lick it, Lick it Good" (August 5, 2005; at 08:55:28); and "My clit is throbbing I

need u" (August 5, 2005, at 14:01:43). It is a wonder that Agent Yanta did not try to allege that

these messages were also coded narcotics conversations.

### h.     other investigative techniques

Besides cursorily stating that normal investigatory procedures will be or have

been unsuccessful or will be too dangerous to employ, Agent Yanta fails to adequately describe

why this is so. She merely states that "the interception of wire communications is the only

available investigative technique which has a reasonable likelihood of revealing and securing

admissible evidence" against Jones and the target subjects. (September 2 Wiretap Affidavit at

51). She further states that "[n]ormal investigative techniques have been tried and have failed,

intentionally misled the approving court and displayed a reckless regard for the truth by omitting

certain facts and noting others out of context to enhance the allegations, which were essential to

a finding of probable cause.

Based on the foregoing, Defendant Jones respectfully requests this Honorable

Court to enter an Order suppressing from use at trial all evidence that was obtained directly or

indirectly as a result of the unlawful interceptions.    Excellent

Dated: Washington, DC
      July 11, 2006                                   Respectfully submitted,

                                **LAW OFFICE OF A. EDUARDO BALAREZO**


                  By: _____
                      A. Eduardo Balarezo (Bar # 462659)
                      400 Fifth Street, NW; Suite 300
                      Washington, DC  20001
                      (202) 639-0999

                  *Counsel for Antoine Jones*

misleadingly states that Uzbekistan is a major exporter of poppy, from which opium and heroin

is derived.  What that information has to do with Jones' alleged cocaine business is anybody's

guess.  *very good*

*Damien Brothers and Wallace Ward Carletta*
*and Quintesa Bavussans and Text message*
*a good morning*

Finally, the August 18 Affidavit states that Maynard's telephone received three

text messages stating: "I need ice 4my beer," "2 cokes & Malibu, pls. Ka[$]h Money," and

"working with a monster."  Agent Yanta explains that in her training and experience narcotics

dealers are known to use innocuous terms to refer to narcotics and narcotics transactions.  (Id. at

28).  Agent Yanta is deliberately misleading in mentioning these text messages without further

context.  The first two texts are from a Levels employee requesting supplies for the club.  The

third text message, when read in the context of other messages, is clearly sexual in nature.  (see

discussion of text messages, infra).  *Quentesa, Carlette, good morning*

Based on the allegations contained in the August 18 Affidavit, which rehashes the

allegations contained in the August 10 Affidavit, the government again failed to demonstrate that

normal investigative procedures had been tried and failed and failed to show the requisite

showing of necessity for such warrants.  Additionally, her misleading and reckless assertions

were necessary for a finding of probable cause.  *good*

3.    the September 2 Wiretap Affidavit

Agent Yanta's September 2 Wiretap Affidavit is generally a rehashing of the

allegations contained in the August 10 and August 18 Affidavits and indicates that the

government had used the following as investigative techniques:

*This is my Bartender
Texting me. My lawyer put a motion
to suppress. The Judge Denied his motion*

Greenwich Mean Time

File Number: 120120.001                    Text Messages are provided in GMT Time.

| SUBMIT DATE | DONE DATE | STATUS | SRC ADDR | DST ADDR | TYPE | TEXT |
|---|---|---|---|---|---|---|
| 06/11/2005 02:17:54 | 06/11/2005 02:18:02 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x088 new msgs for 2025383946\x0atest msg received on Fri Jun 10 10:22:42 PM 2005 |
| 06/11/2005 06:40:36 | 06/11/2005 06:40:40 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x059 new msgs for 2025383946\x0atest msg received on Sat Jun 11 02:46:24 AM 2005 |
| 06/11/2005 14:35:24 | 06/11/2005 14:35:42 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x0a10 new msgs for 2025383946\x0atest msg received on Sat Jun 11 10:40:26 AM 2005 |
| 06/11/2005 14:59:26 | 06/11/2005 14:59:33 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x022 new msgs for 2025383946\x0atest msg received on Sat Jun 11 11:04:18 AM 2005 |
| 06/11/2005 15:01:29 | 06/11/2005 15:01:36 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025383946\x0atest msg received on Sat Jun 11 11:05:18 AM 2005 |
| 06/11/2005 15:02:18 | 06/11/2005 15:02:53 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x011 new msg for 2025383946\x0atest msg received on Sat Jun 11 11:07:07 AM 2005 |
| 06/11/2005 17:19:28 | 06/11/2005 17:19:28 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x022 new msgs for 2025383946\x0atest msg received on Sat Jun 11 01:24:12 PM 2005 |
| 06/11/2005 18:21:07 | 06/11/2005 18:21:15 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x033 new msgs for 2025383946\x0atest msg received on Sat Jun 11 02:26:56 PM 2005 |
| 06/11/2005 18:21:07 | 06/11/2005 18:21:10 | SUCCESS | 1000000000 | 2025383946 | MT | 2024229228 |
| 06/11/2005 18:42:32 | 06/11/2005 18:42:36 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x044 new msgs for 2025383946\x0atest msg received on Sat Jun 11 02:47:21 PM 2005 |
| 06/11/2005 19:20:31 | 06/11/2005 19:20:35 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025383946\x0atest msg received on Sat Jun 11 03:25:20 PM 2005 |
| 06/11/2005 19:42:29 | 06/11/2005 19:42:38 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025383946\x0atest msg received on Sat Jun 11 03:47:18 PM 2005 |
| 06/11/2005 20:27:45 | 06/11/2005 20:27:50 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x033 new msgs for 2025383946\x0atest msg received on Sat Jun 11 04:32:34 PM 2005 |
| 06/11/2005 20:44:01 | 06/11/2005 20:44:07 | SUCCESS | 1000000000 | 2025383946 | MT | 3014559268 |
| 06/11/2005 20:46:32 | 06/11/2005 20:46:38 | SUCCESS | 1000000000 | 2025383946 | MT | 2022027298 |
| 06/11/2005 21:18:32 | 06/11/2005 21:18:40 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x022 new msgs for 2025383946\x0atest msg received on Sat Jun 11 05:20:21 PM 2005 |
| 06/11/2005 22:28:01 | 06/11/2005 22:28:05 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x033 new msgs for 2025383946\x0atest msg received on Sat Jun 11 06:32:49 PM 2005 |
| 06/11/2005 23:46:25 | 06/11/2005 23:46:30 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x044 new msgs for 2025383946\x0atest msg received on Sat Jun 11 07:51:14 PM 2005 |
| 06/12/2005 03:42:54 | 06/12/2005 03:42:59 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x055 new msgs for 2025383946\x0atest msg received on Sat Jun 11 11:47:43 PM 2005 |
| 06/12/2005 07:18:16 | 06/12/2005 07:18:16 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x066 new msgs for 2025383946\x0atest msg received on Sun Jun 12 03:20:03 AM 2005 |
| 06/12/2005 07:43:16 | 06/12/2005 07:43:20 | SUCCESS | 3013794141 | 2025383946 | MT | You should get at me as soon u get a chance you will like me I promise check me out   301 379 4141 |
| 06/12/2005 08:14:16 | 06/12/2005 08:14:22 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x077 new msgs for 2025383946\x0atest msg received on Sun Jun 12 04:19:05 AM 2005 |
| 06/12/2005 16:31:14 | 06/12/2005 16:31:23 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x099 new msgs for 2025383946\x0atest msg received on Sun Jun 12 11:36:04 AM 2005 |
| 06/12/2005 16:39:46 | 06/12/2005 16:39:51 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x011 new msg for 2025383946\x0atest msg received on Sun Jun 12 11:44:43 AM 2005 |
| 06/12/2005 23:29:03 | 06/12/2005 23:29:12 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025383946\x0atest msg received on Sun Jun 12 07:33:52 PM 2005 |
| 06/13/2005 05:39:14 | 06/13/2005 05:39:18 | SUCCESS | 3013794141 | 2025383946 | MY | Just bewteen me and u get at me asap |
| 06/13/2005 06:39:14 | 06/13/2005 06:39:18 | SUCCESS | 3013794141 | 2025383946 | MY | You should get at me as soon as u get a chance you wou |

PROPRIETARY & CONFIDENTIAL
Not for use or Disclosure outside Cingular Wireless and its Affiliates except under written agreement

3/14/2005                                                                     17 of 42

*(Handwritten annotations:)*

Look under W.W. (WALLACE WARD)
It was CARLETTE cellphone
CARLETTE was a Friend of LAWRENCE
I don't know WALLACE WARD

3:48 PM or 2:43 AM  GAY LESBIAN NIGHT
2:38 PM or 1:38 PM – TCB
2:38 AM or 1:38 PM or TCB

301 379 4141  LA GIRL
CARLETTE
on CARLETTE

Time is Questional

Sunday 6-12-2005 - 7:43 AM  3:43 AM morning  15 AM

Monday 6-13-2005 - 6:39 14 AM  2:38 AM morning  6:39 14 AM

Monday 6-13-2005 - 639 14 AM  2:38 AM morning  639 14 AM

Sunday – You should get at me as soon
As u get a chance you will like
me I promise. check me out.

Monday – ...

File Number: 120120.001                    Text Messages are provided in GMT Time.

| SUBMIT DATE | DONE DATE | STATUS | SRC ADDR | DST ADDR | TYPE | TEXT |
|---|---|---|---|---|---|---|
| 06/23/2005 22:25:56 | 06/23/2005 22:26:01 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x011 new msg for 2025383946\x0alast msg received on Thu Jun 23 08:30:20 PM 2005 |
| 06/24/2005 00:19:04 | 06/24/2005 00:21:38 | SUCCESS | 1000000000 | 2025383946 | MT | 2025785811 |
| 06/24/2005 02:18:59 | 06/24/2005 02:19:04 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x022 new msg for 2025383946\x0alast msg received on Thu Jun 23 10:23:53 PM 2005 |
| 06/24/2005 03:36:54 | 06/24/2005 03:36:59 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x033 new msgs for 2025383946\x0alast msg received on Thu Jun 23 11:41:49 PM 2005 |
| 06/24/2005 03:53:28 | 06/24/2005 03:53:33 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x044 new msgs for 2025383946\x0alast msg received on Thu Jun 23 11:58:22 PM 2005 |
| 06/24/2005 04:18:15 | 06/24/2005 04:18:27 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x055 new msgs for 2025383946\x0alast msg received on Fri Jun 24 02:23:09 AM 2005 |
| 06/24/2005 04:37:00 | 06/24/2005 04:37:05 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x066 new msgs for 2025383946\x0alast msg received on Fri Jun 24 00:41:54 AM 2005 |
| 06/24/2005 20:36:43 | 06/24/2005 20:36:53 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x077 new msgs for 2025383946\x0alast msg received on Fri Jun 24 04:40:37 PM 2005 |
| 06/24/2005 23:31:38 | 06/24/2005 23:31:43 | SUCCESS | 2403680771 | 2025383946 | MT | +12403680771 PW: Da land ent. Presents ladies night out every fri an sunday with the tcb bend @club levels ladies free b4 12+with pass or ll |
| 06/24/2005 23:48:21 | 06/24/2005 23:48:29 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x088 new msgs for 2025383946\x0alast msg received on Fri Jun 24 07:53:16 PM 2005 |
| 06/25/2005 03:31:40 | 06/25/2005 03:31:48 | SUCCESS | 2023686046 | 2025383946 | MT | +12023686046 Lissen Scooby, Tuffy, O, Ms Kim @ the Amazon each & every saturday. Ladies free til 11pm. Wbpot/bet awards giveaway. |
| 06/25/2005 03:42:31 | 06/25/2005 03:42:36 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x099 new msgs for 2025383946\x0alast msg received on Fri Jun 24 11:47:26 PM 2005 |
| 06/25/2005 04:10:06 | 06/25/2005 04:10:11 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x0a10 new msgs for 2025383946\x0alast msg received on Sat Jun 25 00:10:00 AM 2005 |
| 06/25/2005 04:24:21 | 06/25/2005 04:24:26 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x0b11 new msgs for 2025383946\x0alast msg received on Sat Jun 25 00:29:16 AM 2005 |
| 06/25/2005 06:49:36 | 06/25/2005 06:49:42 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x0c12 new msgs for 2025383946\x0alast msg received on Sat Jun 25 01:54:33 AM 2005 |
| 06/25/2005 23:16:19 | 06/25/2005 23:16:23 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x0d13 new msgs for 2025383946\x0alast msg received on Sat Jun 25 07:21:14 PM 2005 |
| 06/26/2005 02:27:36 | 06/26/2005 02:27:41 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x0e14 new msgs for 2025383946\x0alast msg received on Sat Jun 25 10:32:31 PM 2005 |
| 06/26/2005 02:32:27 | 06/26/2005 02:32:36 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x0f15 new msgs for 2025383946\x0alast msg received on Sat Jun 25 10:37:22 PM 2005 |
| 06/26/2005 04:31:44 | 06/26/2005 04:31:48 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x1016 new msgs for 2025383946\x0alast msg received on Sun Jun 26 02:08:28 AM 2005 |
| 06/26/2005 18:03:26 | 06/26/2005 18:10:13 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x1117 new msgs for 2025383946\x0alast msg received on Sun Jun 26 02:06:23 PM 2005 |
| 06/26/2005 21:01:26 | 06/26/2005 21:01:52 | SUCCESS | 2403680771 | 2025383946 | MT | +12403680771 PW: Da land ent. Presents ladies night out every fri an sunday with the tcb bend @club levels ladies free b4 12+with pass or ll |
| 06/26/2005 23:52:57 | 06/26/2005 23:53:02 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x1218 new msgs for 2025383946\x0alast msg received on Sun Jun 26 07:57:52 PM 2005 |
| 06/27/2005 02:48:29 | 06/27/2005 02:48:34 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x1319 new msgs for 2025383946\x0alast msg received on Sun Jun 26 10:54:24 PM 2005 |
| 06/27/2005 04:24:56 | 06/27/2005 04:48:01 | SUCCESS | 3017688466 | 2025383946 | MT | Need 2 talk 2 u tonight please, R u coming in? |
| 06/27/2005 07:18:36 | 06/27/2005 07:18:36 | SUCCESS | 1001005080 | 2025383946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025383946\x0alast msg received on Mon Jun 27 03:20:03 AM 2005 |

PROPRIETARY & CONFIDENTIAL
Not for use or Disclosure outside Cingular Wireless and its Affiliates except under written agreement

2/14/2005                                                                23 of 42

---

*Handwritten annotations:*

Lie

TCB
monday morning
12:24 PM

4:24 AM GMT

Q - BARTENDER    DATE - question
Time - question

301 768 8466
6-27-2005 - 4:24:53 AM - Monday    Lie    12:24 AM - TCB
Need 2 talk 2 u tonight please R u coming in

TCB night
12:24 PM

Need 2 talk 2 U tonight

Damien Brossono

This is Quintesa Brossond

**File Number: 120120,001**

**Text Messages are provided in GMT Time.**

| SUBMIT DATE | DONE DATE | STATUS | SRC ADDR | DST ADDR | TYPE | TEXT |
|---|---|---|---|---|---|---|
| 06/29/2005 00:55:26 | 06/29/2005 00:55:34 | SUCCESS | 2024922882 | 2025383946 | MT | Druppydog prod. Present the grand opening of the aqua club sunday july 3rd, performing live the whst band, the publicity band &  (cont.) |
| 06/29/2005 01:29:32 | 06/29/2005 01:29:48 | SUCCESS | 1000000000 | 2025383946 | MT | 2404683125 |
| 06/29/2005 01:56:36 | 06/29/2005 01:56:41 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0b11 new msgs for 2025383946\x0alast msg received on Tue Jun 28 10:01:23 PM 2005 |
| 06/29/2005 13:39:36 | 06/29/2005 13:39:40 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0c12 new msgs for 2025383946\x0alast msg received on Wed Jun 29 09:44:32 AM 2005 |
| 06/29/2005 17:18:40 | 06/29/2005 17:23:45 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0f16 new msgs for 2025383946\x0alast msg received on Wed Jun 29 01:23:36 PM 2005 |
| 06/29/2005 17:54:32 | 06/29/2005 17:54:40 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x1016 new msgs for 2025383946\x0alast msg received on Wed Jun 29 01:59:26 PM 2005 |
| 06/29/2005 19:36:01 | 06/29/2005 19:40:52 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x1218 new msgs for 2025383946\x0alast msg received on Wed Jun 29 03:36:25 PM 2005 |
| 06/29/2005 19:45:06 | 06/29/2005 19:45:12 | SUCCESS | 1000000000 | 2025383946 | MT | |
| 06/29/2005 20:34:10 | 06/29/2005 20:34:18 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x1319 new msgs for 2025383946\x0alast msg received on Wed Jun 29 04:29:06 PM 2005 |
| 06/30/2005 00:25:46 | 06/30/2005 00:28:44 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0f18 new msgs for 2025383946\x0alast msg received on Wed Jun 29 08:47:30 PM 2005 |
| 06/30/2005 00:42:53 | 06/30/2005 00:43:02 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x00 new msgs for 2025383946\x0alast msg received on Wed Jun 29 08:58;10 PM 2005 |
| 06/30/2005 00:50:14 | 06/30/2005 00:50:24 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0b11 new msgs for 2025383946\x0alast msg received on Thu Jun 30 11:23:14 AM 2005 |
| 06/30/2005 18:18:17 | 06/30/2005 18:18:22 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x1622 new msgs for 2025383946\x0alast msg received on Thu Jun 30 12:18:45 PM 2005 |
| 06/30/2005 18:10:49 | 06/30/2005 18:11:18 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x1644 new msgs for 2025383946\x0alast msg received on Thu Jun 30 02:44:56 PM 2005 |
| 06/30/2005 18:40:01 | 06/30/2005 18:40:10 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x1644 new msgs for 2025383946\x0alast msg received on Thu Jun 30 08:06:14 PM 2005 |
| 07/01/2005 00:03:17 | 07/01/2005 00:03:22 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x1a55 new msgs for 2025383946\x0alast msg received on Thu Jun 30 08:14:21 PM 2005 |
| 07/01/2005 00:09:29 | 07/01/2005 00:09:29 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0077 new msgs for 2025383946\x0alast msg received on Thu Jun 30 09:30:26 PM 2005 |
| 07/01/2005 01:26:58 | 07/01/2005 01:26:92 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0088 new msgs for 2025383946\x0alast msg (msg received on Thu Jun 30 11:18:07 PM 2005 |
| 07/01/2005 03:13:10 | 07/01/2005 03:13:14 | SUCCESS | 1001005080 | 2025383946 | MT | |
| 07/01/2005 17:18:37 | 07/01/2005 17:18:41 | SUCCESS | 1001005080 | 2025383946 | MT | Fri Jul 1 01:30:34 PM 2005 |
| 07/01/2005 18:48:48 | 07/01/2005 18:48:51 | SUCCESS | 1000000000 | 2025383946 | MT | 2404781125 |
| 07/01/2005 19:20:05 | 07/01/2005 19:20:09 | SUCCESS | 3017688466 | 2025383946 | MT | Have your package, will c u 2nite at work if that's okay |
| 07/01/2005 20:21:46 | 07/01/2005 20:21:51 | SUCCESS | 2403990771 | 2025383946 | MT | +124039807?1 FW: Da lend ent. Presents ladies night out every til an sunday with the lcb bend @club levels ladies free b4 12~with pass or tl |
| 07/02/2005 00:30:43 | 07/02/2005 00:30:47 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0a10 new msgs for 2025383946\x0alast msg received on Fri Jul  1 08:36:40 PM 2005 |
| 07/02/2005 07:59:26 | 07/02/2005 07:59:33 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0a10 new msgs for 2025383946\x0alast msg received on Sat Jul  2 04:34:22 AM 2005 |
| 07/02/2005 11:56:09 | 07/02/2005 11:56:14 | SUCCESS | 1001005080 | 2025383946 | MT | \x04w01\x02\x00\x0b11 new msgs for 2025383946\x0alast msg received on Sat Jul  2 06:01:07 AM 2005 |

**PROPRIETARY & CONFIDENTIAL**
Not for use or Disclosure outside Cingular Wireless and its Affiliates except under written agreement

2/14/2006                                                                                            26 of 42

*(handwritten notes)*

6 MT
7:20  PM sunday
3:20 PM.      Evening

301 7688466          Probably correct
0-Bartender
7. 21.2005 - 7:20 PM  6MT   Sunday - payday

Have your package, will c u 2nite at work if thats OK

(0 - set point)

3:20 PM or 2:20 PM

File Number: 120120.001                    Text Messages are provided in GMT Time.

| SUBMIT DATE | DONE DATE | STATUS | SRC ADDR | DST ADDR | TYPE | TEXT |
|---|---|---|---|---|---|---|
| | | | | | | \x04\x01\x02\x00\x0b11 new msgs for 2025383946\x0alast msg received on |
| 05/26/2005 12:32:32 | 05/26/2005 12:37:47 | SUCCESS | 1001005080 | 2025383946 | MT | Thu May 26 08:37:14 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x0c12 new msgs for 2025383946\x0alast msg received on |
| 05/26/2005 13:46:19 | 05/26/2005 13:46:24 | SUCCESS | 1001005080 | 2025383946 | MT | Thu May 26 09:51:01 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x0d13 new msgs for 2025383946\x0alast msg received on |
| 05/26/2005 14:24:01 | 05/26/2005 14:24:09 | SUCCESS | 1001005080 | 2025383946 | MT | Thu May 26 10:28:43 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x0e14 new msgs for 2025383946\x0alast msg received on |
| 05/26/2005 17:27:28 | 05/26/2005 17:27:32 | SUCCESS | 1001005080 | 2025383946 | MT | Thu May 26 01:32:10 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x0f15 new msgs for 2025383946\x0alast msg received on |
| 05/26/2005 17:55:51 | 05/26/2005 17:55:58 | SUCCESS | 1001005080 | 2025383946 | MT | Thu May 26 02:00:33 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x1016 new msgs for 2025383946\x0alast msg received on |
| 05/27/2005 12:14:56 | 05/27/2005 12:15:00 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 08:10:38 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x1117 new msgs for 2025383946\x0alast msg received on |
| 05/27/2005 13:40:17 | 05/27/2005 13:40:25 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 09:44:50 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x1218 new msgs for 2025383946\x0alast msg received on |
| 05/27/2005 14:55:40 | 05/27/2005 14:55:49 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 11:00:23 AM 2005 |
| 05/27/2005 17:17:07 | 05/27/2005 17:17:13 | SUCCESS | 1000000000 | 2025383946 | MT | 30143450022 |
| | | | | | | \x04\x01\x02\x00\x1319 new msgs for 2025383946\x0alast msg received on |
| 05/27/2005 18:06:21 | 05/27/2005 18:06:26 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 02:10:04 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x1420 new msgs for 2025383946\x0alast msg received on |
| 05/27/2005 18:37:36 | 05/27/2005 18:37:42 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 02:42:20 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x1521 new msgs for 2025383946\x0alast msg received on |
| 05/27/2005 19:38:42 | 05/27/2005 19:38:47 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 03:43:25 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x1622 new msgs for 2025383946\x0alast msg received on |
| 05/27/2005 21:20:16 | 05/27/2005 21:20:20 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 05:24:56 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x1723 new msgs for 2025383946\x0alast msg received on |
| 05/27/2005 21:46:18 | 05/27/2005 21:46:23 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 05:50:01 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x1824 new msgs for 2025383946\x0alast msg received on |
| 05/28/2005 00:04:34 | 05/28/2005 00:04:38 | SUCCESS | 1001005080 | 2025383946 | MT | Fri May 27 08:09:16 PM 2005 |
| 05/28/2005 13:46:15 | 05/28/2005 15:00:16 | SUCCESS | 1000000000 | 2025383946 | MT | 20239141192 |
| | | | | | | \x04\x01\x02\x00\x1925 new msgs for 2025383946\x0alast msg received on |
| 05/28/2005 16:37:51 | 05/28/2005 16:37:57 | SUCCESS | 1001005080 | 2025383946 | MT | Sat May 28 12:42:34 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x1a26 new msgs for 2025383946\x0alast msg received on |
| 05/28/2005 21:34:20 | 05/28/2005 21:34:29 | SUCCESS | 1001005080 | 2025383946 | MT | Sat May 28 05:39:03 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x1b27 new msgs for 2025383946\x0alast msg received on |
| 05/29/2005 00:31:33 | 05/29/2005 00:31:58 | SUCCESS | 1001005080 | 2025383946 | MT | Sat May 28 08:36:37 PM 2005 |
| 05/29/2005 05:21:33 | 05/29/2005 05:21:37 | SUCCESS | 3017668466 | 2025383946 | MT | Need one |
| | | | | | | \x04\x01\x02\x00\x1c28 new msgs for 2025383946\x0alast msg received on |
| 05/29/2005 07:16:32 | 05/29/2005 07:16:36 | SUCCESS | 1001005080 | 2025383946 | MT | Sun May 29 03:21:36 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x1d29 new msgs for 2025383946\x0alast msg received on |
| 05/29/2005 13:04:43 | 05/29/2005 13:08:14 | SUCCESS | 1001005080 | 2025383946 | MT | Sun May 29 09:08:04 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x1e30 new msgs for 2025383946\x0alast msg received on |
| 05/29/2005 14:14:40 | 05/29/2005 14:14:45 | SUCCESS | 1001005080 | 2025383946 | MT | Sun May 29 10:19:23 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x1f31 new msgs for 2025383946\x0alast msg received on |
| 05/29/2005 18:07:10 | 05/29/2005 18:07:18 | SUCCESS | 1001005080 | 2025383946 | MT | Sun May 29 11:11:53 AM 2005 |
| | | | | | | \x04\x01\x02\x00\x011 new msgs for 2025383946\x0alast msg received on |
| 05/29/2005 22:33:34 | 05/29/2005 22:33:39 | SUCCESS | 1001005080 | 2025383946 | MT | Sun May 29 06:38:18 PM 2005 |
| | | | | | | \x04\x01\x02\x00\x012 new msgs for 2025383946\x0alast msg received on |
| 05/29/2005 23:21:09 | 05/29/2005 23:21:13 | SUCCESS | 1001005080 | 2025383946 | MT | Sun May 29 07:25:53 PM 2005 |

PROPRIETARY & CONFIDENTIAL
Not for use or Disclosure outside Cingular Wireless and its Affiliates except under written agreement

2/14/2005                                                                    12 of 42

*[Handwritten annotations:]*

Pm ⟍

Q Bar
for Bar

GMT → 5:21 AM  Lesbian bar night

( 1:21 AM OR 12:21 AM )

NEED ones
FOR BAR

3017688466
Q Bartender
Happy Hrs ??
5-29-2005
Sunday  5:21:33 Am — when
                              they
                              lie
Lie
I think its 5:21 PM
During Happy HRS
and the Gray is a lie

File Number: 120120.001                    Text Messages are provided in GMT Time.

| SUBMIT DATE | DONE DATE | STATUS | SRC ADDR | DST ADDR | TYPE | TEXT |
|---|---|---|---|---|---|---|
| 06/03/2005 00:21:27 | 06/03/2005 00:21:31 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x035 new msgs for 2025363946\x0alast msg received on Thu Jun 2 08:26:12 PM 2005 |
| 06/03/2005 00:26:49 | 06/03/2005 00:26:53 | SUCCESS | 1000000000 | 2025363946 | MT | 2022361486 |
| 06/03/2005 00:26:49 | 06/03/2005 00:26:57 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x044 new msgs for 2025363946\x0alast msg received on Thu Jun 2 08:31:34 PM 2005 |
| 06/03/2005 02:34:07 | 06/03/2005 02:34:15 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025363946\x0alast msg received on Thu Jun 2 10:36:32 PM 2005 |
| 06/03/2005 11:21:58 | 06/03/2005 11:22:02 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x011 new msgs for 2025363946\x0alast msg received on Fri Jun 3 07:26:43 AM 2005 |
| 06/03/2005 13:20:19 | 06/03/2005 13:20:26 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x022 new msgs for 2025363946\x0alast msg received on Fri Jun 3 09:26:04 AM 2005 |
| 06/03/2005 13:22:35 | 06/03/2005 13:22:44 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025363946\x0alast msg received on Fri Jun 3 09:27:20 AM 2005 |
| 06/03/2005 16:07:28 | 06/03/2005 16:07:32 | SUCCESS | 3017423503 | 2025363946 | MT | (Hey there!)Smile! Have a happy friday! |
| 06/03/2005 19:52:30 | 06/03/2005 19:52:35 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x011 new msgs for 2025363946\x0alast msg received on Fri Jun 3 03:57:15 PM 2005 |
| 06/03/2005 21:56:35 | 06/03/2005 22:40:03 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x033 new msgs for 2025363946\x0alast msg received on Fri Jun 3 06:01:21 PM 2005 |
| 06/03/2005 23:02:36 | 06/03/2005 23:02:41 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025363946\x0alast msg received on Fri Jun 3 07:07:21 PM 2005 |
| 06/04/2005 00:50:19 | 06/04/2005 00:50:26 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025363946\x0alast msg received on Fri Jun 3 08:55:04 PM 2005 |
| 06/04/2005 01:02:01 | 06/04/2005 01:02:06 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x011 new msgs for 2025363946\x0alast msg received on Fri Jun 3 09:06:47 PM 2005 |
| 06/04/2005 05:36:44 | 06/04/2005 05:36:48 | SUCCESS | 3017588466 | 2025363946 | MT | FW: Msg: Need ones bad |
| 06/04/2005 13:07:08 | 06/04/2005 13:07:12 | SUCCESS | 1000000000 | 2025363946 | MT | 3016138440 |
| 06/04/2005 14:27:30 | 06/04/2005 14:27:39 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025363946\x0alast msg received on Sat Jun 4 10:32:16 AM 2005 |
| 06/04/2005 19:56:48 | 06/04/2005 19:56:53 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x011 new msgs for 2025363946\x0alast msg received on Sat Jun 4 04:01:34 PM 2005 |
| 06/04/2005 20:21:59 | 06/04/2005 20:22:04 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x022 new msgs for 2025363946\x0alast msg received on Sat Jun 4 04:26:46 PM 2005 |
| 06/04/2005 22:48:42 | 06/04/2005 22:48:47 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x033 new msgs for 2025363946\x0alast msg received on Sat Jun 4 06:51:28 PM 2005 |
| 06/04/2005 23:43:12 | 06/04/2005 23:43:17 | SUCCESS | 1000000000 | 2025363946 | MT | 2024092386 |
| 06/05/2005 00:00:20 | 06/05/2005 00:00:26 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x044 new msgs for 2025363946\x0alast msg received on Sat Jun 4 08:06:19 PM 2005 |
| 06/05/2005 00:51:48 | 06/05/2005 00:51:52 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x005 new msgs for 2025363946\x0alast msg received on Sat Jun 4 08:24:34 PM 2005 |
| 06/05/2005 12:34:59 | 06/05/2005 12:35:03 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025363946\x0alast msg received on Sun Jun 5 08:26:45 AM 2005 |
| 06/05/2005 12:43:46 | 06/05/2005 12:43:50 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x077 new msgs for 2025363946\x0alast msg received on Sun Jun 5 08:48:31 AM 2005 |
| 06/05/2005 14:06:04 | 06/05/2005 14:06:08 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x088 new msgs for 2025363946\x0alast msg received on Sun Jun 5 10:12:20 AM 2005 |
| 06/05/2005 17:04:34 | 06/05/2005 17:04:48 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x000 new msgs for 2025363946\x0alast msg received on Sun Jun 5 01:02:21 PM 2005 |
| 06/05/2005 17:14:18 | 06/05/2005 17:14:23 | SUCCESS | 1001008080 | 2025363946 | MT | \x04\x01\x02\x00\x011 new msgs for 2025363946\x0alast msg received on Sun Jun 5 01:12:04 PM 2005 |

PROPRIETARY & CONFIDENTIAL
Not for use or Disclosure outside Cingular Wireless and its Affiliates except under written agreement

*(handwritten annotations)*

3017423

Q Bartender
3017688466

GMT - 5:36 AM
TCB - 1:36 PM

301 268-84 66   Lie
Q Bartender
6-04-2005
Sunday  5:36:44 AM — Time is wrong
Need ones Bad                Lie

1:36 PM or 12:36 AM
need ones Bad

GMT

GREENWICH MEAN TIME

# INTERNATIONAL TIME ZONES

**INTERNATIONAL DATE LINE**

**MONDAY SUNDAY**

PRIME MERIDIAN

Los Angeles
Mexico City
Chicago
Philadelphia
New York City
Caracas
Rio de Janeiro
São Paulo
Buenos Aires
Lagos
London
Paris
Madrid
Berlin
Moscow
St. Petersburg
Istanbul
Tehran
Cairo
Karachi
Mumbai (Bombay)
Delhi
Kolkata
Shanghai
Beijing
Tianjin
Seoul
Tokyo
Osaka
Taipei
Manila
Bangkok
Jakarta
Johannesburg
Sydney

2:00   2:30   3:30   8:30   4:30   3:30   5:30   6:30   5:45   5:30   9:30

+11 +12 -12 -11 -10 -9 -8 -7 -6 -5 -4 -3 -2 -1 0 +1 +2 +3 +4 +5 +6 +7 +8 +9 +10

Hours

11 MID- 1 2 3 4 5 6 7 8 9 10 11 NOON 1 2 3 4 5 6 7 8 9 10
PM NIGHT AM AM AM AM AM AM AM AM AM AM AM PM PM PM PM PM PM PM PM PM PM PM

1 SNRS

© MAPQUEST.COM

The world is divided into 24 time zones, each 15° longitude wide. The longitudinal meridian passing through Greenwich, England, is the starting point, and is called the *prime meridian*. The 12th zone is divided by the 180th meridian (International Date Line). When the line is crossed going east, the date is advanced one day; when crossed going west, the date becomes a day earlier.

...rmined herein is accurate at the
...y errors that may occur. Please
...DA
...uth Korea.

*[handwritten: N A D Wonley / Hime in / 3 days]*

```
******* Key *******
Destination-Address    Date Time      System-ID    Source-Address  Billstate      Deliverstate
Message-Text
*******************
   3016136293      04-AUG-05 20:47:25    mosmsc        ROSE                Not-Processed   Received
Missing you Boo!!!  :-)                                7655062746
```

```
   3016136293      04-AUG-05 20:54:05    icsmg         ROSE
I just got out of the hot bubble bath                  7655062746      Not-Processed   Received
```

```
   3016136293      04-AUG-05 21:07:01    lightsurf     ROSE            Not=Processed   Received
You have new Picture Mail!<0a><0a>Click Go/View to see now.<0a>http://pictures.sprintpcs.com/?mivt=HECr4N2nmz8Xmhp7t
                                                      7655062746
```

```
   3016136293      04-AUG-05 21:08:58    lightsurf     ROSE            Not-Processed   Received
You have new Picture Mail!<0a><0a>Click Go/View to see now.<0a>http://pictures.sprintpcs.com/?mivt=YE7r4H2Mmz8fNhshoi
                                                      7655062746
```

```
   3016136293      04-AUG-05 21:57:57    mosmsc                        Not-Processed   Received   T ld
Thank you baby... You're a very good lover             3015360913
```

```
   3016136293      04-AUG-05 21:58:06    mosmsc                        Not-Processed   Received   1  H
Very patient                                           3015360913
```

```
   3016136293      04-AUG-05 21:58:18    icsmg                         Not-Processed   Received   T H
+13015360913<1f>Thank you                              3015360913
```

✓ 
```
   3016136293      04-AUG-05 22:24:58    ney          COLLETTA         Not-Processed   Received   ? ww Start
You should come over before you go home tonight        3013794141                                       Here
```

→ 
```
   3016136293      04-AUG-05 22:26:27    mosmsc       TYMELLA          Not-Processed   Received   T H
How are you feeling ?                                  3015360913
```

✓ 
```
   3016136293      04-AUG-05 22:27:58    mosmsc       COLLETTA         Not-Processed   Received
Back up working with a monster  ):-)                   3013794141
```
*[handwritten: 10:27 PM  SEXUAL REFERENCE   ww 10:27 find]*

✓ 
```
   3016136293      04-AUG-05 22:33:26    ney          COLLETTA         Not-Processed   Received   ? ww
Stop being scared                                      3013794141
```

✓ 
```
   3016136293      04-AUG-05 22:48:10    mosmsc       COLLETTA         Not-Processed   Received   ? ww
I'm sleepy                                             3013794141
```

✓ 
```
   3016136293      04-AUG-05 23:09:27    ney          COLLETTA         Not-Processed   Received   ? ww
Thats why you should come let me finish you off        3013794141
```

✓ 
```
   3016136293      04-AUG-05 23:11:26    ney          COLLETTA         Not-Processed   Received   ? ww
So you can sleep well                                  3013794141
```

```
   3016136293      04-AUG-05 23:17:16    ney          BLONDE OR CVS MANAGER/TRAINER    Not-Processed   Received
Hey there                                              3015232244
```

```
   3016136293      05-AUG-05 00:37:17    icsmg         ROSE            Not-Processed   Received
I love you baby!                                       7655062746
```

*[handwritten bottom: ?   Bartender]*

3016136293    05-AUG-05 00:46:47    ney    *COLLETTA* 3013794141    Not-Processed    Received    *RWW*
Kisses

3016136293    05-AUG-05 00:54:07    mosmsc    *ROSE* 7655062746    Not-Processed    Received
I Love you MORE ! ! ! :-))

3016136293    05-AUG-05 03:07:43    icsmg    *TYMERA* 3015360913    Not-Processed    Received    *T H*
+13015360913<1f>RE:<1f>How you know that--- Thank you baby... You're a very good lov

3016136293    05-AUG-05 06:07:49    mosmsc    3015360913    Not-Processed    Received    *T H*
You enjoy being teased and pleased.

3016136293    05-AUG-05 06:10:13    icsmg    3015360913    Not-Processed    Received    *T H*
+13015360913<1f>RE:<1f>No is-your-wife-a-good--- Thank you baby... You're a very good lov

3016136293    05-AUG-05 06:40:17    icsmg    3015360913    Not-Processed    Received    *T H*
+13015360913<1f>RE:<1f>What the fuck are you doing

*I don't know were all DAYS that be the*

3016136293    05-AUG-05 07:52:16 ᴬᴹ    mosmsc    *MONICA* 2024869391    Not-Processed    Received    *FRIDAY AM 7:52:16*
Good morning baby! ! !

3016136293    05-AUG-05 07:55:04    mosmsc    *ROSE* 7655062746    Not-Processed    Received
Are you busy? ;-)

3016136293    05-AUG-05 07:55:27 ᴬᴹ    mosmsc    *ROSE* 7655062746    Not-Processed    Received    *FRIDAY AM 7:55:22 AM*
Good morning baby! ! !

3016136293    05-AUG-05 07:55:32 ᴬᴹ    icsmg    *ROSE* 7655062746    Not-Processed    Received
No

3016136293    05-AUG-05 07:57:26 ᴬᴹ    mosmsc    *RHONDA OR CYS MANAGER* 3015232244    Not-Processed    Received    *FRIDAY pm 7:57:26*
Good morning baby! ! !

3016136293    05-AUG-05 07:57:39    icsmg    *ROSE* 7655062746    Not-Processed    Received
Hello

3016136293    05-AUG-05 08:16:13    mosmsc    *ROSE* 7655062746    Not-Processed    Received
Love you baby :-D

3016136293    05-AUG-05 08:16:55    ney    *MONICA* 2024869391    Not-Processed    Received
Morning Honey! I just woke up, I had a gooood dream about us. Now I'm wet and hot.

3016136293    05-AUG-05 08:18:32    ney    *MONICA* 2024869391    Not-Processed    Received
I need you

3016136293    05-AUG-05 08:18:41    mosmsc    *MONICA* 2024869391    Not-Processed    Received
Hmmmm ... Let me taste

3016136293    05-AUG-05 08:22:36    icsmg    *ROSE* 7655062746    Not-Processed    Received
Are you ok? Is there something bothering you baby? Can i help?

3016136293    05-AUG-05 08:23:27    mosmsc    *MONICA* 2024869391    Not-Processed    Received    *RHONDA OR CYS MAN... MAKE FRESNO...*

I have a few things to do this morning but later i'll have some time... Will you be busy?

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:28:51 | ney | MONTEA<br>2024869391 | Not-Processed | Received | |

If I'm busy, I'll stop what it is and come home. So just dont forget to call me.

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:29:40 | icsmg | ROSE<br>7655062746 | Not-Processed | Received | |

Baby?

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:39:40 | mosmsc | ROSE<br>7655062746 | Not-Processed | Received | |

I'm here baby

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:45:27 | icsmg | ROSE<br>7655062746 | Not-Processed | Received | |

I love you!

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:51:52 | icsmg | ROSE<br>7655062746 | Not-Processed | Received | |

Talk to me baby!

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:55:28 | mosmsc | ROSE<br>7655062746 | Not-Processed | Received | |

Lick it, Lick it Good   :-)

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:55:52 | ney | MONTIDA<br>2024869391 | Not-Processed | Received | |

Is that cool with you?

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:58:58 | mosmsc | ROSE<br>7655062746 | Not-Processed | Received | |

I Love you MORE ! ! !  :-))

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 08:59:33 | mosmsc | MONTEA<br>2024869391 | Not-Processed | Received | |

Okay baby

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 09:02:58 | icsmg | 7655062746 | Not-Processed | Received | |

Are you ok? Is there something bothering you baby? Can I help?

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 09:03:09 | icsmg | 7655062746 | Not-Processed | Received | |

Are you ok? Is there something bothering you baby? Can I help?

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 09:03:55 | ney | COLLETTA<br>3013794141 | Not-Processed | Received | ? W ✔ |

Whats up sleepie head

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 09:08:31 | mosmsc | COLLETTA<br>3013794141 | Not-Processed | Received | ? ✔ W |

Hey ! ! !

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 09:09:48 | mosmsc | RHONDA<br>2404606495 | Not-Processed | Received | |

How are you feeling ?

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 09:14:16 | icsmg | 2404606495 | Not-Processed | Received | |

+12404606495<1f>Feelin good!

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 09:16:21 | mosmsc | ROSE<br>7655062746 | Not-Processed | Received | |

Had to do a walk thru with Skinny

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 09:16:49 | mosmsc | ROSE<br>7655062746 | Not-Processed | Received | |

I'm here ... Just tried to call ... I'm lovely   :-))

*RAONJA* [handwritten]

3016136293    05-AUG-05 09:18:21    mosmsc    2404606495    Not-Processed    Received
I think about you ... Just wanted to say ...HELLO! ! !

*REAUOA* [handwritten]

3016136293    05-AUG-05 09:19:14    mosmsc    2404606495    Not-Processed    Received
What's Going on Down There?  :-p

*ROSE* [handwritten]

3016136293    05-AUG-05 09:37:03    lightsurf    7655062746    Not-Processed    Reported
You have new Picture Mail!<0a><0a>Click Go/View to see now.<0a>http://pictures.sprintpcs.com/?mivt=REjr4c2umzaog7xLo7t

*MONICA* [handwritten]

3016136293    05-AUG-05 11:18:01    ney    2024869391    Not-Processed    Received
Im outside

*SEXUAL REFERENCE* [handwritten]

*AM* [handwritten]

3016136293    05-AUG-05 11:28:05    icsmg    3015360913    Not-Processed    Received
+13015360913<1f>RE:<1f>My man-is-working-with-a-big-monrter--- Back up working with a monster ):-)

[handwritten right margin] *T 14  RAONA 11:28 05 A*

[handwritten left margin] *READ* with arrow

*ROSE* [handwritten]

3016136293    05-AUG-05 12:14:09    mosmsc    7655062746
Missing you Boo!!!  :-)

[handwritten] *Tymira Hunter*
*3015360913*

3016136293    05-AUG-05 12:14:49    mosmsc    7655062746
What's Going on Down There?  :-p

3016136293    05-AUG-05 12:53:35    mosmsc    7655062746
Love you baby  :-D

[handwritten] *Tymira*

3016136293    05-AUG-05 12:57:06    icsmg    7655062746
Awww i love you to

[handwritten] *301 503-9547*

[handwritten left margin] check mark

*COLLETTA* [handwritten]

3016136293    05-AUG-05 13:03:50    ney    3013794141
Whats up are you working

*TAURUS* [handwritten]

3016136293    05-AUG-05 13:54:24    icsmg    2023307322
+12023307322<1f>Rainbow back

*ROS* [handwritten]

3016136293    05-AUG-05 13:55:51    mosmsc    7655062746
Missing you Boo!!!  :-)

3016136293    05-AUG-05 14:00:36    mosmsc    7655062746    Not-Processed    Received
i'm going to take a nap... Wanna lay with me ?

*TYMIRA* [handwritten]

3016136293    05-AUG-05 14:01:31    mosmsc    3015039547    Not-Processed    Received
How are you feeling ?

*TYMIRA* [handwritten]

3016136293    05-AUG-05 14:01:43    icsmg    3015039547    Not-Processed    Received
My clit is throbbin, i need u

*TAURUS* [handwritten]

3016136293    05-AUG-05 14:01:56    mosmsc    2023307322    Not-Processed    Received
What you up to?

*TAURUS* [handwritten]

3016136293    05-AUG-05 14:02:35    mosmsc    2023307322    Not-Processed    Received
Where are you? :-/

*ROSE*

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 14:03:25 | mosmsc | 7655062746 | Not-Processed | Received | |

:-D

*COLLETTA*

3016136293    05-AUG-05 14:04:24    mosmsc    3013794141    Not-Processed   Received    ? W W

About to take a nap

*TAURUS*

3016136293    05-AUG-05 14:04:30    mosmsc    2023307322    Not-Processed   Received

Missing you Boo!!! :-)

*TAURUS*

3016136293    05-AUG-05 14:06:06    mosmsc    2023307322    Not-Processed   Received

About to take a nap

*COLLETTA*

3016136293    05-AUG-05 14:07:14    ney    3013794141    Not-Processed   Received    ? W W

Sweetie well I am out having a little in the sun later kisses

*TYMERA —*

3016136293    05-AUG-05 14:13:53    mosmsc    3015039547    Not-Processed   Received    TH

Where are you?

*TAURUS*

3016136293    05-AUG-05 14:15:45    icsmg    2023307322    Not-Processed   Received

+12023307322<1f>U could take nap here bitch

*MONICA*

3016136293    05-AUG-05 14:18:56    ney    2024869391    Not-Processed   Received

Jazz, just took her Senior pic and she looked so pretty!

*TYMERA*

3016136293    05-AUG-05 14:19:25    icsmg    3015039547    Not-Processed   Received    TH

Work

3016136293    05-AUG-05 14:25:36    mosmsc    3015039547    Not-Processed   Received    TH

What time are you getting off?

*MONICA*

3016136293    05-AUG-05 14:39:21    mosmsc    2024869391    Not-Processed   Received

:-D

*TAURUS*

3016136293    05-AUG-05 14:40:40    mosmsc    2023307322    Not-Processed   Received

Come get me

*TYMERA*

3016136293    05-AUG-05 14:48:09    icsmg    3015039547    Not-Processed   Received    TH

5pm

*TAURUS*

3016136293    05-AUG-05 15:04:57    icsmg    2023307322    Not-Processed   Received

+12023307322<1f>Washing

*TYMERA*

3016136293    05-AUG-05 15:07:33    mosmsc    3015039547    Not-Processed   Received    TH

I'm going to call to see what's

3016136293    05-AUG-05 15:10:19    mosmsc    3015039547    Not-Processed   Received    TH

You the boss ...baby

3016136293    05-AUG-05 15:11:08    mosmsc    3015039547    Not-Processed   Received    TH

Up

3016136293    05-AUG-05 15:11:12    icsmg    3015039547    Not-Processed   Received    TH

Me and my hot booty b waiting

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 15:13:37 | icsmg | *TYMUN* 3015039547 | Not-Processed | Received | *TH* |
| U daddy | | | | | | |
| 3016136293 | 05-AUG-05 15:14:55 | mosmsc | 3015039547 | Not-Processed | Received | *TH* |
| :-D | | | | | | |
| 3016136293 | 05-AUG-05 15:16:24 | icsmg | *ROSE* 7655062746 | Not-Processed | Received | *ROSE* |
| Happiness will be falling asleep next to you and waking up thinking I'm still in my dreams. | | | | | | |
| 3016136293 | 05-AUG-05 15:19:25 | mosmsc | 7655062746 | Not-Processed | Received | |
| Love you baby  :-D | | | | | | |
| 3016136293 | 05-AUG-05 15:19:45 | mosmsc | 7655062746 | Not-Processed | Received | |
| :-D | | | | | | |
| 3016136293 | 05-AUG-05 15:21:28 | icsmg | 7655062746 | Not-Processed | Received | |
| I have missed you alot today felt like we havent talked very much! | | | | | | |
| 3016136293 | 05-AUG-05 15:21:32 | mosmsc | 7655062746 | Not-Processed | Received | |
| Can you talk now? | | | | | | |
| 3016136293 | 05-AUG-05 15:23:52 | icsmg | 7655062746 | Not-Processed | Received | |
| In a meeting  can tex | | | | | | |
| 3016136293 | 05-AUG-05 15:26:48 | mosmsc | 7655062746 | Not-Processed | Received | |
| Oh really ... Do you have thongs on? | | | | | | |
| 3016136293 | 05-AUG-05 15:27:56 | mosmsc | 7655062746 | Not-Processed | Received | |
| Giving you  alittle taste of what you would get when you get home | | | | | | |
| 3016136293 | 05-AUG-05 15:28:38 | mosmsc | 7655062746 | Not-Processed | Received | |
| I have seen remote vibrators... Lil bullets ...i could control it | | | | | | |
| 3016136293 | 05-AUG-05 15:29:30 | icsmg | 7655062746 | Not-Processed | Received | |
| Yes and a suite | | | | | | |
| 3016136293 | 05-AUG-05 15:30:15 | icsmg | 7655062746 | Not-Processed | Received | |
| Wow! | | | | | | |
| 3016136293 | 05-AUG-05 15:44:47 | icsmg | 7655062746 | Not-Processed | Received | |
| Its not what I feel for you...its what I don't feel for anyone but you. | | | | | | |
| 3016136293 | 05-AUG-05 15:51:19 | mosmsc | 7655062746 | Not-Processed | Received | |
| You are very seductive lately... Makes me think ... I'm the luckiest guy in the world | | | | | | |
| 3016136293 | 05-AUG-05 16:29:24 | telem | 999991 | Not-Processed | Received | |
| Your message was successfully delivered to a person at 202-526-3099 Thanks for using Text to Landline! | | | | | | |
| 3016136293 | 05-AUG-05 16:30:11 | mosmsc | 2025263099 | Not-Processed | Received | |
| Please give lawrence a call | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 17:01:20 | icsmg | *TAURUS* 2023307322 | Not-Processed | Received | |
| +12023307322<1f>Are u ready | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 17:22:31 | mosmsc | *TAURUS* 2023307322 | Not-Processed | Received |
| Run your ass around that track and fall out...If I'm around ... You gonna get a dick in your mouth till you wake up | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 17:44:29 | mosmsc | *TAURUS* 2023307322 | Not-Processed | Received |
| Like a LION.... Grrrrrr | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 17:45:09 | mosmsc | *ROSE* 7655062746 | Not-Processed | Received |
| Love you baby  :-D | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 17:45:26 | icsmg | *TAURUS* 2023307322 | Not-Processed | Received |
| +12023307322<1f>What u going to do fuck me | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 17:49:06 | mosmsc | *TAURUS* 2023307322 | Not-Processed | Received |
| Lick It, Lick It Good   :-) | | | | | |

✓ | | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:01:55 | ney | *COLLETTA* 3013794141 | Not-Processed | Received | ? W W |
| Kisses | | | | | | |

✓ | | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:03:33 | mosmsc | *COLLETTA* 3013794141 | Not-Processed | Received | ? W W |
| Hey | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:05:26 | mosmsc | *TAURUS* 2023307322 | Not-Processed | Received |
| It's hard for me... For real | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:06:08 | icsmg | *TAURUS* 2023307322 | Not-Processed | Received |
| +12023307322<1f>U are going to miss me b<e4>by u leaving me sunday pussy going to waiting 4 u | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:06:19 | mosmsc | *TAURUS* 2023307322 | Not-Processed | Received |
| It's hard for me... For real | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:27:38 | icsmg | *TAURUS* 2023307322 | Not-Processed | Received |
| +12023307322<1f>C<e4>ll house phone please. | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:33:43 | icsmg | *TAURUS* 2023307322 | Not-Processed | Received |
| +12023307322<1f>What baby | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:37:33 | icsmg | *TYMERA* 3015360913 | Not-Processed | Received | *6:37:33 PM* *T.W* |
| +13015360913<1f>RE:<1f>What are you doing? --- Back up working with a monster ):-) | | | | | | |

*6:37 PM*   *RUDDY*

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:39:53 | icsmg | *TAURUS* 2023307322 | Not-Processed | Received |
| +12023307322<1f>Is it good to u and u lick it good to back to front | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:53:31 | mosmsc | *ROSE* 7655062746 | Not-Processed | Received |
| Angel? | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 3016136293 | 05-AUG-05 18:56:13 | mosmsc | 7655062746 | Not-Processed | Received |
| Are you okay? | | | | | |

3016136293    05-AUG-05 18:57:52    icsmg    7655062746    Not-Processed    Received
*ROSE*
Yes

3016136293    05-AUG-05 18:59:34    mosmsc    7655062746    Not-Processed    Received
Love you baby  :-D

3016136293    05-AUG-05 18:59:54    mosmsc    7655062746    Not-Processed    Received
Missing you Boo!!! :-)

3016136293    05-AUG-05 19:10:39    mosmsc    2022108765    Not-Processed    Received
Can you give me a call ... Lawrence

3016136293    05-AUG-05 20:00:24    ney    2024869391    Not-Processed    Received
*MONICA*
Wake Up! Hi Boo miss you!

3016136293    05-AUG-05 20:07:25    mosmsc    2024869391    Not-Processed    Received
*MONICA*
Hey ! Never did get my nap

3016136293    05-AUG-05 20:17:55    mosmsc    7655062746    Not-Processed    Received
*ROSE*
Are you okay baby!

3016136293    05-AUG-05 20:53:01    ney    2024869391    Not-Processed    Received
*MONICA*
Sorry baby

*10:13PM*    *IMPORTANT  Bartindin*    *FRIDAY*
3016136293    05-AUG-05 22:13:22    SMTP    6245    Not-Processed    Received    *10:13 PM*
9668069@skytel.com I need ice 4my beer (11:16pm)0d><0a><0d><0a>Nita Worley

*ROSE*
3016136293    05-AUG-05 22:17:56    icsmg    7655062746    Not-Processed    Received
You ok baby?

3016136293    05-AUG-05 22:24:03    mosmsc    7655062746    Not-Processed    Received
Just busy

3016136293    05-AUG-05 22:27:16    mosmsc    7655062746    Not-Processed    Received
I'm lovely  :-))

3016136293    05-AUG-05 22:37:54    ney    2024869391    Not-Processed    Received
*MONICA*
Wassup Honey

3016136293    05-AUG-05 22:39:27    mosmsc    2024869391    Not-Processed    Received
*MONICA*
<0a>hey

3016136293    05-AUG-05 22:52:09    ney    3013794141    Not-Processed    Received    *YWW*
*COLLETTA*
Good night sexy

3016136293    05-AUG-05 23:07:21    mosmsc    3015360913    Not-Processed    Received    *TH*
*TH*
When you ready?

3016136293    05-AUG-05 23:58:35    ney    2024869391    Not-Processed    Received
*WA MONICA*
Baby Im having a good time

3016136293    06-AUG-05 00:03:13    mosmsc    2024869391    Not-Processed    Received
*WA MONICA*

Handwritten annotations: **:D**, **SAT MORNING 12:33:54 PM**, **No such time**, **KARESSA**, **TCB RMDA 12:33:54**, **RCAD DOWN**, **1:10:36**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3016136293 | 06-AUG-05 00:33:54 | icsmg | 2025283405 | Not-Processed | Received | | KJ |
| +12025283405<1f>2 cokes & malibu, pls. Ka$h Money | | | | | | | |
| 3016136293 | 06-AUG-05 01:10:36 | icsmg | 2025283405 | Not-Processed | Received | | KJ |
| +12025283405<1f>Need a can opener! Ka$h Money | | | | | | | |
| 3016136293 | 06-AUG-05 01:34:52 | icsmg | 3012044449 | Not-Processed | Received | | |
| Hook that Check up for me Teebone | | | | | | | |
| 3016136293 | 06-AUG-05 01:36:42 | mosmsc | 3012044449 | Not-Processed | Received | | |
| Okay I'm in the VIP ... Right now ... I'll do that ASAP | | | | | | | |
| 3016136293 | 06-AUG-05 01:37:38 | icsmg | 3015360913 | Not-Processed | Received | TYMERA | TH |
| +13015360913<1f>RE:<1f>Ready for what --- When you ready? | | | | | | | |
| 3016136293 | 06-AUG-05 01:52:30 | icsmg | 2023307322 | Not-Processed | Received | TAURUS | |
| +12023307322<1f>I wanted <e5> hug today sexy | | | | | | | |
| 3016136293 | 08-AUG-05 02:08:34 | ney | 3013794141 | Not-Processed | Received | COLLETTE | PWW |
| Whats up are you still working | | | | | | | |
| 3016136293 | 06-AUG-05 02:16:51 | icsmg | 3015360913 | Not-Processed | Received | TYMERA | TH |
| +13015360913<1f>RE:<1f>Can you take me home down the street--- When you ready? | | | | | | | |
| 3016136293 | 06-AUG-05 03:13:51 | mosmsc | 7655062746 | Not-Processed | Received | ROSE | |
| Love you baby :-D | | | | | | | |
| 3016136293 | 06-AUG-05 03:14:54 | mosmsc | 7655062746 | Not-Processed | Received | | |
| Missing you Boo!!! :-) | | | | | | | |
| 3016136293 | 06-AUG-05 03:42:43 | mosmsc | 2023307322 | Not-Processed | Received | TAURUS | |
| Missing you Boo!!! :-) | | | | | | | |
| 3016136293 | 06-AUG-05 03:54:06 | icsmg | 3015360913 | Not-Processed | Received | TYMERA | TH |
| +13015360913<1f>RE: you<1f>I feel good baby--- When you ready? | | | | | | | |
| 3016136293 | 06-AUG-05 07:49:29 | mosmsc | 2023307322 | Not-Processed | Received | TAURUS | |
| Good Morning ! ! ! 7:49:29 AM | | | | | | | |
| 3016136293 | 06-AUG-05 07:50:59 | mosmsc | 3015039547 | Not-Processed | Received | TH | TH |
| Good Morning ! ! ! 7:50:59 AM | | | | | | | |
| 3016136293 | 06-AUG-05 07:53:40 | mosmsc | 3015360913 | Not-Processed | Received | TH | TH |
| Good Morning ! ! ! 7:53:40 AM | | | | | | | |
| 3016136293 | 06-AUG-05 07:54:07 | mosmsc | 2024869391 | Not-Processed | Received | MONICA | |
| Good Morning ! ! ! 7:54:07 AM | | | | | | | |
| 3016136293 | 06-AUG-05 07:54:14 | mosmsc | 3015360913 | Not-Processed | Received | TH | TH |
| 7:54:14 AM | | | | | | | |

Handwritten annotations: **AFTER WORK**

3016136293    06-AUG-05 07:54:38    mosmsc    7655062746    Not-Processed  Received
Good Morning ! ! !    *AM*    *ROSE*

3016136293    06-AUG-05 07:55:23    icsmg    7655062746    Not-Processed  Received
Hi    *AM*

3016136293    06-AUG-05 07:55:32    icsmg    3015360913    Not-Processed  Received
+13015360913<1f>RE:<1f>Hey baby — Good Morning ! ! !    *AM*    *TYMERA*    *T H*

3016136293    06-AUG-05 07:56:28    mosmsc    7655062746    Not-Processed  Received
Hi    *ROSE*

3016136293    06-AUG-05 07:57:30    icsmg    7655062746    Not-Processed  Received
Just dropped  ashley off headed to gym!

3016136293    06-AUG-05 07:57:38    mosmsc    7655062746    Not-Processed  Received
How are you feeling ?

3016136293    06-AUG-05 07:58:26    mosmsc    3015360913    Not-Processed  Received    *T H*
How are you feeling ?    *TYMERA*

3016136293    06-AUG-05 07:59:02    icsmg    3015360913    Not-Processed  Received    *T H*
+13015360913<1f>RE:<1f>Lovely --- How are you feeling ?

3016136293    06-AUG-05 08:04:43    icsmg    7655062746    Not-Processed  Received
I've been thinking  about you!    *ROSE*

3016136293    06-AUG-05 08:11:00    icsmg    7655062746    Not-Processed  Received
Can you talk!

3016136293    06-AUG-05 08:33:51    mosmsc    3015360913    Not-Processed  Received    *T H*
Can you talk now?    *TYMERA*

3016136293    06-AUG-05 09:35:27    ney    2024869391    Not-Processed  Received
Goodmorning!    *AM*    *MONICA*

3016136293    06-AUG-05 09:41:10    icsmg    7655062746    Not-Processed  Received
Loving you is like breathing...How can I stop?    *ROSE*

3016136293    06-AUG-05 11:15:23    ney    2024869391    Not-Processed  Received
Call me    *MONICA*

3016136293    06-AUG-05 11:47:15    icsmg    7655062746    Not-Processed  Received
I miss you!    *ROSE*

3016136293    06-AUG-05 11:55:43    ney    3013794141    Not-Processed  Received  *√ WW ?*
Hello my friend fine i hope have fun on this nice sunny day...Guess who is thinking about you    *COLLETTA*

3016136293    06-AUG-05 12:03:03    icsmg    7655062746    Not-Processed  Received
I'm getting sleepy!    *ROSE*

*TYMRA*

3016136293   06-AUG-05 14:43:16   icsmg   3015360913   Not-Processed   Received   *T H*
+13015360913<1f>RE:<1f>Yes — Can you talk now?

*ROSE*

3016136293   06-AUG-05 17:40:19   icsmg   7655062746   Not-Processed   Received
Miss you!

3016136293   07-AUG-05 00:03:57   icsmg   7655062746   Not-Processed   Received
Baby are you there?   I really need you!

*TYMRAR*

3016136293   07-AUG-05 02:17:15   icsmg   3015039547   Not-Processed   Received   *TH*
Can u play with me

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
176 messages found
\*\*\*\*\*\*\* Key \*\*\*\*\*\*\*

target telephone, believed to be in use by **ANTOINE JONES** called the number in Jamaica again, and then called **MAYNARD** six times between 2:58 p.m. and 3:22 p.m. These calls were followed closely by a call to **ANTOINE JONES** from (215) 917-4008, which is listed in the name of JIMMY KING, at 6813 Oakland Street, Philadelphia, PA, but believed to be used by **TERRENCE DIXON, a/k/a, NIMROD BABYLON.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

90.  Finally, analysis of pen register data pertaining to both **(202) 538-3946**, the **target telephone** and (301) 613-6293, **MAYNARD's** cellular telephone, reveals recent contact between both of these telephones and (998) 885-3310.  Specifically, on July 26, 2005, **(202) 538-3946**, the **target telephone**, received a call from that number at 2:06:45 p.m., with a duration of zero seconds. At 2:07:05 p.m., the **target telephone** received another call from that number, with a duration of nine seconds. Approximately five seconds later, on (301) 613-6293, **MAYNARD** received a phone call lasting seven minutes and 29 seconds from the same number, (998) 885-3310. The subscriber information pertaining to this telephone is unknown, but analysts have confirmed that the (998) prefix is the international calling code for the country of Uzbekistan.  Given that these contacts between the **target telephone**, believed to be used by **ANTOINE JONES**, (301) 613-6293, **MAYNARD's** phone, and Uzbekistan took place within the same time frame as the contacts between the above-described telephones and the telephone in McAllen, Texas, a common point of entry of cocaine into the United States, investigators believe that these contacts with Uzbekistan pertain to the illegal activities of **ANTOINE JONES** and **MAYNARD**. Additionally, your affiant

*[handwritten: This buy Anthony Givens couldn't ID me from the witness stand, he CD two of my co-defendant pick me also]*

ten times between 2003 and 2004. Additionally, CS-2 had clearly gained Jones' trust in that

Jones allegedly fronted CS-2 at least $120,000 worth of cocaine. (See August 10 Affidavit at

15). *[handwritten: Very Good]*

*[handwritten: Annette don't know him lies]* *[handwritten: And ide X don't know me]*

CS-3 told the government that it had heard from Anthony Koonce that Koonce

was buying large quantities of cocaine from the owner of Levels. The August 10 Affidavit fails

to mention whether CS-3 ever purchased narcotics from Koonce or whether any attempt was

made to buy directly from Jones. Additionally, the affidavit fails to state whether CS-3 ever

even attempted to purchase drugs from Jones. *[handwritten: Did he know me? never serve me? Did they try to interview him on 7/11/07]*

In fact, the August 10 Affidavit is devoid of any facts indicating that the *[handwritten: Alie - I want the statement]*

government sought to make any undercover buys. There is scant support for the claim that the

efforts were unsuccessful to work up the ladder, if that was the purpose of seeking the wiretap.

There were no efforts to try and learn the sources through further surveillance or undercover

purchases. Thus, based on the allegations contained in the August 10 Affidavit, the government

has failed to demonstrate that normal investigative procedures had been tried and failed. Rather,

the government sought to short-circuit normal investigation and went right for the most intrusive

methods without the requisite showing of necessity for such warrants. *[handwritten: Very Good]*

## 2. August 18 Affidavit

The August 18 Affidavit executed by Agent Yanta is for the most part a word-for-

word rehashing of the August 10 Affidavit. The only new information provided in the August 18

Affidavit is that pen-register data disclosed that Jones telephone received two calls from a

*[handwritten: X three calls Uzbekistan number - not on my cell phone records]*

number in Uzbekistan (998-885-3310). These two calls lasted a total of zero and nine seconds

respectively. The August 18 Affidavit further states that the same Uzbekistan number called

Maynard's telephone for a period of almost seven-and-one-half minutes. Agent Yanta *[handwritten: lies]*

*[handwritten: Lawrence had only a pen-register]*

*[handwritten: Needs to check]*

15

✕ cingular
raising the bar

Account Number
0050465090

Account Name
DENISE JONES

Date of Invoice
August 08, 2005

Page 27 of 38

## DETAIL OF CURRENT ACTIVITY - CONTINUED

### VOICE USAGE FOR (202)538-3946 - Continued

| Item | Date | Time | Number Called | Calls To | Qnty Used | Rate | Charge Description | Charge |
|---|---|---|---|---|---|---|---|---|
| 1574 | 07/23 | 06:38P | (202)538-3946 | WASHINGTON DC | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1575 | 07/23 | 06:43P | (202)975-0949 | ONTARIO CA | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1576 | 07/23 | 06:49P | (301)468-7211 | INCOMING | 15MIN | | SHARED NIGHT/WEEKEND | |
| 1577 | 07/23 | 07:49P | (301)468-7211 | INCOMING | 7MIN | | SHARED NIGHT/WEEKEND | |
| 1578 | 07/23 | 08:30P | (301)613-6293 | WALDORF MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1579 | 07/23 | 08:30P | (240)353-1534 | SILVER SPG MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1580 | 07/23 | 08:49P | (202)411-0000 | INCOMING | 7MIN | | SHARED NIGHT/WEEKEND | |
| 1581 | 07/23 | 08:50P | (240)607-6697 | WASHINGTON DC | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1582 | 07/23 | 08:55P | (202)277-8552 | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1583 | 07/23 | 09:54P | (202)468-7211 | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1584 | 07/23 | 10:00P | (202)277-8552 | WASHINGTON DC | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1585 | 07/23 | 10:06P | (240)607-6697 | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1586 | 07/23 | 10:26P | (202)607-6697 | WASHINGTON DC | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1587 | 07/23 | 10:30P | (202)607-6697 | INCOMING | 1MIN | | CALL WAITING | |
| 1588 | 07/23 | 10:30P | (240)475-1125 | WASHINGTON DC | 1EVT | | SHARED NIGHT/WEEKEND | |
| 1589 | 07/23 | 10:31P | (240)475-2981 | SILVER SPG MD | 1EVT | | SHARED NIGHT/WEEKEND | |
| 1590 | 07/23 | 10:35P | (240)375-3465 | WASHINGTON DC | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1591 | 07/23 | 11:37P | (202)607-6697 | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1592 | 07/23 | 11:38P | (202)607-6697 | WASHINGTON DC | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1593 | 07/23 | 11:39P | (301)653-3607 | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1594 | 07/24 | 12:26A | (202)255-4484 | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1595 | 07/24 | 01:50A | (301)653-3607 | WASHINGTON DC | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1596 | 07/24 | 01:50A | (202)468-7211 | WASHINGTON TN2N1 B | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1597 | 07/24 | 02:55A | (301)653-3607 | WALDORF MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1598 | 07/24 | 02:55A | (301)653-3607 | WALDORF MD | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1599 | 07/24 | 03:00A | (202)255-4484 | WALDORF MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1600 | 07/24 | 03:00A | (202)255-4484 | WASHINGTON DC | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1601 | 07/24 | 03:54A | (240)416-2249 | WALDORF MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1602 | 07/24 | 03:54A | (202)255-4484 | WASHINGTON DC | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1603 | 07/24 | 03:56A | (240)416-2249 | WALDORF MD | 1MIN | | SHARED NIGHT/WEEKEND | |

## DETAIL OF CURRENT ACTIVITY - CONTINUED

### VOICE USAGE FOR (202)538-3946 - Continued

| Item | Date | Time | Number Called | Calls To | Qnty Used | Rate | Charge Description | Charge |
|---|---|---|---|---|---|---|---|---|
| 1631 | 07/24 | 06:58A | (301)870-7874 | LA PLATA MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1632 | 07/24 | 06:32A | (240)475-1125 | WASHINGTON DC | 2EVT | | SHARED NIGHT/WEEKEND | |
| 1633 | 07/24 | 06:35A | (202)538-3946 | WASHINGTON DC | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1634 | 07/24 | 06:41A | (301)870-7874 | LA PLATA MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1635 | 07/24 | 01:09P | (202)825-9590 | WASHINGTON DC | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1636 | 07/24 | 01:11P | | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1637 | 07/24 | 01:17P | | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1638 | 07/24 | 01:21P | | INCOMING | 3MIN | | SHARED NIGHT/WEEKEND | |
| 1639 | 07/24 | 01:52P | | INCOMING | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1640 | 07/24 | 01:53P | (301)870-7874 | INCOMING | 4MIN | | SHARED NIGHT/WEEKEND | |
| 1641 | 07/24 | 02:21P | (301)870-7874 | LA PLATA MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1642 | 07/24 | 02:38P | (301)702-2124 | CAPITOL HTS MD | 3MIN | | SHARED NIGHT/WEEKEND | |
| 1643 | 07/24 | 02:46P | (301)702-2124 | CAPITOL HTS MD | 1EVT | | SHARED NIGHT/WEEKEND | |
| 1644 | 07/24 | 02:38P | (202)989-0100 | WASHINGTON DC | 15MIN | | MESSAGE RETRIEVAL | |
| 1645 | 07/24 | 02:41P | | INCOMING | 1MIN | | DROP CALL/NO CHARGE | |
| 1647 | 07/24 | 02:41P | (240)416-2249 | WALDORF MD | 1EVT | | MESSAGE RETRIEVAL | |
| 1649 | 07/24 | 03:33P | (301)870-7874 | LA PLATA MD | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1650 | 07/24 | 04:01P | (202)538-3946 | SILVER SPG MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1651 | 07/24 | 04:15P | (240)381-1424 | WASHINGTON DC | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1652 | 07/24 | 04:16P | (240)381-1424 | SILVER SPG MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1653 | 07/24 | 04:21P | (240)381-1424 | SILVER SPG MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1654 | 07/24 | 04:24P | (240)381-1424 | SILVER SPG MD | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1655 | 07/24 | 04:25P | (240)381-1424 | SILVER SPG MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1656 | 07/24 | 04:27P | (255)381-1424 | SILVER SPG MD | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1657 | 07/24 | 04:29P | (240)381-1424 | SILVER SPG MD | 2MIN | | SHARED NIGHT/WEEKEND | |
| 1658 | 07/24 | 06:36P | (202)538-3946 | WASHINGTON DC | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1659 | 07/24 | 06:38P | (301)870-7874 | WALDORF MD | 5MIN | | MESSAGE RETRIEVAL | |
| 1660 | 07/24 | 06:41P | (202)255-4484 | WALDORF MD | 1EVT | | SHARED NIGHT/WEEKEND | |
| 1661 | 07/24 | 06:41P | | WALDORF MD | 1EVT | | MESSAGE RETRIEVAL | |
| 1662 | 07/24 | 04:43P | (202)255-4484 | WASHINGTON DC | 1MIN | | CALL WAITING | |
| 1663 | 07/24 | 04:52P | | WASHINGTON DC | 5MIN | | SHARED NIGHT/WEEKEND | |
| 1664 | 07/24 | 04:50P | (202)255-4484 | WASHINGTON DC | 1EVT | | SHARED NIGHT/WEEKEND | |
| 1665 | 07/24 | 07:07P | (240)375-3465 | SILVER SPG MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1666 | 07/24 | 07:05P | (202)538-3946 | WASHINGTON DC | 10MIN | | SHARED NIGHT/WEEKEND | |
| 1667 | 07/24 | 07:05P | (301)702-2124 | WASHINGTON DC | 1EVT | | SHARED NIGHT/WEEKEND | |
| 1668 | 07/24 | 07:07P | (202)538-3946 | WASHINGTON DC | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1669 | 07/24 | 07:09P | (301)702-2124 | CAPITOL HTS MD | 1EVT | | SHARED NIGHT/WEEKEND | |
| 1670 | 07/24 | 07:09P | (240)375-3465 | CAPITOL HTS MD | 1MIN | | SHARED NIGHT/WEEKEND | |
| 1671 | 07/24 | 07:13P | (240)289-0100 | WASHINGTON DC | 1MIN | | SHARED NIGHT/WEEKEND | |



| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 20:22:59 EDT | 0:07:35 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 20:22:47 EDT | 0:00:04 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 20:22:26 EDT | 0:00:00 | N | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 2022390 | 4432803092 | 7/26/2005 | 20:22:02 EDT | 0:02:39 | O | P | 14432803092 |
| WF0213679 | 166E | 2025383946 | 3016533607 | 2025383946 | 7/26/2005 | 20:17:16 EDT | 0:00:13 | I | P | (3016533607) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 20:16:11 EDT | 0:00:03 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 2023069856 | 2025383946 | 7/26/2005 | 20:14:29 EDT | 0:00:11 | I | P | (2023069856) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 20:07:54 EDT | 0:00:26 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 20:07:53 EDT | 0:00:04 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 20:04:09 EDT | 0:00:04 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 19:59:05 EDT | 0:00:03 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 19:54:59 EDT | 0:00:03 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 19:46:56 EDT | 0:00:04 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 19:45:57 EDT | 0:00:04 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 19:45:19 EDT | 0:00:04 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 19:44:42 EDT | 0:00:04 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 3018707874 | 2025383946 | 7/26/2005 | 19:44:27 EDT | 0:00:04 | I | P | (3018707874) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 19:24:54 EDT | 0:00:04 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 19:18:40 EDT | 0:00:05 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2024687211 | 2025383946 | 7/26/2005 | 19:11:10 EDT | 0:00:03 | I | P | (2024687211) |
| WF0213679 | 166E | 2025383946 | 2024687211 | 2025383946 | 7/26/2005 | 19:10:38 EDT | 0:00:06 | I | P | (2024687211) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 19:09:09 EDT | 0:00:04 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | | 2025383946 | 7/26/2005 | 19:05:30 EDT | 0:00:13 | I | P | ( ) |
| WF0213679 | 166E | 2025383946 | 2022438393 | 2025383946 | 7/26/2005 | 18:44:24 EDT | 0:01:05 | I | P | (2022438393) |
| WF0213679 | 166E | 2025383946 | 2404624971 | 2025383946 | 7/26/2005 | 18:43:45 EDT | 0:00:06 | I | P | (2404624971) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 18:43:11 EDT | 0:00:03 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 18:43:05 EDT | 0:00:01 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 18:34:02 EDT | 0:00:08 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 18:28:03 EDT | 0:00:05 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 18:22:16 EDT | 0:00:12 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 18:18:54 EDT | 0:00:04 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 18:18:41 EDT | 0:00:00 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 8765392380 | W 2025383946 | 7/26/2005 | 18:07:04 EDT | 0:00:04 | I | P | (18765392380) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 17:19:47 EDT | 0:00:07 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | | 2025383946 | 7/26/2005 | 16:23:27 EDT | 0:00:00 | N | P | ( ) |
| WF0213679 | 166E | 2025383946 | | 2025383946 | 7/26/2005 | 16:15:48 EDT | 0:00:05 | I | P | (1876539238) |
| WF0213679 | 166E | 2025383946 | | 2025383946 | 7/26/2005 | 16:15:27 EDT | 0:00:00 | N | P | (1876539238) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2025753880 | 7/26/2005 | 16:10:42 EDT | 0:06:34 | O | P | 2025753880 |
| WF0213679 | 166E | 2025383946 | 2404162249 | 2025383946 | 7/26/2005 | 16:10:26 EDT | 0:00:00 | U | P | 12404162249 |
| WF0213679 | 166E | 2025383946 | 2404162249 | 2025383946 | 7/26/2005 | 16:10:19 EDT | 0:00:00 | U | P | 12404162249 |
| WF0213679 | 166E | 2025383946 | 2024199863 | 2025383946 | 7/26/2005 | 16:08:01 EDT | 0:01:55 | I | P | (2024199863) |
| WF0213679 | 166E | 2025383946 | 2403811424 | 2025383946 | 7/26/2005 | 16:06:20 EDT | 0:00:49 | O | P | 2403811424 |
| WF0213679 | 166E | 2025383946 | 2404162249 | 2025383946 | 7/26/2005 | 16:05:36 EDT | 0:00:20 | O | P | 12404162249 |
| WF0213679 | 166E | 2025383946 | 2404752981 | 2025383946 | 7/26/2005 | 16:04:47 EDT | 0:00:41 | O | P | 2404752981 |
| WF0213679 | 166E | 2025383946 | 2404162249 | 2025383946 | 7/26/2005 | 16:03:03 EDT | 0:00:14 | I | P | (12404162249) |
| WF0213679 | 166E | 2025383946 | 2404162249 | 2025383946 | 7/26/2005 | 16:02:38 EDT | 0:00:11 | I | P | (12404162249) |
| WF0213679 | 166E | 2025383946 | 2404162249 | 2025383946 | 7/26/2005 | 15:49:34 EDT | 0:00:06 | I | P | (12404162249) |
| WF0213679 | 166E | 2025383946 | 2025753880 | 2025383946 | 7/26/2005 | 15:47:14 EDT | 0:00:31 | I | P | (2025753880) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 15:32:08 EDT | 0:00:03 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2404752981 | 7/26/2005 | 15:26:18 EDT | 0:00:43 | O | P | 2404752981 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2403753465 | 7/26/2005 | 15:22:51 EDT | 0:00:48 | O | P | 2403753465 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2403753465 | 7/26/2005 | 15:22:30 EDT | 0:00:07 | U | P | 2403753465 |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 15:20:39 EDT | 0:01:00 | O | P | 2022890100 |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 15:15:02 EDT | 0:00:10 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 14:54:02 EDT | 0:02:32 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 14:45:26 EDT | 0:00:04 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 14:45:08 EDT | 0:00:00 | N | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 14:44:45 EDT | 0:00:04 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 14:44:27 EDT | 0:00:00 | N | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3014292606 | 7/26/2005 | 14:28:38 EDT | 0:00:32 | O | P | 3014292606 |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 14:27:46 EDT | 0:00:04 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2407231497 | 7/26/2005 | 14:26:41 EDT | 0:00:18 | O | P | 2407231497 |
| WF0213679 | 166E | 2025383946 | 2026799611 | 2025383946 | 7/26/2005 | 14:22:45 EDT | 0:00:03 | I | P | (2026799611) |
| WF0213679 | 166E | 2025383946 | 2024687211 | 2025383946 | 7/26/2005 | 14:14:58 EDT | 0:01:41 | O | P | 2024687211 |
| WF0213679 | 166E | 2025383946 | 2403753465 | 2025383946 | 7/26/2005 | 14:09:28 EDT | 0:00:03 | I | P | (2403753465) |
| WF0213679 | 166E | 2025383946 | 2403753465 | 2025383946 | 7/26/2005 | 14:09:07 EDT | 0:00:00 | N | P | (2403753465) |
| WF0213679 | 166E | 2025383946 | | 2025383946 | 7/26/2005 | 14:07:05 EDT | 0:00:08 | I | P | (9988853310) |
| WF0213679 | 166E | 2025383946 | | 2025383946 | 7/26/2005 | 14:06:46 EDT | 0:00:00 | N | P | (9988853310) |
| WF0213679 | 166E | 2025383946 | 3014292606 | 2025383946 | 7/26/2005 | 13:54:48 EDT | 0:19:23 | I | P | (3014292606) |
| WF0213679 | 166E | 2025383946 | 2403990771 | 2025383946 | 7/26/2005 | 13:51:54 EDT | 0:01:15 | O | P | 12403990771 |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/26/2005 | 13:31:10 EDT | 0:03:23 | O | P | 2022690100 |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/26/2005 | 13:28:55 EDT | 0:01:24 | I | P | (3016136293) |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/26/2005 | 13:28:28 EDT | 0:02:07 | O | P | 2025383946 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/26/2005 | 13:27:49 EDT | 0:00:45 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/26/2005 | 13:27:28 EDT | 0:00:55 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/26/2005 | 13:27:08 EDT | 0:00:47 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2409687431 | 2025383946 | 7/26/2005 | 13:26:29 EDT | 0:00:38 | O | P | 2409687431 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 4432803092 | 7/26/2005 | 13:24:29 EDT | 0:01:21 | O | P | 14432803092 |
| WF0213679 | 166E | 2025383946 | 3017517614 | 2025383946 | 7/26/2005 | 13:22:18 EDT | 0:01:55 | I | P | (3017517614) |
| WF0213679 | 166E | 2025383946 | 3017517614 | 2025383946 | 7/26/2005 | 13:21:20 EDT | 0:00:32 | O | P | (3017517614) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 4432803092 | 7/26/2005 | 13:20:30 EDT | 0:01:38 | O | P | 14432803092 |
| WF0213679 | 166E | 2025383946 | 3014047512 | 2025383946 | 7/26/2005 | 13:03:29 EDT | 0:00:04 | I | P | (3014047512) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 13:02:36 EDT | 0:00:04 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 12:58:08 EDT | 0:00:04 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | 2404751125 | 2025383946 | 7/26/2005 | 11:31:45 EDT | 0:00:21 | I | P | (12404751125) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 11:16:06 EDT | 0:00:04 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 11:14:53 EDT | 0:00:25 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2409687431 | 2025383946 | 7/26/2005 | 11:05:23 EDT | 0:00:04 | I | P | (2409687431) |
| WF0213679 | 166E | 2025383946 | 2023067900 | 2025383946 | 7/26/2005 | 10:55:10 EDT | 0:00:56 | I | P | (2023067900) |
| WF0213679 | 166E | 2025383946 | 2022554484 | 2025383946 | 7/26/2005 | 10:37:34 EDT | 0:00:02 | I | P | (12022554484) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 10:33:11 EDT | 0:00:05 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2022778552 | 2025383946 | 7/26/2005 | 10:27:14 EDT | 0:00:06 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/26/2005 | 10:20:57 EDT | 0:00:23 | I | P | (2022765845) |

NO RECORD ON Cell PHONE

Terrence Dixon
AKA
Nimrod Babylon
42 seconds

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 15:58:19 EDT | 0:01:18 | O | P | 3016136293 |
| WF0206025 | 245F | 2159174008 | 2025383946 | 2025383946 | 7/25/2005 | 15:54:48 EDT | 0:00:53 | O | P | 2025383946 |
| WF0213679 | 166E | 2025383946 | 2159174008 | 2025383946 | 7/25/2005 | 15:54:10 EDT | 0:00:42 | I | P | (2159174008) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/25/2005 | 15:22:45 EDT | 0:00:22 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2025383946 | 7/25/2005 | 15:22:29 EDT | 0:00:00 | N | P | (2022765845) |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 15:12:56 EDT | 0:01:48 | I | P | 2025383946 |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/25/2005 | 15:12:37 EDT | 0:01:55 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 15:12:18 EDT | 0:01:48 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 15:11:41 EDT | 0:00:39 | I | P | 2025383946 |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/25/2005 | 15:11:20 EDT | 0:00:53 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 15:11:01 EDT | 0:00:45 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2404751125 | 2025383946 | 7/25/2005 | 14:58:54 EDT | 0:56:46 | I | P | (12404751125) |
| WF0213679 | 166E | 2025383946 | 2023267900 | 2025383946 | 7/25/2005 | 14:46:47 EDT | 0:36:36 | O | P | 12023267900 |
| WF0213679 | 166E | 2025383946 | 2403045543 | 2025383946 | 7/25/2005 | 14:44:37 EDT | 0:00:11 | I | P | (2403045543) |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/25/2005 | 14:42:29 EDT | 0:00:29 | I | P | (3016136293) |
| WF0213679 | 166E | 3016136293 | 3016136293 | 2025383946 | 7/25/2005 | 14:42:02 EDT | 0:00:44 | O | P | 2025383946 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2025383946 | 7/25/2005 | 14:40:59 EDT | 0:00:30 | I | P | (2022778552) |
| WF0213679 | 166E | 2025383946 | 2024490390 | 2025383946 | 7/25/2005 | 14:37:15 EDT | 0:01:32 | I | P | (2024490390) |
| WF0213679 | 166E | 2025383946 | 2403816280 | 2025383946 | 7/25/2005 | 14:31:44 EDT | 0:00:04 | I | P | (12403816280) |
| WF0213679 | 166E | 2025383946 | 2026941240 | 2025383946 | 7/25/2005 | 14:29:04 EDT | 0:00:00 | N | P | (2026941240) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2022778552 | 7/25/2005 | 14:21:30 EDT | 0:00:33 | O | P | 2022778552 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016553173 | 7/25/2005 | 14:19:22 EDT | 0:00:27 | O | P | 13016553173 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2022321563 | 7/25/2005 | 14:16:56 EDT | 0:00:11 | O | P | 2022321563 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2022321563 | 7/25/2005 | 14:16:32 EDT | 0:00:12 | O | P | 2022321563 |
| WF0213679 | 166E | 2025383946 | 2024490390 | 2025383946 | 7/25/2005 | 14:14:33 EDT | 0:00:58 | O | P | 2024490390 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2404751125 | 7/25/2005 | 14:11:17 EDT | 0:00:41 | O | P | 2404751125 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2403753485 | 7/25/2005 | 14:10:29 EDT | 0:00:30 | O | P | 2403753485 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2404751125 | 7/25/2005 | 14:07:22 EDT | 0:00:28 | O | P | 2404751125 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3014292606 | 7/25/2005 | 14:06:29 EDT | 0:00:06 | O | P | 3014292606 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3014292606 | 7/25/2005 | 14:05:55 EDT | 0:00:24 | O | P | 3014292606 |
| WF0213679 | 166E | 2025383946 | 2403045543 | 2025383946 | 7/25/2005 | 14:03:40 EDT | 0:00:04 | I | P | (2403045543) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2403045543 | 7/25/2005 | 14:03:29 EDT | 0:00:00 | N | P | (2403045543) |
| WF0213679 | 166E | 2025383946 | 8785382300 W | 2025383946 | 7/25/2005 | 14:03:05 EDT | 0:02:18 | I | P | (18785382300) |
| WF0213679 | 166E | 2025383946 | 8785382300 W | 2025383946 | 7/25/2005 | 14:02:04 EDT | 0:02:28 | I | P | (18785382300) |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 14:00:55 EDT | 0:01:35 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 14:00:38 EDT | 0:01:44 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 14:00:16 EDT | 0:01:35 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 13:58:21 EDT | 0:02:08 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 13:58:01 EDT | 0:02:24 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:57:42 EDT | 0:02:08 | I | P | (2025383946) |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:57:37 EDT | 0:00:00 | N | P | (2025383946) |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:57:28 EDT | 0:00:34 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 13:57:08 EDT | 0:00:45 | O | P | 3016136293 |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/25/2005 | 13:57:03 EDT | 0:00:56 | I | P | (3016136293) |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:56:49 EDT | 0:00:40 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/25/2005 | 13:56:43 EDT | 0:00:00 | N | P | (3016136293) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/25/2005 | 13:53:12 EDT | 0:03:27 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/25/2005 | 13:49:43 EDT | 0:00:53 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2403045543 | 2025383946 | 7/25/2005 | 13:49:04 EDT | 0:00:38 | O | P | 2403045543 |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/25/2005 | 13:46:13 EDT | 0:01:46 | O | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/25/2005 | 13:43:19 EDT | 0:02:29 | I | P | (2022690100) |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:41:55 EDT | 0:01:41 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 3016136293 | 2025383946 | 7/25/2005 | 13:41:37 EDT | 0:01:54 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:41:27 EDT | 0:00:04 | I | P | (2025383946) |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:41:16 EDT | 0:01:42 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 13:41:09 EDT | 0:00:08 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:40:48 EDT | 0:00:00 | N | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2023267900 | 2025383946 | 7/25/2005 | 13:38:21 EDT | 0:00:54 | I | P | (2023267900) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 13:37:01 EDT | 0:00:46 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 13:36:41 EDT | 0:00:56 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:36:22 EDT | 0:00:14 | I | P | (2025383946) |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:36:22 EDT | 0:00:48 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 3016136293 | 7/25/2005 | 13:36:02 EDT | 0:00:34 | O | P | 3016136293 |
| WF0213679 | 166E | 3016136293 | 2025383946 | 3016136293 | 7/25/2005 | 13:35:43 EDT | 0:00:14 | I | P | (2025383946) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/25/2005 | 13:34:46 EDT | 0:00:34 | O | P | 2022690100 |
| WF0213679 | 166E | 2025383946 | 2403045543 | 2025383946 | 7/25/2005 | 13:09:27 EDT | 0:00:03 | I | P | (2403045543) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/25/2005 | 13:07:09 EDT | 0:00:04 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2022690100 | 2025383946 | 7/25/2005 | 13:06:38 EDT | 0:00:04 | I | P | (2022690100) |
| WF0213679 | 166E | 2025383946 | 2403045543 | 2025383946 | 7/25/2005 | 13:01:46 EDT | 0:00:44 | U | P | 2403045543 |
| WF0213679 | 166E | 2025383946 | 4432800392 | 2025383946 | 7/25/2005 | 12:58:41 EDT | 0:02:25 | O | P | 14432800392 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2105281460 | 7/25/2005 | 12:49:58 EDT | 0:02:33 | O | P | 2105281460 |
| WF0213679 | 166E | 2025383946 | 2105281460 | 2025383946 | 7/25/2005 | 12:37:08 EDT | 0:00:01 | I | P | (2105281460) |
| WF0213679 | 166E | 2025383946 | 2105281460 | 2025383946 | 7/25/2005 | 12:36:45 EDT | 0:00:00 | N | P | (2105281460) |
| WF0213679 | 166E | 2025383946 | 2404751125 | 2025383946 | 7/25/2005 | 12:25:37 EDT | 0:23:37 | O | P | 12404751125 |
| WF0213679 | 166E | 2025383946 | 2023267900 | 2025383946 | 7/25/2005 | 12:24:13 EDT | 0:00:54 | O | P | 2023267900 |
| WF0213679 | 166E | 2025383946 | 2404751125 | 2025383946 | 7/25/2005 | 11:34:50 EDT | 0:00:47 | I | P | (12404751125) |
| WF0213679 | 166E | 2025383946 | 2403045543 | 2025383946 | 7/25/2005 | 11:33:00 EDT | 0:00:15 | I | P | (2403045543) |
| WF0213679 | 166E | 2025383946 | 2023267900 | 2025383946 | 7/25/2005 | 11:31:23 EDT | 0:01:01 | I | P | (2023267900) |
| WF0213679 | 166E | 2025383946 | 2403045543 | 2025383946 | 7/25/2005 | 11:29:57 EDT | 0:00:15 | I | P | (2403045543) |
| WF0213679 | 166E | 2025383946 | 2022562526 | 2025383946 | 7/25/2005 | 11:28:53 EDT | 0:00:33 | I | P | (12022562526) |
| WF0213679 | 166E | 2025383946 | 2404751125 | 2025383946 | 7/25/2005 | 11:25:34 EDT | 0:00:39 | I | P | (12404751125) |
| WF0213679 | 166E | 2025383946 | 3014689174 | 2025383946 | 7/25/2005 | 11:08:09 EDT | 0:00:49 | I | P | (3014689174) |
| WF0213679 | 166E | 2025383946 | 2022765845 | 2025383946 | 7/25/2005 | 10:59:42 EDT | 0:00:05 | I | P | (2022765845) |
| WF0213679 | 166E | 2025383946 | 3016553607 | 2025383946 | 7/25/2005 | 10:58:51 EDT | 0:00:20 | I | P | (3016553607) |
| WF0213679 | 166E | 2025383946 | 2403753485 | 2025383946 | 7/25/2005 | 10:36:53 EDT | 0:00:25 | I | P | (2403753485) |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2025383946 | 7/25/2005 | 10:31:10 EDT | 0:00:25 | I | P | (18785382300) |
| WF0213679 | 166E | 2025383946 | 5712433110 | 2025383946 | 7/25/2005 | 9:46:03 EDT | 0:00:03 | I | P | (15712433110) |
| WF0213679 | 166E | 2025383946 | 2404162249 | 2025383946 | 7/25/2005 | 3:18:48 EDT | 0:00:50 | O | P | 2404162249 |
| WF0213679 | 166E | 2025383946 | 2023802276 | 2025383946 | 7/25/2005 | 2:50:34 EDT | 0:00:13 | I | P | (2023802276) |
| WF0213679 | 166E | 2025383946 | 3012570109 | 2025383946 | 7/25/2005 | 1:22:43 EDT | 0:00:13 | I | P | (3012570109) |
| WF0213679 | 166E | 2025383946 | 2023748530 | 2025383946 | 7/24/2005 | 22:56:10 EDT | 0:00:13 | I | P | (2023748530) |
| WF0213679 | 166E | 2025383946 | 2404624971 | 2025383946 | 7/24/2005 | 22:00:54 EDT | 0:09:24 | I | P | (2404624971) |
| WF0213679 | 166E | 2025383946 | 2404633129 | 2025383946 | 7/24/2005 | 21:59:27 EDT | 0:00:00 | N | P | (2404633129) |
| WF0213679 | 166E | 2025383946 | 2024218063 | 2025383946 | 7/24/2005 | 21:58:29 EDT | 0:00:38 | O | P | 2024218063 |
| WF0213679 | 166E | 2025383946 | 2024218063 | 2025383946 | 7/24/2005 | 21:53:14 EDT | 0:04:35 | I | P | (2024218063) |
| WF0213679 | 166E | 2025383946 | 2024218063 | 2025383946 | 7/24/2005 | 21:52:26 EDT | 0:00:36 | O | P | 2024218063 |
| WF0213679 | 166E | 2025383946 | 2025383946 | 2024218063 | 7/24/2005 | 21:51:05 EDT | 0:01:09 | O | P | 2024218063 |



# Grand Opening

## Scoopie's

### Soul Cafe

## Tuesday May 31st

### Open Daily 11:00am-8:00pm • Tuesday thru Saturday

**10% Off**   *featuring Daily Specials:*   **10% Off**

Fish • Barbeque Chicken • Pork Chop

Meat Loaf • Turkey Wing

Everyday served with 2 sides and bread

### Call For Details: 202.269.0100 /// Nette 301.653.3607

SW-00171

SW-00171

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :

    Plaintiff,                     :   Docket No. CR 05-386

    v.                             :

ANTOINE JONES, ADRIAN              :   Washington, D.C.
JACKSON, MICHAEL HUGGINS, and      :   November 27, 2006
KEVIN HOLLAND,                     :   1:55 p.m.

    Defendants.

*AFTERNOON SESSION*
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE ELLEN SEGAL HUVELLE*
*UNITED STATES DISTRICT JUDGE*

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
    John Geise, Assistant US Attorney;
    Rachel Lieber, Assistant US
    Attorney
    555 4th Street
    Washington, DC 20001
    202.616.9156

For Defendant Jones:      LAW OFFICES OF EDUARDO BALAREZO
    Eduardo Balarezo, Esq.
    400 Fifth Street, NW
    Suite 500
    Washington, DC 20001
    202.639.0999

For Defendant Jackson:    LAW OFFICE OF JON NORRIS
    Jon Norris, Esq.
    641 Indiana Avenue, NW
    Washington, DC 20001
    202.842.2695

---

2

For Defendant Huggins:    LAW OFFICES OF RUDOLPH ACREE
    Rudolph Acree, Esq.
    1211 Connecticut Avenue, NW
    Suite 303
    Washington, DC 20036
    202.331.0739

For Defendant Holland:    LAW OFFICES OF BRIAN McDANIEL
    Brian McDaniel, Esq.
    1211 Connecticut Avenue, NW
    Washington, DC 20036
    202.331.0739

Court Reporter:           Scott L. Wallace, RDR, CRR
    Official Court Reporter
    Room 6814, U.S. Courthouse
    Washington, D.C. 20001
    202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

3

**AFTERNOON SESSION, NOVEMBER 27, 2006**

1

2    (1:55 p.m.)

3    MS. LIEBER: Your Honor, I think we have a request about

4    timing, in terms of the timeline, Mr. Balarezo and I -- but I

5    don't want to speak for him.

6    THE COURT: We're back to the timeline again?

7    MS. LIEBER: Yes, just in terms of the time --

8    MR. BALAREZO: We're speaking as one now, Your Honor.

9    MS. LIEBER: As to the timeline, Mr. Balarezo and I can

10    sit down and go through this. I would propose that we do it

11    after this witness. We just take the chunk of time we have, sit

12    down together with the transcripts, with an agent, with the

13    computer, and get it right, so there's no -- so we wouldn't have

14    to spend half a day on Wednesday arguing about things.

15    THE COURT: I entirely agree with that. I thought he was

16    going to go through and see what other objections he has. The

17    timeline is so much longer than this, at least you could focus on

18    what he objects to, but if you want to do it some other way, I

19    don't care how you do it.

20    Is everybody on the defense side opting to have

21    Mr. Balarezo go through this tedious process, or do you all want

22    to participate?

23    MR. McDANIEL: I may participate for a while, Your Honor.

24    THE COURT: Until you lose interest.

25    MS. LIEBER: I just think in terms of the best, most

---

4

1    efficient use of anybody's time.

2    THE COURT: Do you have anybody else out there? O'Brien

3    and Horne are basically it?

4    MS. LIEBER: Your Honor, I have witnesses ready to go for

5    the rest of the day and tomorrow.

6    THE COURT: But who else is there? I have Horne and

7    O'Brien. I don't have anybody else. Am I missing somebody?

8    MS. LIEBER: We may have the maintenance man from Summit

9    Circle. We probably have a detective, just to move in the drugs

10    for Mr. Givens that were recovered from him, because they make up

11    one of the counts in the indictment.

12    THE COURT: One of the counts?

13    MS. LIEBER: One of the substantive counts.

14    THE COURT: Overt or --

15    MS. LIEBER: The PWID with Mr. -- PWID count against

16    Mr. Jones, but that again would be a ten-minute witness, so in

17    terms of --

18    THE COURT: Do you think -- I don't know how long Horne

19    and O'Brien are going to take. Are you telling me if we stop

20    today after this gentleman, that you'll be finishing your case

21    tomorrow?

22    MS. LIEBER: Wednesday.

23    THE COURT: Because we have a lot of tapes to listen to.

24    MS. LIEBER: We have not a ton, we have some, and

25    Detective Horne, frankly, the last bit of her testimony will be

**5**

1  talking about various components of the timeline. So, for
2  instance, looking at October 14th, and walking through what
3  happened on certain days, not the whole timeline, but I'm going
4  use the timeline with her, that summary exhibit with her.
5      THE COURT: Well, I don't -- if you want to do it this
6  way, Mr. Balarezo, I suppose I don't really care how you go about
7  doing it, as long as we cut down the inefficiency. I thought it
8  would be less if you identified time. If you think you could get
9  through it this afternoon?
10     MR. BALAREZO: I think we agreed on a method of getting
11 through it today and getting it settled today.
12     THE COURT: All right. Don't forget, though, what a
13 summary evidence is supposed to be.
14     Okay. Let's try to keep your eye on that and not have
15 Horne carrying the ball. If you want her to be the witness, then
16 you don't use the timeline.
17     MS. LIEBER: Your Honor, I'm just going to have her talk
18 about using that as a reference. The exhibit is the exhibit and
19 it speaks for itself.
20     THE COURT: Okay. As long as she's not interpreting and
21 all the rest.
22     MS. LIEBER: I'm just going to have her say, "On
23 October 14th, you heard these calls coming across the wire, what
24 did you do in response and what did you think about -- why is
25 this significant?"

**6**

1      It's part of the investigation, and instead of just giving
2  them an exhibit and saying, "Have at it," I think it's important
3  for them to know why we think it works this way.
4      THE COURT: Well, yes and no. That's what closing
5  argument is about. You take that timeline and you work with it,
6  you don't have her do it for you. All right. We'll see.
7      Okay. Let's finish up with the witness. Can you bring
8  him back, please. The jury's here now, again?
9      THE DEPUTY CLERK: Yes.
10     THE COURT: And the two other issues that I need
11 assistance on, one has a -- you're going to -- the other thing
12 you're going to have to make defense counsel aware of before too
13 long is the burnt tape (sic). I don't believe they're going to
14 take long on these 20 witnesses, so we need to figure out that,
15 to find out if we have any problems with any of the transcripts
16 which you are going to propose as evidence, right?
17     MS. LIEBER: I didn't hear what you said, "the burnt"?
18 The disk -- of all the calls?
19     THE COURT: Yes. In case the case goes through or in
20 quicker, I would like to know what that exhibit is, as well as
21 the transcripts.
22     MS. LIEBER: Your Honor, what we'll do is -- I'm just
23 going to take a look at our notes and then run past them before
24 we burn the disk, run past them, all the call numbers that
25 everybody agrees has been played.

**7**

1      THE COURT: Okay. However you want to do it.
2      You ought to give them a list in writing or something.
3      MS. LIEBER: That's what I'm saying, if I'm going through
4  and figure out which calls I think were played, give them a
5  chance to take a look at it and tell me if I'm wrong --
6      THE COURT: Okay.
7      MS. LIEBER: -- and then give that list to the agent to
8  burn the disk.
9      THE COURT: Fine.
10     All right. So she's planning to put together the
11 transcripts to go along with them. If anybody has any problem
12 with that procedure, kindly file something in writing by the end
13 of the week, all right?
14     Okay. Bring them in.
15     (Jury in at 2:02 p.m.)
16     THE COURT: Sorry, ladies and gentlemen.
17     Okay. Go ahead, Mr. Balarezo, you were going to play --
18 we got the audio working?
19     MR. BALAREZO: I think it is, Your Honor. Thank you.
20     CONTINUED CROSS-EXAMINATION OF ANTHONY GIVENS
21 BY MR. BALAREZO:
22     MR. BALAREZO: Good afternoon, ladies and gentlemen.
23 Mr. Givens, good afternoon.
24     THE WITNESS: Good afternoon.
25 BY MR. BALAREZO:

**8**

1  Q.   Before we left off, I was talking to you about the tape
2  of your interview from the day that you were arrested.
3  A.   Yes.
4  Q.   And I asked you, before lunch, a couple questions about
5  what you told the police at that time. Do you remember those
6  questions?
7  A.   Yes.
8  Q.   About being a courier and about getting $500 to deliver
9  those -- that 500 grams of crack. Do you remember that?
10 A.   Yes.
11 Q.   Okay. Let me go ahead and play -- it's been marked as
12 Jones Number 30 --
13     THE COURT: It's in evidence. It's 33.
14     (Videotape played.)
15 BY MR. BALAREZO:
16 Q.   Now, you agree that that is you, correct?
17 A.   Yes.
18 Q.   And you can see yourself?
19 A.   Yes. I can't see it right here, though.
20     (Videotape played.)
21 BY MR. BALAREZO:
22 Q.   Let me stop that for one second.
23     Now, you also said that when you were talking to these
24 gentlemen, you understood that you were in trouble, right?
25 A.   Uhm, no, not really.

9

1 **Q.**    Well, you had just been caught with 500 grams of crack
2 cocaine in your car; you had been arrested; you knew you were in
3 trouble because of that, correct?
4 **A.**    Some trouble, but I didn't really understand how much
5 trouble I was in, at that point.
6 **Q.**    But the reason you already said you had talked to them
7 was because you wanted to help yourself out, try to make the
8 troubles go away, if possible, correct?
9 **A.**    No, I didn't think my troubles were going to go away.
10 **Q.**    So you didn't have anything better to do than talk to
11 these agents that day?
12      MS. LIEBER: Objection.
13      THE COURT: Sustained.
14 BY MR. BALAREZO:
15 **Q.**    Well, you talked to them, right?
16 **A.**    Yeah, I talked to them.
17 **Q.**    The reason you talked to them is because you want to help
18 yourself out?
19 **A.**    I thought I was going to get a bond.
20      THE COURT: You thought you were going to get what?
21      THE WITNESS: I thought I was going to get a bond.
22      THE COURT: Bond?
23      THE WITNESS: Yeah, a bond.
24 BY MR. BALAREZO:
25 **Q.**    Let's listen.

10

1      (Videotape played.)
2 BY MR. BALAREZO:
3 **Q.**    You heard that question, right? Did you cook the crack
4 cocaine up?
5 **A.**    Yes.
6 **Q.**    And you told them no, right?
7 **A.**    That's right.
8 **Q.**    Let me back it up.
9      (Videotape played.)
10 BY MR. BALAREZO:
11 **Q.**    Let me stop it right there.
12      Did you hear that question and the answer you gave?
13 **A.**    Yes.
14 **Q.**    When did you come into possession of that crack cocaine
15 and you said two days ago, right?
16 **A.**    Yes.
17 **Q.**    You told these jurors you had got it a month before, from
18 Antoine Jones, right?
19 **A.**    Yes.
20 **Q.**    So one or the other is not correct, right?
21 **A.**    Yes.
22 **Q.**    You're either lying to the cop or lying to the jury,
23 right?
24 **A.**    Yes.
25 **Q.**    We'll go to the next one.

11

1      (Videotape played.)
2 BY MR. BALAREZO:
3 **Q.**    So right there, they're asking you who gave you that
4 crack cocaine, right?
5 **A.**    Yes.
6 **Q.**    You claim to know the name, but you don't want to give it
7 to them right there?
8 **A.**    Yes.
9 **Q.**    Although you want to tell the truth, you want to help
10 yourself out, you don't give them the name of your source?
11      MS. LIEBER: Objection. That's not what he testified
12 about, with respect to these detectives.
13      THE COURT: I don't know, but I thought we were just
14 playing the tape. I'm a little perplexed by the procedure. I
15 understand you -- finish the tape, would you?
16      (Videotape played.)
17      MR. BALAREZO: Your Honor, is the Court not going to let
18 me stop?
19      THE COURT: Can you approach?
20      (Following sidebar discussion had on the record:)
21      THE COURT: The point of this tape going in is to impeach
22 him. It isn't as substantive evidence, so it goes in for the
23 contradictions. I don't know why we're stopping.
24      BY MR. BALAREZO: Because there's specific contradictions.
25 That's why I'm stopping right there.

12

1      THE COURT: We all know. I don't understand what you're
2 doing. And then you ask him which one is right? He's all
3 ready -- most of it -- you can't really impeach somebody with
4 something he already said on direct, that I told him something
5 and it was wrong. There's no point for that.
6      MR. BALAREZO: He hasn't said that, Your Honor. What he
7 said --
8      THE COURT: Well, certainly about whether or not he said
9 that, he didn't give him the names, so it's not like saying, you
10 know, you're telling something different here, now.
11      MR. BALAREZO: But these other times, what he said at the
12 beginning of my cross was that he never told him that he was a
13 middleman, that he never got the 500 that he was talking about
14 getting.
15      THE COURT: What do you want to stop him for, to say, are
16 you a middleman or not a middleman? Where is the impeachment?
17      MR. BALAREZO: I understand, but I'm stopping it to point
18 out to the jury, this is what he said back then and this is what
19 he told you. I don't think that's improper. We have a whole
20 tape. The jury is not going to see the whole tape and may not
21 ever look at it again.
22      THE COURT: Play the whole tape, that's fine with me, but
23 ...
24      MR. BALAREZO: But it's only another minute or so long,
25 Your Honor, and it's only three times I'm going to stop it.

---

**13**

1    THE COURT: It's not the way you do it, but if you want to

2  go ahead and stop him and ask him what you already asked him,

3  that's not the way you impeach somebody.

4    MR. BALAREZO: Then what's the purpose of showing the tape

5  at all, if I have already impeached him? Your Honor, I have to

6  show him the tape because he made a prior inconsistent statement.

7  And that's impeachment.

8    THE COURT: That's right, the tape. You don't stop the

9  tape and say, "Didn't you say you're a middleman on the tape?"

10  It's in there.

11    MR. BALAREZO: So are you saying -- is the Court saying I

12  can't question him about what he said in the tape, to point out

13  the impeachment? I'm sort of lost.

14    THE COURT: I'm not lost at all.

15    Impeachment means that you put in what he said and then

16  argue to the jury he's not believable. You don't sit around and

17  question him about whether it's right or wrong or whatever.

18    MR. BALAREZO: It's his statement, Your Honor.

19    THE COURT: It's only being offered to impeach him, and

20  therefore get it out. You don't sit there and stop and say,

21  "Didn't you say this on the tape?" The tape is in evidence for

22  impeachment purposes. I don't -- anyways, go ahead and finish it

23  up, but it's so -- it's not proper impeachment. I don't know

24  what the --

25    MS. LIEBER: I would ask that we just play the rest of the

---

**14**

1  tape and ask questions later.

2    THE COURT: He can argue to the jury until the cows come

3  home about the inconsistencies, you don't stop here and ask him

4  about it.

5    MR. BALAREZO: Your Honor, I need to be able to confront

6  him with his prior statement and that's what I'm doing. I can't

7  see --

8    THE COURT: You want to confront him with what?

9    MR. BALAREZO: That he made a prior inconsistent

10  statement. That's the whole thing. I asked him the questions,

11  he denied saying these things, I'm only trying to show that it's

12  inconsistent with what he said to the jury.

13    THE COURT: We've got it in evidence that this is the

14  statement he made. The jury concludes whether or not -- how

15  inconsistent it is. But I'm allowing it to go to the jury for

16  that very purpose, the inconsistencies. I've never heard anybody

17  stopping and saying, "By the way, isn't that inconsistent?"

18    MR. BALAREZO: It's the same thing that we did with the

19  transcript from the grand jury testimony. You were asked this

20  question and you said this, here, boom, it's the same thing I'm

21  doing, except I have a tape.

22    THE COURT: I know, but you don't also say to the witness,

23  "Isn't it inconsistent with what you told the jury here today?"

24    Listen go ahead. You can do what you want on this one.

25  Thank you.

---

**15**

1    (Sidebar discussion concluded.)

2    MR. BALAREZO: May I proceed, Your Honor?

3    THE COURT: Yes.

4    (Videotape played.)

5  BY MR. BALAREZO:

6  Q.    Mr. Givens, I asked you before lunch if you had -- if

7  they had questioned you about who you got the drugs from and

8  what you were going to get paid for it. And what you told this

9  jury was that you got paid or were going to get paid $3300 for

10  an eighth. Do you remember that? Before lunch, you said that?

11  A.    Before lunch, I thought I said 3800.

12  Q.    Thirty-eight.

13    Well, you said that you weren't going to get a $500 for

14  the half of key, correct?

15  A.    That's not totally correct.

16  Q.    Well, what you told this officer that was interviewing

17  you was, that you were going to get $500 for delivering it to

18  somebody else and that you were acting solely as a middleman.

19  You denied that this morning, right?

20  A.    I'm saying?

21  Q.    This morning when I asked you the question, specifically,

22  if you had told the officers that you were just a middleman,

23  that you were just going to deliver it. You said no, because

24  you said you were going to deal the drugs, right?

25  A.    I said --

---

**16**

1  Q.    Did you forget that?

2  A.    -- I said I am the middleman.

3  Q.    That's what you said on this tape?

4  A.    In the sense that I got it from somebody else and I was

5  going to deliver it to another person.

6  Q.    But what you said at first was that you were going to

7  deal those drugs, not a middleman, you weren't just delivering

8  it, you were going to deal it to make money for yourself, not

9  just for that $500, right?

10  A.    Yeah.

11  Q.    So now, what you told the officers on the day of your

12  arrest is different from what you're telling this jury today,

13  right?

14  A.    No.

15  Q.    So both versions are the truth, according to you?

16  A.    No, it's not the truth. What he was asking about was the

17  crack cocaine, specific. Like I told you in the tape, I had

18  three-eighths and a little over, and when the officer approached

19  me, I was going to deliver the little overs. When he asked me

20  how much would that net -- before this tape came on, I was

21  trying to explain to him what I would profit, a little bit over,

22  and then he asked me further down the line about, specifically,

23  about the eighth, which I told him I was going to deliver for

24  roughly around $3300.

25    So I'm trying to give -- talk to them and answer the

---

**17**

1 questions, according to how they're asking the questions.
2 **Q.** How they asked you.
3 Well, they asked you about three different times. The
4 first time was about the 500 grams that you were going to get
5 500. The second one was for the eighth of a kilogram that you
6 had gotten from the same person a month prior, not three days
7 prior, and that you were going to get $3300 for it. And then
8 the third one, which is going to come up, let's look at that
9 one.
10 (Videotape played.)
11 MS. LIEBER: Your Honor, objection at this point.
12 THE COURT: Stop.
13 MR. BALAREZO: I can stop it here.
14 THE COURT: Is that the end of the playing?
15 MS. LIEBER: I don't know what this is impeaching.
16 THE COURT: Okay. Well, let's stop it, then. He said he
17 can stop it here.
18 Okay. Turn it off, please.
19 MR. BALAREZO: Oh, sorry.
20 BY MR. BALAREZO:
21 **Q.** So Mr. Givens, you just heard that last little summary
22 from the officers about the different times.
23 **A.** Yes.
24 **Q.** The time you got arrested and a month before.
25 **A.** Right.

**18**

1 **Q.** There's no explanation about, well, I was going to
2 deliver one-eighth to someone at this time and I got this and
3 that, right? You told him about several separate times that you
4 were going to deliver drugs from somebody else, to somebody
5 else, and that you were just the middleman.
6 **A.** That I purchased drugs from him. I cooked it. I
7 separated them into eighths and I was delivering them in
8 eighths.
9 **Q.** That's not exactly what you said on that videotape just
10 now, is it?
11 **A.** That's what I said. I was -- we were talking about
12 eighths. That's what I was saying, it was eighths.
13 **Q.** All right. Now, let me ask you about your plea agreement
14 that we talked a little bit about this morning.
15 You are aware in your plea agreement, you're only taking
16 responsibility for the drugs that you were arrested with; is
17 that correct?
18 **A.** Yes.
19 **Q.** You told the government that you had been involved in
20 drug dealing with Antoine Jones for multiple kilogram
21 quantities, right?
22 **A.** Yes.
23 **Q.** But you're only taking responsibility for the 500 grams
24 of crack cocaine?
25 **A.** Yes.

**19**

1 **Q.** All right. And you do know that because you took
2 responsibility for only the 500 grams of crack cocaine, that
3 your guidelines are lower than if you had taken responsibility
4 for the entire amount of drugs that you've claimed that you sold
5 with Antoine Jones, right?
6 **A.** Yes.
7 **Q.** And so because they allowed you to plead guilty to a
8 lower amount of drugs, that is a benefit to you; isn't it?
9 MS. LIEBER: Objection.
10 THE COURT: What?
11 MS. LIEBER: What he's allowed to do.
12 THE COURT: No. It's what he understands.
13 Do you think the amount of drugs you pled to had any
14 effect on your exposure, in terms of sentencing guidelines?
15 Do you understand the question?
16 THE WITNESS: No, I don't think I do. Because from my
17 understanding, the guidelines are advisory now.
18 BY MR. BALAREZO:
19 **Q.** And you do know that the judges can still follow what the
20 guidelines say, right? And the more drugs you're involved with,
21 the higher the guideline numbers, the higher the sentence you're
22 looking at, possibly?
23 **A.** Do I know that?
24 **Q.** Are you aware of that?
25 **A.** I thought I felt it was advisory.

**20**

1 I'm not asking you that.
2 I'm asking: Are you aware that your guideline sentence
3 would have been higher if the drug amount would have been
4 higher?
5 **A.** I'm not aware of that.
6 **Q.** You're not aware of that.
7 You didn't talk to your lawyer about that?
8 MS. LIEBER: Objection.
9 THE COURT: Sustained as to --
10 MR. BALAREZO: I'm not asking what they said.
11 THE COURT: Sustained.
12 BY MR. BALAREZO:
13 **Q.** Now, this morning when you came in and you were asked by
14 Ms. Lieber to identify Mr. Jones, do you remember that?
15 **A.** Yes.
16 **Q.** Do you see -- well, when I'm sitting at the table, there
17 are eight individuals sitting there, right? Four defendants and
18 one lawyer each. That's eight. Do you agree with that?
19 THE COURT: We agree, go ahead. What's your next
20 question?
21 MR. BALAREZO: Well, does the witness agree? He's the one
22 on the stand.
23 THE COURT: I know, but let's move on.
24 BY MR. BALAREZO:
25 **Q.** Well, you don't know any of the lawyers, right?

21

1  **A.**  No.
2  **Q.**  And out of the four defendants, you do know Kevin
3  Holland, correct?
4  **A.**  Yes.
5  **Q.**  So, you got four defendants.  You know Kevin Holland, you
6  know he's not Antoine Jones, right?
7  **A.**  Right.
8  **Q.**  So that leaves three defendants, correct?
9  **A.**  Yes.
10  **Q.**  The first one, you say it's Mr. Jackson with the blue
11  sweater.  You said that that's him, that's Antoine Jones?
12  **A.**  Yes.
13  **Q.**  You were wrong, right?
14  **A.**  Yes, I was wrong.
15  **Q.**  And then you said Mr. Huggins at the end, with the tan
16  sweater?
17  **A.**  Yes.
18  **Q.**  So you already covered three, right?  Three defendants
19  out of the four, right?
20  **A.**  Two.
21  **Q.**  Well, you know Mr. Holland, you know he's not Antoine
22  Jones.
23  **A.**  Okay.
24  **Q.**  You're wrong with Mr. Jackson.
25  **A.**  Right.

22

1  **Q.**  You're wrong with Mr. Huggins.
2  **A.**  Right.
3  **Q.**  That only leaves one more, right?
4  **A.**  Yes.
5  **Q.**  So that's when you pick out Antoine Jones over here,
6  right?
7  **A.**  Right.
8  **Q.**  And you complain that you can't see, you don't have your
9  glasses, right?
10  **A.**  I don't have my glasses.
11  **Q.**  Well, when you came in, you walked right by him, did you
12  not?
13  **A.**  Yes.
14  **Q.**  You walked right through here.  I was standing here and
15  you walked within inches of him, correct?
16  **A.**  Yes.
17  **Q.**  And you looked over there?
18  **A.**  Yes.
19  **Q.**  And you saw the defendants and you never looked at them?
20  **A.**  Yes.
21  **Q.**  And you know we're going to ask you to identify Antoine
22  Jones, and you never looked at him.
23  **A.**  No, not when I came in the courtroom.
24  **Q.**  So you picked out the only one that was left, that's what
25  you're telling us?

23

1  MS. LIEBER:  Objection.
2  THE COURT:  Sustained.
3  BY MR. BALAREZO:
4  **Q.**  Now, about these deals that you said you did with
5  Mr. Jones, you agreed with me this morning that you've done
6  somewhere in the neighborhood of 12 to 24, based on your
7  estimate, right?
8  **A.**  Yes.
9  **Q.**  Now, do you see the agent sitting over here with the pink
10  blouse, Agent Yanta?
11  **A.**  Yes.
12  **Q.**  You've been in meetings and debriefings with her present,
13  correct?
14  **A.**  Yes.
15  **Q.**  And other agents, right?
16  **A.**  With her.
17  **Q.**  With her only.  Fine.  Were any of the prosecutors there?
18  **A.**  Yeah, Ms. Lieber.
19  THE COURT:  Who?
20  THE WITNESS:  Ms. Lieber.
21  BY MR. BALAREZO:
22  **Q.**  And possibly another agent or two?
23  **A.**  I just remember those two, basically.
24  **Q.**  All right.  And did you not, at one of these meetings
25  that you had, where Agent Yanta was present, did you not tell

24

1  her that you had bought cocaine from Antoine Jones ten times?
2  **A.**  Yes.
3  **Q.**  Okay.  Well, 10 times is a little different than 12 to
4  24, is it not?
5  **A.**  No.
6  **Q.**  In your mind it's not different?
7  **A.**  It's not different, because Agent Yanta asked how many
8  times did we meet, and I told you I met him two to four times in
9  a month, but every time -- when she asked the question about
10  whether I purchased from him, I tried to base it like ten times,
11  but we actually met more times than ten times.
12  Like I said, we went to the sports complex, we didn't --
13  we didn't deal any drugs then, but we met.  That was your
14  question.
15  **Q.**  You said you did not have a social relationship with
16  Antoine Jones, correct?
17  **A.**  And I didn't.
18  **Q.**  Not like you met and went to church or something, right?
19  **A.**  No.
20  **Q.**  You didn't kick back and have a beer at a bar or
21  something, right?
22  **A.**  No.
23  **Q.**  When you met, it was to buy drugs?
24  **A.**  Not every time.
25  **Q.**  Not every time.

25

1    And you told this jury earlier this morning that the
2    first purchase you made from Mr. Jones was 500 grams of crack
3    cocaine, correct?
4    **A.**    It wasn't crack cocaine, it was 500 grams of powder
5    cocaine.
6    **Q.**    Think about it, your initial statement was 500 grams of
7    crack, and then Ms. Lieber asked you later, and you've changed
8    to powder, right?
9    **A.**    No, it was -- according to -- he dealt in white powder,
10   so it was 500 grams of powder cocaine.
11   **Q.**    And when you were buying with Beanie, you were buying
12   kilogram quantities; is that right?
13   **A.**    Yes.
14   **Q.**    Okay. And you started a smaller kilogram amount and it
15   got larger, correct?
16   **A.**    Yes.
17   **Q.**    Until some point, you bought up to 10 kilograms?
18   **A.**    Correct.
19   **Q.**    Now, at another one of those meetings with Agent Yanta,
20   when you were giving them information, you told her that between
21   late 2003 and early 2004, you were buying one-eighth to 1 kilo
22   quantities from an Antoine Jones.
23   **A.**    Right.
24   **Q.**    Now, that's not what you're telling this jury today.
25   Right now, it's kilogram quantities, correct?

26

1    **A.**    In the beginning, that's what it was.
2    **Q.**    It was one-eighth -- what you told Agent Yanta during
3    that period, which is that period that you said you dealt with
4    Antoine Jones, from late 2003 until early 2004, you previously
5    told her -- told them, that you were dealing one-eighth to
6    1 kilo, right?
7    **A.**    Right.
8    **Q.**    Now, you also told the jury that when you began dealing
9    with Mr. Jones, you were paying $23,000 per kilo, right?
10   **A.**    Roughly.
11   **Q.**    Was it roughly or --
12   **A.**    Yeah.
13   **Q.**    23,000, right?
14   **A.**    23,000.
15   **Q.**    And the more cocaine you purchased from him, he lowered
16   the price for you, right?
17   **A.**    He eventually did.
18   **Q.**    The more you purchased, eventually he lowered the price
19   to 21,000 per kilo, right? Is that different now?
20   **A.**    No, it's not different.
21   **Q.**    Well, do you agree with they me that that's what you
22   said?
23   **A.**    I agree. I agree.
24   **Q.**    It went from 23,000 to $21,000 per kilo, right?
25   **A.**    Yes.

27

1    **Q.**    And $21,000 per kilo was towards the end of your
2    relationship, in 2004 sometime, right?
3    **A.**    Uhm, I don't know if it was always towards the end, so
4    much as it could have been in the middle.
5    **Q.**    Could have been in the middle.
6    You don't remember the exact times?
7    **A.**    No.
8    **Q.**    All right. You don't remember the exact dates?
9    **A.**    I don't know the exact time. I wasn't out there writing
10   it down.
11   **Q.**    You have no records of these transactions?
12   **A.**    Records, like writing it down?
13   **Q.**    You have a tally sheet somewhere?
14   **A.**    No, I don't.
15   **Q.**    All right. You said you fronted you drugs on occasion,
16   didn't you keep a record of what you owed him, that kind of
17   thing?
18   **A.**    Well, if I owe him 21,000 and he fronted me 2 kilos, I
19   know it's 42,000. I didn't need to write it down to remember
20   that. I'm quite sure if it wasn't right, he would have reminded
21   me.
22   **Q.**    And you remember this from a year and a half ago or more,
23   right? Over two years, actually.
24   **A.**    Yeah.
25   **Q.**    Okay. Now, 23,000, that was the most that you ever paid

28

1    for it, right?
2    **A.**    Yes.
3    THE COURT: Per kilo.
4
5    BY MR. BALAREZO:
6    **Q.**    Per kilo, correct?
7    **A.**    Yes.
8    **Q.**    And during one of these meetings with Agent Yanta, did
9    you not tell them that, at one point, you purchased a total of
10   10 kilos from Mr. Jones?
11   **A.**    I told her I got 10 kilos from him. I don't know if I
12   purchased it.
13   **Q.**    You got 10 kilos, but you paid for five, correct?
14   **A.**    Something like that.
15   **Q.**    And what you paid for five kilos was $120,000, right?
16   **A.**    I think I paid a 100 and I owed him for the rest, I
17   believe.
18   **Q.**    I'm going to be very specific here.
19   Did you or did you not tell Agent Yanta, that at some
20   point, you paid $120,000 for 5 kilos?
21   **A.**    That could be correct.
22   **Q.**    Okay. And if you paid 120,000 for 5 kilos, that comes
23   out to 24,000 per kilo, right?
24   **A.**    Yes.
25   **Q.**    So now that price is different from the most you ever

29

1  paid, right?
2  **A.**  Well, I'm not sure if that's reduced at the time.
3  **Q.**  Was it 24,000 -- less than $24,000 per kilo?
4  **A.**  Pardon me?
5  **Q.**  Is 23,000 per kilo less than 24,000 per kilo?
6  **A.**  Yes, it is.  Yes.
7  **Q.**  You agree with that?
8  **A.**  Yes.
9  **Q.**  So you're telling the jury you paid from 21,000 to
10  23,000, but at some point you paid 24,000.  Is that what you are
11  telling us?
12  **A.**  No, I'm telling you that I paid -- if I had gotten
13  10 kilos and 125,000, I gave him everything I had, and what I
14  owed him I would pay him the difference.
15  **Q.**  But what you told us is you paid for five and he fronted
16  you five?
17  **A.**  Right.
18  **Q.**  So, you paid 120 for 5 kilos, right?
19  **A.**  I paid for more than that, but like I say, if I had
20  125,000, and I was getting 10 kilos, I gave him what I had,
21  because the people that I was getting kilos for, I charged them
22  a different amount of money anyway.  So instead of taking the
23  money off the top, I just let it transfer and I took mine off at
24  the back end.
25  **Q.**  I'm not asking what you charge other people, I'm asking

30

1  what Antoine Jones charged you?
2  **A.**  Okay.  He charged me $23,000 a kilo.
3  **Q.**  And on that occasion, it's 24,000 now, right?
4  **A.**  No, it's not.
5  **Q.**  You also talked about markings, that the kilos had, the
6  ones that you purchased, do you remember that?
7  **A.**  Yes.
8  **Q.**  Now, in your experience dealing drugs, you're aware that
9  markings on drugs, cocaine in particular, are like a brand,
10  right?
11  **A.**  I'm not aware of that.
12  **Q.**  Like Nike sells sneakers and they have that little swoosh
13  mark, right?  Are you aware of that?
14  **A.**  I'm aware of that.
15  **Q.**  That's what markings serve.  In fact, that's what you
16  told Ms. Lieber, because you said it depends what the quality
17  is, when it was processed.  That's what the markings said.
18  **A.**  You said it was like a brand.  I don't feel like that.  I
19  feel they have an end price to them.
20  **Q.**  It's not just to make them look pretty, correct?  It's to
21  identify the cocaine.
22  **A.**  I don't know that.
23  **Q.**  You don't know that and you don't deal cocaine.  You've
24  never seen that before.
25  MS. LIEBER:  Objection.

31

1  THE COURT:  Yes.  Sustained.
2  THE WITNESS:  I don't --
3  THE COURT:  Wait.  Wait.
4  You don't have to answer, if I sustain the objection.
5  Everybody slow down.
6  Go ahead.
7  BY MR. BALAREZO:
8  **Q.**  And the brands that you had looked at, they were
9  different.  There was a Jesus Christ at some point; there was
10  some stars, some crosses?
11  THE COURT:  Wait.  Ms. Lieber, she is objecting because he
12  doesn't accept the word brand so --
13  MR. BALAREZO:  Well, the markings.
14  THE COURT:  The markings.  The markings that you
15  mentioned, one was Jesus Christ, I believe, right?
16  THE WITNESS:  I said one was Jesus Christ?
17  BY MR. BALAREZO:
18  **Q.**  Well, sir, did you see the Jesus Christ stamp on the
19  cocaine or not?
20  **A.**  Well, I --
21  **Q.**  Did you see it or not?
22  THE COURT:  Wait, finish your sentence.  We're getting
23  confused.
24  THE WITNESS:  What I'm saying is -- when the cocaine came
25  in, it had brands, and I was giving you examples of some of the

32

1  brands I see, not necessarily from him, but just brands that I
2  see, because they asked, "Do they have anything on them?"  That's
3  what I answered.
4  THE COURT:  Well --
5  BY MR. BALAREZO:
6  **Q.**  You just used the word brands.  That's what I was asking.
7  **A.**  Okay.
8  **Q.**  It's your word, "brands."  You saw Jesus Christ stamped
9  on the cocaine, right?  That's what you said this morning, are
10  you --
11  **A.**  That's not what I said.
12  THE COURT:  All right.  The jury's recollection will
13  control, but go ahead.
14  BY MR. BALAREZO:
15  **Q.**  And you told Agent Yanta, in one of those meetings, that
16  you saw crosses, right?
17  **A.**  Right.
18  **Q.**  You saw cars, you saw stars.  Do you remember that?
19  **A.**  I testified.  I told her the things that I seen imprinted
20  on cocaine.
21  **Q.**  But not Jesus Christ?
22  **A.**  I'll tell you one thing, I'm not saying they came from,
23  him, but I have seen it on there.
24  **Q.**  Now, you've -- you thought, according to you, you dealt
25  with Mr. Jones for a period of six months from 2003 to early

33

```
1    2004, but yet you were never at Level's Night Club; is that
2    correct?
3    A.    No.
4    Q.    Never went there?
5    A.    No.
6    Q.    Never dealt drugs with Antoine Jones there, never picked
7    up drugs, never gave him money?
8          THE COURT:  At Levels.
9          MR. BALAREZO:  At Levels.
10         THE WITNESS:  No.
11   BY MR. BALAREZO:
12   Q.    Now, when you purchased this cocaine from Mr. Jones,
13   according to you, you were doing it to make money for yourself,
14   correct?
15   A.    No.
16   Q.    And at no point did you -- that Antoine Jones tell you,
17   here's 10 kilos, go sell it to these people right here, right?
18   A.    No, he didn't tell me directly, send me to any particular
19   person.
20   Q.    You were free sell it to whom you wanted, right?
21   A.    Yes.
22   Q.    If you wanted to sell it in eighths, you could sell it in
23   eighths?
24   A.    Yes.
25   Q.    If you wanted to sell it in kilos, you could sell it in
```

34

```
1    kilos.  He never told you where to go sell it, correct?
2    A.    No.
3    Q.    He never told you what to do with it.  It was just take
4    the drugs, do whatever you want, right?  Give me the money.
5    A.    Right.
6    Q.    He never -- you never saw somebody by the name of John
7    Adams delivering drugs to you, correct?
8    A.    No.
9    Q.    Did you ever see anybody by the name Lawrence Maynard
10   delivering drugs to you?
11   A.    No.
12   Q.    All right.  Now, how many times would you say that you
13   had -- during these transactions, that you had direct
14   face-to-face contact with Mr. Jones?
15         THE COURT:  You mean -- are you saying when drugs were
16   provided or ...
17         MR. BALAREZO:  During the transactions what I said,
18   Your Honor.
19         THE COURT:  You mean when drugs were provided in exchange
20   for money.  Is that what you are saying, as opposed to -- he's
21   not drawing a distinction.
22         MR. BALAREZO:  I'll reform the question.
23   BY MR. BALAREZO:
24   Q.    Mr. Givens, during the times that you say Mr. Jones sold
25   cocaine to you in exchange for money --
```

35

```
1    A.    All right.
2    Q.    -- how many times out of those, do you think you had
3    direct face-to-face contact with him?
4          THE WITNESS:  I'm not sure.  I'm not sure how many times I
5    had direct face-to-face contact.
6    BY MR. BALAREZO:
7    Q.    So out of the 12 to 24 deals that you said you made,
8    estimatedly [sic] --
9    A.    Right.
10   Q.    -- how many would you say you had face-to-face contact?
11   A.    Face-to-face contact?  To put a number on it?  I'm not
12   sure.
13   Q.    Well, today's not the first time you've seen Antoine
14   Jones, right?
15   A.    No, but I would say that -- to put a number, I would be
16   guessing.
17         THE COURT:  Don't guess.
18   BY MR. BALAREZO:
19   Q.    More than one, would that be fair to say?
20   A.    Yes, more than one.
21   Q.    More than five?
22   A.    Anything other than that, I think I would be guessing.
23   Q.    So let's say maybe more than five.
24         During that time, you had your glasses or your contacts
25   on, so you were able to see, correct?
```

36

```
1    A.    Sometimes -- most of the time, actually, we was -- I had
2    my glasses on.
3    Q.    So when you have your glasses on, you can see, right?
4    A.    I can see better.
5    Q.    Can you describe for me some specific feature of
6    Mr. Jones?  The way he looks?
7    A.    The way he looks?
8    Q.    Yeah.
9    A.    Fair complexion, fair height, his eye is messed up.
10         THE COURT:  Huh?
11         THE WITNESS:  One of his eyes is messed up.  To me, he got
12   a -- he's a little built, but other than that, that's about it.
13   BY MR. BALAREZO:
14   Q.    And that description you've given Mr. Jones is something
15   that you could have observed here today?
16         MS. LIEBER:  Objection.
17         THE COURT:  Yeah.  Sustained.
18         MS. LIEBER:  Why ask the question?
19         THE COURT:  You asked.
20         MR. BALAREZO:  I have nothing else.
21         THE COURT:  Anything, Mr. Norris?
22         MR. NORRIS:  Yes.
23         CROSS-EXAMINATION OF ANTHONY GIVENS
24   BY MR. NORRIS:
25   Q.    Good day, Mr. Givens.
```

37

1  **A.**  Good day.
2  **Q.**  Mr. Givens, just to be clear, you're looking at up to
3  life in prison, correct?
4  **A.**  Yes.
5  **Q.**  You're looking at a mandatory 10 if there's no benefit
6  from the 5K, correct?
7  **A.**  Yes.
8  **Q.**  And the reason you're here is to get the benefit of the
9  plea bargain that you made to the government, correct?
10  **A.**  The ten years?
11  **Q.**  To get the benefit, to try to do better than the ten
12  years, right?
13  **A.**  I'm doing it -- I'm trying to get the ten years.
14  **Q.**  You want to go home one day, right?
15  **A.**  Definitely.
16  **Q.**  Ten years is better than life. Do you agree with me
17  there?
18  **A.**  Yes.
19  **Q.**  And if the government is pleased with your testimony and
20  they provide the 5K motion to the judge, Judge Walton, you can
21  do better than the ten years, correct?
22  **A.**  I don't know. I don't think -- it's a question for the
23  judge, from my understanding.
24  MR. NORRIS: That's right.
25  BY MR. NORRIS:

38

1  **A.**  He still can give me life.
2  **Q.**  He can give you life and he can give you ten years,
3  right?
4  **A.**  Right.
5  BY MR. NORRIS:
6  **Q.**  And if there's no 5K -- those are the only two options;
7  somewhere between ten on the bottom and life on the top end,
8  right?
9  **A.**  Correct.
10  **Q.**  Okay. But if the government is pleased enough with your
11  testimony that you provided substantial assistance, and they
12  provide a 5K motion to Judge Walton, that would allow Judge
13  Walton, if he chose to, to do better than the ten years, less
14  than the ten years, correct?
15  **A.**  That's my understanding.
16  **Q.**  And just like ten years is better than life, less
17  than ten years is better than ten years, right?
18  **A.**  Yes.
19  **Q.**  Okay. You'd be happier if you got less than ten years,
20  correct?
21  **A.**  Yes, I would.
22  **Q.**  The sooner you go home, the happier you are, correct?
23  **A.**  Not necessarily the happier.
24  **Q.**  Okay. Well, you've met with the government in
25  preparation for your testimony here, right?

39

1  **A.**  Yes.
2  **Q.**  Okay. How many times have you met with the government?
3  **A.**  I think with them too, I think maybe two or three times.
4  **Q.**  Okay. Now, because you're happy with doing ten years,
5  you don't want the jury to think you would say anything to get
6  the most benefit, right?
7  **A.**  I'm not going to say anything.
8  **Q.**  Okay. Well, you knew that coming to court you would have
9  to testify about transactions that you say happened with Antoine
10  Jones, right?
11  **A.**  Yes.
12  **Q.**  And you never had any transactions with my client Adrian
13  Jackson, have you?
14  **A.**  No.
15  **Q.**  Okay. And you knew that in addition to testifying about
16  things that you say happened with Antoine Jones, you knew that
17  the government would ask you to identify Antoine Jones in court,
18  correct?
19  **A.**  Yes.
20  **Q.**  Okay. Now, you were asked a question about being able to
21  pick out Antoine Jones in court here today, right?
22  **A.**  Yes.
23  **Q.**  Okay. And you didn't say to the ladies and gentlemen at
24  that point "you know, I don't have my glasses today, I'm not
25  sure I can see well enough to identify him," you didn't tell

40

1  them that at first, did you?
2  **A.**  No.
3  **Q.**  Okay. What you did, in order to try to fulfill your
4  agreement with the government, is you really wanted to pick
5  someone out, didn't you?
6  **A.**  No.
7  **Q.**  Well, you pointed your finger at my client, a man you say
8  you had no dealings with --
9  **A.**  Right.
10  **Q.**  -- and said that's Antoine Jones, didn't you?
11  **A.**  Yes.
12  **Q.**  And that's because you really wanted to help the
13  government out, right?
14  **A.**  That I pointed to him and said that he was Antoine Jones?
15  **Q.**  Yes. Instead of saying I can't tell, I can't see.
16  **A.**  No. I thought I was pointing the right person out.
17  **Q.**  Okay. You're so eager to help, what you did was you
18  pointed the wrong person out, right?
19  **A.**  Right.
20  **Q.**  And you were still so eager to help out that you did it
21  again and you pointed the wrong person out again when you
22  pointed to Mr. Huggins, correct?
23  **A.**  Right.
24  MR. NORRIS: Nothing further.
25  THE COURT: Mr. McDaniel.

41

CROSS-EXAMINATION OF ANTHONY GIVENS

1    CROSS-EXAMINATION OF ANTHONY GIVENS
2  BY MR. McDANIEL:
3  **Q.**   Good afternoon, Mr. Givens.
4  **A.**   Good afternoon.
5  **Q.**   You know Mr. Holland from when you were much younger; is
6  that fair to say?
7  **A.**   Yes.
8  **Q.**   Boys club type age; is that right?
9  **A.**   Yes.
10 **Q.**   You've never gotten any drugs from Mr. Holland; is that
11 correct?
12 **A.**   No.
13 **Q.**   And you have never given any drugs to Mr. Holland; is
14 that right?
15 **A.**   No.
16    CROSS-EXAMINATION OF ANTHONY GIVENS
17 BY MR. ACREE:
18 **Q.**   The first thing I want to ask you:  Was it your testimony
19 that you said when you were talking to the police on that
20 videotape, that you just thought you were in a little bit of
21 trouble?
22 **A.**   No.
23 **Q.**   Not a lot of trouble?
24 **A.**   No.
25 **Q.**   So, did there come a time when you figured you were in a

42

1  lot of trouble?
2  **A.**   Yes.
3  **Q.**   So, even though you didn't even think you were in a lot
4  of trouble, you lied to the police anyway; isn't that right?
5  **A.**   Yes, sir.
6  **Q.**   Okay.  So, now that you know you're in a lot of trouble,
7  there's even a greater chance you're going to lie, isn't there?
8  **A.**   No.  The thing is that --
9  **Q.**   That's all right.
10    THE COURT:  That's all right.  He answered no.  Anything
11 else?
12    MR. ACREE:  Yes, Your Honor.
13 BY MR. ACREE:
14 **Q.**   Now, was it also your testimony to Mr. Norris that you
15 wouldn't necessarily be happier if you went home sooner; is that
16 your testimony?
17 **A.**   Yes, that's my testimony.
18 **Q.**   Sir, wouldn't you be happier to go home today rather than
19 five years from now?  Take your time.
20    MS. LIEBER:  Your Honor --
21    THE COURT:  Sustained.  Don't make comments, please.  Can
22 you answer that?
23    THE WITNESS:  I put myself in a real tight situation by
24 sitting up here and testifying in front of these people, and a
25 lot of -- what they may not understand is that my life is on the

43

1  line.
2     MR. BALAREZO:  Objection, Your Honor.
3     THE COURT:  Okay.
4  BY MR. ACREE:
5  **Q.**   The only thing I'm asking you --
6  **A.**   -- I haven't finished --
7  **Q.**   -- is are you happier to go home today rather than five
8  years --
9  **A.**   -- He won't let me finish --
10 **Q.**   -- from today?
11    THE WITNESS:  He objected and I didn't get to finish.
12    THE COURT:  You can go ahead and answer his question if
13 you can.  He wants to know whether you'd be happier to go home
14 today rather than five years.  That's all he's asking.
15 BY MR. ACREE:
16 **Q.**   When would you rather go home, today or five years from
17 now?  Which would make you happier?
18 **A.**   Today.
19 **Q.**   Okay.  All right.  Now, one of the things that I wanted
20 to ask you was, with regard to the way that according to you you
21 received the drugs from Mr. Jones, was it your testimony that
22 when you got the drugs from Mr. Jones, that it was wrapped in --
23 did you say Seran Wrap?
24 **A.**   It was one of the things it was wrapped in?
25 **Q.**   Okay.  What else was it wrapped in?

44

1  **A.**   It was in -- it was wrapped in twos.
2  **Q.**   Say it again?
3  **A.**   Wrapped in twos, two kilos --
4     THE COURT:  Number 2.
5     THE WITNESS:  -- per package.
6  BY MR. ACREE:
7  **Q.**   Okay.  Every time?
8  **A.**   Not every time, okay.
9  **Q.**   Okay.
10 **A.**   Two kilos per package, and they had this thing where you
11 can put food in the plastic containers to suck the air out.
12 That was similar to what the containers looked like.  So, once
13 you got the clear package off, you had two individual kilos of
14 cocaine, okay.  So the wrappings are, like I said, they're
15 bubble wrap, Seran Wrap -- I'm sorry, Seran Wrap, they might
16 have some aluminum foil.
17 **Q.**   Each time or these are different times it would come out?
18 **A.**   Each time.
19 **Q.**   Okay.
20 **A.**   Each time.
21 **Q.**   Okay.  So each time you're saying Seran Wrap, bubble wrap
22 and aluminum foil?
23 **A.**   Yeah.  And it had something gritty.  I don't know what
24 the name of it is.
25    THE COURT:  Are you saying that the individual packages

**45**

1 were wrapped with all these things every time?

2     THE WITNESS: Yes. I never got --

3     THE COURT: Bubble wrap, tin foil, Seran Wrap and some of

4 the --

5     THE WITNESS: They were individually wrapped, so other

6 than the initial -- other than the initial half a kilo, it was

7 bubble wrapped or aluminum wrapped or --

8 BY MR. ACREE:

9 **Q.** And how -- you said a half a kilo, and how was that

10 packaging?

11 **A.** In a Ziploc bag.

12 **Q.** Just a plain Ziploc bag?

13 **A.** Right. It had been unwrapped.

14 **Q.** And was it a clear Ziploc bag?

15 **A.** Yes.

16 **Q.** I'm sorry?

17 **A.** Yes.

18 **Q.** Okay. Now, the other thing that you talked about was the

19 fact that there was an impression or an imprint on the drugs; is

20 that right?

21 **A.** Yes.

22 **Q.** And what imprint was there on the ones you claim to have

23 gotten from Mr. Jones?

24 **A.** I believe that they were crosses, but the imprints

25 varied.

**46**

1 **Q.** You say "you believe"?

2 **A.** Right. To my recollection, that's what I remember.

3 **Q.** So, are you having trouble remembering or you were

4 getting drugs from so many people you don't know which one is

5 which?

6 **A.** No, I'm having trouble remembering. It was a long time

7 ago.

8 **Q.** So you're having trouble remembering what happened back

9 at that time?

10 **A.** No, I'm not having trouble remembering what happened back

11 then.

12 **Q.** I'm just responding to what you said.

13 **A.** What I was saying is when I was getting kilos of cocaine,

14 they had imprints.

15 **Q.** Okay.

16 **A.** So when the question was asked to describe them, I gave

17 them a description of what the person was giving.

18 **Q.** Well, no, let me just ask you the specific question,

19 though. Do you know what the imprint, the imprint or the

20 impression was on the drugs that you got from Mr. Jones?

21     If you don't remember, then just say you don't remember,

22 but I'm asking specifically about what you claim you say you got

23 from Mr. Jones.

24 **A.** I don't recollect exactly.

25 **Q.** That's fine, you're not sure.

**47**

1 **A.** I'm not sure.

2 **Q.** Now, when -- let me just ask you this. When the

3 officers -- when the police found drugs in your car, according

4 to you you bought powder, but you had already changed it to

5 crack at that time; is that right?

6 **A.** Yes.

7 **Q.** And you did that on your own; Mr. Jones didn't have

8 anything to do with that?

9 **A.** No, he didn't have anything to do with that.

10 **Q.** Say it again.

11 **A.** No, he didn't have anything to do with that.

12 **Q.** Now, one of the things you said was that you -- sometimes

13 you would meet Mr. Jones at a Home Depot; is that right?

14 **A.** Yes.

15 **Q.** And it was your understanding that Mr. Jones was going to

16 that Home Depot to get some stuff for his club. That's what you

17 testified to, right?

18 **A.** That's what was told to me.

19 **Q.** Right. That was your understanding, right?

20 **A.** Right.

21 **Q.** And he would do that for you, he would do that; that is,

22 go get stuff from Home Depot before he would do anything with

23 you; isn't that right?

24 **A.** I'm not necessarily sure what he did in Home Depot, but I

25 know on occasion when I first started to meet him, he would be

**48**

1 up there, he would be out there in Home Depot so we would meet

2 in the parking lot or whatever.

3 **Q.** Well, in other words, sometimes he would make you wait;

4 isn't that right?

5 **A.** Uhm, with the Sam's club incident --

6 **Q.** With the what?

7 **A.** Sam's club.

8 **Q.** I'm speaking about Home Depot now. My only question to

9 you is whether or not Mr. Jones would go into the Home Depot

10 before he would meet with you when you claim you were getting

11 drugs from him. That's my question now.

12 **A.** No, I don't know what he was going in there for. Before

13 the Sam club incident, he was pretty on time.

14 **Q.** So, one of the things that you said you did -- you had

15 met with Agent Yanta, right?

16 **A.** Um-hmm.

17 **Q.** And other members of law enforcement; isn't that right?

18 **A.** Yes.

19 **Q.** Okay. And you told Agent Yanta and the other members

20 from law enforcement that sometimes you and Beanie or whoever

21 else would have to wait for Mr. Jones to shop in Home Depot

22 before he would waive for you; didn't you tell them that?

23 **A.** Uhm --

24 **Q.** Sir, did you tell them that? That's the first thing, and

25 then you can give the explanation.

49

1   **A.**   Uhm, they were coming out.
2   **Q.**   Did you tell them that, yes or no, and then give the
3 explanation. That's all I want to know is whether you told them
4 that. That's the only question pending.
5   MS. LIEBER: Objection, objection.
6   THE COURT: Sustained, sustained. You don't need to shout
7 and you don't need to ask a number of times.
8   Do you remember whether you told him, is the question.
9   THE WITNESS: I don't think I waited for him in front of
10 Home Depot. I think the time we arrived he would come out. It
11 was a little time, but it wasn't an inconvenience, I felt like.
12   THE COURT: Okay. Listen to the question.
13 BY MR. ACREE:
14   **Q.**   You're giving different answers now.
15   THE COURT: No, no, just ask the question. Just ask the
16 question.
17 BY MR. ACREE:
18   **Q.**   The first thing is -- I'm not asking you what happened
19 now. I'm asking you what you told Agent Yanta and other members
20 of law enforcement.
21   **A.**   Okay.
22   **Q.**   That's my only question.
23   **A.**   Okay.
24   **Q.**   Now, it sounded like you gave two answers. Well, let me
25 say, did you just now say that, "No, we didn't have to wait for

50

1 him?" Didn't you say that at one point just now?
2   **A.**   I said he was pretty prompt.
3   **Q.**   And then you said, "well, we had to wait a little bit,
4 but I didn't think it was an inconvenience." Isn't that what
5 you just said at one time?
6   **A.**   He was pretty prompt.
7   **Q.**   Sir, I'm just asking you did you say those two things?
8   **A.**   He was pretty prompt. I'm sorry --
9   **Q.**   You don't want to answer my question.
10   **A.**   What I'm trying to explain to you is that --
11   THE COURT: Mr. Acree, do you have another question? You
12 want to ask him about what he told the agents. Don't go back and
13 forth about what he just testified to.
14   MR. ACREE: I can ask him about what he said. I'm
15 breaking it down whether he said two different things, Your
16 Honor. I can't ask him that?
17   THE COURT: Nope, move on.
18   MR. ACREE: Oh, okay.
19 BY MR. ACREE:
20   **Q.**   Well, let me ask you this. Which one is right, you
21 didn't have to wait or you didn't have to wait that long?
22   **A.**   In the Home Depot situation?
23   **Q.**   Yes, sir.
24   **A.**   I didn't feel I had to wait. It wasn't an inconvenience,
25 no. When he came out, he came out.

51

1   **Q.**   Are you saying you didn't have to wait at all or you
2 didn't have to wait that long? I'm just trying to figure out
3 whether you had to wait at all.
4   **A.**   When he came, he came out.
5   **Q.**   Okay. So you didn't have to wait at all?
6   **A.**   When he pulled up, when we called him on the phone, he
7 came out.
8   **Q.**   So you didn't have to wait at all then, is that right or
9 wrong?
10   **A.**   I mean, you're playing with words. It's like I had to
11 wait until he came out, obviously. I had to wait till he got to
12 the car.
13   **Q.**   Let me ask you this. This is my only question then: Did
14 you tell Agent Yanta and other members of law enforcement that
15 you had to wait on Antoine Jones while he shopped in Home Depot
16 for the club? Did you tell them, yes or no? Either you
17 did or you didn't.
18   **A.**   I could have told him that, that I had to wait.
19   **Q.**   You're not sure?
20   **A.**   I could have told him that I had to wait --
21   **Q.**   That was my only question.
22   **A.**   -- for him to come out of the store and get into his car.
23   **Q.**   That's the question now.
24   THE COURT: Okay. Do you have another one, Mr. Acree?
25 Let's finish it up.

52

1 BY MR. ACREE:
2   **Q.**   Now, with regard to -- I think you already testified
3 you've never been to the club; is that right?
4   **A.**   I've never been to the club.
5   **Q.**   Okay. And one of the things that you -- that according
6 to you sometimes when Mr. Jones would meet with you, that he
7 would meet with other customers, was that your testimony?
8   **A.**   No.
9   **Q.**   Okay. And just to be clear -- in other words, because I
10 think you said you might be one place, and Mr. Jones would be --
11 excuse me. Mr. Jones would have someone else like at another
12 pump or something like that?
13   **A.**   Correct.
14   **Q.**   And you said that was another customer?
15   **A.**   I believe so.
16   **Q.**   So you don't really know if it was another customer?
17   **A.**   I seen bags exchange hands.
18   **Q.**   Right now I'm asking you whether or not you know whether
19 Mr. Jones gave someone else some drugs?
20   **A.**   No.
21   **Q.**   Okay. And you never saw Mr. Jones exchanging any bags
22 with Mr. Huggins; is that right?
23   **A.**   No.
24   **Q.**   Okay.
25   MR. ACREE: That's all I have, Your Honor. Thank you.

**53**

1    MS. LIEBER: Your Honor, we have to approach. I have one
2    question I want to clear up.
3    THE COURT: One second, ladies and gentlemen. Let's have
4    the jury take a short recess. Ten minutes, please.
5    (Jury out at 2:56 p.m.)
6    THE COURT: Okay, sir. I'll excuse the witness briefly.
7    Okay. I'm sorry. No, we're going to excuse him. We're taking a
8    break. But I'll hear your proposal.
9    What do you propose to do?
10   MS. LIEBER: Your Honor, a truthful answer -- which I
11   intend to elicit unless the Court tells me I can't -- a fruitful
12   answer to "would you be happier to go home today versus five
13   years from now?" is "I'm concerned about going home right now
14   because my mother has been threatened, and I'm concerned about
15   testifying here." They opened the door, I put it on the record a
16   week ago --
17   THE COURT: You did?
18   MS. LIEBER: Oh, yes, when we talked a week ago why we had
19   various marshals and whoever else talking to folks who had come
20   into the courtroom.
21   THE COURT: I didn't know it was his mother.
22   MS. LIEBER: I actually said Mr. Givens' mother had been
23   threatened. And they were on notice about it, they asked these
24   questions and they wanted to attack a witness like that, and I
25   think I'm entitled to elicit that answer.

**54**

1    MR. ACREE: We can either leave it where it is or we can
2    go to the next step, because no matter what the situation is, we
3    get to ask the question as to whether he wants to go home sooner.
4    Now, if he wanted to give that answer, he could have given it. I
5    don't think there was any bar to him giving that answer.
6    THE COURT: Everybody kept saying give me a yes or no.
7    The government is saying we want to have the opportunity to
8    explain why he was hesitant to answer that question yes or no.
9    That's what happened. You kept on saying you have to answer yes
10   or no.
11   MR. ACREE: And that's because that's the only answer.
12   There is --
13   MS. LIEBER: No.
14   MR. ACREE: Well, in other words --
15   THE COURT: There's no question he was hesitating about
16   answering.
17   MR. ACREE: That's unfair, Your Honor, because he
18   hesitated to answer every question he was asked. But beyond
19   that, the bottom line is to look at this witness -- the biggest
20   problem with this witness is that he didn't want to answer
21   questions. If he didn't like a question, he wanted to take his
22   time and answer it. The bottom line is that at the end of the
23   day I think we can all agree he would be happier going home
24   earlier rather than later. And the only thing I'm saying is that
25   it can't be left with the only reason he wants to go home is

**55**

1    because of his mother. That can't be the only answer and be left
2    with that. And the only thing I'm saying is that if they want to
3    ask that question, that's fine, but the bottom line --
4    THE COURT: Mr. Norris doesn't think it's fine.
5    MR. ACREE: Well, me and Mr. Norris, unfortunately, are
6    not the same person.
7    Your Honor, the only thing I can say is that no matter how
8    Ms. Lieber leaves the question, I, myself, want to come back and
9    clear it up and make sure it's clear to the jury that he wants to
10   go home earlier rather than later. It's obvious and it shouldn't
11   be left any other way, is my only point is.
12   MS. LIEBER: Your Honor, I would just add one --
13   THE COURT: It wasn't your question, sir.
14   MR. BALAREZO: Well, it does affect me my client who is on
15   trial, and the concern I have is that if that --
16   THE COURT: -- I have no --
17   MR. BALAREZO: -- if the threat to the mother is left out
18   there it's going to imply that my client did something, and
19   there's absolutely no evidence of that from what I can tell
20   unless they have something saying --
21   THE COURT: The jury would be instructed that it wasn't --
22   we have no evidence to suggest that this came from any of these
23   people. The problem is that you kept pushing him and pushing
24   him, he didn't want to answer, and now the government would like
25   to bring out why he didn't want to answer.

**56**

1    MS. LIEBER: And Your Honor, he actually started to answer
2    and he was cut off by Mr. Acree. He said, what the jury doesn't
3    understand is that my life is on the line.
4    THE COURT: I understand, I understand that.
5    MS. LIEBER: And he should be allowed to complete that.
6    THE COURT: I understand that. You've got to listen to
7    the government a little better.
8    MR. ACREE: And it may -- well, I was not aware of that
9    threat. It doesn't mean that the government didn't tell me about
10   it, but I'm not -- I don't know about that threat. I apologize
11   for not knowing. I don't know under what circumstances and in
12   what way Ms. Lieber gave us this information that she was under a
13   threat.
14   THE COURT: All right. Mr. Norris, let me hear from you.
15   MR. ACREE: Put it this way: Like I said, I didn't say
16   they didn't say it, but I didn't recall that that was --
17   THE COURT: She did. She may not have said it was his
18   mother, but she certainly -- Mr. Norris.
19   If I permit it, the Court would also instruct that there
20   is no evidence here that any one of these defendants called that
21   mother, but what they're asking here is to give an explanation.
22   Go ahead, Mr. Norris.
23   MR. NORRIS: Yes. I'm moving for a mistrial, Your Honor,
24   based on his answer. I was dealing in the same answer, I stopped
25   where I stopped to make sure this guy didn't blurt something out

57

1  or make up a fear for his life or whatever. And, you know --
2      THE COURT: So, what's your mistrial basis for? You mean
3  that they asked the question?
4      MR. NORRIS: No, based on what's come out at this point,
5  based on him blurting out that he's fearing for his life.
6      THE COURT: I'll be happy to instruct anything. Certainly
7  I'm not declaring a mistrial because he gets pressed and pressed
8  and pressed -- and he finally kept it to a yes or no. But you
9  know, people keep asking questions constantly and they're getting
10  burned by the answers.
11      MR. NORRIS: That's the problem with multiple co-defendant
12  cases in conspiracy cases.
13      THE COURT: Your request for a mistrial is denied. Would
14  you like an instruction that that answer -- that there is no
15  suggestion here of any threat to his family by any defendant or
16  there's no evidence, is all I'm going to say. I'm not going to
17  say there is no suggestion. Is that what you want?
18      MR. NORRIS: It depends on the Court's ruling on what the
19  government's request is, whether they're going to be able to
20  revisit this. I would object to them being able to revisit and
21  flush out on redirect. If they do, then I would request an
22  instruction.
23      THE COURT: Okay.
24      MR. McDANIEL: Your Honor, we would also object on behalf
25  of Mr. Holland. Mr. Holland may have asked four questions of

58

1  this witness at all. And the prejudice to Mr. Holland, Your
2  Honor, is that there is the potential for this jury to believe
3  that one, if not all of the defendants sitting at the table, had
4  something to do with these threats. He's already explained why
5  it is that he was hesitating. He already provided his response.
6  I don't think there's any need for the government to go back and
7  to say also, in addition to the fear that you have for your own
8  life, there's also this fear that you have for your mother. He
9  gave the response that we were trying to avoid to begin with,
10  which was that he --
11      THE COURT: You didn't -- not you, Mr. McDaniel. There
12  wasn't much of an effort to try to avoid it.
13      I'm sorry. I want to know what the record actually
14  reflects.
15      (Discussion had off the record between the Court and the
16  court reporter.)
17      THE COURT: Back on the record. I now have what he said,
18  and I think this is quite accurate. Mr. Acree kept on asking,
19  "wouldn't you be happier to go home today, rather than five years
20  from now or ten," I don't know -- I can't read that. "Take your
21  time." And then I sustained, "don't make comments, please."
22      And then as an aside, please, you cannot have -- the
23  reporter's having a very difficult time with people talking over
24  each other, and that includes all of us. All right. Go back.
25  And then I said, "Sustained, don't make comments, please. You

59

1  can answer that." "I put myself in a real tight situation,
2  sitting up here and testifying in front of these people, and a
3  lot of what they may not understand is that my life is on the
4  line." Then Mr. Balarezo said "objection." And then Mr. Acree
5  goes back and says "the only thing I'm asking you -- I haven't
6  finished. Are you happier, happier to go home rather than five
7  years."
8      In any case, that's where we're at. He hasn't said his
9  life has been threatened. And Ms. Lieber, out of an abundance of
10  caution, given that this is a co-defendant trial -- people keep
11  doing this, they keep opening doors, but I'm not going to open
12  all this up given the fact that we don't have much evidence
13  regarding any of these people and any cautionary instruction. I
14  sympathize with your instruction, but if people don't listen the
15  government is more than willing to tell you what they've got, but
16  I'm afraid, Mr. Acree -- be careful.
17      MS. LIEBER: Let me just ask this then. There is another
18  component. I think that I would expect out of his mouth, and so
19  as not to run afoul of the Court's ruling I'm going to seek leave
20  to lead a little bit around the edges. I suspect that one other
21  thing he will say about not wanting to get out tomorrow is
22  because he thinks he deserves to do some time because he was a
23  drug dealer, and he's said that. He's said that to me in the
24  past. It's not fodder for direct examination, but it certainly
25  is for redirect, and I want to lead to that and not -- in other

60

1  words the Court --
2      THE COURT: Can I make a suggestion.
3      He would -- anybody in their right mind is going to think
4  he's happier to go home today than later, and you can ask him if
5  you think -- that he understands or is willing to do time for
6  what he did for being a drug dealer, but don't go back to the
7  question about how happy he is to go home today or tomorrow
8  because all we're going to do is then hear more problems for no
9  good reason. I don't care if you want to ask him whether he has
10  any feeling about doing time. Is there anything else we have to
11  worry about? And I'm not going to keep on saving people here for
12  asking questions when they don't know the answer.
13      MR. ACREE: And I would just say, just for the Court, Your
14  Honor, that I did not -- I remember that we had a discussion
15  about that, but I never heard on the record that Anthony Givens
16  and/or his mother had been threatened. I didn't know that and I
17  didn't hear that. So that would have something to do with the
18  question and -- that's the only thing I can say, is that I didn't
19  hear that, and so there was no intent on my part to go beyond or
20  to elicit that. I don't even know -- I even had to ask when that
21  was said and in what context because I didn't even know anything
22  about that.
23      THE COURT: Okay.
24      MR. ACREE: I didn't want the Court to think I was just
25  disregarding information out there and then asking the Court not

61

1  to let it in. That's not the situation at all. That's surely
2  was not necessarily clear to me. It's almost like -- suppose
3  that issue didn't come up about the people in the back. I mean
4  it wasn't something that we had just independently known about,
5  that somebody had given us this information that was out there
6  and we need to be concerned about that. So I just want to make
7  it clear for the record that it was not any intent to bring it
8  out and then ask the Court to let it come in.
9      THE COURT: Listen to the answer next time. The guy was
10  going down that road when you kept pressing him. All right.
11  That's enough.
12      MR. NORRIS: Your Honor, I understand the Court's ruling.
13  I appreciate that. My request is actually that the Court strike
14  the portion of the testimony that --
15      THE COURT: Denied.
16      MR. NORRIS: -- the Court read back.
17      THE COURT: Denied.
18      MR. NORRIS: And then my only other request is, based on
19  what Ms. Lieber suggested, I would ask the Court to instruct the
20  witness before the jury comes in not to mention anything on
21  redirect about fear or threats or anything like that.
22      THE COURT: She's not going to ask, and she's given
23  permission to do a little leading, because sometimes if one of
24  you all open it up, I'm not going to continue to resurrect this
25  problem. So she'll lead him about his desire to do some time or

62

1  his willingness.
2      Thank you. Okay. We'll resume in 10 minutes. Are we
3  finished or do we have more for him?
4      MS. LIEBER: I have some redirect.
5      THE COURT: How much?
6      MS. LIEBER: Twelve minutes.
7      THE COURT: Can we not take a break ourselves and bring
8  them back in?
9      MR. BALAREZO: I wanted to go to the men's room for two
10  seconds.
11      THE COURT: Fine. Five minutes and then we can finish,
12  because you wanted to spend some time after this.
13      MR. BALAREZO: I don't want, to but I am.
14      THE COURT: Thank you.
15      (Break taken from 3:12 p.m. until 3:23 p.m.)
16      THE COURT: Okay. Let's get the witness and we're going
17  to finish this witness.
18      While the witness is coming -- oh. We're almost finished
19  with the testimony.
20      MR. BALAREZO: No, no, I'm just making peace.
21      THE COURT: Ms. Lieber is next up. Tell Gwen we're ready.
22  Thank you.
23      (Jury in at 3:25 p.m.)
24      THE COURT: Sorry about the interruption, ladies and
25  gentlemen. Today we're going to end with this witness, and

63

1  tomorrow we have to end before 4 because I have to be in another
2  one of these judicial portrait hangings on the 6th floor. So
3  tomorrow you're going to be leaving a little early, as well as
4  today.
5      And also, just to explain, we are -- this week we expect
6  to finish the government's case, so we're moving along very
7  swiftly, but these interruptions are because we're getting at the
8  end of the case for the government, as is always the case, and
9  we'll have the same thing happen at the end of all the evidence,
10  probably. There are things that are coming up, loose ends, so to
11  speak, legal things, so please bear with us. We're not trying to
12  make your life impossible. What we're trying to do is speed
13  things up, and our schedule as predicted, I don't think is going
14  to change. If anything, it's going to be shorter, okay. So I
15  don't expect that actually the evidence will go all the way to
16  the middle of January at all. But you do have to be patient with
17  us as we take up what I call loose ends, but they're legal
18  problems that are challenging for me.
19      Okay. Go ahead, Ms. Lieber. Now listen to the questions
20  and we'll get finished. Thank you.
21      MS. LIEBER: Thank you, Your Honor.
22      REDIRECT EXAMINATION OF ANTHONY GIVENS
23  BY MS. LIEBER:
24  Q.   Good afternoon, Mr. Givens.
25  A.   Good afternoon.

64

1  Q.   When we broke, we were talking about your expectations
2  and your hopes. Do you hope to get out of jail sooner than
3  life?
4  A.   Yes.
5  Q.   Is that why you cooperated, is that one of the reasons
6  you cooperated?
7  A.   One of them.
8  Q.   Okay. Do you also, sir, feel as though you should do
9  some time?
10  A.   Yes.
11  Q.   Why?
12  A.   I feel I bear some responsibility in this situation. And
13  for that I want to try to right my wrongs in a sense and do the
14  right thing. Not only for me, but people that are in my life as
15  well. So, I felt like ten years was a -- I feel like I should
16  get an opportunity and that was a fair amount of punishment for
17  me.
18  Q.   You think that ten years is a fair amount of punishment?
19  A.   Yeah. So, my lawyer advised me that the 5K was, you
20  know -- it was iffy, it's not a promise or anything like that,
21  so in my mind I'm looking like I'm being sentenced with the
22  start of ten years and to life, which from my lawyer my
23  understanding was that I was well above the 240 months, which
24  they are talking about now, but I didn't figure that out until
25  later on until my history was factored in.

**65**

1    So, at first I felt like I was just more in the 300 range
2  as far as months are concerned, and after I heard about the plea
3  agreement to 120 months, I felt like it was a good opportunity
4  for me, you know, to take that.
5    **Q.**    Now, Mr. Balarezo asked you a series of questions about
6  that videotape, when you made that statement right after your
7  arrest in May of '04?
8        THE COURT: That's Exhibit 33 for Jones.
9        MS. LIEBER: Thank you, Your Honor.
10  BY MS. LIEBER:
11    **Q.**    At the point that you gave that videotaped statement, had
12  you consulted with an attorney at that point?
13    **A.**    No. I felt like at that particular time I didn't -- I
14  didn't feel like I was going to District Court, one. I felt
15  like I was going to Superior Court. I felt like maybe I would
16  get a bond. That's what I was told to me before the tape had run,
17  that it's a possibility that I get a bond, it's Superior Court
18  and things like that. So I think that -- they didn't really --
19  they knew what the situation was and I was manipulating the
20  situation because I thought I was going to leave.
21    Prior to that, when I did have an attorney and he had a
22  chance, he had an opportunity to review the tape and things that
23  I said, I think at that point I realized like how much trouble I
24  was in and that that interview put me in real trouble, more than
25  I started out, and that's when I realized that I'm not in

**66**

1  Superior Court, I'm in District Court and that -- the things
2  about guidelines, I had no idea what that meant. I didn't know
3  that my prior history was a factor in my sentencing. I didn't
4  know anything about enhancements or anything. So all those
5  things came to me after that tape. So, I have a lot of other
6  factors as far as some other things that was going on that was
7  in my head as well.
8    I was being real manipulative in the video because, like
9  I say, I thought I was going to get out. I never thought I
10  would be sitting here.
11    **Q.**    And why didn't you tell the detectives in that videotape
12  that you were actually moving, you know, substantial
13  quantities -- kilogram quantities of cocaine? Why didn't you
14  tell them that then when you got locked up with 400 grams?
15    **A.**    Only because I felt I was in a Superior Court case, and I
16  didn't feel like I was going to get over ten years. I didn't
17  feel like they caught me with eighths, and I pretty much
18  accepted what was there that was in my presence. Not only me,
19  but when I talked to my lawyer and I decided to come in and talk
20  to the government, he advised me that --
21        THE COURT: I'd just as soon not have him talking about
22  what his lawyer said.
23  BY MS. LIEBER:
24    **Q.**    Mr. Givens, let me ask you this: Were you perfectly 100
25  percent truthful all the way with the police on that videotape

**67**

1  the day you got locked up?
2    **A.**    No.
3    **Q.**    Okay. Were you perfectly 100 percent truthful with the
4  jury now?
5    **A.**    Yes.
6    **Q.**    How did you serve as a middleman in the course of your
7  dealings with Antoine Jones?
8    **A.**    I feel like I am. I feel like for the people that gave
9  me their money to buy from him, I am the middleman. I feel like
10  I'm going to get compensated for doing it or I wouldn't have
11  done it. And a lot of the things that they're talking about, I
12  am the middleman. I didn't cook crack cocaine for a lot of
13  people, I just simply gathered their money up. They told me
14  what they wanted, I went to him, I purchased it, and I returned
15  it. That I'm certain.
16    **Q.**    And you talked a little bit about just now about you
17  thought you were going to Superior Court, you didn't expect to
18  be sitting here in District Court. Tell the jury, what's the
19  difference in your mind between a case going to Superior Court
20  and a case going to District Court.
21    **A.**    It's everything. It's -- this is where the big boys are
22  at. This is where they're carrying weight. This is where you
23  can get life.
24        THE COURT: This is what he thinks. It's not being
25  offered for the truth.

**68**

1        THE WITNESS: This is where you can get life and you can
2  get fined for a million dollars. Superior Court is -- it's the
3  same crime, but it's totally different. The guidelines are
4  totally different. Nothing is mandatory. It's -- they take a
5  lot of other factors into account, and it's just a different
6  environment.
7  BY MS. LIEBER:
8    **Q.**    And speaking of Superior Court, Mr. Balarezo asked you
9  some questions about your old case, your 1999 case. That was in
10  Superior Court; is that right?
11    **A.**    Yes.
12    **Q.**    Okay. Was that a cooperation agreement or was that just
13  a straight plea?
14    **A.**    That was a straight plea. I didn't cooperate with the
15  government in the 1999 case. They basically -- it was -- the
16  circumstances were real vague, and they came to me and asked
17  me -- if I cop to one, they'll drop the other. My lawyer
18  advised me that it's a good chance that I would get probation.
19    **Q.**    Did you?
20    **A.**    Yeah, I got two years' probation.
21    **Q.**    Now, you were asked a bunch of questions about your
22  identification of Mr. Jones --
23    **A.**    Yes.
24    **Q.**    -- this morning. Sitting here right now, are you sure
25  that you identified the right person as Mr. Jones?

**69**

1  A.    I'm positive.

2      MR. NORRIS: Which time?

3      THE COURT: Which time is the question.

4      MS. LIEBER: Was that an objection or was that --

5      THE COURT: I have no idea.

6      MR. NORRIS: Request for clarification.

7      THE WITNESS: The guy in the black jacket and green shirt.

8      THE COURT: Green shirt is what he said. And what jacket,

9  plaid?

10     THE WITNESS: That's what I said.

11     THE COURT: All right.

12     MS. LIEBER: He said black jacket.

13     THE COURT: Let the record -- I'm sorry, you said green

14  shirt and what?

15     THE WITNESS: A black jacket.

16     MR. NORRIS: He's the only one left.

17     MS. LIEBER: Objection. Your Honor, can we please have

18  them stop commenting. I'm sorry.

19     THE COURT: If you have an objection, stand up. No

20  comments. I'm sorry. You indicated it was the gentleman with

21  what?

22     THE WITNESS: The green shirt sitting beside the lawyer,

23  second seat.

24     THE COURT: Fine. Let the record reflect that he's

25  describing the shirt and the location of Mr. Jones. Anything

**70**

1  else?

2  BY MS. LIEBER:

3  Q.    Now, Mr. Norris asked you about the identification.

4  Could you have said Adrian Jackson was involved in your dealings

5  with Mr. Jones?

6  A.    Could I have said it?

7  Q.    Yes, could you have said it.

8  A.    No.

9  Q.    Okay. Why couldn't you have said it?

10  A.    I don't know.

11  Q.    Is it true that he was?

12  A.    Involved?

13  Q.    Yeah.

14  A.    I don't know. Would you say it even if it weren't true?

15  A.    No, I wouldn't. If that's the case I would say Kevin was

16  involved. I know him. I don't have any reason to lie. If I'm

17  going to lie on that guy, why wouldn't I lie on Kevin. I know

18  him. I didn't lie on him. I told y'all the truth.

19  Q.    Thank you. Now, Mr. Balarezo asked you something about a

20  distinguishing feature. Did you observe this distinguishing

21  feature about Mr. Jones prior to coming into the courtroom this

22  morning?

23  A.    Yes.

24  Q.    Mr. Balarezo asked you some questions about $120,000 for

25  five kilograms, which is 24,000 a kilo versus 23,000 a kilo

**71**

1  versus 21,000 a kilo.

2      Just explain to the jury, what have you given Mr. Jones

3  and why?

4  A.    Talking about 10 transactions. Cash varied. And the

5  thing about what he's trying to say, and I understand how he's

6  trying to manipulate the points, but --

7      MR. BALAREZO: Objection, Your Honor.

8      THE COURT: Overruled, overruled. Let him finish.

9      THE WITNESS: If Antoine was giving me kilos for 23,000

10  and I would charge somebody else 26,000, I didn't take the money

11  out, I simply put it all together and I gave it to him. And at

12  the end, you know what I'm saying, I would take my portion from

13  the end in a lump sum instead of giving them two. So certain

14  things, the numbers -- the amount of money varied from time to

15  time according to what we wanted and what other people wanted.

16  BY MS. LIEBER:

17  Q.    Did you have a contract with Mr. Jones that I'll pay you

18  X, a hundred thousand dollars today and another $30,000 next

19  Tuesday, and the finally 40 a week from Saturday?

20  A.    We didn't have a contract.

21  Q.    Did you keep corporate books and invoices to record

22  specifically what you gave him when?

23  A.    No. I knew what amount of money I gave him and I knew

24  what I owed him.

25  Q.    Now, Mr. Balarezo also asked you about the number of

**72**

1  meetings you had with Mr. Jones versus the number of times you

2  actually conducted a transaction.

3  A.    Yes.

4  Q.    Were there times that you met with Mr. Jones where you

5  just talked and no money and cocaine changed hands?

6  A.    There were several times we would meet. And like I say,

7  there were several points in our dealings where we wanted to

8  move to another level, we wanted to buy and we felt we should

9  have a better price as far as the cocaine was concerned, so

10  every conversation or every meeting wasn't about -- wasn't a

11  transaction of drugs. Sometimes I owed him money. So, he would

12  have to come to me, come to us to get it. Sometimes drugs were

13  transacted and sometimes it was just money.

14  Q.    Now, you were also asked some questions about Beanie, and

15  whether or not you know Beanie's name. Did you provide

16  identifying information about Beanie to the agents in this case?

17  A.    Yes.

18  Q.    Where he lived?

19  A.    Where he lived, car description, I gave his whole

20  profile. I gave as much information as I could give you.

21  Q.    Now, when you testified this morning, you were talking

22  about the initial quantity of cocaine that you obtained from

23  Mr. Jones, the 500 grams?

24  A.    Right.

25  Q.    Okay. Did you ever obtain crack cocaine from Mr. Jones?

73

1  **A.**  Crack?

2  **Q.**  Yes.

3  **A.**  No.

4  **Q.**  Okay. So, if you said crack cocaine, was that a truthful

5  statement or misstatement?

6  **A.**  That was a misstatement. I wouldn't purchase crack

7  cocaine from him; powder cocaine would be more of what he gave.

8  **Q.**  And finally, Mr. Givens, let me ask you some questions

9  about your plea. Did you plead guilty to the counts in your

10  indictment?

11  **A.**  Yes.

12  **Q.**  Okay. And I want to show you -- now, this is

13  government's miscellaneous 12, and it's in evidence, paragraph

14  2. Sir, how much crack cocaine did you agree that you were

15  responsible for here on the third line?

16  **A.**  150, but no less than 500.

17  **Q.**  Okay. Grams of cocaine base; is that right?

18  **A.**  Yes.

19  **Q.**  Okay. How much -- do you remember sitting here today

20  exactly how many grams of crack cocaine -- cocaine base you were

21  arrested with?

22  **A.**  Do I remember saying it?

23  **Q.**  Do you remember how many grams were in the car with you?

24  **A.**  No.

25  **Q.**  Okay. If I showed you your proffer that you agreed to,

74

1  do you see there what was recovered?

2  **A.**  458.

3  **Q.**  Is that between 150 and 500 grams?

4  **A.**  Yes.

5  **Q.**  Okay. Now, finally, Mr. Balarezo asked you about whether

6  or not you pled guilty to these other transactions with

7  Mr. Jones. Did we know about that information or did you

8  provide that to us?

9  **A.**  Prior to what he talked about, I didn't cooperate until

10  later on down the line in my own trial. So, no, y'all didn't

11  know that I had any dealings with him until after we sat down.

12  And I didn't even sit down with y'all, I sat down with someone

13  else who talked to me about everything, and I gave them

14  something they were interested in and it just went that way.

15      MS. LIEBER: Thank you. That's all I have. Thank you

16  very much.

17      THE COURT: Anything else? Anybody? Mr. Balarezo?

18      MR. BALAREZO: I have no questions.

19      MR. NORRIS: No, Your Honor.

20      THE COURT: Mr. McDaniel?

21      MR. McDANIEL: No, Your Honor.

22      THE COURT: Mr. Acree?

23      MR. ACREE: No, Your Honor.

24      THE COURT: All right. This witness can be excused. One

25  second, marshal.

75

1      Ladies and gentlemen, this is a good time to break. It's

2  20 of and we have a lot of things to talk about here, so you

3  might as well go home and have a nice evening. Please do not

4  discuss the case. Breakfast at 9; 9:30 we'll resume. Thank you

5  everybody.

6      (Jury out at 3:41 p.m.)

7      THE COURT: Okay, marshal, you can excuse the witness,

8  please. We're finished with this witness, correct?

9      MS. LIEBER: That's correct.

10      THE COURT: Can I just quickly. I know you're going to

11  work and we'll have to give you some more time tomorrow to finish

12  this project because Wednesday is the end of the government's

13  cases. So by Wednesday, defense counsel, you're going to have to

14  give them dates of birth and witness identification so they can

15  do their work. Wednesday. Okay.

16      By Wednesday, I need to know whether the government will

17  burn the -- hopefully this week will burn the transcripts -- I

18  mean the tapes and then put together the transcripts, so if we

19  have any problems before they go to the jury we'll know about it.

20      I do have two questions. One relating -- maybe you're

21  going to have to educate me. Count 3 refers to which unindicted

22  co-conspirator, by the way, Adams?

23      MS. LIEBER: What's the date? I'm sorry, Your Honor.

24      THE COURT: October 14th.

25      MS. LIEBER: Hunter.

76

1      THE COURT: Hunter. All right. But Count 2 is this

2  gentleman?

3      MS. LIEBER: That's right.

4      THE COURT: I'm a little perplexed because this talks

5  about crack, charging the defendant, possession with intent to

6  distribute. Isn't everybody going to get so confused?

7      MR. GEISE: It is a Pinkerton theory, Your Honor, there's

8  no question about that, as to both Counts 2 and 3.

9      THE COURT: I don't understand why you bothered even

10  making it so complicated. Why isn't it just that Jones possessed

11  with intent to distribute, and then he distributed it to this

12  guy. Why do we have to worry about cocaine -- he would have to

13  be some kind of -- there's a whole nother level of instruction

14  that goes along with charging him with crack here.

15      MR. GEISE: The practical problem, Judge, is we don't know

16  whether those distributions from Jones took place in Maryland or

17  the District. We know that the seizures took place in the

18  District. That's the problem with charging the substantive count

19  based on the distribution from the defendant to either Mr. Hunter

20  or Mr. Givens.

21      You are correct, Your Honor, that does require, for both

22  of those counts, that there be a Pinkerton instruction.

23      THE COURT: Great. I never, ever thought there was

24  anything harder to understand than Pinkerton. Okay. I just

25  wanted to understand myself.

77

1    Last of all, Mr. Norris, am I going to be required to deal

2  with Count 4 at the end of the government's case?

3    MR. NORRIS: Your Honor, again, I don't have my indictment

4  in front of me. Count 4 is the brandishing?

5    THE COURT: My initial thinking is I may have created a

6  problem where none exists, but I need to at least have some lead

7  time. If you assume the government is going to finish up by

8  Wednesday, do you have anything to suggest about this Count 4?

9    MR. NORRIS: Yes.

10    THE COURT: Obviously, they're going to get a possession

11  instruction. The question is whether we give them any other

12  instruction or is the brandishing only for me in terms of

13  sentencing? That's the -- is it an enhancement and do I have to

14  worry about *Aprendi*?

15    MR. GEISE: Let me look at that.

16    THE COURT: You have to please look long and hard at that.

17  This is the kind of thing that involves a *Harris/Aprendi* issue.

18  I agree that no one has overturned *Harris*, but I'm loathed not to

19  let the jury make the decision if we're going to have an

20  enhancement.

21    MR. GEISE: Then we do have to charge down, Your Honor,

22  because then it does have to be brandish; if you don't find

23  brandish, did he possess, or the other way around, I suppose.

24  But I suppose you could -- you could find that someone possessed

25  it but they didn't brandish it, and those are two different

78

1  levels of the 924(c).

2    THE COURT: The question is, does the jury decide that,

3  does the Court decide that?

4    MR. GEISE: It's likely *Harris* has not been reversed, and

5  that's what *Harris* I believe addresses, but it is, you know --

6    MR. NORRIS: I'm going to be moving the Court, and I hope

7  to supplement this with cases, not to allow the brandishing to go

8  to the jury.

9    THE COURT: Okay. Well, it's much more complicated than I

10  thought. I've always instructed, if the government's theory was

11  one or the other, and I understand it could be a lesser included,

12  but apparently I don't -- there's case law that suggests I'm not

13  supposed to be instructing the jury on all this stuff. So,

14  hopefully you'll be ready to address it on Wednesday.

15    MR. GEISE: The Court hasn't specifically overruled

16  *Harris*, Your Honor, but I grant you under *Aprendi* and *Booker* one

17  could wonder.

18    THE COURT: All right. We'll be back and tomorrow we'll

19  have more time on this timeline again. Thank you.

20    (Proceedings adjourned at 3:46 p.m.)

21

22    <u>**C E R T I F I C A T E**</u>

23    I, Scott L. Wallace, RDR-CRR, certify that the

foregoing is a correct transcript from the record of proceedings

24  in the above-entitled matter.

25

    ---------------------------

    Scott L. Wallace, RDR, CRR

79

1    <u>**I N D E X**</u>

2

3  <u>EXAMINATIONS</u>                    <u>Page</u>

4  CONTINUED CROSS-EXAMINATION OF ANTHONY GIVENS 7
   BY MR. BALAREZO

5

6  CROSS-EXAMINATION OF ANTHONY GIVENS        36
   BY MR. NORRIS

7  CROSS-EXAMINATION OF ANTHONY GIVENS        41
   BY MR. McDANIEL

8

9  CROSS-EXAMINATION OF ANTHONY GIVENS        41
   BY MR. ACREE

10 REDIRECT EXAMINATION OF ANTHONY GIVENS     63
   BY MS. LIEBER

11

12

13        <u>EXHIBITS</u>

   <u>NO.</u>  <u>DESCRIPTION</u>              <u>Page</u>

14

15
16
17
18
19
20
21
22
23
24
25

**$**

**$120,000** [3] - 28:15, 20; 70:24
**$21,000** [2] - 26:24; 27:1
**$23,000** [2] - 26:9; 30:2
**$24,000** [1] - 29:3
**$30,000** [1] - 71:18
**$3300** [3] - 15:9; 16:24; 17:7
**$500** [4] - 8:8; 15:13, 17; 16:9

**'**

**'04** [1] - 65:7

**0**

**05-386** [1] - 1:5

**1**

**1** [2] - 25:21; 26:6
**10** [11] - 24:3; 25:17; 28:10, 13; 29:13, 20; 33:17; 37:5; 62:2; 71:4
**100** [3] - 28:16; 66:24; 67:3
**12** [4] - 23:6; 24:3; 35:7; 73:13
**120** [2] - 29:18; 65:3
**120,000** [1] - 28:22
**1211** [2] - 2:2, 6
**125,000** [2] - 29:13, 20
**14th** [3] - 5:2, 23; 75:24
**150** [2] - 73:16; 74:3
**1999** [2] - 68:9, 15
**1:55** [2] - 1:8; 3:2

**2**

**2** [5] - 27:18; 44:4; 73:14; 76:1, 8
**20** [2] - 6:14; 75:2
**20001** [4] - 1:17, 21, 24; 2:10
**2003** [2] - 25:21; 26:4; 32:25
**20036** [2] - 2:3, 6
**2004** [1] - 25:21;

26:4; 27:2; 33:1
**2006** [2] - 1:8; 3:1
**202.326.0566** [1] - 2:11
**202.331.0739** [2] - 2:4, 7
**202.616.9156** [1] - 1:18
**202.639.0999** [1] - 1:22
**202.842.2695** [1] - 1:25
**21,000** [4] - 26:19; 27:18; 29:9; 71:1
**23,000** [8] - 26:13, 24; 27:25; 29:5, 10; 70:25; 71:9
**24** [3] - 23:6; 24:4; 35:7
**24,000** [6] - 28:23; 29:3, 5, 10; 30:3; 70:25
**240** [1] - 64:23
**26,000** [1] - 71:10
**27** [2] - 1:8; 3:1
**2:02** [1] - 7:15
**2:56** [1] - 53:5

**3**

**3** [2] - 75:21; 76:8
**30** [1] - 8:12
**300** [1] - 65:1
**303** [1] - 2:3
**33** [2] - 8:13; 65:8
**36** [1] - 79:5
**3800** [1] - 15:11
**3:12** [1] - 62:15
**3:23** [1] - 62:15
**3:25** [1] - 62:23
**3:46** [1] - 78:20

**4**

**4** [4] - 63:1; 77:2, 4, 8
**40** [1] - 71:19
**400** [2] - 1:20; 66:14
**41** [2] - 79:7
**42,000** [1] - 27:19
**458** [1] - 74:2
**4th** [1] - 1:17

**5**

**5** [3] - 28:20, 22; 29:18
**500** [15] - 1:21; 8:9; 9:1; 12:13; 17:4;

18:23; 19:2; 25:2, 4, 6, 10; 72:23; 73:16; 74:3
**555** [1] - 1:17
**5K** [5] - 37:6, 20; 38:6, 12; 64:19

**6**

**63** [1] - 79:10
**641** [1] - 1:24
**6814** [1] - 2:10
**6th** [1] - 63:2

**7**

**7** [1] - 79:4

**9**

**9** [1] - 75:4
**924(c)** [1] - 78:1
**9:30** [1] - 75:4

**A**

**able** [5] - 14:5; 35:25; 39:20; 57:19
**above-entitled** [1] - 78:24
**absolutely** [1] - 55:19
**abundance** [1] - 59:9
**accept** [1] - 31:12
**accepted** [1] - 66:18
**according** [9] - 16:15; 17:1; 25:9; 32:24; 33:13; 43:20; 47:3; 52:5; 71:15
**account** [1] - 68:5
**accurate** [1] - 58:18
**ACREE** [26] - 2:1; 41:17; 42:12; 43:4, 15; 44:6; 45:8; 49:13, 17; 50:14, 18-19; 52:1, 25; 54:1, 11, 14, 17; 55:5; 56:8, 15; 60:13, 24; 74:23; 79:9
**Acree** [8] - 2:2; 50:11; 51:24; 56:2; 58:18; 59:4, 16; 74:22
**acting** [1] - 15:18
**Adams** [2] - 34:7; 75:22
**add** [1] - 55:12
**addition** [2] - 39:15; 58:7

**address** [1] - 78:14
**addresses** [1] - 78:5
**adjourned** [1] - 78:20
**ADRIAN** [1] - 1:7
**Adrian** [1] - 39:12; 70:4
**advised** [3] - 64:19; 66:20; 68:18
**advisory** [2] - 19:17, 25
**affect** [1] - 55:14
**afoul** [1] - 59:19
**afraid** [1] - 59:16
**afternoon** [8] - 5:9; 7:22-24; 41:3; 63:24
**AFTERNOON** [2] - 1:10; 3:1
**age** [1] - 41:8
**Agent** [12] - 23:10, 25; 24:7; 25:19; 26:2; 28:8, 19; 32:15; 48:15, 19; 49:19; 51:14
**agent** [4] - 3:12; 7:7; 23:9, 22
**agents** [4] - 9:11; 23:15; 50:12; 72:16
**ago** [5] - 10:15; 27:22; 46:7; 53:16, 18
**agree** [13] - 3:15; 8:16; 20:18, 21; 26:21, 23; 29:7; 37:16; 54:23; 73:14; 77:18
**agreed** [3] - 5:10; 23:5; 73:25
**agreement** [5] - 18:13, 15; 40:4; 65:3; 68:12
**agrees** [1] - 6:25
**ahead** [11] - 7:17; 8:11; 13:2, 22; 14:24; 20:19; 31:6; 32:13; 43:12; 56:22; 63:19
**aided** [1] - 2:12
**air** [1] - 44:11
**allow** [2] - 38:12; 78:7
**allowed** [3] - 19:7, 11; 56:5
**allowing** [1] - 14:15
**almost** [2] - 61:2; 62:18
**aluminum** [3] - 44:16, 22; 45:7
**AMERICA** [1] - 1:4
**amount** [10] - 19:4, 8, 13; 20:3; 25:14; 29:22; 64:16, 18;

71:14, 23
**answer** [27] - 10:12; 16:25; 31:4; 42:22; 43:12; 50:9; 53:10, 12, 25; 54:4, 8-9, 11, 18, 20, 22; 55:1, 24-25; 56:1, 24; 57:14; 59:1; 60:12; 61:9
**answered** [2] - 32:3; 42:10
**answering** [1] - 54:16
**answers** [3] - 49:14, 24; 57:10
**Anthony** [1] - 60:15
**ANTHONY** [10] - 7:20; 36:23; 41:1, 16; 63:22; 79:4, 7-8, 10
**Antoine** [25] - 10:18; 18:20; 19:5; 21:6, 11, 21; 22:5, 21; 24:1, 16; 25:22; 26:4; 30:1; 33:6, 16; 35:13; 39:9, 16-17, 21; 40:10, 14; 51:15; 67:7; 71:9
**ANTOINE** [1] - 1:7
**anyway** [2] - 29:22; 42:4
**anyways** [1] - 13:22
**apologize** [1] - 56:10
**APPEARANCES** [1] - 1:13
**appreciate** [1] - 61:13
**approach** [2] - 11:19; 53:1
**approached** [1] - 16:18
**Aprendi** [2] - 77:14; 78:16
**argue** [2] - 13:16; 14:2
**arguing** [1] - 3:14
**argument** [1] - 6:5
**arrest** [2] - 16:12; 65:7
**arrested** [5] - 8:2; 9:2; 17:24; 18:16; 73:21
**arrived** [1] - 49:10
**aside** [1] - 58:22
**assistance** [2] - 6:11; 38:11
**Assistant** [2] - 1:15
**assume** [1] - 77:7
**at.3:41** [1] - 75:6
**attack** [1] - 53:24
**attorney** [2] - 65:12, 21

**Attorney** [2] - 1:15
**ATTORNEY'S** [1] -
1:15
**audio** [1] - 7:18
**Avenue** [3] - 1:24;
2:2, 6
**avoid** [2] - 58:9, 12
**aware** [11] - 6:12;
18:15; 19:24; 20:2,
5-6; 30:8, 11, 13-14;
56:8

**B**

**bag** [3] - 45:11, 14
**bags** [2] - 52:17, 21
**BALAREZO** [62] -
1:19; 3:8; 5:10; 7:19,
21-22, 25; 8:15, 21;
9:14, 24; 10:2, 10;
11:2, 17, 24; 12:6, 11,
17, 24; 13:4, 11, 18;
14:5, 9, 18; 15:2, 5;
17:13, 19-20; 19:18;
20:10, 12, 21, 24;
23:3, 21; 28:5; 31:7,
13, 17; 32:5, 14; 33:9,
11; 34:17, 22-23;
35:6, 18; 36:13, 20;
43:2; 55:14, 17; 62:9,
13, 20; 71:7; 74:18;
79:4
**Balarezo** [14] - 1:20;
3:4, 9, 21; 5:6; 7:17;
59:4; 65:5; 68:8;
70:19, 24; 71:25;
74:5, 17
**ball** [1] - 5:15
**bar** [2] - 24:20; 54:5
**bargain** [1] - 37:9
**base** [3] - 24:10;
73:17, 20
**based** [6] - 23:6;
56:24; 57:4; 61:18;
76:19
**basis** [1] - 57:2
**Beanie** [4] - 25:11;
48:20; 72:14, 16
**Beanie's** [1] - 72:15
**bear** [2] - 63:11;
64:12
**beer** [1] - 24:20
**BEFORE** [1] - 1:11
**began** [1] - 26:8
**begin** [1] - 58:9
**beginning** [2] -
12:12; 26:1
**behalf** [1] - 57:24
**believable** [1] -

13:16
**benefit** [5] - 19:8;
37:5, 8, 11; 39:6
**beside** [1] - 69:22
**best** [1] - 3:25
**better** [10] - 9:10;
36:4; 37:11, 16, 21;
38:13, 16-17; 56:7;
72:9
**between** [5] - 25:20;
38:7; 58:15; 67:19;
74:3
**beyond** [2] - 54:18;
60:19
**big** [1] - 67:21
**biggest** [1] - 54:19
**birth** [1] - 75:14
**bit** [7] - 4:25; 16:21;
11:14; 41:20; 50:3;
59:20; 67:16
**black** [3] - 69:7, 12,
15
**blouse** [1] - 23:10
**blue** [1] - 21:10
**blurt** [1] - 56:25
**blurting** [1] - 57:5
**bond** [5] - 9:19, 21,
23; 65:16
**Bond** [1] - 9:22
**Booker** [1] - 78:16
**books** [1] - 71:21
**boom** [1] - 14:20
**bothered** [1] - 76:9
**bottom** [4] - 38:7;
54:19, 22; 55:3
**bought** [3] - 24:1;
25:17; 47:4
**boys** [1] - 67:21
**Boys** [1] - 41:8
**brand** [3] - 30:9, 18;
31:12
**brandish** [3] - 77:22,
25
**brandishing** [3] -
77:4, 12; 78:7
**brands** [6] - 31:8, 25;
32:1, 6, 8
**break** [3] - 53:8;
62:7; 75:1
**Break** [1] - 62:15
**Breakfast** [1] - 75:4
**breaking** [1] - 50:15
**BRIAN** [1] - 2:5
**Brian** [1] - 2:5
**briefly** [1] - 53:6
**Bring** [1] - 7:14
**bring** [4] - 6:7; 55:25;
61:7; 62:7
**broke** [1] - 64:1
**bubble** [1] - 44:15,

21; 45:7
**Bubble** [1] - 45:3
**built** [1] - 36:12
**bunch** [1] - 68:21
**burn** [4] - 6:24; 7:8;
75:17
**burned** [1] - 57:10
**burnt** [2] - 6:13, 17
**buy** [3] - 24:23; 67:9;
72:8
**buying** [3] - 25:11,
21
**BY** [52] - 7:21, 25;
8:15, 21; 9:14, 24;
10:2, 10; 11:2, 24;
15:5; 17:20; 19:18;
20:12, 24; 23:3, 21;
28:5; 31:7, 17; 32:5,
14; 33:11; 34:23;
35:6, 18; 36:13, 24;
37:25; 38:5; 41:2, 17;
42:13; 43:4, 15; 44:6;
45:8; 49:13, 17;
50:19; 52:1; 63:23;
65:10; 66:23; 68:7;
70:2; 71:16; 79:4, 6-7,
9

**C**

**cannot** [1] - 58:22
**car** [6] - 9:2; 47:3;
51:12, 22; 72:19;
73:23
**care** [3] - 3:19; 5:6;
60:9
**careful** [1] - 59:16
**carrying** [2] - 5:15;
67:22
**cars** [1] - 32:18
**case** [18] - 4:20;
6:19; 59:8; 63:6, 8;
66:15; 67:19; 68:9,
15; 70:15; 72:16;
75:4; 77:2; 78:12
**cases** [4] - 57:12;
75:13; 78:7
**Cash** [1] - 71:4
**caught** [2] - 9:1;
66:17
**caution** [1] - 59:10
**cautionary** [1] -
59:13
**certain** [3] - 5:3;
67:15; 71:13
**Certainly** [1] - 57:6
**certainly** [1] - 12:8;
56:18; 59:24
**certify** [1] - 78:23

**challenging** [1] -
63:18
**chance** [4] - 7:5;
42:7; 65:22; 68:18
**change** [1] - 63:14
**changed** [3] - 25:7;
47:4; 72:5
**charge** [3] - 29:25;
71:10; 77:21
**charged** [3] - 29:21;
30:1
**charging** [3] - 76:5,
14, 18
**chose** [1] - 38:13
**Christ** [6] - 31:9,
15-16, 18; 32:8, 21
**chunk** [1] - 3:11
**church** [1] - 24:18
**Circle** [1] - 4:9
**circumstances** [2] -
56:11; 68:16
**claim** [1] - 11:6;
45:22; 46:22; 48:10
**claimed** [1] - 19:4
**clarification** [1] -
69:6
**clear** [9] - 37:2;
44:13; 45:14; 52:9;
53:2; 55:9; 61:2, 7
**CLERK** [1] - 6:9
**client** [4] - 39:12;
40:7; 55:14, 18
**closing** [1] - 6:4
**Club** [1] - 33:1
**club** [8] - 41:8;
47:16; 48:5, 7, 13;
51:16; 52:3
**co** [3] - 57:11; 59:10;
75:22
**co-conspirator** [1] -
75:22
**co-defendant** [2] -
57:11; 59:10
**cocaine** [38] - 9:2;
10:4, 14; 11:4; 16:17;
18:24; 19:2; 24:1;
25:3-5, 10; 26:15;
30:9, 21, 23; 31:19,
24; 32:9, 20; 33:12;
34:25; 44:14; 46:13;
66:13; 67:12; 72:5, 9,
22, 25; 73:4, 7, 14,
17, 20; 76:12
**COLUMBIA** [1] - 1:2
**coming** [6] - 5:23;
39:8; 49:1; 62:18;
63:10; 70:21
**commenting** [1] -
69:18
**comments** [4] -

42:21; 58:21, 25;
69:20
**compensated** [1] -
67:10
**complain** [1] - 22:8
**complete** [1] - 56:5
**complex** [1] - 24:12
**complexion** [1] -
36:9
**complicated** [2] -
76:10; 78:9
**component** [1] -
59:18
**components** [1] -
5:1
**computer** [2] - 2:12;
3:13
**computer-aided** [1] -
2:12
**concern** [1] - 55:15
**concerned** [5] -
53:13; 61:6; 65:2;
72:9
**concluded** [1] - 15:1
**concludes** [1] -
14:14
**conducted** [1] - 72:2
**confront** [2] - 14:5, 8
**confused** [2] - 31:23;
76:6
**Connecticut** [2] -
2:2, 6
**conspiracy** [1] -
57:12
**conspirator** [1] -
75:22
**constantly** [1] - 57:9
**consulted** [1] - 65:12
**contact** [5] - 34:14;
35:3, 5, 10
**contacts** [1] - 35:24
**containers** [1] -
44:11
**context** [1] - 60:21
**continue** [1] - 61:24
**CONTINUED** [2] -
7:20; 79:4
**contract** [2] - 71:17,
20
**contradictions** [2] -
11:23
**control** [1] - 32:13
**conversation** [1] -
72:10
**cook** [2] - 10:3;
67:12
**cooked** [1] - 18:6
**cooperate** [2] -
68:14; 74:9
**cooperated** [2] -

64:5
cooperation [1] -
68:12
cop [2] - 10:22;
68:17
corporate [1] - 71:21
Correct [3] - 25:18;
38:9; 52:13
correct [38] - 8:16;
9:3, 8; 10:20; 15:14;
18:17; 21:3, 8; 22:15;
23:13; 24:16; 25:3,
15, 25; 28:6, 13, 21;
30:20; 33:2, 14; 34:1,
7; 35:25; 37:3, 6, 9,
21; 38:14, 20, 22;
39:18; 40:22; 41:11;
75:8; 76:21; 78:23
counsel [2] - 1:22;
75:13
Count [5] - 75:21;
76:1; 77:2, 4, 8
count [2] - 4:15;
76:18
Counts [1] - 76:8
counts [5] - 4:11-13;
73:9; 76:22
couple [1] - 8:4
courier [1] - 8:8
course [1] - 67:6
Court [31] - 2:9;
11:17; 13:11; 53:11;
56:19; 58:15; 60:1,
13, 24-25; 61:8, 13,
16, 19; 65:14, 17;
66:1, 15; 67:17-20;
68:2, 8, 10; 78:3, 6,
15
court [4] - 39:8, 17,
21; 58:16
Court's [3] - 57:18;
59:19; 61:12
Courthouse [1] -
2:10
courtroom [3] -
22:23; 53:20; 70:21
covered [1] - 21:18
cows [1] - 14:2
CR [1] - 1:5
crack [20] - 8:9; 9:1;
10:3, 14; 11:4; 16:17;
18:24; 19:2; 25:2, 4,
7; 47:5; 67:12; 72:25;
73:4, 6, 14, 20; 76:5,
14
Crack [1] - 73:1
created [1] - 77:5
crime [1] - 68:3
cross [1] - 12:12
CROSS [8] - 7:20;

36:23; 41:1, 16; 79:4,
7
CROSS-
EXAMINATION [8] -
7:20; 36:23; 41:1, 16;
79:4, 7
crosses [1] - 31:10;
32:16; 45:24
CRR [3] - 2:9; 78:23,
25
customer [2] - 52:14,
16
customers [1] - 52:7
cut [2] - 5:7; 56:2

D

D.C [1] - 1:7; 2:10
date [1] - 75:23
dates [2] - 27:8;
75:14
days [3] - 5:3; 10:15;
17:6
DC [5] - 1:17, 21, 24;
2:3, 6
deal [6] - 15:24; 16:7;
24:13; 30:23; 77:1
dealer [2] - 59:23;
60:6
dealing [5] - 18:20;
26:5, 8; 30:8; 56:24
dealings [5] - 40:8;
67:7; 70:4; 72:7;
74:11
deals [2] - 23:4; 35:7
dealt [4] - 25:9; 26:3;
32:24; 33:6
debriefings [1] -
23:12
decide [2] - 78:2
decided [1] - 66:19
decision [1] - 77:19
declaring [1] - 57:7
Defendant [4] - 1:19,
23; 2:1, 5
defendant [5] -
57:11, 15; 59:10;
76:5, 19
defendants [8] -
20:17; 21:2, 5, 8, 18;
22:19; 56:20; 58:3
Defendants [1] - 1:9
defense [3] - 3:20;
6:12; 75:13
Definitely [1] - 37:15
deliver [7] - 8:8;
15:23; 16:5, 19, 23;
18:2, 4
delivering [5] -

15:17; 16:7; 18:7;
34:7, 10
Denied [2] - 61:15,
17
denied [3] - 14:11;
15:19; 57:13
Depot [11] - 47:13,
16, 22, 24; 48:1, 8-9,
21; 49:10; 50:22;
51:15
DEPUTY [1] - 6:9
describe [2] - 36:5;
46:16
describing [1] -
69:25
DESCRIPTION [1] -
79:13
description [3] -
36:14; 46:17; 72:19
deserves [1] - 59:22
desire [1] - 61:25
detective [1] - 4:9
Detective [1] - 4:25
detectives [2] -
11:12; 66:11
difference [2] -
29:14; 67:19
different [19] - 12:10;
16:12; 17:3, 22; 24:3,
6-7; 26:19; 28:25;
29:22; 31:9; 44:17;
49:14; 50:15; 68:3-5;
77:25
difficult [1] - 58:23
direct [5] - 12:4;
34:13; 35:3, 5; 59:24
directly [1] - 33:18
discuss [1] - 75:4
Discussion [1] -
58:15
discussion [3] -
11:20; 15:1; 60:14
disk [3] - 6:18, 24;
7:8
disregarding [1] -
60:25
distinction [1] -
34:21
distinguishing [1] -
70:20
distribute [2] - 76:6,
11
distributed [1] -
76:11
distribution [1] -
76:19
distributions [1] -
76:16
District [6] - 65:14;
66:1; 67:18, 20; 76:17

DISTRICT [3] - 1:1,
12
Docket [1] - 1:5
dollars [2] - 68:2;
71:18
done [2] - 23:5;
67:11
door [1] - 53:15
doors [1] - 59:11
down [15] - 3:10, 12;
5:7; 16:22; 27:10, 12,
19; 31:5; 50:15;
61:10; 74:10-12;
77:21
drawing [1] - 34:21
drop [1] - 68:17
drug [4] - 18:20;
20:3; 59:23; 60:6
drugs [35] - 4:9;
15:7, 24; 16:7; 18:4,
6, 16; 19:4, 8, 13, 20;
24:13, 23; 27:15;
30:8; 33:6; 34:4, 7,
10, 15, 19; 41:10, 13;
43:21; 45:19; 46:4,
20; 47:3; 48:11;
52:19; 72:11
during [4] - 26:2;
28:8; 34:13, 24
During [1] - 34:17;
35:24

E

eager [2] - 40:17, 20
early [4] - 25:21;
26:4; 32:25; 63:3
edges [1] - 59:20
EDUARDO [1] - 1:19
Eduardo [1] - 1:20
educate [1] - 75:21
effect [1] - 19:14
efficient [1] - 4:1
effort [1] - 58:12
eight [3] - 15:12;
20:17
eighth [7] - 15:10;
16:23; 17:5; 18:2;
25:21; 26:2, 5
eighths [8] - 16:18;
18:7, 12; 33:22; 66:17
Either [1] - 51:16
either [3] - 19:22;
54:1; 76:19
elicit [3] - 53:11, 25;
60:20
ELLEN [1] - 1:11
end [17] - 7:12;
17:14; 21:15; 27:1, 3;

29:24; 30:19; 38:7;
54:22; 62:25; 63:1,
8-9; 71:12; 75:12;
77:2
ends [2] - 63:10, 17
enforcement [4] -
48:17, 20; 49:20;
51:14
enhancement [2] -
77:13, 20
enhancements [1] -
66:4
entire [1] - 19:4
entirely [1] - 3:15
entitled [2] - 53:25;
78:24
environment [1] -
68:6
Esq [4] - 1:20, 23;
2:2, 5
estimate [1] - 23:7
estimatedly [1] -
35:8
evening [1] - 75:3
eventually [2] -
26:17
evidence [14] - 5:13;
6:16; 8:13; 11:22;
13:21; 14:13; 55:19,
22; 56:20; 57:16;
59:12; 63:9, 15; 73:13
exact [3] - 27:6, 8
exactly [3] - 18:9;
46:24; 73:20
EXAMINATION [10] -
7:20; 36:23; 41:1, 16;
63:22; 79:4, 7-8, 10
examination [1] -
59:24
EXAMINATIONS [1]
- 79:3
examples [1] - 31:25
except [1] - 14:21
exchange [3] -
34:19, 25; 52:17
exchanging [1] -
52:21
excuse [4] - 52:11;
53:6; 75:7
excused [1] - 74:24
Exhibit [1] - 65:8
exhibit [5] - 5:4, 18;
6:2, 20
EXHIBITS [1] - 79:13
exists [1] - 77:6
expect [4] - 59:18;
63:5, 15; 67:17
expectations [1] -
64:1
experience [1] - 30:8

**explain** [5] - 16:21;
50:10; 54:8; 63:5;
71:2
   **explained** [1] - 58:4
   **explanation** [4] -
18:1; 48:25; 49:3;
56:21
   **exposure** [1] - 19:14
   **eye** [2] - 5:14; 36:9
   **eyes** [1] - 36:11

**F**

   **face** [9] - 34:14; 35:3,
5, 10
   **Face** [1] - 35:11
   **face-to-face** [4] -
34:14; 35:3, 5, 10
   **Face-to-face** [1] -
35:11
   **fact** [3] - 30:15;
45:19; 59:12
   **factor** [1] - 66:3
   **factored** [1] - 64:25
   **factors** [2] - 66:6;
68:5
   **fair** [5] - 35:19; 36:9;
41:6; 64:16, 18
   **Fair** [1] - 36:9
   **family** [1] - 57:15
   **far** [3] - 65:2; 66:6;
72:9
   **fear** [4] - 57:1; 58:7;
61:21
   **fearing** [1] - 57:5
   **feature** [3] - 36:5;
70:20
   **felt** [10] - 19:25;
49:11; 64:15; 65:1, 3,
13-15; 66:15; 72:8
   **Fifth** [1] - 1:20
   **figure** [4] - 6:14; 7:4;
51:2; 64:24
   **figured** [1] - 41:25
   **file** [1] - 7:12
   **finally** [4] - 57:8;
71:19; 73:8; 74:5
   **Fine** [4] - 7:9; 23:17;
62:11; 69:24
   **fine** [4] - 12:22;
46:25; 55:3
   **fined** [1] - 68:2
   **finger** [1] - 40:7
   **finish** [13] - 6:7;
11:15; 13:22; 31:22;
43:9, 11; 51:25;
62:11, 17; 63:6; 71:8;
75:11; 77:7
   **finished** [6] - 43:6;

59:6; 62:3, 18; 63:20;
75:8
   **finishing** [1] - 4:20
   **first** [11] - 16:6; 17:4;
21:10; 25:2; 35:13;
40:1; 41:18; 47:25;
48:24; 49:18; 65:1
   **Five** [1] - 62:11
   **five** [14] - 28:13, 15;
29:15; 35:21, 23;
42:19; 43:7, 14, 16;
53:12; 58:19; 59:6;
70:25
   **floor** [1] - 63:2
   **flush** [1] - 57:21
   **focus** [1] - 3:17
   **fodder** [1] - 59:24
   **foil** [3] - 44:16, 22;
45:3
   **folks** [1] - 53:19
   **follow** [1] - 19:19
   **Following** [1] - 11:20
   **food** [1] - 44:11
   **FOR** [1] - 1:2
   **foregoing** [1] - 78:23
   **forget** [2] - 5:12; 16:1
   **forth** [1] - 50:13
   **Four** [1] - 20:17
   **four** [5] - 21:2, 5, 19;
24:8; 57:25
   **frankly** [1] - 4:25
   **free** [1] - 33:20
   **front** [4] - 42:24;
49:9; 59:2; 77:4
   **fronted** [3] - 27:15,
18; 29:15
   **fruitful** [1] - 53:11
   **fulfill** [1] - 40:3

**G**

   **gathered** [1] - 67:13
   **GEISE** [6] - 76:7, 15;
77:15, 21; 78:4, 15
   **Geise** [1] - 1:15
   **gentleman** [3] - 4:20;
69:20; 76:2
   **gentlemen** [7] - 7:16,
22; 8:24; 39:23; 53:3;
62:25; 75:1
   **given** [8] - 36:14;
41:13; 54:4; 59:10,
12; 61:5, 22; 71:2
   **GIVENS** [10] - 7:20;
36:23; 41:1, 16;
63:22; 79:4, 7-8, 10
   **Givens** [13] - 4:10;
7:23; 15:6; 17:21;
34:24; 36:25; 37:2;

41:3; 60:15; 63:24;
66:24; 73:8; 76:20
   **Givens'** [1] - 53:22
   **glasses** [6] - 22:9;
35:24; 36:2; 39:24
   **government** [20] -
18:19; 37:9, 19;
38:10, 24; 39:2, 17;
40:4, 13; 54:7; 55:24;
56:7, 9; 58:6; 59:15;
63:8; 66:20; 68:15;
75:16; 77:7
   **government's** [6] -
57:19; 63:6; 73:13;
75:12; 77:2; 78:10
   **Grams** [1] - 73:17
   **grams** [14] - 8:9; 9:1;
17:4; 18:23; 19:2;
25:2, 4, 6, 10; 66:14;
72:23; 73:20, 23; 74:3
   **grand** [1] - 14:19
   **grant** [1] - 78:16
   **Great** [1] - 76:23
   **greater** [1] - 42:7
   **green** [3] - 69:7, 13,
22
   **Green** [1] - 69:8
   **gritty** [1] - 44:23
   **guess** [1] - 35:17
   **guessing** [2] - 35:16,
22
   **guideline** [2] - 19:21;
20:2
   **guidelines** [6] - 19:3,
14, 17, 20; 66:2; 68:3
   **guilty** [3] - 19:7;
73:9; 74:6
   **guy** [5] - 56:25; 61:9;
69:7; 70:17; 76:12
   **Gwen** [1] - 62:21

**H**

   **half** [5] - 3:14; 15:14;
27:22; 45:6, 9
   **hands** [2] - 52:17;
72:5
   **hangings** [1] - 63:2
   **happier** [14] - 38:19,
22-23; 42:15, 18;
43:7, 13, 17; 53:12;
54:23; 58:19; 59:6;
60:4
   **happy** [3] - 39:4;
57:6; 60:7
   **hard** [1] - 77:16
   **harder** [1] - 76:24
   **Harris** [4] - 77:18;
78:4, 16

**Harris/Aprendi** [1] -
77:17
   **head** [1] - 66:7
   **hear** [7] - 6:17;
10:12; 53:8; 56:14;
60:8, 17, 19
   **heard** [6] - 5:23;
10:3; 14:16; 17:21;
60:15; 65:2
   **height** [1] - 36:9
   **help** [6] - 9:7, 17;
11:9; 40:12, 17, 20
   **hesitant** [1] - 54:8
   **hesitated** [1] - 54:18
   **hesitating** [2] -
54:15; 58:5
   **higher** [4] - 19:21;
20:3
   **history** [2] - 64:25;
66:3
   **hmm** [1] - 48:16
   **HOLLAND** [1] - 1:8
   **Holland** [10] - 2:5;
21:3, 5, 21; 41:5, 10,
13; 57:25; 58:1
   **Home** [11] - 47:13,
16, 22, 24; 48:1, 8-9,
21; 49:10; 50:22;
51:15
   **home** [19] - 14:3;
37:14; 38:22; 42:15,
18; 43:7, 13, 16;
53:12; 54:3, 23, 25;
55:10; 58:19; 59:6;
60:4, 7; 75:3
   **Honor** [45] - 3:3, 8,
23; 4:4; 5:17; 6:22;
7:19; 11:17; 12:6, 25;
13:5, 18; 14:5; 15:2;
17:11; 34:18; 42:12,
20; 43:2; 50:16;
52:25; 53:1, 10;
54:17; 55:7, 12; 56:1,
23; 57:24; 58:2;
60:14; 61:12; 63:21;
63:9; 69:17; 71:7;
74:19, 21, 23; 75:23;
76:7, 21; 77:3, 21;
78:16
   **HONORABLE** [1] -
1:11
   **hope** [2] - 64:2; 78:6
   **hopefully** [2] - 75:17;
78:14
   **hopes** [1] - 64:2
   **Horne** [5] - 4:3, 6,
18, 25; 5:15
   **HUGGINS** [1] - 1:7
   **Huggins** [5] - 2:1;
21:15; 22:1; 40:22;

52:22
   **hundred** [1] - 71:18
   **Hunter** [3] - 75:25;
76:1, 19
   **HUVELLE** [1] - 1:11

**I**

   **idea** [2] - 66:2; 69:5
   **identification** [3] -
68:22; 70:3; 75:14
   **identified** [2] - 5:8;
68:25
   **identify** [5] - 20:14;
22:21; 30:21; 39:17,
25
   **identifying** [1] -
72:16
   **iffy** [1] - 64:20
   **impeach** [4] - 11:21;
12:3; 13:3, 19
   **impeached** [1] - 13:5
   **impeaching** [1] -
17:15
   **impeachment** [5] -
12:16; 13:7, 13, 22
   **Impeachment** [1] -
13:15
   **imply** [1] - 55:18
   **important** [1] - 6:2
   **impossible** [1] -
63:12
   **impression** [2] -
45:19; 46:20
   **imprint** [4] - 45:19,
22; 46:19
   **imprinted** [1] - 32:19
   **imprints** [2] - 45:24;
46:14
   **improper** [1] - 12:19
   **inches** [1] - 22:15
   **incident** [2] - 48:5,
13
   **included** [1] - 78:11
   **includes** [1] - 58:24
   **inconsistencies** [2] -
14:3, 16
   **inconsistent** [6] -
13:6; 14:9, 12, 15, 17,
23
   **inconvenience** [3] -
49:11; 50:4, 24
   **independently** [1] -
61:4
   **Indiana** [1] - 1:24
   **indicated** [1] - 69:20
   **indictment** [3] - 4:11;
73:10; 77:3
   **individual** [2] -

44:13, 25
  individually [1] -
45:5
  individuals [1] -
20:17
  inefficiency [1] - 5:7
  information [7] -
25:20; 56:12; 60:25;
61:5; 72:16, 20; 74:7
  initial [5] - 25:6;
45:6; 72:22; 77:5
  instance [1] - 5:2
  Instead [1] - 40:15
  instead [3] - 6:1;
29:22; 71:13
  instruct [3] - 56:19;
57:6; 61:19
  instructed [2] -
55:21; 78:10
  instructing [1] -
78:13
  instruction [8] -
57:14, 22; 59:13;
76:13, 22; 77:11
  intend [1] - 53:11
  intent [4] - 60:19;
61:7; 76:5, 11
  interest [1] - 3:24
  interested [1] - 74:14
  interpreting [1] -
5:20
  interruption [1] -
62:24
  interruptions [1] -
63:7
  interview [2] - 8:2;
65:24
  interviewing [1] -
15:16
  investigation [1] -
6:1
  invoices [1] - 71:21
  Involved [1] - 70:12
  involved [4] - 18:19;
19:20; 70:4, 16
  involves [1] - 77:17
  issue [2] - 61:3;
77:17
  issues [1] - 6:10
  itself [1] - 5:19

**J**

  jacket [4] - 69:7, 12,
15
  JACKSON [1] - 1:7
  Jackson [5] - 1:23;
21:10, 24; 39:13; 70:4
  jail [1] - 64:2

  January [1] - 63:16
  Jesus [6] - 31:9,
15-16, 18; 32:8, 21
  John [2] - 1:15; 34:6
  JON [1] - 1:23
  Jon [1] - 1:23
  JONES [1] - 1:7
  Jones [68] - 1:19;
4:16; 8:12; 10:18;
18:20; 19:5; 20:14;
21:6, 11, 22; 22:5, 22;
23:5; 24:1, 16; 25:2,
22; 26:4, 9; 28:10;
30:1; 32:25; 33:6, 12,
16; 34:14, 24; 35:14;
36:6, 14; 39:10,
16-17, 21; 40:10, 14;
43:21; 45:23; 46:20,
23; 47:7, 13, 15; 48:9,
21; 51:15; 52:6,
10-11, 19, 21; 65:8;
67:7; 68:22, 25;
69:25; 70:5, 21; 71:2,
17; 72:1, 4, 23, 25;
74:7; 76:10, 16
  judge [2] - 37:20, 23
  JUDGE [1] - 1:12
  Judge [4] - 37:20;
38:12; 76:15
  judges [1] - 19:19
  judicial [1] - 63:2
  jurors [1] - 10:17
  JURY [1] - 1:11
  Jury [4] - 7:15; 53:5;
62:23; 75:6
  jury [31] - 10:22;
12:18, 20; 13:16;
14:2, 12, 14-15, 19,
23; 15:9; 16:12; 25:1,
24; 26:8; 29:9; 39:5;
53:4; 55:9, 21; 56:2;
58:2; 61:20; 67:4, 18;
71:2; 75:19; 77:19;
78:2, 8, 13
  jury's [2] - 6:8; 32:12

**K**

  keep [7] - 5:14;
27:16; 57:9; 59:10;
60:11; 71:21
  kept [6] - 54:6, 9;
55:23; 57:8; 58:18;
61:10
  Kevin [4] - 21:2, 5;
70:15, 17
  KEVIN [1] - 1:8
  key [1] - 15:14
  kick [1] - 24:20

  kilo [18] - 25:21;
26:6, 9, 19, 24; 27:1;
28:3, 6, 23; 29:3, 5;
30:2; 45:6, 9; 70:25;
71:1
  kilogram [6] - 17:5;
18:20; 25:12, 14, 25;
66:13
  kilograms [2] -
25:17; 70:25
  kilos [20] - 27:18;
28:10, 13, 15, 20, 22;
29:13, 18, 20-21;
30:5; 33:17, 25; 34:1;
44:3, 10, 13; 46:13;
71:9
  kind [3] - 27:16;
76:13; 77:17
  kindly [1] - 7:12
  knowing [1] - 56:11
  known [1] - 61:4

**L**

  Ladies [1] - 75:1
  ladies [5] - 7:16, 22;
39:23; 53:3; 62:24
  larger [1] - 25:15
  Last [1] - 77:1
  last [2] - 4:25; 17:21
  late [2] - 25:21; 26:4
  law [5] - 48:17, 20;
49:20; 51:14; 78:12
  LAW [4] - 1:19, 23;
2:1, 5
  Lawrence [1] - 34:9
  lawyer [8] - 20:7, 18;
64:19, 22; 66:19, 22;
68:17; 69:22
  lawyers [1] - 20:25
  lead [4] - 59:20, 25;
61:25; 77:6
  leading [1] - 61:23
  least [2] - 3:17; 77:6
  leave [3] - 54:1;
59:19; 65:20
  leaves [3] - 21:8;
22:3; 55:8
  leaving [1] - 63:3
  left [7] - 8:1; 22:24;
54:25; 55:1, 11, 17;
69:16
  legal [2] - 63:11, 17
  less [7] - 5:8; 29:3, 5,
38:13, 16, 19; 73:16
  lesser [1] - 78:11
  level [2] - 72:8; 76:13
  Level's [1] - 33:1
  levels [1] - 78:1

  Levels [2] - 33:8
  lie [5] - 42:7; 70:16
  LIEBER [58] - 3:3, 7,
9, 25; 4:4, 8, 13, 15,
22, 24; 5:17, 22; 6:17,
22; 7:3, 7; 9:12;
11:11; 13:25; 17:11,
15; 19:9, 11; 20:8;
23:1; 30:25; 36:16,
18; 42:20; 49:5; 53:1,
10, 18, 22; 54:13;
55:12; 56:1, 5; 59:17;
62:4, 6; 63:21, 23;
65:9; 66:23; 68:7;
69:4, 12, 17; 70:2;
71:16; 74:15; 75:9,
23, 25; 76:3; 79:10
  Lieber [13] - 1:16;
20:14; 23:18, 20;
25:7; 30:16; 31:11;
55:8; 56:12; 59:9;
61:19; 62:21; 63:19
  lied [1] - 42:4
  life [19] - 37:3, 16;
38:1, 7, 16; 42:25;
56:3; 57:1, 5; 58:8;
59:3, 9; 63:12; 64:3,
14, 22; 67:23; 68:1
  likely [1] - 78:4
  line [9] - 16:22; 43:1;
54:19, 22; 55:3; 56:3;
59:4; 73:15; 74:10
  list [2] - 7:2, 7
  listen [5] - 4:23;
9:25; 56:6; 59:14;
63:19
  Listen [3] - 14:24;
49:12; 61:9
  lived [2] - 72:18
  loathed [1] - 77:18
  location [1] - 69:25
  locked [2] - 66:14;
67:1
  look [8] - 6:23; 7:5;
12:21; 17:8; 30:20;
54:19; 77:15
  looked [5] - 22:17,
19, 22; 31:8; 44:12
  looking [5] - 5:2;
19:22; 37:2, 5; 64:21
  looks [2] - 36:6
  loose [2] - 63:10, 17
  lose [1] - 3:24
  lost [2] - 13:13
  lower [2] - 19:3, 8
  lowered [2] - 26:15,
18
  lump [1] - 71:13
  lunch [4] - 8:4; 15:6,
10

  lying [2] - 10:22

**M**

  machine [1] - 2:12
  maintenance [1] -
4:8
  man [2] - 4:8; 40:7
  mandatory [2] -
37:5; 68:4
  manipulate [1] - 71:6
  manipulating [1] -
65:19
  manipulative [1] -
66:8
  mark [1] - 30:13
  marked [1] - 8:11
  markings [3] - 30:5,
9, 15, 17; 31:13
  marshal [2] - 74:25;
75:7
  marshals [1] - 53:19
  Maryland [1] - 76:16
  matter [3] - 54:2;
55:7; 78:24
  Maynard [1] - 34:9
  McDaniel [10] - 2:5;
3:23; 40:25; 41:2;
57:24; 58:11; 74:20;
79:7
  mean [7] - 34:15, 19;
51:10; 56:9; 57:2;
61:3; 75:18
  means [1] - 13:15
  meant [1] - 66:2
  meet [8] - 24:8;
47:13, 25; 48:1, 10;
52:6; 72:6
  meeting [1] - 72:10
  meetings [6] - 23:12,
24; 25:19; 28:8;
32:15; 72:1
  members [1] - 48:17,
19; 49:19; 51:14
  men's [1] - 62:9
  mention [1] - 61:20
  mentioned [1] -
31:15
  messed [2] - 36:9,
11
  met [9] - 24:8, 11,
13, 18, 23; 38:24;
39:2; 48:15; 72:4
  method [1] - 5:10
  MICHAEL [1] - 1:7
  middle [3] - 27:4;
63:16
  middleman [12] -
12:13, 16; 13:9;

15:18, 22; 16:2, 7;
18:5; 67:6, 9, 12
**might** [3] - 44:15;
52:10; 75:3
**million** [1] - 68:2
**mind** [4] - 24:6; 60:3;
64:21; 67:19
**mine** [1] - 29:23
**minute** [2] - 4:16;
12:24
**minutes** [4] - 53:4;
62:2, 6, 11
**miscellaneous** [1] -
73:13
**missing** [1] - 4:7
**misstatement** [2] -
73:5
**mistrial** [4] - 56:23;
57:2, 7, 13
**money** [16] - 16:8;
29:22; 33:7, 13; 34:4,
20, 25; 67:9, 13;
71:10, 14, 23; 72:5,
11, 13
**month** [4] - 10:17;
17:6, 24; 24:9
**months** [4] - 32:25;
64:23; 65:2
**morning** [10] - 15:19,
21; 18:14; 20:13;
23:5; 25:1; 32:9;
68:24; 70:22; 72:21
**most** [6] - 3:25; 12:3;
27:25; 28:25; 36:1;
39:6
**mother** [9] - 53:14,
21-22; 55:1, 17;
56:18, 21; 58:8; 60:16
**motion** [2] - 37:20;
38:12
**mouth** [1] - 59:18
**move** [4] - 4:9;
20:23; 50:17; 72:8
**moving** [4] - 56:23;
63:6; 66:12; 78:6
**MR** [118] - 3:8, 23;
5:10; 7:19, 21-22, 25;
8:15, 21; 9:14, 24;
10:2, 10; 11:2, 17, 24;
12:6, 11, 17, 24; 13:4,
11, 18; 14:5, 9, 18;
15:2, 5; 17:13, 19-20;
19:18; 20:10, 12, 21,
24; 23:3, 21; 28:5;
31:7, 13, 17; 32:5, 14;
33:9, 11; 34:17,
22-23; 35:6, 18;
36:13, 20, 22, 24;
37:24; 38:5; 40:24;
41:2, 17; 42:12; 43:2,

4, 15; 44:6; 45:8;
49:13, 17; 50:14,
18-19; 52:1, 25; 54:1,
11, 14, 17; 55:5, 14,
17; 56:8, 15, 23; 57:4,
11, 18, 24; 60:13, 24;
61:12, 16, 18; 62:9,
13, 20; 69:2, 6, 16;
71:7; 74:18, 21, 23;
76:7, 15; 77:3, 9, 15,
21; 78:4, 6, 15; 79:4,
6-7, 9
**MS** [58] - 3:3, 7, 9,
25; 4:4, 8, 13, 15, 22,
24; 5:17, 22; 6:17, 22;
7:3, 7; 9:12; 11:11;
13:25; 17:11, 15;
19:9, 11; 20:8; 23:1;
30:25; 36:16, 18;
42:20; 49:5; 53:1, 10,
18, 22; 54:13; 55:12;
56:1, 5; 59:17; 62:4,
6; 63:21, 23; 65:9;
66:23; 68:7; 69:4, 12,
17; 70:2; 71:16;
74:15; 75:9, 23, 25;
76:3; 79:10
**multiple** [2] - 18:20;
57:11

**N**

**name** [6] - 11:6, 10;
34:6, 9; 44:24; 72:15
**names** [1] - 12:9
**necessarily** [5] -
32:1; 38:23; 42:15;
47:24; 61:2
**need** [10] - 6:10, 14;
14:5; 27:19; 49:6;
58:6; 61:6; 75:16;
77:6
**neighborhood** [1] -
23:6
**net** [1] - 16:20
**Never** [2] - 33:4, 6
**never** [23] - 12:12;
14:16; 22:19, 22;
30:24; 33:1, 6-7; 34:1,
3, 6; 39:12; 41:10, 13;
45:2; 52:3, 21; 60:15;
66:9; 76:23
**next** [6] - 10:25;
20:19; 54:2; 61:9;
62:21; 71:18
**nice** [1] - 75:3
**Night** [1] - 33:1
**Nike** [1] - 30:12
**NO** [1] - 79:13
**none** [1] - 77:6

**NORRIS** [22] - 1:23;
36:22, 24; 37:24;
38:5; 40:24; 56:23;
57:4, 11, 18; 61:12,
16, 18; 69:2, 6, 16;
74:19; 77:3, 9; 78:6;
79:6
**Norris** [10] - 1:23;
36:21; 42:14; 55:4;
56:14, 18, 22; 70:3;
77:1
**notes** [1] - 6:23
**nother** [1] - 76:13
**nothing** [1] - 36:20
**Nothing** [2] - 40:24;
68:4
**notice** [1] - 53:23
**November** [1] - 1:8
**NOVEMBER** [1] - 3:1
**Number** [2] - 8:12;
44:4
**number** [5] - 35:11,
15; 49:7; 71:25; 72:1
**numbers** [3] - 6:24;
19:21; 71:14
**NW** [4] - 1:20, 24;
2:2, 6

**O**

**O'Brien** [3] - 4:2, 7,
19
**object** [2] - 57:20, 24
**objected** [1] - 43:11
**objecting** [1] - 31:11
**Objection** [11] - 9:12;
11:11; 19:9; 20:8;
23:1; 30:25; 36:16;
43:2; 49:5; 69:17;
71:7
**objection** [6] - 17:11;
31:4; 49:5; 59:4; 69:4,
19
**objections** [1] - 3:16
**objects** [1] - 3:18
**observe** [1] - 70:20
**observed** [1] - 36:15
**obtain** [1] - 72:25
**obtained** [1] - 72:22
**obvious** [1] - 55:10
**obviously** [1] - 51:11
**Obviously** [1] -
77:10
**occasion** [3] - 27:15;
30:3; 47:25
**October** [3] - 5:2, 23;
75:24
**OF** [17] - 1:2, 4, 11,
19, 23; 2:1, 5; 7:20;

36:23; 41:1, 16;
63:22; 79:4, 7-8, 10
**offered** [2] - 13:19;
67:25
**OFFICE** [2] - 1:15, 23
**officer** [2] - 15:16;
16:18
**officers** [4] - 15:22;
16:11; 17:22; 47:3
**OFFICES** [3] - 1:19;
2:1, 5
**Official** [1] - 2:9
**old** [1] - 68:9
**once** [1] - 44:12
**One** [7] - 4:12; 36:11;
53:3; 64:7; 74:24;
75:20
**one** [56] - 3:8; 4:11;
6:11; 8:22; 10:20, 25;
12:2; 14:24; 17:5, 8-9;
18:2; 20:18, 21;
21:10; 22:3, 24;
23:24; 25:19, 21;
26:2, 5; 28:8; 31:15;
32:15, 22; 35:19;
37:14; 43:19, 24;
46:4; 47:12; 48:14;
50:1, 5, 20; 51:24;
52:5, 10; 53:1; 55:12;
56:20; 58:3; 59:20;
61:23; 63:2; 64:5;
65:14; 68:17; 69:16;
77:18; 78:11, 16
**one-eighth** [4] -
18:2; 25:21; 26:2, 5
**ones** [2] - 30:6;
45:22
**open** [2] - 59:11;
61:24
**opened** [1] - 53:15
**opening** [1] - 59:11
**opportunity** [4] -
54:7; 64:16; 65:3, 22
**opposed** [1] - 34:20
**opting** [1] - 3:20
**options** [1] - 38:6
**order** [1] - 40:3
**ought** [1] - 7:2
**ourselves** [1] - 62:7
**Overruled** [1] - 71:8
**overruled** [2] - 71:8;
78:15
**overs** [1] - 16:19
**Overt** [1] - 4:14
**overturned** [1] -
77:18
**owe** [1] - 27:18
**owed** [5] - 27:16;
28:16; 29:14; 71:24;
72:11

**own** [3] - 47:7; 58:7;
74:10

**P**

**p.m** [9] - 1:8; 3:2;
7:15; 53:5; 62:15, 23;
75:6; 78:20
**package** [3] - 44:5,
10, 13
**packages** [1] - 44:25
**packaging** [1] -
45:10
**Page** [2] - 79:3, 13
**paid** [16] - 15:8;
27:25; 28:13, 15-16,
20, 22; 29:1, 9-10, 12,
15, 18
**paragraph** [1] -
73:13
**Pardon** [1] - 29:4
**parking** [1] - 48:2
**part** [2] - 6:1; 60:19
**participate** [1] - 3:22
**particular** [3] - 30:9;
33:18; 65:13
**past** [3] - 6:23; 59:24
**patient** [1] - 63:16
**pay** [2] - 29:14; 71:17
**paying** [1] - 26:9
**peace** [1] - 62:20
**pending** [1] - 49:4
**people** [18] - 29:21,
25; 33:17; 42:24;
46:4; 55:23; 57:9;
58:23; 59:2, 10,
13-14; 60:11; 61:3;
64:14; 67:8, 13; 71:15
**per** [10] - 26:9, 19,
24; 27:1; 28:23; 29:3,
5; 44:5, 10
**Per** [2] - 28:3, 6
**percent** [2] - 66:25;
67:3
**perfectly** [2] - 66:24;
67:3
**period** [3] - 26:3;
32:25
**permission** [1] -
61:23
**permit** [1] - 56:19
**perplexed** [2] -
11:14; 76:4
**person** [9] - 16:5;
17:6; 33:19; 40:16,
18, 21; 46:17; 55:6;
68:25
**phone** [1] - 51:6
**pick** [3] - 22:5; 39:21;

40:4
**picked** [2] - 22:24; 33:6
**pink** [1] - 23:9
**Pinkerton** [3] - 76:7, 22, 24
**place** [3] - 52:10; 76:16
**plaid** [1] - 69:9
**plain** [1] - 45:12
**Plaintiff** [1] - 1:5
**planning** [1] - 7:10
**plastic** [1] - 44:11
**Play** [1] - 12:22
**play** [3] - 7:17; 8:11; 13:25
**played** [10] - 6:25; 7:4; 8:14, 20; 10:1, 9; 11:1, 16; 15:4; 17:10
**playing** [3] - 11:14; 17:14; 51:10
**plea** [7] - 18:13, 15; 37:9; 65:2; 68:13; 73:9
**plead** [2] - 19:7; 73:9
**pleased** [2] - 37:19; 38:10
**pled** [2] - 19:13; 74:6
**point** [19] - 9:5; 11:21; 12:5, 17; 13:12; 17:11; 25:17; 28:9, 20; 29:10; 31:9; 33:16; 39:24; 50:1; 55:11; 57:18; 46:21
**pointed** [5] - 40:7, 14, 18, 21
**pointing** [1] - 40:16
**points** [2] - 71:6; 72:7
**police** [5] - 8:5; 41:19; 42:4; 47:3; 66:25
**portion** [2] - 61:14; 71:12
**portrait** [1] - 63:2
**positive** [1] - 69:1
**possess** [1] - 77:23
**possessed** [2] - 76:10; 77:24
**possession** [3] - 10:14; 76:5; 77:10
**possibility** [1] - 65:17
**possible** [1] - 9:8
**possibly** [2] - 19:22; 23:22
**potential** [1] - 58:2
**powder** [6] - 25:4, 8-10; 47:4; 73:7
**practical** [1] - 76:15

**predicted** [1] - 63:13
**prejudice** [1] - 58:1
**preparation** [1] - 38:25
**presence** [1] - 66:18
**present** [2] - 23:12, 25
**pressed** [3] - 57:7
**pressing** [1] - 61:10
**pretty** [6] - 30:20; 48:13; 50:2, 6, 8; 66:17
**previously** [1] - 26:4
**price** [5] - 26:16, 18; 28:25; 30:19; 72:9
**prison** [1] - 37:3
**probation** [2] - 68:18, 20
**problem** [8] - 7:11; 54:20; 55:23; 57:11; 61:25; 76:15, 18; 77:6
**problems** [4] - 6:15; 60:8; 63:18; 75:19
**procedure** [2] - 7:12; 11:14
**proceed** [1] - 15:2
**Proceedings** [2] - 2:12; 78:20
**proceedings** [1] - 78:23
**PROCEEDINGS** [1] - 1:11
**process** [1] - 3:21
**processed** [1] - 30:17
**produced** [1] - 2:12
**proffer** [1] - 73:25
**profile** [1] - 72:20
**profit** [1] - 16:21
**project** [1] - 75:12
**promise** [1] - 64:20
**prompt** [3] - 50:2, 6, 8
**proper** [1] - 13:23
**proposal** [1] - 53:8
**propose** [3] - 3:10; 6:16; 53:9
**prosecutors** [1] - 23:17
**provide** [4] - 37:20; 38:12; 72:15; 74:8
**provided** [4] - 34:16, 19; 38:11; 58:5
**pulled** [1] - 51:6
**pump** [1] - 52:12
**punishment** [2] - 64:16, 18
**purchase** [2] - 25:2; 73:6
**purchased** [9] - 18:6;

24:10; 26:15, 18; 28:9, 12; 30:6; 33:12; 67:14
**purpose** [2] - 13:4; 14:16
**purposes** [1] - 13:22
**pushing** [1] - 55:23
**put** [11] - 7:10; 13:15; 35:11, 15; 42:23; 44:11; 53:15; 59:1; 65:24; 71:11; 75:18
**Put** [1] - 56:15
**PWID** [2] - 4:15

**Q**

**quality** [1] - 30:16
**quantities** [6] - 18:21; 25:12, 22, 25; 66:13
**quantity** [1] - 72:22
**questioned** [1] - 15:7
**questions** [20] - 8:4, 6; 14:1, 10; 17:1; 53:24; 54:21; 57:9, 25; 60:12; 63:19; 65:5; 68:9, 21; 70:24; 72:14; 73:8; 74:18; 75:20
**quicker** [1] - 6:20
**quickly** [1] - 75:10
**quite** [2] - 27:20; 58:18

**R**

**Rachel** [1] - 1:16
**range** [1] - 65:1
**rather** [8] - 42:18; 43:7, 14, 16; 54:24; 55:10; 58:19; 59:6
**RDR** [3] - 2:9; 78:23, 25
**RDR-CRR** [1] - 78:23
**read** [2] - 58:20; 61:16
**ready** [4] - 4:4; 12:3; 62:21; 78:14
**real** [5] - 42:23; 59:1; 65:24; 66:8; 68:16
**realized** [2] - 45:23, 25
**really** [6] - 5:6; 8:25; 9:4; 12:3; 40:4, 12; 52:16; 65:18
**reason** [6] - 9:6, 17; 37:8; 54:25; 60:9; 70:16
**reasons** [1] - 64:5

**received** [1] - 43:21
**recess** [1] - 53:4
**recollect** [1] - 46:24
**recollection** [2] - 32:12; 46:2
**record** [12] - 11:20; 27:16; 53:15; 58:13, 15, 17; 60:15; 61:7; 69:13, 24; 71:21; 78:23
**records** [1] - 27:11
**Records** [1] - 27:12
**recovered** [2] - 4:10; 74:1
**REDIRECT** [2] - 63:22; 79:10
**redirect** [4] - 57:21; 59:25; 61:21; 62:4
**reduced** [1] - 29:2
**reference** [1] - 5:18
**refers** [1] - 75:21
**reflect** [1] - 69:24
**reflects** [1] - 58:14
**reform** [1] - 34:22
**regard** [2] - 43:20; 52:2
**regarding** [1] - 59:13
**relating** [1] - 75:20
**relationship** [2] - 24:15; 27:2
**remember** [19] - 8:5, 9; 15:10; 20:14; 23:23; 27:6, 8, 19, 22; 30:6; 32:18; 46:2, 21; 49:8; 60:14; 73:19, 22
**remembering** [4] - 46:3, 6, 8, 10
**reminded** [1] - 27:20
**reported** [1] - 2:12
**reporter** [1] - 58:16
**Reporter** [2] - 2:9
**reporter's** [1] - 58:23
**Request** [1] - 69:6
**request** [6] - 3:3; 57:13, 19, 21; 61:13, 18
**require** [1] - 76:21
**required** [1] - 77:1
**respect** [1] - 11:12
**responding** [1] - 46:12
**response** [3] - 5:24; 58:5, 9
**responsibility** [5] - 18:16, 23; 19:2; 64:12
**responsible** [1] - 73:15
**rest** [4] - 4:5; 5:21; 13:25; 28:16
**resume** [1] - 62:2;

75:4
**resurrect** [1] - 61:24
**returned** [1] - 67:14
**reversed** [1] - 78:4
**review** [1] - 65:22
**revisit** [2] - 57:20
**road** [1] - 61:10
**room** [1] - 62:9
**Room** [1] - 2:10
**roughly** [2] - 16:24; 26:11
**Roughly** [1] - 26:10
**RUDOLPH** [1] - 2:1
**Rudolph** [1] - 2:2
**ruling** [1] - 57:18; 59:19; 61:12
**run** [4] - 6:23; 59:19; 65:16

**S**

**Sam** [1] - 48:13
**Sam's** [2] - 48:5, 7
**sat** [2] - 74:11
**Saturday** [1] - 71:19
**saving** [1] - 60:11
**saw** [7] - 22:19; 32:8, 16, 18; 34:6; 52:21
**schedule** [1] - 63:13
**Scott** [3] - 2:9; 78:23, 25
**seat** [1] - 69:23
**second** [6] - 8:22; 17:5; 53:3; 69:23; 74:25
**seconds** [1] - 62:10
**see** [20] - 3:16; 6:6; 8:18; 12:20; 14:7; 20:16; 22:8; 23:9; 31:18, 21; 32:1; 34:9; 35:25; 36:3; 39:25; 40:15; 74:1
**seek** [1] - 59:19
**SEGAL** [1] - 1:11
**seizures** [1] - 76:17
**sell** [7] - 33:17, 20, 22, 25; 34:1
**sells** [1] - 30:12
**send** [1] - 33:18
**sense** [2] - 16:4; 64:13
**sentence** [3] - 19:21; 20:2; 31:22
**sentenced** [1] - 64:21
**sentencing** [3] - 19:14; 66:3; 77:13
**separate** [1] - 18:3
**separated** [1] - 18:7

**Seran** [5] - 43:23;
44:15, 21; 45:3
**series** [1] - 65:5
**serve** [2] - 30:15;
67:6
**SESSION** [2] - 1:10;
3:1
**settled** [1] - 5:11
**several** [3] - 18:3;
72:6
**sheet** [1] - 27:13
**shirt** [5] - 69:7, 14,
22, 25
**shop** [1] - 48:21
**shopped** [1] - 51:15
**short** [1] - 53:4
**shorter** [1] - 63:14
**shorthand** [1] - 2:12
**shout** [1] - 49:6
**show** [3] - 13:6;
14:11; 73:12
**showed** [1] - 73:25
**showing** [1] - 13:4
**sic** [1] - 35:8
**sic)** [1] - 6:13
**side** [1] - 3:20
**Sidebar** [1] - 15:1
**sidebar** [1] - 11:20
**significant** [1] - 5:25
**similar** [1] - 44:12
**simply** [2] - 67:13;
71:11
**sit** [5] - 3:10; 13:16,
20; 74:12
**sitting** [10] - 20:16;
23:9; 42:24; 58:3;
59:2; 66:10; 67:18;
69:22; 73:19
**Sitting** [1] - 68:24
**situation** [8] - 42:23;
50:22; 54:2; 59:1;
61:1; 64:12; 65:19
**six** [1] - 32:25
**slow** [1] - 31:5
**smaller** [1] - 25:14
**sneakers** [1] - 30:12
**social** [1] - 24:15
**sold** [2] - 19:4; 34:24
**solely** [1] - 15:18
**someone** [6] - 18:2;
40:5; 52:11, 19;
74:12; 77:24
**sometime** [1] - 27:2
**Sometimes** [3] -
36:1; 72:11
**sometimes** [6] -
47:12; 48:3, 20; 52:6;
61:23; 72:13
**somewhere** [3] -

23:6; 27:13; 38:7
**soon** [1] - 66:21
**sooner** [4] - 38:22;
42:15; 54:3; 64:2
**sorry** [10] - 17:19;
44:15; 45:16; 50:8;
53:7; 58:13; 69:13,
18, 20; 75:23
**Sorry** [2] - 7:16;
62:24
**sort** [1] - 13:13
**sounded** [1] - 49:24
**source** [1] - 11:10
**speaking** [3] - 3:8;
48:8; 68:8
**speaks** [1] - 5:19
**specific** [5] - 11:24;
16:17; 28:18; 36:5;
46:18
**specifically** [5] -
15:21; 16:22; 46:22;
71:22; 78:15
**speed** [1] - 63:12
**spend** [2] - 3:14;
62:12
**sports** [1] - 24:12
**stamp** [1] - 31:18
**stamped** [1] - 32:8
**stand** [2] - 20:22;
69:19
**standing** [1] - 22:14
**stars** [2] - 31:10;
32:18
**start** [1] - 64:22
**started** [4] - 25:14;
47:25; 56:1; 65:25
**statement** [9] - 13:6,
18; 14:6, 10, 14; 25:6;
65:6, 11; 73:5
**STATES** [4] - 1:1, 4,
12, 15
**States** [1] - 1:15
**step** [1] - 54:2
**still** [3] - 19:19; 38:1;
40:20
**stop** [14] - 4:19; 8:22;
10:11; 11:18; 12:15,
25; 13:2, 8, 20; 14:3;
17:13, 16-17; 69:18
**Stop** [1] - 17:12
**stopped** [1] - 56:24
**stopping** [4] - 11:23,
25; 12:17; 14:17
**store** [1] - 51:22
**straight** [2] - 68:13
**Street** [2] - 1:17, 20
**strike** [1] - 61:13
**stuff** [3] - 47:16, 22;
78:13
**substantial** [2] -

38:11; 66:12
**substantive** [3] -
4:13; 11:22; 76:18
**suck** [1] - 44:11
**suggest** [2] - 55:22;
77:8
**suggested** [1] -
61:19
**suggestion** [3] -
57:15, 17; 60:2
**suggests** [1] - 78:12
**Suite** [2] - 1:21; 2:3
**sum** [1] - 71:13
**summary** [3] - 5:4,
13; 17:21
**Summit** [1] - 4:8
**Superior** [9] - 65:15,
17; 66:1, 15; 67:17,
19; 68:2, 8, 10
**supplement** [1] -
78:7
**suppose** [4] - 5:6;
61:2; 77:23
**supposed** [2] - 5:13;
78:13
**surely** [1] - 61:1
**suspect** [1] - 59:20
**sustain** [1] - 31:4
**Sustained** [9] - 9:13;
20:9, 11; 23:2; 31:1;
36:17; 42:21; 49:6;
58:25
**sustained** [2] - 49:6;
58:21
**sweater** [2] - 21:11,
16
**swiftly** [1] - 63:7
**swoosh** [1] - 30:12
**sympathize** [1] -
59:14


**T**

**table** [2] - 20:16;
58:3
**talks** [1] - 76:4
**tally** [1] - 27:13
**tan** [1] - 21:15
**tape** [24] - 6:13; 8:1;
11:14, 21; 12:20, 22;
13:4, 6, 8-9, 12, 21;
14:1, 21; 16:3, 17, 20;
65:16, 22; 66:5
**tapes** [2] - 4:23;
75:18
**tedious** [1] - 3:21
**Ten** [2] - 37:16; 53:4
**ten** [22] - 4:16; 24:1,
10-11; 37:10, 13, 21;

38:2, 7, 13-14, 16-17,
19; 39:4; 58:20;
64:15, 18, 22; 66:16
**ten-minute** [1] - 4:16
**terms** [6] - 3:4, 7, 25;
4:17; 19:14; 77:12
**testified** [6] - 11:11;
32:19; 47:17; 50:13;
52:2; 72:21
**testify** [1] - 39:9
**testifying** [4] - 39:15;
42:24; 53:15; 59:2
**testimony** [13] -
4:25; 14:19; 37:19;
38:11, 25; 41:18;
42:14, 16-17; 43:21;
52:7; 61:14; 62:19
**theory** [2] - 76:7;
78:10
**therefore** [1] - 13:20
**they've** [1] - 59:15
**thinking** [1] - 77:5
**thinks** [2] - 59:22;
67:24
**third** [2] - 17:8; 73:15
**Thirty** [1] - 15:12
**Thirty-eight** [1] -
15:12
**thousand** [1] - 71:18
**threat** [5] - 55:17;
56:9, 13; 57:15
**threatened** [4] -
53:14, 23; 59:9; 60:16
**threats** [2] - 58:4;
61:21
**three** [7] - 12:25;
16:18; 17:3, 6; 21:8,
18; 39:3
**Three** [1] - 21:18
**three-eighths** [1] -
16:18
**tight** [2] - 42:23; 59:1
**timeline** [10] - 3:4, 6,
9, 17; 5:1, 3-4, 16;
6:5; 78:19
**timing** [1] - 3:4
**tin** [1] - 45:3
**today** [21] - 4:20;
5:11; 14:23; 16:12;
25:24; 36:15; 39:21,
24; 42:18; 43:7, 10,
14, 16; 53:12; 58:19;
60:4, 7; 63:4; 71:18;
73:19
**Today** [2] - 43:18;
62:25
**today's** [1] - 35:13
**together** [4] - 3:12;
7:10; 71:11; 75:18
**tomorrow** [8] - 4:5,

21; 59:21; 60:7; 63:1,
3; 75:11; 78:18
**ton** [1] - 4:24
**took** [4] - 19:1;
29:23; 76:16
**top** [2] - 29:23; 38:7
**total** [1] - 28:9
**totally** [3] - 15:15;
68:3
**towards** [2] - 27:1, 3
**transacted** [1] -
72:13
**transaction** [2] -
72:2, 11
**transactions** [7] -
27:11; 34:13, 17;
39:9, 12; 71:4; 74:6
**transcript** [3] - 2:12;
14:19; 78:23
**TRANSCRIPT** [1] -
1:11
**transcription** [1] -
2:12
**transcripts** [6] -
3:12; 6:15, 21; 7:11;
75:17
**transfer** [1] - 29:23
**trial** [3] - 55:15;
59:10; 74:10
**TRIAL** [1] - 1:11
**tried** [1] - 24:10
**trouble** [10] - 8:24;
9:3-5; 41:21, 23; 42:1,
4, 6; 46:3, 6, 8, 10;
65:23
**troubles** [2] - 9:8
**true** [2] - 70:11, 14
**truth** [5] - 11:9;
16:15; 67:25; 70:18
**truthful** [4] - 53:10;
66:25; 67:3; 73:4
**try** [6] - 5:14; 9:7;
37:11; 40:3; 58:12;
64:13
**trying** [11] - 14:11;
16:21, 25; 37:13;
50:10; 51:2; 58:9;
63:11; 71:5
**Tuesday** [1] - 71:19
**Turn** [1] - 17:18
**Twelve** [1] - 62:6
**two** [19] - 6:10;
10:15; 23:22; 24:8;
27:23; 38:6; 39:3;
44:3, 13; 49:24; 50:7,
15; 62:9; 68:20;
71:13; 75:20; 77:25
**Two** [2] - 21:20;
44:10
**twos** [1] - 44:1, 3

**type** [1] - 41:8

## U

**U.S** [1] - 2:10
**Um-hmm** [1] - 48:16
**under** [3] - 56:11; 78:16
**understood** [1] - 8:24
**unfair** [1] - 54:17
**unfortunately** [1] - 55:5
**unindicted** [1] - 75:21
**UNITED** [4] - 1:1, 4, 12, 15
**United** [1] - 1:15
**unless** [2] - 53:11; 55:20
**unwrapped** [1] - 45:13
**up** [31] - 4:10; 6:7; 10:4, 8; 13:23; 17:8; 25:17; 33:7; 36:9, 11; 37:2; 42:24; 48:1; 51:6, 25; 53:2; 55:9; 57:1; 59:2, 12; 61:3, 24; 62:21; 63:10, 13, 17; 66:14; 67:1, 13; 69:19; 77:7
**US** [2] - 1:15

## V

**vague** [1] - 68:16
**varied** [3] - 45:25; 71:4, 14
**various** [2] - 5:1; 53:19
**versions** [1] - 16:15
**versus** [4] - 53:12; 70:25; 71:1; 72:1
**video** [1] - 66:8
**videotape** [5] - 18:9; 41:20; 65:6; 66:11, 25
**Videotape** [8] - 8:14, 20; 10:1, 9; 11:1, 16; 15:4; 17:10
**videotaped** [1] - 65:11

## W

**Wait** [4] - 31:3, 11, 22
**wait** [17] - 48:3, 21; 49:25; 50:3, 21, 24;

51:1-3, 5, 8, 11, 15, 18, 20
**waited** [1] - 49:9
**waive** [1] - 48:22
**walked** [3] - 22:11, 14
**walking** [1] - 5:2
**Wallace** [3] - 2:9; 78:23, 25
**Walton** [3] - 37:20; 38:12
**wants** [4] - 43:13; 54:3, 25; 55:9
**Washington** [7] - 1:7, 17, 21, 24; 2:3, 6, 10
**Wednesday** [8] - 3:14; 4:22; 75:12, 15-16; 77:8; 78:14
**week** [6] - 7:13; 53:16, 18; 63:5; 71:19; 75:17
**weight** [1] - 67:22
**white** [1] - 25:9
**whole** [7] - 5:3; 12:19, 22; 14:10; 72:19; 76:13
**willing** [2] - 59:15; 60:5
**willingness** [1] - 62:1
**wire** [1] - 5:23
**WITNESS** [23] - 7:24; 9:21, 23; 19:16; 23:20; 31:2, 16, 24; 33:10; 35:4; 36:11; 42:23; 43:11; 44:5; 45:2, 5; 49:9; 68:1; 69:7, 10, 15, 22; 71:9
**witness** [20] - 3:11; 4:16; 5:15; 6:7; 14:22; 20:21; 53:6, 24; 54:19; 58:1; 61:20; 62:16-18, 25; 74:24; 75:7, 14
**witnesses** [2] - 4:4; 6:14
**wonder** [1] - 78:17
**word** [3] - 31:12; 32:6, 8
**words** [5] - 48:3; 51:10; 52:9; 54:14; 60:1
**works** [1] - 6:3
**worry** [3] - 60:11; 76:12; 77:14
**Wrap** [5] - 43:23; 44:15, 21; 45:3
**wrap** [3] - 44:15, 21; 45:3

**wrapped** [8] - 43:22, 24-25; 44:1; 45:1, 5, 7
**Wrapped** [1] - 44:3
**wrappings** [1] - 44:14
**write** [1] - 27:19
**writing** [4] - 7:2, 12; 27:9, 12
**wrongs** [1] - 64:13

## Y

**y'all** [3] - 70:18; 74:10, 12
**Yanta** [12] - 23:10, 25; 24:7; 25:19; 26:2; 28:8, 19; 32:15; 48:15, 19; 49:19; 51:14
**year** [1] - 27:22
**years** [25] - 27:23; 37:10, 12-13, 16, 21; 38:2, 13-14, 16-17, 19; 39:4; 42:19; 43:8, 14, 16; 53:13; 58:19; 59:7; 64:15, 18, 22; 66:16
**years'** [1] - 68:20
**younger** [1] - 41:5
**yourself** [6] - 8:18; 9:7, 18; 11:10; 16:8; 33:13

## Z

**Ziploc** [3] - 45:11, 14

20061127 AM

20   there with me come with me.  Mr. McDaniel and I had discussed
21   an issue that I wanted to clarify with the witness.
22           THE COURT:  Mr. McDaniel will come with you then,
23   that's fine.  I don't know what that means but at a minimum.
24           Can we bring him in?
25           MS. LIEBER:  Sure, yes.
     31


1            (There was a pause in the proceedings.)
2            THE COURT:  Are we ready to proceed?
3            MS. LIEBER:  We are.
4            (Jury Present.)
5            THE COURT:  All right.  Ladies and gentlemen, we're
6    ready to proceed.
7            ANTHONY GIVENS, GOVERNMENT WITNESS, SWORN
8                     DIRECT EXAMINATION
9    BY MS. LIEBER:
10   Q    Good morning, sir.  In a nice, clear voice, can you
11   please introduce yourself to our jury.
12   A    My name is Anthony Givens.
13   Q    How do you spell Givens?
14   A    G-I-V-E-N-S.
15   Q    Sir, do you have a nickname?
16   A    Pig, P-I-G.
17   Q    How did you get that nickname?
18   A    My grandmother.
19   Q    Your grandmother?
20   A    Yes, ma'am.
21   Q    How old are you?
22   A    Thirty-four.
23   Q    And are you presently incarcerated?
                        Page 27

20061127 AM

24  A  Yes.

25  Q  Where are you currently incarcerated?
    32

1   A  CTF or CTA.

2   Q  And what is CTF or CTA?

3   A  D.C. jail.

4   Q  It's sort of a component of the D.C. jail?

5   A  Yes, ma'am.

6            THE COURT:  You're going to have to speak up a bit

7   so everybody all the way down can hear you.  All right, sir?

8            THE WITNESS:  Okay.

9   BY MS. LIEBER:

10  Q  Mr. Givens, prior to your time that you're spending now

11  incarcerated, where did you live generally?

12  A  In Northeast, Washington, D.C.

13  Q  Where were you born and raised?

14  A  In the Capitol Hill, Eastern High School area.

15  Q  Is that in Northeast here in Washington?

16  A  That's Southeast, just a bit over.

17  Q  Okay.  Where did you go to elementary school?

18  A  I went to Payne Elementary.

19  Q  Is that Payne, P-A-Y-N-E?

20  A  Yes, ma'am.

21  Q  Where did you go to school beyond that?

22  A  I went to Elliott and then I went to McKinley.

23  Q  Elliott Jr. High School?

24  A  Yes, ma'am.

25  Q  And McKinley Tech High School?
    33

1   A   Yes, ma'am.

2   Q   How long have you been incarcerated?

3   A   About 31 months now.

4   Q   When were you first locked up?

5   A   '04, May 11th.

6   Q   When you were arrested, tell the jury why were you

7   arrested?

8   A   When I was arrested, I was carrying 500 grams of crack

9   cocaine.  I was arrested for that.

10  Q   When you say you were carrying it, did you intend to

11  actually sell that crack cocaine?

12  A   Yes.

13  Q   Because you had close to 500 grams of crack cocaine,

14  were you indicted for that offense?

15  A   Yes.

16  Q   After you were indicted for that offense, were you

17  indicted for possession with intent to distribute 50 grams or

18  more of cocaine base?

19  A   Yes.

20  Q   Is cocaine base known as crack on the street?

21  A   Yes.

22  Q   Were you indicted for that offense?

23  A   Yes, I was.

24  Q   Did you ultimately make a decision about what to do

25  about that indictment?
    34


1   A   Yes.

2   Q   What was your decision?

3   A   To cooperate with the Government as far as the case, as

20061127 AM

    4  far as my case was.

    5  Q   When you say "cooperate with the Government," did you

    6  actually enter a plea of guilty to the indictment?

    7  A   Yes.

    8          MS. LIEBER:  Your Honor, at this time I'm going to

    9  show Mr. Balarezo, all counsel, what I've marked, going to

   10  mark as Miscellaneous 12.

   11          THE DEPUTY CLERK:  Miscellaneous 11 was a

   12  stipulation.

   13          MS. LIEBER:  Your Honor, if we can just approach on

   14  one matter.  I'm sorry about that.

   15          (Bench conference.)

   16          THE COURT:  We have something that needs to come

   17  out?

   18          MS. LIEBER:  I'll do that too.  Your Honor, with

   19  respect to this, I asked my secretary to pull a signed copy

   20  of his plea letter, which this is not a signed copy.  She is

   21  out this morning.  So I couldn't actually get that from her.

   22          I'm going to use this with Mr. Givens because it is

   23  identical.  It's just not signed.  So I'm just going to

   24  substitute, Mr. Balarezo has already given me permission to

   25  substitute a signed copy when it goes back.
   35


    1          MR. BALAREZO:  I just don't want to have any issue

    2  when I'm crossing saying I have not signed it.

    3          MS. LIEBER:  I am going to actually say to him this

    4  is an unsigned version of your plea agreement.

    5          THE COURT:  Fine, for the record, we'll substitute

    6  it, this one for the other one.  Any problems?

    7          MR. BALAREZO:  No.

 8              THE COURT:  Okay.  Go ahead.

 9              (Open Court.)

10              THE COURT:  Any objection to its admission,

11    Miscellaneous 12?

12              MR. BALAREZO:  No, subject to our discussion, Your

13    Honor.

14              THE COURT:  Let's make it clear, this is an

15    unsigned copy, and we'll just put in the signed copy as soon

16    as it's available, when your secretary gets back.

17              MS. LIEBER:  Thank you.

18              (Government Exhibit No. Miscellaneous 12

19               was admitted into evidence.)

20    BY MS. LIEBER:

21    Q    Mr. Givens, I'm going to show you what I've marked at

22    the bottom as Miscellaneous 12 here, and I want to ask you to

23    take a look at this.  First of all, is this, just so

24    everybody knows, is this an unsigned copy of your plea

25    letter?
      36


 1    A    Yes.

 2    Q    Actually, why don't I have you take a look at it?

 3              Mr. Givens, if you would take a look at that and

 4    see if you recognize what that document is.

 5    A    This is my plea letter.

 6    Q    Except for the fact that this actual copy doesn't have

 7    your signature on it, is this the plea letter that you agreed

 8    to when you pled guilty?

 9    A    Yes.

10    Q    Okay.  And I'm going to just spend a few minutes talking

11    about the letter itself.  In this plea letter, first of all,

20061127 AM

12   who is Pleasant Broadnax.

13   A   That's my lawyer.

14   Q   In this plea letter, what have you agreed to plead

15   guilty to here in Paragraph 1?

16   A   I agreed to plead to 21 USC 841, dash (a)(1).

17   Q   Now, do you know about 21 USC 841(a)(1).  In other

18   words, are you familiar with the U.S. Code?

19   A   No, I'm not familiar with the U.S. Code.  But I'm quite

20   sure it's distributing crack cocaine above 50 grams.

21   Q   In fact, is it, above here, possession with intent to

22   distribute 50 grams or more of cocaine base?

23   A   Yes.

24   Q   How much time, are you aware that you're facing a

25   mandatory minimum amount of time?
     37


1   A   Yes.

2   Q   How much time are you facing as a mandatory minimum?

3   A   Ten years.

4   Q   What's the maximum that you are facing?

5   A   I believe life.

6   Q   Mr. Givens, did you have an opportunity to ~> over this

7   plea letter with your attorney?

8   A   Yes.

9   Q   Did he explain to you various aspects of the plea

10   letter?

11   A   Yes.

12   Q   In terms of the sentencing, well first of all, are you

13   the same Anthony Givens that was convicted in 1999 of

14   distribution of PCP in Superior Court?

15   A   Yes.

Page 32

20061127 AM
16    Q    What is your understanding of how the sentencing would

17    take place in your case?

18              THE COURT:  Let me just remind the jury, we've had

19    this before, but you've just heard evidence regarding the

20    prior conviction of this witness, and you may use it in

21    considering his credibility.  I instructed you on this

22    before.  I will instruct you again I'm sure in the future.

23    Okay.

24              MS. LIEBER:  Thank you, Your Honor.

25
      38


1    BY MS. LIEBER:

2    Q    Mr. Givens, what is your understanding about the

3    sentencing guidelines?  Are you familiar that there are

4    sentencing guidelines?

5    A    Yes.

6    Q    In terms of your plea letter, who ultimately decides

7    what sentence you get?

8    A    The judge.

9    Q    Do I have any say in the sentence that you get?

10   A    I don't believe so.

11   Q    Is there anything I can do for you?  Under the plea that

12   you agreed to, is there anything I can do --

13              THE COURT:  You mean the Government.

14              MS. LIEBER:  I'm sorry.  I mean, the Government.

15   Thank you.

16   BY MS. LIEBER:

17   Q    Is there anything the Government can do to assist you in

18   your sentencing?

19   A    No, I think my plea is a mandatory ten years.  I think

Page 33

20061127 AM
20  that's what I pled to.  So in this that's about it.

21  Q    What is your understanding of what you get, the benefit

22  of cooperating with the Government?

23  A    They could take my cooperation into consideration.  I

24  think that's, I could still be sentenced to ten years or to

25  life.  There is no guarantee.
    39


1   Q    Have I promised you what sentence you'll get?

2   A    No.

3   Q    What promises have I made to you?

4   A    None.

5   Q    Are you aware of something called a 5K motion?

6   A    Yes.

7   Q    Tell the jury what your understanding is of a 5K motion.

8   A    My understanding of a 5K motion is that, if I cooperate

9   and testify to the truth, that a 5K motion is a motion that

10  would be filed in my behalf saying that my cooperation was

11  helpful.  That would be another considering factor for the

12  judge for my sentencing.

13  Q    Now, Mr. Givens, you said that you were arrested in May

14  of 2004 in possession of almost half a kilogram of crack

15  cocaine?

16  A    Yes.

17  Q    Have you sold drugs in the past?

18  A    Yes.

19  Q    What kinds of drugs have you sold in the past?

20  A    PCP, marijuana and crack cocaine.

21  Q    Now, have you ever had any legitimate employment?

22  A    Yes.

23  Q    Tell the jury about that.

20061127 AM

24   A   I have a CDL.  I work for BFI.  I did trash removal.

25   Q   When you say CDL is that a commercial driver's license?
     40

 1   A   Yes, ma'am.

 2   Q   Do you have to take extra steps to obtain a CDL beyond a

 3   typical driver's license?

 4           MR. BALAREZO:  Objection.

 5           THE COURT:  What's the basis?

 6           MR. BALAREZO:  It's irrelevant.

 7           THE COURT:  Overruled.  Go ahead.

 8   BY MS. LIEBER:

 9   Q   You can answer.

10   A   It's a couple of classes you have to take as far as

11   safety, as far as learning the vehicle, the trucks; 30,000

12   pounds is very dangerous.  If I'm in an accident with a truck

13   of that size, most likely somebody else is going to get

14   killed.

15           So it's important for you to know how to operate

16   the vehicle in the public, things like that.  Also, your

17   medical record is important because they don't want you to

18   drive and you have a heart attack or anything like that.  So

19   it's a lot of key components to having a CDL.

20   Q   And when you had your CDL, you said you worked for BFI.

21   Is that a trash removal company?

22   A   Yes.

23   Q   I'm going to talk to you now about drug dealing,

24   specifically cocaine.

25   A   Okay.
     41

20061127 AM

1   Q   Do you know someone named Antoine Jones?

2   A   Yes.

3   Q   How do you know Antoine Jones?

4   A   Through a acquaintance of mine.

5   Q   What's the name of your acquaintance?

6   A   Beanie.

7   Q   Is that Beanie?

8   A   Yes.

9   Q   Do you know Beanie's real name?

10  A   Not offhand.

11  Q   How did you come to meet Mr. Jones?

12  A   We grew up in the neighborhood that I was associated

13  with and we became friends.

14  Q   How did you become friends, through Beanie?

15  A   You mean Antoine?

16  Q   Yes.  I'm sorry, were you telling us you grew up with

17  Beanie?

18  A   Yes.  Yes, me and him became friends.

19  Q   I'm sorry.  I misunderstood.  Let's backtrack to Beanie.

20  You say you grew up in the same neighborhood as Beanie?

21  A   Yes.

22  Q   And became friends?

23  A   Yes.

24  Q   How is it that Beanie introduced you to Antoine Jones?

25  A   He came to me and he was telling me about --
    42


1           MR. BALAREZO:  Objection.

2           THE COURT:  We're not talking about Beanie?  Who

3   came to you?  Who's the person?

4           THE WITNESS:  Beanie, he came to me, my friend.  He

20061127 AM

5   came to me and we had a discussion.

6           MR. BALAREZO: Objection.

7           MS. LIEBER: Your Honor, can we approach?

8           THE COURT: Yes. Let's approach.

9           (Bench conference.)

10          THE COURT: I don't know what he is about to say.

11  Is it being offered for the truth? where are we in time

12  please?

13          MS. LIEBER: I was about, I was -- we're going to

14  talk about the fall of 2003. Your Honor, these are clearly

15  co-conspirator statements in furtherance of a drug

16  conspiracy.

17          THE COURT: Because?

18          MS. LIEBER: Because the statements are going to be

19  that Beanie came to Givens and wanted to talk to him about

20  getting cocaine from Antoine Jones. That Beanie had a source

21  of cocaine who was Antoine Jones. So while Beanie is

22  certainly not charged, this is -- he can be an unindicted

23  co-conspirator. These are statements. Doesn't have to be an

24  indicted co-conspirator for a 801(D)(2)(e) co-conspirator

25  statement to come in.

43

1           THE COURT: Where is he going with this? In '03,

2   Beanie says to him, I have a source, Antoine Jones?

3           MS. LIEBER: Yes, basically Beanie was brokering

4   cocaine transactions between Mr. Jones and Mr. Givens for a

5   time. And then Mr. Givens started buying cocaine directly

6   from Mr. Jones. So it is all part and parcel.

7           MR. BALAREZO: This is the problem we're having

8   before. They're throwing names out that are part of

Page 37

 9  conspiracy and we're supposed to lay down.  We don't know

10  anything about Beanie.  We don't know whether he was part of

11  this conspiracy or another conspiracy.  That's the problem

12  we're having.  They're throwing all these things out for the

13  truth.  It is compounding the problem.

14            THE COURT:  They're entitled to introduce

15  co-conspirators' statements in furtherance of.  This guy

16  became a co-conspirator through Beanie.  So, and Beanie

17  apparently was dealing directly with Jones.  I have not

18  allowed them to go off in another circle beyond the people

19  who dealt directly with Jones.  So, it is part and parcel.

20  These were his distributors.  So, it's overruled.  It comes

21  in as a co-conspirator statement.

22            (Open Court.)

23  BY MS. LIEBER:

24  Q   Mr. Givens, tell the jury how is it that Beanie came to

25  you to talk about Antoine Jones?
    44


 1            THE COURT:  How is it, what does that mean?

 2  BY MS. LIEBER:

 3  Q   Tell the jury about the first time you heard the name

 4  Antoine Jones, how that came up.

 5  A   He wanted to finance a drug buy.

 6  Q   Who wanted to finance a drug buy?

 7  A   Beanie.

 8  Q   How do you know that?

 9  A   Because we talked on several occasions about him buying

10  cocaine from Antoine.

11  Q   Let's start with the timeframe.  About when was this,

12  when you had your first conversation with Beanie about

20061127 AM

13    financing a drug buy with Antoine?

14    A    I believe around October of '03.

15    Q    When you say Antoine, do you see Antoine Jones here in

16    court today?

17    A    Yes.

18    Q    Can you identify him by where he's seated and something

19    that he's wearing?

20    A    I think the fourth seat, blue sweater.

21             MS. LIEBER:  Your Honor, I'm sorry.

22             MR. BALAREZO:  Objection.

23             THE COURT:  Is that the person that just stood up

24    that you say is Antoine Jones?

25             THE WITNESS:  Maybe I'm not correct.  Maybe it's
      45


1    the last guy.  Maybe it's the last guy, I'm sorry, in the tan

2    sweater.  I don't know how many seats that will be.

3             MS. LIEBER:  Okay.

4             THE COURT:  The one that just stood up?  I just

5    want to know.

6             THE WITNESS:  I'm trying to see.  I'm having a hard

7    time seeing that far.

8             MS. LIEBER:  Okay.  Why don't you do this, Mr.

9    Givens.  Why don't you stand up and take a look around the

10   courtroom and see if you see Mr. Jones.  I will get out of

11   the way.

12            THE WITNESS:  Can I move closer?

13            THE COURT:  Yes, you can.

14   BY MS. LIEBER:

15   Q    Mr. Givens, do you see Mr. Jones here in court?

16   A    Seat number one.

                        Page 39

20061127 AM

17    Q    Just so we're clear, from where you were seated where

18    you are seated now in that witness chair, you had a hard time

19    seeing the person --

20    A    I have difficulty seeing period.

21    Q    Okay.  Tell the jury about that, first of all, your

22    difficulty seeing.

23              THE COURT:  Can we find out who he has identified

24    for the record so it's clear to me.  Who did you describe

25    again?  Would you tell us where he's seated.
      46


1              THE WITNESS:  Number one seat, got a green shirt,

2    black jacket.

3              MS. LIEBER:  Your Honor, may the record reflect an

4    identification of Mr. Jones.

5              MR. BALAREZO:  The record reflects his third

6    identification of Mr. Jones.

7              THE COURT:  Well, all right, the record will

8    reflect that on this occasion the gentleman in the green

9    shirt is Mr. Jones.

10    BY MS. LIEBER:

11    Q    Mr. Givens, you had to come down from the witness stand

12    to make that identification; is that right?

13    A    Yes.

14    Q    Now, sitting here, having come down from the witness

15    stand, are you sure that the person you have just identified,

16    the man in the green shirt, is Antoine Jones?

17    A    Yes.

18    Q    Why is it, tell the jury, that you had to actually come

19    down and move closer?

20    A    I was supposed to have prescription glasses filled from
                              Page 40

20061127 AM

21  CCA, but the block that I'm on, I'm having a hard time

22  receiving them.

23  Q   So you're supposed to actually have visional correction?

24  A   Yes.

25     Q   Do you have contact lenses in or anything like that
    47

1   right now?

2   A   They won't allow me to have contacts, only glasses which

3   were not provided for me before I got here.

4   Q   Now, when Beanie came to you in October of 2003 and said

5   he wanted to finance a drug transaction, what specifically

6   did he tell you he wanted to buy?

7   A   500 grams of crack cocaine, he wanted to buy.

8   Q   Did he tell you how, was he looking for money from you

9   or why is it that he came, why did he tell you he wanted to

10  involve you in this process?

11  A   He was telling me that he wanted to purchase the cocaine

12  from Antoine. And that he didn't have the money to. I guess

13  he negotiated a 500-gram --

14          MR. BALAREZO:  Objection.

15          THE COURT:  I'm sorry. We don't want to you guess.

16  You can tell us what he told you.

17          THE WITNESS:  He said that he negotiated a deal for

18  500 grams of crack cocaine, but he didn't have the money.

19          THE COURT:  He said he negotiated what?

20          THE WITNESS:  A deal for 500 grams of crack

21  cocaine.

22  BY MS. LIEBER:

23  Q   But he didn't have the money; is that right?

24  A   But he didn't have the money.

Page 41

20061127 AM

25   Q   Did he identify, in this first occasion, the name of his
     48

1    source of who he wanted to buy the drugs from?

2    A    Yes.

3    Q    What did he tell you about Antoine Jones?

4    A    In the beginning, he didn't tell me much.  He just was

5    telling me that basically he wanted me to give him, loan him

6    the money.  That he would pay me a percentage of my money

7    back with interest and things like that.  But he didn't tell

8    me too much about him other than his name and that's about

9    it.

10   Q    Did you, at that point, try to start a drug relationship

11   with Mr. Jones on your own, separate from Beanie?

12   A    Down the line, yes.

13   Q    But at the very beginning, did you?

14   A    No.

15   Q    Did you ultimately start buying wholesale quantities of

16   cocaine yourself through Beanie from somebody, from a source?

17   A    Yes.

18   Q    When did it start that you actually started buying

19   wholesale quantities of cocaine yourself through Beanie?

20              MR. BALAREZO:  Objection to wholesale, Your Honor.

21              THE COURT:  Overruled.

22   BY MS. LIEBER:

23   Q    What kind of quantities were you buying?  Why kind of

24   quantities of cocaine were you buying through Beanie?

25   A    Started out buying 500 grams of crack cocaine, it
     49

20061127 AM

 1  started out because I was really skeptical about the whole

 2  situation.

 3  Q   who was skeptical?  I'm sorry.

 4  A   I was.

 5  Q   Why were you skeptical?  You were skeptical about the

 6  whole situation.  What does what mean?

 7  A   I don't know him.  It's my money.

 8          THE COURT:  You didn't know who?

 9          THE WITNESS:  I don't know Antoine at all.  You

10  know what I'm saying?  I feel like I have everything to lose

11  in this situation.  I'm giving them my money.  If something

12  happens, something bad goes wrong, anything, I think my money

13  is going to be in the balance, going to be in limbo, so I'm

14  really skeptical about it in the beginning.

15  BY MS. LIEBER:

16  Q   Okay.  So is that why you started buying smaller

17  quantities?

18  A   I felt like 500 grams was real small.

19  Q   You feel like 500 grams is small?

20  A   That's how I felt.

21  Q   Did you ultimately start buying larger quantities of

22  cocaine?

23  A   Yes.

24  Q   Okay.  Tell the jury how it was that you went from 500

25  grams to larger quantities.
    50


 1  A   Well, the first purchase, the 500 grams, it was really

 2  good.  It was better than expected.  It was cheaper than I

 3  expected.  And so, I think my greed put me in this situation.

 4  So, after 500 grams, after the 500 grams, I started taking it

Page 43

20061127 AM
5  around, letting other people see it, and everybody seemed to
6  love it.

7  Q   I'm going to stop you there.  You said you started
8  taking it around and letting other people see it.  Tell the
9  jury what specifically you did when you say you let other
10  people see it.

11  A   Well, the quality of the cocaine was really good.

12  Q   How do you know that?

13  A   Through mixing it, putting the base on it, through
14  cooking it and through the texture and things like that,
15  through the oil.  It was really good.

16  Q   When you say "cooking it and putting a base on it," just
17  tell the jury, when you got 500 grams was it powder or was it
18  crack?

19  A   It was powder.

20  Q   When you got 500 grams, half a kilogram of powder
21  cocaine from Mr. Jones, what did you do to that, what did you
22  personally do to it so you could tell?  When you say "put a
23  base on it," what's that mean?

24  A   Basically, what you do is you take it, you moisturize it
25  with water and you heat it slowly.  And through that process,
51

1  it slowly melts down from a powder to an oil substance.  It's
2  hard to tell what you have in a powdery substance.  But once
3  you get it down to an oil, you get a sense of what you have,
4  the quality of it and everything.  Based on the quality of
5  it, it depend on how much base you can put to it.  The more
6  base you can put to it, basically the more money you can get.

7  Q   Why is it that you get more money the more base you can
8  put on powder cocaine?

Page 44

20061127 AM

9   A   Because if the oil is good, it absorbed more baking
10  soda, which is base.  So, for example, if you had 250 grams,
11  you put it in there, if you can add a hundred grams of baking
12  soda, when it all come back together it's 350 grams.
13          So at the price you sell cocaine and you have a box
14  of baking soda, which is basically fifty-cents, you put a
15  hundred grams of that in there, come out with 350.  That's
16  how you make your money.  But if the oil is not good, it
17  won't hold.  It won't be right.
18  Q   So when you said that you started showing it around to
19  people, did you show them the cocaine already cooked up into
20  crack or did you show them the powder and the process that
21  you used?
22  A   Some I showed them the process because everything is in
23  the process.  And once people, once I knew, once people saw
24  it, they, you know what I'm saying, I felt they would love
25  it.
52


1   Q   And did they?  Did you get a good response?
2   A   Yes.
3   Q   To the cocaine that you had from Mr. Jones?
4   A   I had a wonderful response.  It was almost unbelievable
5   to be honest with you.
6   Q   How did that affect your willingness to buy bigger
7   quantities from Mr. Jones?
8   A   I was willing to pay in the background and not really
9   get involved, just to loan my money.
10  Q   I'm sorry, just to what your money?
11  A   Loan it.
12  Q   Okay.  Who did you loan your money to?

Page 45

20061127 AM

13    A    Beanie.

14    Q    If you're just loaning money to Beanie, how is it that

15    you made money?

16    A    We would do like percentages, like, if I gave him

17    $12,000, he'll say, I'll give you 15 back.  And that's how

18    the agreement was worked out.  It was either you could do

19    money or you can do, you know, the cocaine per se.  But you

20    work out the agreement in the beginning as far as how they

21    would pay your money back.

22    Q    So, in the beginning, you just made your money by

23    basically charging high interest rates?

24    A    Exactly.

25    Q    And when you ultimately started buying cocaine for
    53



1    yourself to sell, how much cocaine were you buying at a time?

2    A    It went from, I think, after the half a kilo we

3    purchased two kilos of cocaine.

4              THE COURT:  We?

5    BY MS. LIEBER:

6    Q    Who is we?

7    A    Me and Beanie.

8    Q    How did that shake out, you and Beanie?  How much of

9    that two kilos was yours and how much of that was Beanie's?

10   A    All of it was mine basically.

11   Q    Did you pay for all of it?

12   A    Yes.

13   Q    What did you do with the cocaine, that next quantity

14   that you bought, the two kilograms, what did you do with

15   that?

16   A    We took one, and we put it in our own neighborhood

Page 46

20061127 AM

17   through Beanie.  That's how Beanie basically got his money.

18   Q   When you say "put it in your own neighborhood," what

19   does that mean?

20   A   We sold it in our neighborhood, where we came from.

21   Q   What neighborhood is that?

22   A   Capers, Arthur Capers.

23   Q   Okay.  Is Arthur Capers, is that an apartment complex?

24   A   It's an apartment complex.

25   Q   When you sold it, what quantities did you sell it in?
   54

1   A   Me?

2   Q   First of all, did you actually sell hand-to-hand?

3   A   No, I didn't sell hand-to-hand.

4   Q   How is it that that first kilogram went into your

5   neighborhood, in what quantities?

6   A   Eighth, 62s and basically that was how it went in my

7   neighborhood.

8   Q   When you say an eighth, is that an eighth of a kilogram?

9   A   That's an eighth of a kilogram of crack cocaine.

10   Q   Okay.  When you all sold it, had you already converted

11   it to crack?

12   A   Yes.

13   Q   When you say a 62, how much?

14   A   62 grams of crack cocaine.

15   Q   And you say that you didn't actually sell it

16   hand-to-hand; is that right?

17   A   Right.

18   Q   How did the crack actually get sold as eighths and 62s?

19   A   I would cook it up and wrap it up, weigh it out, wrap it

20   up and give it to Beanie.  And basically, he would distribute

20061127 AM

21    it lower to whatever people wanted it in the neighborhood in

22    various ways.

23    Q    When you say you weighed it, how did you weigh it?

24    A    On a scale.

25    Q    What kind of scale?
   55

1    A    A digital scale.

2    Q    About how big was the digital scale?

3    A    When you have kilos of cocaine, you need two scales

4    actually.  You need one that weighs at least 500 grams or

5    more.  You need another one that weighs approximately

6    100 grams or less.  The hundred grams or less is a more

7    accurate scale.  So it is best to have both of them.

8    Q    Now, did there come a time that you collected money from

9    other people interested in buying cocaine from Mr.  Jones?

10    A    Yes.

11    Q    First of all, about when did you start collecting money

12    from other people to buy cocaine from Mr. Jones?

13    A    Well, we bought the two kilos of cocaine.  Like I said,

14    I gave Beanie one and to add the base to it.  That's how we

15    basically got our money, Beanie and I, because of the base,

16    like I said, you add it to the cocaine and it stretches, so

17    it enhances the weight.  So, more weight, more money.  So

18    that's how we did that.  That's like our day-to-day money.

19    That was our gram money.

20    Q    Let me ask you this.  How much were you paying for a

21    kilogram of cocaine from Mr. Jones, again, this is the

22    beginning?

23    A    We started out paying like 23, I believe.

24    Q    Twenty-three what?

Page 48

25   A   Twenty-three thousand dollars for a kilo of cocaine.
    56

1   Q   Of powder cocaine?

2   A   Yes, which, at the time, was still a beautiful price.

3   Q   If you weren't getting from Mr. Jones, how much were you

4   typically paying for a kilogram of cocaine in the fall of

5   2003, prior to dealing with Mr. Jones?

6   A   Twenty-six thousand and 28,000.

7   Q   So the first time was about 23,000?

8   A   From Antoine?

9   Q   Yes.

10   A   Yes.

11   Q   Now, again, tell the jury, there came a time when you

12   started collecting money from other folks?

13   A   Right.   What I did with the other kilo of cocaine is,

14   every kilo of cocaine is a thousand grams.   So I cut it down

15   into 250 grams, which is a quarter.   Then what I started

16   doing was I took them quarters out to different neighborhoods

17   to guys that I knew and sold them.

18          Sold the cocaine in quarters, in powder, in powder

19   because I needed the, because Antoine sold the cocaine so

20   cheap, I realized that it was easier for me, I could sell it

21   at 25, 26 and make money just straight off the top of the

22   cocaine, without cooking it, without really having to do too

23   much to it.

24   Q   I'm sorry.   Just so we're clear, when you say 25 or 26,

25   is that thousand dollars?
    57

1   A   Thousand dollars.   Twenty-six thousand dollars.   So,
                        Page 49

20061127 AM

2    what my plan was, was to have Beanie in the neighborhood

3    doing the day-to-day thing, the day-to-day grind, every day.

4    Then I would go out to other neighborhoods and solicit other

5    people that I knew had money, but so I started out purchasing

6    the cocaine myself just to let them know, like, it's cool.

7    It's perfect.  It's not going to change, building confidence,

8    building, you know, relationships with other people.

9    Q    These were neighborhoods different from the Capers?

10   A    Right.

11   Q    After you sold those four quarter kilograms in different

12   neighborhoods, did that increase interest in your business?

13   A    Yes.

14   Q    Tell the jury what you did based on the increased

15   interest in the cocaine?

16   A    Well, our money grew definitely.  Our money grew, me and

17   Beanie's money grew.  So we had more people in the

18   neighborhood that were interested in doing business with us.

19   So that grew.  So, it was like we went from a kilo of cocaine

20   in the neighborhood to two.  And from the 250 grams I sold to

21   like four people, they basically wanted to buy a kilo of

22   cocaine themselves.

23   Q    Did you help them do that?  Did you help get kilograms

24   of cocaine from Antoine Jones to these other interested

25   customers?
     58

1    A    Yes.

2    Q    About when did you start brokering cocaine transactions

3    in kilogram quantities?

4    A    I would say December of '03, just before the New Year.

5    Q    Just so we're clear, in terms of the total length of

20061127 AM

6  your cocaine relationship with Antoine Jones, you say you

7  started in October of 2003.  And when was the last time you

8  purchased cocaine from Antoine Jones?

9   A   I think in April, probably about the last time I got

10 cocaine from Antoine.

11          THE COURT:  April of what year?

12          THE WITNESS:  '04.

13 BY MS. LIEBER:

14  Q   Then you were locked up in May of '04; is that right?

15  A   May of '04, the 11th.

16  Q   Okay.  And from May 11th to the present, have you been

17 incarcerated the whole time?

18  A   Yes.

19  Q   We're talking about you brokering cocaine transactions,

20 you know, kilogram quantities of cocaine transactions between

21 Mr. Jones and other customers.

22          THE COURT:  Can I have a date when you actually met

23 Mr. Jones?  I'm a little confused.

24          THE WITNESS:  When I met him?

25          THE COURT:  Yes.
   59



1          THE WITNESS:  I met him in --

2          THE COURT:  When is the first time you saw him face

3  to face?

4          THE WITNESS:  Face to face I saw him, I would say,

5  in December, when the quantities went up.

6  BY MS. LIEBER:

7   Q   That was my next series of questions.  I'm sorry.  In

8  the first few months that you were getting cocaine from

9  Antoine Jones, did you actually receive it from his hands or

Page 51

20061127 AM

10    did you receive it from somebody else?

11    A    We would drive and meet him, me and Beanie would drive

12    and meet him at various locations.

13    Q    Who would actually go and have a face-to-face meeting

14    with Mr. Jones, you or Beanie?

15    A    Beanie.

16    Q    Did there come a time that Beanie actually introduced

17    you in person to Mr. Jones?

18    A    Yes.

19    Q    When was that?

20    A    I think in December we met, in December.

21    Q    When you said you and Beanie --

22            THE COURT:  I'm sorry, in December you what?

23            THE WITNESS:  We met in December.

24    BY MS. LIEBER:

25    Q    Had you accompanied Beanie in October or November to
   60

1    meet with Mr. Jones but not actually -- that's a terrible

2    question.  Strike that.

3            In October or November, tell the jury, you say that

4    you accompanied Beanie.  What does that mean?

5    A    Well, the money started getting, it started to be more

6    money.  It wasn't $12,000 any more with the half.  It started

7    being more, so like around a hundred.  So I started going

8    with him.

9    Q    You say "12,000 for a half."  What does that mean?

10    A    Twelve thousand dollars for a half, that's what I was

11    told it was being charged for the half on the loan.

12    Q    Just so we're clear, half is what is a half?

13    A    500 grams.

Page 52

20061127 AM

14    Q    Of powder cocaine?

15    A    Powder cocaine.

16    Q    You say that it then got up to a hundred and you started

17    going with Beanie?

18    A    Right, the money.

19    Q    A hundred is what, a hundred thousand dollars?

20    A    A hundred thousand dollars or better.

21    Q    Whose money was that hundred thousand dollars?

22    A    I would say like half of it was ours and the other half

23    was people who put in to buy up front.  So, I would go get,

24    solicit, get their money and take it with me.

25    That was more so the reason why I started to ride
61

1    along to go and to make sure that other people's money was,

2    you know, I was responsible for other people's money and not

3    Beanie because I felt like he wasn't the best type of person

4    being in that type of situation.  So I went to make sure that

5    the money, you know, got where it was supposed to get to him

6    and that the cocaine was in my possession.

7    Q    Okay.  Did you ultimately then start meeting without

8    Beanie even being there?

9    A    No.

10    Q    Tell the jury how it is that you first met in person,

11    face to face Mr. Jones?

12    A    Well we had a lot of little meetings first.  We would

13    meet at various locations around Maryland.  My first

14    encounter was when we went to a Sam's Club.  So, like I say,

15    we met a couple times before.  We met at the Sam's Club.  We

16    was there early.  He was there late.  He didn't arrive at the

17    time he said he was.  So we was sitting, waiting on him.
Page 53

20061127 AM

18    Q    How is it that you all decided to meet at Sam's Club?

19    A    He would pick the spots, and we would just meet.  I

20    would be with Beanie.  He would call.  So we would tell him,

21    basically what we wanted, how much money we had.  When we

22    would, he would meet, he would decide where we met at.

23    Q    You said various spots in Maryland.  Give the jury a

24    sense of some of the places that you met with Mr. Jones

25    during that six-month or so period.
      62


1    A    Central Avenue, we met by the Home Depot.  We met --

2              THE COURT:  Central Avenue where, in Maryland or

3    D.C.?

4              THE WITNESS:  In Maryland, Home Depot in Maryland.

5    We met off Central Avenue at Home Depot.  There's a 7-Eleven,

6    we met at the 7-Eleven.  The Crown gas station, we met there.

7    We met at the Wendy's, which is all in the same area.

8    BY MS. LIEBER:

9    Q    Okay.  All in the same area off of Central Avenue?

10    A    Right.  Then we met at the Sam's, which is not far.

11    It's by FedEx Field.  We met there a couple of times as well.

12    Q    When you say you met at Sam's Club or the Home Depot,

13    where specifically did you meet with Mr. Jones, like where,

14    was it in the parking lot, in the building, behind the

15    building?

16    A    At Sam's?

17    Q    Yes, for instance Sam's, where would you meet?

18    A    At Sam's, like I said, he was late.  So we were sitting

19    in the parking lot.  So when he arrived, I let Beanie do most

20    of the talking.  So as I got out, he was like, he wanted to

21    introduce us and things like that, my first time, so he
                              Page 54

20061127 AM

22  introduced.  I went into the Sam's Club, went in.  They did

23  the transaction.  I came out.  And they was in there talking

24  for a little bit, in the cars for a little bit.  He got out,

25  got in his truck and he left.
    63

1           THE COURT:  Who left?

2           THE WITNESS:  Antoine got out the car, got in his

3   truck and he left.

4           THE COURT:  Was this the first time that you were

5   introduced to him?

6           THE WITNESS:  Yes, Ma'am.

7   BY MS. LIEBER:

8   Q   You say he got into his truck, what kind of truck?  What

9   kind of vehicle did Mr. Jones drive?

10  A   He drove a Cherokee, gold in color, Maryland tags.

11  Q   Now, are you also familiar with a fitness center near

12  FedEx Field?

13  A   Yes.

14  Q   Okay.  Do you know the name of the fitness center?

15  A   I'm not sure.  I think it's Sports Complex or something

16  like that.

17  Q   Did you ever meet with Mr. Jones there?

18  A   Yes.

19  Q   What kinds of things did you do when you met with

20  Mr. Jones at the Sports Complex by FedEx Field?

21  A   They would work out, him and Beanie.

22          MR. BALAREZO:  Objection, foundation, basis.

23          THE COURT:  Tell us, you were there at the Sports

24  Complex?

25          THE WITNESS:  Yes.
                    Page 55

64

```
1              THE COURT:  What did you see?
2              THE WITNESS:  Them working out.  They was going to
3     work out.
4     BY MS. LIEBER:
5     Q   Did you actually see them lifting weights inside the
6     Sports Complex?
7     A   Yes.
8     Q   Did you yourself go in and work out with Mr. Jones and
9     Beanie?
10    A   No.
11    Q   What did you do when they were working out?
12    A   I really didn't do anything.  I didn't work out.  I
13    didn't -- I looked around.  I walked around the facility.  It
14    was my first time there.  I heard a lot about it.  So I
15    basically was just looking at the sights.  I watched people
16    do aerobics.  It was more so about business for me, not about
17    working out.
18    Q   Okay.  When you say it was about business to you, what
19    does that mean?
20    A   I looked at every opportunity as an opportunity to do
21    better business.  And the thing about it was, I had to do
22    things kind of like through Beanie in a sense.  Like we
23    didn't have a relationship whereas though I felt like I could
24    voice my opinion.  So I had to kind of, we was out there to
25    do business.  I wasn't out there to work out.  Or I wasn't
```
65

```
1     there to go to stores or anything like that.  I was there to
```

20061127 AM

2  do business.  And the sooner my business was done, I was
3  ready to go.
4    Q   So, for instance, when you all met at the Sam's Club
5  with Mr. Jones, what type of business were you out there to
6  conduct?
7    A   I was out there to conduct more cocaine.  I wanted him
8  to, I wanted us to buy.  We had a hundred thousand dollars.
9  He felt like we were spending a lot of money with him.  I
10  wanted him to give us some, honestly, to trust us more, to
11  build, I wanted, it's called fronting, which is like
12  consignment.
13        It's like we'd give him a hundred thousand dollars.
14  Then he'd give us 50 thousand and we'll just owe him the
15  rest.  That's what I wanted.  So I looked at these meetings
16  as an opportunity to try to get him to give us more leeway as
17  far as more cocaine so that we can stretch out a little more.
18    Q   So did there come a time that Mr. Jones fronted you
19  cocaine?
20    A   Yes.
21    Q   Okay.  You've been talking about you doing these things
22  for business purposes.  Did you have a social relationship
23  with Mr. Jones?
24    A   No.
25    Q   Did you go out with Mr. Jones?
66

1    A   No.
2    Q   And we talked about the sports, the FedEx Field gym, the
3  Sports Complex.  Did you conduct cocaine transactions with
4  Mr. Jones there?
5    A   No.

Page 57

20061127 AM
6    Q    Why then did you go to the Sports Complex?

7    A    Like I say, I felt it was an opportunity to do business.
8    Even when you're not, because, say like when you, when you at
9    FedEx Field, I mean, when we're at Sam's Club, it's not an
10   opportunity to do business because I have a hundred thousand
11   dollars in money.  He has several kilos of cocaine.  I wanted
12   to make the transaction as fast as possible, and I wanted to
13   get on my way.

14          So, it's hard to talk.  It's hard to do business
15   that way.  I never had a conversation with him on the phone.
16   So, these opportunities at FedEx, at the Complex were good
17   opportunities for us to try to do better business, to do more
18   cocaine, for him to trust us more.  And that's the object of
19   us, me going, anyway.

20   Q    When you met with Mr. Jones at the gym, at that Sports
21   Complex, did you talk to Mr. Jones about cocaine?

22   A    No, not really.  I didn't talk to him.  I would tell
23   Beanie what I desired, what I felt like he should do, what I
24   felt like we were doing for him.

25   Q    When you say we were doing for him, you and Beanie were
     67


1    doing for whom?

2    A    For Antoine.

3    Q    What did you think you and Beanie were doing for
4    Antoine?

5    A    We were putting a hundred thousand dollars in his pocket
6    with ease.

7    Q    With ease?

8    A    Yes, with ease, like we were on time.  We owned up to
9    every word that we had.  I felt like we had been in a solid

Page 58

20061127 AM
10   relationship.  I felt like we should take it to the next

11   level.  I felt like the opportunity was now.  And that we had

12   to try to acquire as much cocaine as possible because I

13   started noticing it was more so a pattern of when he would

14   have it and then when he would run out.

15          So my thing was to try to acquire as much, as many

16   kilos as he had from his possession to our possession.  But

17   the money wasn't moving as fast as I would have liked it to,

18   to have been.  So I felt like if he trusted us more, we would

19   have more leeway.  And that's what I felt like them

20   conversations was about.

21   Q   Did there come a time that you did start getting more

22   cocaine from him, that your relationship developed with

23   Mr. Jones?

24   A   Yes.

25   Q   Were you satisfied with the way that your relationship
     68


1    was going?

2    A   Yes.

3    Q   When you met at these places on Central Avenue, and the

4    Home Depot and the like, how is it that you transferred money

5    to Mr. Jones and Mr. Jones transferred cocaine to you?

6    A   Through bags.

7    Q   What kind of bags?

8    A   Backpacks, shopping bags.  We would buy backpacks and

9    buy bags because we didn't want the same looking bags all the

10   time, so basically, bags.

11   Q   What was the most amount of cocaine that you ever got at

12   one time from Mr. Jones?

13   A   I think in New Year in January I think we acquired ten

                              Page 59

20061127 AM
14  kilos of cocaine from him at one time, I believe.

15  Q   Did you pay for all those ten kilograms in cash or was

16  some of that fronted to you by Mr. Jones?

17  A   Some of it was fronted.

18  Q   First of all, did you pay Mr. Jones back for the cocaine

19  that was fronted to you?

20  A   Definitely.

21          THE COURT:  Ms. Lieber, may I ask how long your

22  direct is?

23          MS. LIEBER:  I probably have maybe ten minutes.

24          THE COURT:  Is everybody okay?  Go ahead, Ms.

25  Lieber.
    69


1   BY MS. LIEBER:

2   Q   Now, you said the most you ever got was ten kilograms of

3   cocaine.  When you obtained kilogram quantities at a time

4   from Mr. Jones, what generally did that cocaine look like

5   when you first got it?

6   A   It was in clear plastic.  It was two in a stack, two in

7   a wrap.

8          THE COURT:  Two kilos?

9          THE WITNESS:  Two kilos of cocaine in one bubble

10  wrap.  When you took the two kilos out, you had various

11  wrappings.  You had, say Saran wrap, aluminum foil.  You had,

12  some had balloon type of wrap.  It would be wrapped layers

13  and layers and layers.  You might have a gooey substance in

14  there.

15  BY MS. LIEBER:

16  Q   A gooey substance?

17  A   Yes.  It is dark in color, real sticky, greasy.  It's,

Page 60

20061127 AM
18  the odor is, the odor is like no other.  I can't even base it

19  on anything.

20  Q  Was it a powerful odor?

21  A  Yes.  Yes, that's basically how it was wrapped.

22  Q  What did the powder itself look like after you got off

23  all the lawyers?

24  A  When you peel off all the layers, it most likely has a

25  imprint printed in it.  It's different.  It varies from time
    70


1  to time, but sometimes it has like a crosses or it could have

2  numbers or letters or faces of Jesus, it varies.

3  Q  These are imprinted actually in the powder itself?

4  A  In the powder itself.

5        THE COURT:  I don't understand what that means.

6  Can you explain what you mean?  There is a picture of Jesus

7  in the powder meaning that somebody's drawn a picture in the

8  powder?

9        THE WITNESS:  It's like, cocaine, in its process it

10 is liquid.  When it's heated, that's when it becomes powder.

11 So they take it and they suppress it.  It's like coffee.  You

12 know what I'm saying?  You go to the grocery store and you

13 see a hard thing of coffee.  It's like they compress it.

14 Take all the air out and compress it really hard so it makes

15 the powder really hard.  But in the compression they put a

16 stamp on it to let you, most time they let you know, that

17 it's the same product.  It's consistent, things like that.

18 So it is an engraving sort of.

19 Q  An engraving?

20 A  Yeah, it's like an imprint when they press it together.

21 Q  Give the jury a sense of this.  You know, you talk

Page 61

20061127 AM

22    about, this is an example with sort of the coffee, they can

23    squeeze all the air out.  When you unwrapped all the

24    wrappings and you had a kilogram there in front of you, was

25    it fine powder like sugar or was it harder?
      71

1    A    It's very hard until you grind it.  You have to grind it

2    back down to a very fine powder.

3    Q    Now, we talked a little bit about your arrest on

4    May 11th of 2004.  Where did you get the powder that you used

5    to make into the crack cocaine that you were arrested with?

6    A    From Antoine.

7    Q    About when did you purchase that powder?

8    A    In April, I believe in April.

9    Q    April 2004?

10   A    Yes.

11              MS. LIEBER:  Court's indulgence.

12   BY MS. LIEBER:

13   Q    I'm sorry, just a few more questions about the money.

14   You said that you gave Mr. Jones money in plastic bags and

15   backpacks.

16   A    Yes.

17   Q    When you gave it to Mr. Jones, did he ever count that

18   money in front of you?

19   A    Never.

20   Q    You're smiling a little bit.  Tell the jury why, why is

21   it that is of note to you?

22   A    Well, when I would talk to Beanie about Antoine, he used

23   to tell me things about Antoine.  He would do certain things

24   that I felt like, you know, he could do more.  Like, he was

25   capable of more but he was only spoon feeding us.
     72

Page 62

20061127 AM

1    Q    Who is he?

2    A    Antoine.  Antoine was only spoon feeding us.  But I felt

3    like he was capable of much more.  The quality of the cocaine

4    was an indication.  And the pricing of the cocaine was

5    definitely an indication.  We went from paying, like I say,

6    almost $23,000 for a ki' of cocaine to almost 21.  Which was

7    I felt like was unheard of for the quality of it.

8    Q    Now, let me stop you there.  Did the price that you paid

9    per kilo actually go down over the course of your

10   relationship with Mr. Jones?

11   A    Yes.

12   Q    From 23 to 21?

13   A    Yes.

14   Q    What is it about the money, the fact that he didn't

15   count the money that you find, how did you feel about that?

16   A    I felt like a person who don't really have a lot of

17   money, who is grinding every day, they need every penny of

18   their money.  So they count it to make sure it's right, to

19   make sure the deal was, you know, everything was straight,

20   things like that.

21               MR. BALAREZO:  Your Honor, I object to what I think

22   is coming next.

23               THE COURT:  I don't know.  I don't have a opinion

24   of what is coming next.  I don't care what he thinks.

25               MS. LIEBER:  I'm sorry.  I can ask the next
     73

1    question.

2    BY MS. LIEBER:

                          Page 63

20061127 AM

3   Q    You said he never counted it.  Did Mr. Jones ever ask

4   you if it was all there or if the money was straight or

5   anything like that?

6   A    Never.

7   Q    In your experience is that common or uncommon?

8   A    It is very uncommon because some --

9          THE COURT:  That's all right.  We're getting far

10  afield here.  Approximately how many times are we talking

11  about that you were present when you exchanged money for

12  drugs with Mr. Jones?

13         THE WITNESS:  Every time, I wasn't the first

14  500 grams of crack cocaine, but, after that, every time I was

15  there.

16         THE COURT:  What would that be per month?

17         THE WITNESS:  It would vary per month, but I think

18  four times a month, twice a month, whenever we could get up

19  the money to see him, we would.

20  BY MS. LIEBER:

21  Q    You said that you began to notice a pattern that certain

22  times of the month that Mr. Jones would have more cocaine; is

23  that right?

24  A    That's right.

25         MR. BALAREZO:  Objection.  I don't believe I heard

74


1   him say --

2          THE COURT:  I don't think so either.

3          MR. BALAREZO:  So I move to strike that, Your

4   Honor.

5          THE COURT:  Yes, that's true.  Stricken.

6   BY MS. LIEBER:

Page 64

20061127 AM

7    Q    Mr. Givens, did you tell the jury that you noticed a
8    pattern?

9    A    Yes.

10   Q    What was that pattern?

11   A    The pattern was that, when he first would call, it was
12   pretty much whatever you could buy.  Then, that might be the
13   first week of the month.  So, we try to gather up as much
14   money as we can to go back as fast as we can.  The second
15   week, it's like the pickings get slim.  We might want five.
16   He may not have nothing but three.  The last two weeks it was
17   definitely like, couldn't get it.  We always had to wait
18   until probably like the next month or so.

19          MS. LIEBER:  Court's indulgence.

20   BY MS. LIEBER:

21   Q    Were there times that you conducted transactions with
22   Mr. Jones while Mr. Jones was in his jeep?

23          MR. BALAREZO:  Objection, Your Honor, it's leading,
24   putting words in his mouth.

25          THE COURT:  Overruled.
     75


1          MR. BALAREZO:  There's no testimony to the jeep.

2          THE COURT:  He mentioned the jeep, overruled.  Go
3    ahead.

4    BY MS. LIEBER:

5    Q    Were there times that you conducted transactions with
6    Mr. Jones when he was in his jeep?

7    A    Yes.

8    Q    Did you ever have any other contact with the jeep when
9    Mr. Jones was not actually physically in the jeep?

10   A    I don't understand.

Page 65

20061127 AM

11    Q    Okay.  Have you yourself ever been inside that jeep?

12    A    No.

13    Q    Were you ever with Beanie and observed Beanie inside the

14    jeep?

15    A    Yes.

16    Q    You said that sometimes you used shopping bags and

17    sometimes you used backpacks?

18    A    Yes.

19    Q    Why would you use backpacks instead of shopping bags?

20    A    I started to feel like shopping bags looked tacky.

21    Money started to weigh it down.  It was heavy.  It just, it

22    looked, it just didn't look good to me.  I think backpacks

23    concealed more.  It was more sturdy.  You could hold more

24    money.  It was better all around.

25         MS. LIEBER:  Court's indulgence.

76

1    BY MS. LIEBER:

2    Q    Sorry to jump back to one other thing, but briefly, Mr.

3    Givens, you said that you met with Mr. Jones at various

4    commercial places on Central Avenue?

5    A    Right.

6    Q    Did you observe Mr. Jones with your own eyes, prior to

7    meeting with you, did you see where he was coming from?

8    A    Yes.

9    Q    Tell the jury, did you have any concerns about that?

10    A    He would meet, we started out meeting at Home Depot a

11    lot.  So I was really concerned about the Home Depot thing.

12    Q    Why were you concerned about meeting at Home Depot?

13    A    We always met at the same spot.  I felt like we should

14    change location.  We keep meeting at the same location.  I

Page 66

20061127 AM

15  was like me and Beanie, I'm like, why we keep meeting in the

16  same location?  Why we can't move around a little bit?

17  Beanie was telling me that he was, he had a, was going to

18  open a club and the reason that he met at the Home Depot is

19  because he would buy supplies and basically --

20          MR. BALAREZO:  Objection, Your Honor.

21          THE COURT:  We need to take a short recess any way,

22  ladies and gentlemen.  So we'll break now for about ten

23  minutes here.  Thank you.

24          (Jury Out.)

25          THE COURT:  We'll resume in ten minutes.
    77


1           (A brief recess was taken.)

2           THE COURT:  Mr. Geise, did you resolve the exhibit,

3  Miscellaneous 7?  It was a Lockhart report.

4           MR. GEISE:  If it was admitted, it should not have

5  been.  It was just for ID.  It was to refresh recollection.

6  I talked with Gwen, we agreed.

7           THE COURT:  All right.  The rest of the

8  Miscellaneous, my record shows are in.

9           MR. GEISE:  I believe that's correct.  I'll double

10  check, Judge.

11          (Jury Present.)

12  BY MS. LIEBER:

13  Q   Good morning, again, Mr. Givens.  You said that you were

14  arrested on May 11, 2004.  Where were you arrested?

15  A   Nannie Helen Burroughs, Northeast, Washington, D.C.

16  Q   Do you remember what block?

17  A   The 5200 block, I believe.

18  Q   That's here in Washington, D.C.?
                        Page 67

20061127 AM

19   A   Yes.

20   Q   When you were arrested, did you give any information

21   that day, the day that you were arrested?

22   A   No, the day that I was arrested, no.

23             THE COURT:  I'm having a little trouble hearing

24   you, sir.  Could you speak a little louder?

25             THE WITNESS:  No.

78


1    BY MS. LIEBER:

2    Q   Do you remember talking to detectives shortly after your

3    arrest?

4    A   Yes.

5    Q   Did you give some information to them after your arrest?

6    A   Yes.

7    Q   When you met with Mr. Jones at various places, did you

8    have concerns about other people?

9             MR. BALAREZO:  Objection, vague, Your Honor.

10            THE COURT:  A little bit.  Do you understand what

11   she is asking you?

12            THE WITNESS:  No.

13   BY MS. LIEBER:

14   Q   For instance, say you met at say Wendy's with Mr. Jones,

15   did you have a concern about other people seeing you and

16   Mr. Jones?

17   A   Definitely.

18   Q   Okay.  Tell the jury about that.

19   A   We'd be driving the same two cars every time.  I'm

20   driving a white Ford Expedition.  He is driving a gold

21   Cherokee.  It was like we were meeting up at the same place

22   at the same time.  I had concerns about it because people

Page 68

20061127 AM

23   work in the gas stations, people work at Wendy's and things

24   of that sort.  So I had concern about it.

25   Q   Did you have a concern about other customers possibly
     79

1   seeing you?

2   A   Yes.

3   Q   Tell the jury about that.

4   A   We met at the Crown gas station.  He is at a pump, we at

5   a pump.  When he had somebody else put up at another pump, I

6   just felt like that just wasn't a good thing for me.

7   Q   What were you concerned that this other person, these

8   other customers might do or say?

9   A   I was concerned that they might tell actually.

10   Q   Finally, we talked a lot about this person, Beanie, did

11   you ever cut him out of your relationship between you and

12   Mr. Jones?

13   A   Money wise, yeah, but as far as the contact with

14   Antoine, no.

15   Q   Why not?

16   A   Because I needed him.

17   Q   I'm sorry?

18   A   I needed him.  I felt like I needed him.  I felt like I

19   was safer with him in the middle.  I felt like it was a safer

20   arrangement with him being in the middle, than me being on

21   the one hand and him being on the other hand because, you

22   know, we never had no direct contact.  I felt like anything

23   he do it wasn't going to directly fall on me.  That was my

24   thought.

25          MS. LIEBER:  That's all I have, sir, thank you.
     80

Page 69

20061127 AM

1           THE WITNESS:  You're welcome.

2           THE COURT:  Mr. Balarezo.

3           MR. BALAREZO:  Thank you.

4                    CROSS EXAMINATION

5    BY MR. BALAREZO:

6    Q    Mr. Givens, good morning.

7    A    Good morning.

8    Q    You are wearing the blue uniform of C.C.A. you

9    indicated, right?

10   A    Yes.

11   Q    That is the correctional treatment facility?

12   A    Yes.

13   Q    That's actually not the D.C. jail.  That's another jail

14   that's next to the Correctional Treatment Facility, right?

15   A    It's all considered D.C. jail.

16   Q    Listen to my question.  It's not the actual D.C. jail at

17   1900 D Street, Southeast.  It is Correctional Treatment

18   Facility at 1901 E Street, Southeast, correct?

19   A    Correct.

20   Q    It's got a different address, right?

21   A    Yes.

22   Q    You know this because you get your little money orders

23   from family, that kind of thing, right?

24   A    Right.

25   Q    So it's not the D.C. jail.  Either it is or it isn't?
     81

1           MS. LIEBER:  Objection.

2           THE COURT:  Do you know whether it's part of the

                         Page 70

20061127 AM
 3  D.C. jail or a separate facility?  I think that's what he's

 4  asking.

 5           THE WITNESS:  I feel like it's the same facility.

 6  BY MR. BALAREZO:

 7  Q   Well you've been at the D.C. jail itself, right?

 8  A   Yes.

 9  Q   You know at the D.C. jail they wear orange, correct?

10  A   Yes.

11  Q   You know that when your family visits there, you have to

12  see them through those plate glass windows.

13           MS. LIEBER:  Objection.

14           THE COURT:  Overruled.

15  BY MR. BALAREZO:

16  Q   You said you got arrested 30 months ago about, right?

17  A   Yes.

18  Q   You didn't go to C.C.A. right away, correct?

19  A   No.

20  Q   You went to C.C.A. after you cut the deal with the

21  Government, right?

22  A   No.

23  Q   When did you go to C.C.A.?

24  A   I stayed in the 1901 D Street for I think 45 days or so.

25  Q   Where is that, at the jail?
    82


 1  A   Yes.

 2  Q   And then you went to C.C.A.?

 3  A   Yes.

 4  Q   Wasn't that the result of the Government asking that you

 5  be placed over there?

 6  A   No.

Page 71

20061127 AM
7    Q    They just happened to put you over there?

8    A    No, I had an injury to my Achilles' tendon in the jail

9    playing basketball, which they further found out that I

10   ruptured my Achilles' tendon.  So they sent me to C.C.A. to

11   get an operation.

12   Q    And that injury is fine now, correct?

13   A    No.

14   Q    Is that why you're still at C.C.A.?

15            MS. LIEBER:  Objection.

16            THE COURT:  If he knows.  Do you know why you

17   didn't go back to the jail at D Street?

18            THE WITNESS:  No.  After I did the surgery, I

19   remained in C.C.A. even before I made the, cooperated with

20   the Government.

21   BY MR. BALAREZO:

22   Q    Now, now you're at C.C.A.  You're at the Unit C4A, which

23   is the snitch block, right?

24            MS. LIEBER:  Objection.

25            THE COURT:  Sustained.
   83


1            MR. BALAREZO:  Isn't that the unit that --

2            THE COURT:  Sustained.  It was sustained.  So

3    don't --

4            MR. BALAREZO:  I asked a separate question, Your

5    Honor.

6            THE COURT:  You can strike the last question,

7    ladies and gentlemen.

8            MR. BALAREZO:  Very well.

9    BY MR. BALAREZO:

10   Q    Now, Mr. Givens, you've indicated that, when you were

Page 72

20061127 AM
11    arrested back in May 11 of 2004, you had in your possession

12    500 grams of crack cocaine, correct?

13    A    Nearly close.

14    Q    And that wasn't the first transaction you've ever done

15    in your life, correct?

16    A    I don't understand your question, transaction with who?

17    Q    You're a drug dealer, right?

18    A    Yes.

19    Q    You've dealt drugs before.  You said you've dealt

20    marijuana?

21    A    Yes.

22    Q    You've dealt PCP?

23    A    Yes.

24    Q    And you've dealt crack?

25    A    Yes.
      84


1    Q    So you know what crack is, right?

2    A    Yes.

3    Q    And you know what cocaine is, right?

4    A    Yes.

5    Q    One's a powder, cocaine, right?

6    A    Right.

7    Q    And crack is a rock.  That's how they sell it, correct?

8    A    Yes.

9    Q    So you know exactly what cocaine powder is, and you know

10    exactly what crack cocaine is, right?

11    A    Yes.

12    Q    And what you've said is that, when you were arrested on

13    May 11, 2004, you were arrested with 500 grams, thereabouts,

14    of crack cocaine, correct?

Page 73

20061127 AM

15    A    Yes.

16    Q    There's no mistake that it was crack cocaine.  It wasn't

17    powder, correct?

18    A    Yes.

19    Q    Now, when you were arrested, you were in your car; is

20    that right?

21    A    No.

22    Q    You were walking to your car?

23    A    Yes.

24    Q    And the police approached you to talk to you and they

25    noticed that your tags were expired or something along those
      85


1    lines, right?

2              MS. LIEBER:  Objection.

3              THE COURT:  What did the police tell you?  Did they

4    say anything about your tags?

5              THE WITNESS:  No.

6    BY MR. BALAREZO:

7    Q    Did you know that your tags were expired at that time?

8    A    Yes.

9    Q    When you pled guilty in your case, you agreed to what's

10    called a factual proffer, correct?

11    A    Yes.

12    Q    Do you know what a factual proffer is?  It tells you

13    what the facts that you're agreeing to are?

14    A    Yes.

15    Q    Did it not include in that factual proffer that you had,

16    that the police saw the expired tags and the expired

17    inspection sticker?

18    A    They did see the expired tags and the expired inspection

Page 74

20061127 AM
19  sticker, but that wasn't the reason why he stopped me.

20  Q    The reason he stopped you is because they thought

21  somebody was putting up posters in the neighborhood, correct?

22  A    Yes.

23  Q    You were walking back to your car at the time and the

24  officer noticed that there was crack cocaine in the car,

25  right?
86

1  A    No.

2  Q    He didn't notice the crack cocaine?

3  A    No.

4  Q    Well, he didn't stop you because of the posters, right?

5  A    Yes.

6  Q    That's why he stopped you, and that's why he arrested

7  you?

8  A    No, that's why he stopped me.  He stopped me to ask me

9  about the posters.  He said that the posters were illegally

10  posted on the trees and things like that.  He wanted to ask

11  me a couple of questions about the posters.

12  Q    Right.  And when they had you in your car and they

13  looked around in your car, that's when they saw the crack

14  cocaine in plain view, and you were arrested for the crack

15  cocaine, right?

16  A    No.

17  Q    Well, sir, do you have the plea agreement up there?

18        THE COURT:  You're saying no to what?  There is a

19  compound question here.  No what?

20        THE WITNESS:  No, that's not the sequence of

21  events.  He asked me questions about the poster board.  I

22  declined to answer his questions.  He continued to follow me

Page 75

20061127 AM

23  ' to the car.  He asked me about the registration and the

24  inspection sticker, which were dead.  Therefore, I tried to

25  get into the car and get the tags, I was going to reregister
    87

1  the tags.  Then he seen the crack cocaine.

2  BY MR. BALAREZO:

3   Q   All that being said, the crack cocaine was in plain view

4  in your car, right?

5   A   Yes.

6   Q   So, you're this drug dealer with experience and you have

7  the crack cocaine just sitting there in plain view, right,

8  when the police came?

9           MS. LIEBER:  Objection, argumentative.

10          THE COURT:  Sustained.

11  BY MR. BALAREZO:

12   Q   You've had experience previous to that selling crack

13  cocaine, correct?

14   A   Yes.

15   Q   When you were arrested, you were interviewed by the

16  police.  Is that true?

17   A   Yes.

18   Q   When you were arrested and interviewed by the police,

19  you immediately agreed to make a statement, right?

20   A   Yes.

21   Q   They read you your rights, your right to remain silent,

22  all those things, and you said I want to go ahead and make a

23  statement, correct?

24   A   Yes.

25   Q   When you talked to them, they asked you about the drugs
   88

Page 76

20061127 AM

1   that you had on you at the time that you were arrested; is
2   that right?
3   A   Yes.
4   Q   At that time, what you told them is that you had gotten
5   the crack cocaine three days before.  Do you remember that?
6   A   Yes.
7   Q   Now, the reason you wanted to talk to the police is you
8   were trying to get out of trouble, correct?
9   A   Yes.
10  Q   I mean that's the only reason, correct?
11  A   Yes.
12  Q   So, you wanted to tell them the truth to help yourself
13  out, right?
14  A   Yes.
15  Q   So what you told them then that you had gotten the crack
16  three days before, that wasn't the truth, right?
17  A   No.
18  Q   Because now, today, you're telling the jury that you got
19  it about a month before?
20  A   That's correct.
21  Q   Also, when you, you told the jury today that you were
22  going to sell that crack cocaine, correct?
23  A   Yes.
24  Q   The 500 grams that you got arrested with?
25  A   Yes.
    89


1   Q   But did you not tell the police, when you were arrested
2   and you gave that statement, that you were merely going to
3   deliver that drug?

Page 77

20061127 AM

4   A   For money, yeah, I was going to deliver it.

5   Q   So you were saying you were just going to deliver it,
6   right?

7           THE COURT:   I don't understand what the question
8   is.   Are you asking him what did he say to the police?

9           MR. BALAREZO:   Let me clarify.

10  BY MR. BALAREZO:

11  Q   Did you not tell the police that you were merely a
12  courier for the 500 grams?

13  A   Courier?

14  Q   A courier.

15  A   No.

16  Q   Did you not tell the police that you were going to get
17  paid $500 for being a courier for the 500 grams?

18  A   I told the police officer that I was going to get paid a
19  hundred dollars for carrying an eighth of cocaine.   That's
20  what I said.

21          THE COURT:   You told police what?

22          THE WITNESS:   An eighth.

23          THE COURT:   You were going to be paid how much?

24          THE WITNESS:   They were asking me about the eighth
25  of cocaine.   I told them that I was going to courier it,
    90


1   deliver it.   I planned on doing that that particular morning.
2   He asked me roughly what would that cost.   I roughly told him
3   that it was $3500.   So he asked me various questions about
4   prices and things like that.   I gave him exactly what he
5   asked me.

6   BY MR. BALAREZO:

7   Q   The eighth of a kilo, it that what we're talking about?

Page 78

20061127 AM

8   A   Yes.

9   Q   You said that you were going to get thirty-some hundred

10  dollars, but that wasn't the 500 grams that you got arrested

11  for.

12  A   It was within there.

13  Q   It was part of that?

14  A   Yes.

15  Q   So you never told them that you were going to get $500

16  for delivering the 500 grams to somebody else?

17  A   Not the eighth, no.

18  Q   I'm talking about the 500 grams here, half a kilo, not

19  an eighth.

20  A   No.

21  Q   Did you not tell them that this was actually the third

22  time that you've done this?  Being a courier, in case you

23  didn't get that.

24  A   No.

25  Q   You never told them that?
    91


1           MR. BALAREZO:  Your Honor, I would like to --

2   BY MR. BALAREZO:

3   Q   And as far as you know, were you aware that that

4   interview was being videotaped by the police?

5   A   Yes.

6           MR. BALAREZO:  Your Honor, I'd like to introduce

7   what I've marked as Defendant's Jones Number 33.  It's

8   obtained from the Government.  I don't think the Government

9   has any objection.  It is about a two-minute --

10          THE COURT:  Do you know what it is?  Are you about

11  to admit into evidence?  Before you play it, it's got to be
                                    Page 79

20061127 AM

12    admitted into evidence.  Is it an actual video or is it just
13    an audio?
14                  MR. BALAREZO:  It's a video.
15                  THE COURT:  Okay.  Any objection to the admission
16    of 33?
17                  MS. LIEBER:  No, Your Honor.
18                  THE COURT:  Okay.
19                  MR. ACREE:  I guess, Your Honor, are we admitting
20    it for impeachment?
21                  THE COURT:  It doesn't make any difference.  If
22    we're going to use it, it's going to be admitted for whatever
23    purpose.  It's his prior statement and the purpose for it
24    could be talked about later.
25                  Do you want to approach?  Does it impact you?
      92


1                  MR. ACREE:  Yes, Your Honor.
2                  (Bench conference.)
3                  THE COURT:  Are you asking for an instruction?
4    This is not under oath.  It probably does go for impeachment
5    but it is going into evidence.
6                  MR. ACREE:  Well I guess the only place I'm coming
7    from, to be honest with you, I have not seen it.  So I guess
8    my concerns -- I'll just make my point.
9                  THE COURT:  I assume it is how much he was going to
10    be paid for how much he was going to deliver.
11                  MR. ACREE:  If I make my points then everybody can
12    answer whatever question there is.  My only concern is that I
13    don't know whether I should have a concern or not because I
14    don't know what is in it.  So I thought that it was just
15    coming in to impeach that particular point.
                                    Page 80

20061127 AM

16         I guess my position is that, for purposes of

17   impeachment, the entire tape doesn't have to be admitted.  I

18   thought only that particular portion of the tape that deals

19   with the question on which he was impeaching it was coming

20   in.  So my only concern is that, if we're saying we're

21   admitting it, are we just playing it for that impeachment or

22   are we admitting the whole thing?  Not that I necessarily

23   have an objection to it being admitted.

24         MR. BALAREZO:  Your Honor, it is probably two

25   minutes.

93

1         THE COURT:  I assume that the two minutes went to

2   what he was testifying to.  Is it more than that?

3         MR. BALAREZO:  I can probably ask him a couple of

4   questions that I can impeach him with any way.

5         THE COURT:  That's not the point.

6         MR. ACREE:  I guess my point is I'm not saying I

7   don't want it to be played.  I'm concerned because I have not

8   seen it.

9         MR. BALAREZO:  There is no mention of Mr. Huggins,

10   Mr. Jackson or Mr. Holland.  There is no mention of my client

11   for that matter.

12         THE COURT:  He is trying to show a prior

13   inconsistent statement.  And it has something to do with his

14   credibility.  Ultimately, I can instruct them now.  It is not

15   coming in for the truth because it is not under oath.

16   Generally, I instruct later but I don't have any problem.

17         You've seen it, is it way beyond?  Is there lots of

18   it that is beyond what's going on here now?  Or is it just

19   sort of --

Page 81

`'   ,'   '`                          20061127 AM

20       MR. ACREE:  Let me just say, because I didn't know

21  until we got up here that it doesn't have anything to do with

22  Mr. Huggins on that regard, I don't necessarily have an

23  objection.  But I didn't know that until I got up here.

24       THE COURT:  Now you know that.

25       Does the Government have any objection?  Does
    94


1   anybody want, let's see.

2       It's not coming in for the truth.  I actually never

3   specifically instructed, at this point in time, but I don't

4   have any problem with it.

5       MR. ACREE:  I'm not requesting the instruction.  I

6   just wanted to make sure that it was --

7       THE COURT:  Generally what happens at the end of

8   the day, this is probably the first time we had it when it

9   wasn't under oath.  Do you want an instruction?  No?  Do you

10  have any objection to its admission?  Then let's play it.  I

11  think the representation is it has nothing specific --

12       MR. ACREE:  Sure.  I just didn't know that.

13       THE COURT:  It's what he was talking about when he

14  first got arrested.  Okay.

15       (Open Court.)

16       THE COURT:  Thirty-three is admitted

17       (Defendant Jones Exhibit No. 33

18        was admitted into evidence.)

19  BY MR. BALAREZO:

20  Q   That interview back in May 11 of 2004, when you were

21  arrested, Ms. Lieber asked you, you've had a prior drug

22  conviction, correct?

23  A   Yes.
                          Page 82

.  .  .                                    20061127 AM

24    Q    In 1999, I believe, you had a drug conviction for

25    distribution of PCP?
      95


1     A    Yes.

2     Q    That's a felony conviction in Superior Court, right?

3     A    Yes.

4     Q    At that time, you pled guilty and you cut a deal with

5     the government back then also, correct?

6     A    No.

7     Q    No?

8     A    I pled guilty and received two years of probation.

9     Q    Well, you are aware that you were indicted on two counts

10    back then, correct?

11    A    Two counts?

12    Q    Unlawful distribution of a controlled substance --

13    excuse me.   Unlawful distribution of a controlled substance,

14    PCP, and unlawful distribution of a controlled substance in a

15    drug-free zone, marijuana.   You don't remember that?

16    A    Yes.

17    Q    You do remember it now?

18    A    I remember.

19    Q    Well, I'll mark this Jones Number 33?

20              THE COURT:   It's already in evidence?

21              MR. BALAREZO:   This is something else.

22              THE COURT:   We already used 33.

23              MR. BALAREZO:   Thirty-four, Your Honor.

24              THE COURT:   I think he's misunderstanding you cut a

25    deal.  What happened to the two counts that you were charged
      96


Page 83

. . .                                    20061127 AM

1    with back in '99?

2              THE WITNESS:  They asked me if I'll plead to the

3    PCP, that they would drop the marijuana and the drug.  So

4    that's what I agreed to.

5    BY MR. BALAREZO:

6    Q   Right.  You had a plea agreement with the Government

7    back in 1999, right?  You were indicted on two counts.  They

8    dropped one, you plead to the other, right?

9    A   Yes.

10   Q   Because otherwise you would have gone to trial and

11   possibly been convicted of both counts, right?

12   A   Right.

13   Q   And you know that the PCP count that you got, that you

14   pled guilty to, carried up to a 30-year penalty over there,

15   correct?

16   A   Yes.

17   Q   The agreement that you got from the Government was to a

18   possible three-year sentence, correct?

19   A   They didn't say what I would get.  But they said that

20   they would drop one for the other if I pled to it.

21   Q   And you never discussed with your attorney at the time,

22   Mr. Iverson, what the penalties were?

23             MS. LIEBER:  Objection.

24             THE COURT:  Sustained.

25             MR. BALAREZO:  Were you aware what the --
     97


1              THE COURT:  Sustained, sustained.

2    BY MR. BALAREZO:

3    Q   Were you aware what the penalty was for distribution of

20061127 AM

4    PCP?

5            MS. LIEBER:  Objection.

6            THE COURT:  He said it would carry the 30-year

7    penalty.  If you have any other questions about this, I guess

8    we have to approach.  I'm lost, 1999?

9            MR. BALAREZO:  Yes, Your Honor.

10           THE COURT:  Let's approach.

11           (Bench conference.)

12           THE COURT:  I'm sorry.  What are we doing?  This is

13    unrelated to this case.

14           MR. BALAREZO:  I understand.  This is the same

15    thing that I did with, I think, John Adams.  This guy has

16    prior convictions.  He cut a deal with the Government.

17           THE COURT:  You are confusing him.  We now know he

18    dropped one count.  He pled.  That's a plea agreement.

19    You've been talking about cutting deals as if it were

20    cooperation.  So go on.  Where are we?

21           MR. BALAREZO:  That's all I am going to ask him

22    about that.

23           THE COURT:  Why is it relevant?

24           MR. BALAREZO:  Because it goes to the credibility

25    in the sense that he has cut a deal, pled guilty, cooperating

98

1    now, cut a deal back then, got a deal back in.

2            THE COURT:  It's in.  He cut a deal insofar as he

3    got probation apparently.  They dropped the counts and --

4            MR. BALAREZO:  Your Honor, the whole thing is in

5    1999 they agreed to cap their allocution.  Now they're

6    agreeing to file a 5K letter.

7            MS. LIEBER:  It is completely different.  And Mr.

Page 85

20061127 AM

8    Balarezo knows that.

9            THE COURT:  This is totally complicating.  What

10   they do over in Superior Court doesn't have to do with

11   cooperation.

12            MR. BALAREZO:  It has to do is he keeps getting

13   benefits from the same U.S. Attorney's Office?

14            THE COURT:  The benefits in '99 have nothing to do

15   with the benefits here.  They're completely divorced.  You've

16   gotten in his prior conviction.  It goes to credibility.

17   Benefits?  He pled guilty.

18            MR. BALAREZO:  It is a benefit that the Government

19   agreed to cap one to three.

20            THE COURT:  It is not relevant to what he is doing

21   here.

22            Are you going to add anything new?  I've already

23   ruled in your favor.

24            MR. GEISE:  Let me add a couple of things.  Mr.

25   Balarezo has already gone beyond impeachment, more than that.

99


1    They're now left with the impression that this guy had some

2    other kind of cooperation when the Court has pointed out,

3    this is the usual deal to get people to plea.  And it's very

4    hard to clarify that.

5            THE COURT:  You can ask him on redirect if he had

6    cooperated before but this line of questioning is over, Mr.

7    Balarezo.  It is nothing probative.  Thank you.

8            (Open Court.)

9            THE COURT:  Are we moving to the tape please?

10            MR. BALAREZO:  Sure, I'll play it now, Your Honor.

11            (There was a pause in the proceedings.)

                        Page 86

```
 '   ,  '                          20061127 AM
12              MR. BALAREZO:  Your Honor, I can move on to another
13   line and come back to the tape.
14              THE COURT:  Okay.
15   BY MR. BALAREZO:
16   Q   Now, we'll come back to the video, Mr. Givens.  When you
17   were arrested for the 500 grams of crack back in May of 2004,
18   you decided to cooperate with the Government; is that right?
19   A   At some point, yeah.
20   Q   You signed that plea agreement that Ms. Lieber showed
21   you, Miscellaneous 12, which is the unsigned document that is
22   in evidence.  Do you remember that?
23   A   Uh-huh.
24              THE COURT:  Can I see the date please?
25
    100
```

```
 1   BY MR. BALAREZO:
 2   Q   You did that on September 29, 2005; is that right?
 3   A   Uh-huh.
 4   Q   That was about four months after, excuse me, over a year
 5   after you were arrested, right?
 6              THE COURT:  Just shy of a year, I think.
 7              THE WITNESS:  Yes.
 8   BY MR. BALAREZO:
 9   Q   Well, you were arrested in May of 2004?
10   A   Yes.
11   Q   So September of 2005 would be about 16 months later?
12   A   Right.
13   Q   When you decided to cooperate with the Government, you
14   decided to give them information about Antoine Jones; is that
15   right?
```

20061127 AM
16   A   I decided to tell them the truth about whatever they

17   asked me about.

18   Q   Now, on May 11th, when you made that tape that we'll see

19   in a little bit, you never mentioned Antoine Jones, correct?

20   A   Right.

21   Q   According to you, the crack you had was his, or that you

22   had gotten it from him?

23   A   In the tape?

24   Q   No.  I'm just asking you generally.  The crack that you

25   had in your car that you were arrested for, you told this

101

1   jury that you had gotten from Antoine Jones, right?

2   A   Yes.

3   Q   So, the day, on May 11th, the day you got arrested with

4   that crack, Antoine Jones never crosses your lips, correct?

5   A   In the tape?

6   Q   In the tape.

7   A   They asked me about, about a particular question and I

8   told them that prior to the tape.  That I didn't feel

9   comfortable about discussing everything.  The officer asked

10   me to accept what was in my possession.  I felt that the tape

11   was about me confessing about what was in my possession.

12   Q   And confessing about what was in your possession.  But

13   they asked you specifically where did you get the drugs from,

14   and you didn't tell them Antoine Jones.  Is that right?

15   A   I didn't make a statement.  I chose not to make a

16   statement at that point because I felt like I --

17   Q   Yes or no?

18            THE COURT:  Did you tell them about Antoine Jones

19   at the time?

20061127 AM

20      THE WITNESS:  NO.

21   BY MR. BALAREZO:

22   Q   Now, the plea agreement that you signed with the

23   Government you pled guilty to one count of possession with

24   intent to distribute 50 grams or more, correct?

25   A   Yes.

102

1   Q   Even though you had 500 grams on you, right?

2   A   Yes.

3   Q   You do know that, because you had that prior felony drug

4   conviction from Superior Court, Ms. Lieber asked you what's

5   the mandatory jail time, you told her ten years; is that

6   right?

7   A   Under my plea agreement, ten years.

8   Q   Well you are aware that, because you have that prior

9   drug conviction, that you could have been facing, if the

10   Government had filed papers, repeat papers against you, 20

11   year mandatory, correct?

12   A   Yes.

13   Q   And they didn't file the repeat papers, right?

14   A   No.

15   Q   That was basically part of the agreement, correct?

16   A   No.

17   Q   Well, it's not written in here, right?

18   A   That they were going to sentence me to 20 years?

19   Q   No, no, listen to me.  It's not written in the agreement

20   that they were not going to file the repeat papers.  That

21   would have subjected you to a 20-year mandatory sentence,

22   right?

23   A   I don't understand what you're saying.

Page 89

20061127 AM
24   Q   You just agreed with me that, because of your prior

25   felony drug conviction from Superior Court, if the Government
     103

1    had filed repeat papers -- do you know what repeat papers

2    are?

3    A   Yes.

4    Q   Basically repeat offender status?

5    A   Yes.

6    Q   That you would have been facing a 20-year mandatory

7    minimum sentence, not ten?

8    A   Yes.

9    Q   You were aware of that?

10   A   Yes.

11   Q   No where in the agreement does it say we're not going to

12   file repeat papers, right?

13   A   Right.

14   Q   But they didn't file repeat papers, and they could have,

15   right?

16   A   I don't know.

17   Q   Well, you just said that they could have and you said

18   that --

19   A   And then you asked me about something that they could

20   have done.  I don't know what they would have done.

21   Q   Did you read this?

22   A   I read it.

23   Q   Did you understand it?

24   A   I understand it.

25   Q   Did you have a lawyer when you went through with it?
     104

20061127 AM

1    A    Yes, I did.

2    Q    When you pled guilty before Judge Walton, you didn't

3    question any of that, did you?

4            MS. LIEBER:  Objection.

5            THE COURT:  I don't know what that means.

6    BY MR. BALAREZO:

7    Q    When you pled guilty in front of Judge Walton, did you

8    question the fact of what mandatory sentence you were looking

9    at?

10    A    I felt that --

11    Q    Listen to my question.

12            THE COURT:  Wait, no.  You are asking him if he

13    asked Judge Walton anything about the mandatory he faced.  At

14    the time he entered the plea, he faced a ten-year mandatory.

15    That's critical because he was only pleading.  There were no

16    repeat papers filed.  So, I don't know what you're asking him

17    about Judge Walton.

18    BY MR. BALAREZO:

19    Q    When you were in front of Judge Walton to plead guilty,

20    you were under oath, right?

21    A    Yes.

22    Q    And the Judge asked a lot of questions about the plea

23    agreement, right?

24    A    Yes.

25    Q    And you said you understood everything?
    105

1    A    Yes.

2    Q    All I'm asking you simply is, no where in the agreement

3    does it say that the Government will not file repeat papers?

4    You read it?
                        Page 91

20061127 AM

5    A    Right.

6    Q    And it's not in here, right?

7    A    Right.

8    Q    But you are aware that that is part of the agreement,

9    right? You agreed to cooperate. They're not going to file

10   repeat papers?

11   A    No, that's not part of the agreement. My lawyer advised

12   me that a ten-year mandatory was in my best interest.

13   Knowing that they could file repeat papers, why wouldn't I

14   take the ten year versus 20-year mandatory? That was advised

15   me by my own lawyer.

16   Q    So that's part of the agreement? That's what I'm

17   asking.

18   A    No, it's not part of the agreement. They didn't file

19   repeat papers.

20   Q    Now, the life, the maximum that you're looking at is

21   life, correct?

22   A    Yes.

23   Q    And you're pretty sure you're not going to get life in

24   prison, correct?

25   A    I'm not pretty sure.
     106


1    Q    Well, the reason you cooperated is, if you're facing

2    this ten-year as you say, if you had gone to trial and lost,

3    that would have been the minimum that you would have been

4    facing, right?

5    A    Right.

6    Q    And you told Ms. Lieber that you were aware of what the

7    sentencing guidelines were, right?

8    A    I'm aware of what the sentencing guidelines are.
                              Page 92

9  Q  And you're aware that the sentencing guidelines take

10  into account your prior criminal history, right?

11  A  Yes.

12  Q  Take into account the weight of the drugs that you were

13  carrying, correct?

14  A  Yes.

15  Q  They give a sentencing range, right?

16  A  Yes.

17  Q  And you are aware that, given your criminal history and

18  the amount of drugs that you were carrying, you would have

19  been looking at a 14 to 17-and-a-half year sentence possibly

20  under the guidelines.  Right?

21  A  Something like that.

22  Q  Which is more than the mandatory minimum?

23          THE COURT:  Of ten years, yes.

24          THE WITNESS:  Yes.

25

107

1  BY MR. BALAREZO:

2  Q  Of ten years, all right.  And you do know that, if the

3  Government does not file the 5K letter that Ms. Lieber talked

4  about, you know that the Judge has to sentence you to at

5  least ten years mandatory?

6  A  Yes.

7  Q  Now, you didn't cooperate in order to get ten years,

8  right?

9  A  Actually, yes.

10  Q  So you'd be happy with ten years?  Is that what you're

11  telling us?

12  A  Versus 20, yes.

Page 93

20061127 AM

13   Q   I'm not talking about 20.  I'm just talking about 10?

14   A   Versus 20 to life, I think, however, I would take the

15   ten.

16   Q   You'd be happy with probation, perhaps, right?

17   A   But I have a mandatory sentence so.

18   Q   That's not what I asked.  Just try to answer my

19   question.  You would be happier with probation.  Is that fair

20   to say?

21   A   Of course.

22   Q   All right.  And you know that the only way that you

23   could possibly get probation and less than ten years is if

24   the Government files that 5K letter with Judge Walton, right?

25   A   It's a possibility.
108

1   Q   That's not what I asked, sir.  I said, the only way that

2   the Judge can sentence you to less than ten years is if they

3   file that 5K with the Judge, right?

4   A   Yes, my understanding, yes.

5   Q   And they're the ones that determine whether or not

6   they're going to file the 5K, right?

7   A   Yes.

8   Q   The Judge, if they don't file it, has to give you ten

9   years?

10   A   Yes.

11   Q   The Judge can't make them file a 5K, correct?

12   A   Yes.

13   Q   And who determines whether or not the 5K is going to be

14   filed is the Government, right?

15   A   Yes.

16   Q   Because that depends on the extent of your cooperation,

20061127 AM

17   right?

18   A   Yes.

19   Q   They determine when your cooperation begins and when it

20   ends, correct?

21   A   Yes.

22   Q   And they also determine if your cooperation is truthful,

23   complete and accurate, correct?

24   A   Yes.

25   Q   They determine everything about that?
     109


1    A   Yes.

2    Q   And if you don't satisfy them to whatever extent, you

3    may not get that 5K letter, right?

4              MS. LIEBER:  Objection of satisfying them.

5              THE COURT:  Well, unless they file a motion under

6    5K, you -- I don't understand the objection.  Go ahead and

7    answer it.  If you don't satisfy them, you don't get a 5K.

8              THE WITNESS:  I'm telling the truth.  So, I don't

9    know if that will satisfy them or not.  I can only tell the

10   events that happened.

11   BY MR. BALAREZO:

12   Q   And telling the truth is something that they want you to

13   do, right?

14   A   It's something I want to do.

15   Q   Besides what you want to do, in order to satisfy them

16   and get that 5K, you have to tell the truth.  That's in your

17   agreement, right?

18   A   No, that's not in my agreement.  To satisfy them, that's

19   not in my agreement.

20   Q   How about to tell the truth as you were saying?
                        Page 95

20061127 AM

21   A   That's in my agreement, to tell the truth.

22   Q   And the ones who determine that you're telling the truth

23   for the purposes of filing that 5K motion is the prosecutor,

24   correct?

25   A   Yeah.
110


1    Q   It's not the Judge, right?  And it's not the jury?

2    A   No, the Judge, he going to look at it the same way.

3    Q   Sir, the Judge cannot --

4              THE COURT:  Careful.  The Judge gets to determine.

5              THE WITNESS:  He get to determine, not them.

6              THE COURT:  Judge Walton will determine.

7              MR. BALAREZO:  Your Honor, did Judge Walton not

8    determine whether or not the Government files a 5K.

9    BY MR. BALAREZO:

10   Q   Is that correct, sir?

11   A   It's their job to file the 5K, but it's still Judge

12   Walton's decision.  He still can give me anything.  He still

13   can give me life.  He still can give me ten years.  He still

14   can give me anything he wants.  So I think it's more about if

15   he thinks that I'm telling the truth than they feel like I'm

16   telling the truth.

17   Q   Sir, is Judge Walton in the room right now?

18             MS. LIEBER:  Objection.

19             THE COURT:  Sustained.

20   BY MR. BALAREZO:

21   Q   Does he know what you're testifying to?

22             THE COURT:  The Government has, the only ones to

23   file the 5K.  After that, it's up to the Judge what to do.

24   Judge Walton is a different Judge in this courthouse but not

`,  ,  .`                        20061127 AM

25   in this trial.  Okay.  Go ahead.
   111


1    BY MR. BALAREZO:

2    Q    Now, when you were arrested -- strike that.

3              You began, as you say, dealing with Mr. Jones some

4    time in 2003, right?

5    A    Yes.

6    Q    When exactly did you begin that business?

7    A    Around October.

8    Q    October 2003.  And you went until the time you got

9    arrested, right?

10   A    Somewhere around April.

11   Q    So April was the last time you had any transactions, if

12   you will, with Mr. Jones?

13   A    Some where around there, yes.

14   Q    So that would be about six months you dealt with him,

15   right?

16   A    Yes.

17   Q    And you testified to the jury that you would deal

18   approximately four times a month; is that correct?

19   A    It depends.

20   Q    On what?

21   A    If I had the money, like I said, if I had other people

22   who was interested, they could call me and say that they

23   wanted something.  And then I would have to try to get in

24   touch with him the best way.  You know what I'm saying.  So

25   that really determined how much running back and forth we
   112

20061127 AM

1    did.

2    Q    When you answered that question for Ms. Lieber, you said

3    four times a month. You didn't have all of this explanation,

4    right? And that was on average basically?

5    A    I said two to four times actually.

6    Q    All right. Well, two to four times, six months times

7    two, that's 12 times. Six time four, that's 24 times, right?

8    Do you agree?

9    A    Do I agree that's how many times I went to see him?

10    Q    Based on your testimony, yes?

11    A    I'm not going to agree to that.

12    Q    Well you said two to four times?

13    A    I said it varied.

14    Q    So what does it vary to now?

15           MS. LIEBER: Objection, what does it vary to now.

16           THE COURT: Sustained. Ask a different question.

17    He said before, two to four times a month. So what do you

18    want him to answer?

19           MR. BALAREZO: I just asked him. I'm trying to get

20    an answer, Your Honor.

21    BY MR. BALAREZO:

22    Q    Two to four times over six months, that's either 12 to

23    24 times that you've dealt with Mr. Jones, right?

24    A    What I'm saying is that --

25           MR. BALAREZO: Your Honor, if I could get the

113

1    witness just to answer the question.

2           THE COURT: Let him explain it. Go ahead.

3           THE WITNESS: What I'm saying is two to four times,

4    every month is different. It wasn't like, it wasn't like we

Page 98

5   made a point to say we would meet every Monday.  That's not

6   how it goes.  You're trying to make me say that we met four

7   times every week.  That's not what I'm trying to say.

8          What I'm trying to say is that, when the money was

9   there, I went back to him.  If I had money, then I bought

10  something.  If I did not have any money or didn't have any

11  business with him, I did not go back.  That's what I'm trying

12  to say.  And it varied from month to month.  It didn't start

13  off.

14  BY MR. BALAREZO:

15  Q   Sir, it was your testimony two to four times a month.

16  Is that correct?

17  A   Yes.

18  Q   You testified that you dealt with him for about six

19  months, correct?

20  A   Yes.

21  Q   So, based on the six-month period and the two to four

22  times a month, it comes out, doing simple math, to 12 to 24

23  times that you claim you dealt with Mr. Jones.  That's all

24  I'm asking you based on your testimony.

25  A   That's a good estimate I would say.
114


1   Q   Twelve to 24 times, right?

2   A   That's a good estimate.

3   Q   The first time you dealt with him, you didn't deal with

4   him directly, correct?

5   A   No.

6   Q   You dealt, you said, through this guy Beanie?

7   A   Yes.

8   Q   This guy Beanie who grew up with you in the

Page 99

20061127 AM

9    neighborhood, right?

10   A    Yes.

11   Q    How old are you?

12   A    I'm 34 years old.

13   Q    You've known him most of your life, correct?  When you

14   grew up with him, you grew up with him when you were young?

15   A    More than half.

16   Q    You came up with him, right?

17   A    More than half.

18   Q    You don't know Beanie's name, right?

19   A    No.

20   Q    All that time, more than half of your life, you never

21   found out Beanie's name?

22   A    No.

23   Q    Okay.  And regarding the transactions, these 12 to 24

24   transactions that you claim to have done with Mr. Jones,

25   you're really the only witness to those, correct?
     115


1            MS. LIEBER:  Objection.

2            THE COURT:  He wouldn't know.  I don't understand

3    the question, sustained.

4    BY MR. BALAREZO:

5    Q    Are you aware if your phones were being tapped?

6    A    No.

7    Q    Do you know if Mr. Jones's phones were being tapped back

8    in 2004?

9    A    No, I don't know.

10   Q    Did the Government ever play you any calls between you

11   and Mr. Jones?

12   A    No.

20061127 AM
13    Q    Did the Government ever show you any videotapes between

14    you and Mr. Jones doing anything?

15    A    No.

16    Q    Do you have any pictures with you and Mr. Jones?

17    A    No.

18    Q    So, based on those things, really the only evidence of

19    that is your testimony, correct, of the transactions with

20    Antoine Jones involving you and him?

21          MS. LIEBER:  Objection.

22          THE COURT:  Could you ask him if he is aware of any

23    other evidence regarding these?  I frankly don't understand

24    the question.

25          MR. BALAREZO:  Maybe I should sit down, Your Honor.
   116


1          THE COURT:  Okay.  Do you have any other questions?

2          MR. BALAREZO:  Yes, Your Honor.  I do.

3          THE COURT:  Well, sustain that one.

4    BY MR. BALAREZO:

5    Q    To your knowledge, has Beanie been arrested?

6          MS. LIEBER:  Objection.  May we approach, Your

7    Honor?  Other evidence.  It is a simple answer.

8          THE COURT:  All right.  Excuse us, ladies and

9    gentlemen.

10          (Bench conference.)

11          MS. LIEBER:  Your Honor, there is the other

12    evidence if we have to get into it.  I'm just going to ask if

13    I can have leeway on cross to say would it surprise you that

14    Mr. Jones were meeting with all these other people doing the

15    same thing, same place, the same modus operandi.

16          THE COURT:  No.  I don't care whether it would

Page 101

20061127 AM

17  surprise him or not.  You can argue it to the jury.  But you

18  don't ask him --

19              MR. BALAREZO:  I was prevented from doing this with

20  the other witnesses.  They have nothing but this guy's

21  testimony.  That's all I'm getting at.  I'm not talking about

22  the inferences you can draw from Mr. Bermea or anybody else.

23  All they have --

24              THE COURT:  They can argue to the jury.  You don't

25  use these argumentative questions with the witness.

117


1               MR. BALAREZO:  But Your Honor, I can because it

2   goes to his credibility.

3               THE COURT:  You argue the credibility to the jury

4   not to what does he know about the other evidence.  There is

5   all kinds of different evidence out there.

6               MR. BALAREZO:  Not of this, Your Honor.  That's why

7   it is specifically limited to his transactions.

8               THE COURT:  It is argumentative.

9               And I don't want you bringing up whether he is

10  surprised.

11              MS. LIEBER:  Of course, I can't say this.  He can't

12  say this either.

13              THE COURT:  Do you have any questions?

14              MR. BALAREZO:  Yes, Your Honor, I do.

15              THE COURT:  We'll take a break now.

16              (Open Court.)

17              THE COURT:  All right, ladies and gentlemen.  This

18  is a good time to break for lunch.  We'll resume at quarter

19  to 2:00.  Have a good lunch.

20              (Jury Out.)

Page 102

20061127 AM
21          THE COURT:   If the Government has handed me a case
22   on transcripts, what is it that you're planning to ask so we
23   don't have a big delay for defense counsel?  We have played
24   many, many tapes.  Some are coming in now in terms of just
25   summary.  There has been no question, I mean, any rulings
     118

1   about the authenticity or the accuracy.  These tapes are
2   pretty clear.

3          We had no specific objections for me to rule on.
4   So all these tapes, to the extent some of them have been
5   played, all of this stuff is not going to be dumped on the
6   jury at the end of the day anyway, is it?  I wasn't sure
7   where you want to go.  You better let counsel know so I can
8   specifically rule.

9          MR. GEISE:   It isn't my intent, Your Honor, to send
10   back all 6,000 calls.  We've marked the total universe of the
11   wire for identification.

12          THE COURT:   1, 2, 3 went in only for
13   identification.

14          MR. GEISE:   Exactly, but it would be our intention
15   to send back to the jury the disks that contain the calls
16   that are reflected in the transcripts.

17          THE COURT:   Well, do you really, there are a lot
18   that have never been played.  You don't want the jury --

19          MR. GEISE:   Well, Your Honor, they're either going
20   to be played or going to be as part of the summary of
21   Detective Horne.  So, they're entitled to have, it seems to
22   me, if they want to verify that.  There are two different
23   questions, one is --

24          THE COURT:   Wait.  I thought the whole point of the

Page 103

25    summary was to eliminate that very problem.  Otherwise, if
119

1    you don't want the summary to stand as a summary of these
2    calls, then Mr. Balarezo and I don't have to go through this.
3    We'll play them all and we'll sit here and listen to them.
4        You can't have it every which way.  You can't have
5    a summary and have the jury spend their time picking those
6    calls that they want to listen to, and we don't know what
7    they are.  I'm very troubled by that.  So some way or
8    another, we have to decide what specifically either whether
9    they get tapes sent back or whether they get transcripts sent
10   back, whether they make requests.  They hear what they're
11   going to hear.  I'm in favor of knowing what's going on and
12   not just having them perusing through things without us
13   knowing what.
14       MS. LIEBER:  May I consult with Mr. Geise?
15       THE COURT:  I think I decided this one clearly.
16       (There was a pause in the proceedings.)
17       MR. GEISE:  Your Honor, Ms. Lieber makes the point
18   to me that, when we are done playing all calls, we can have a
19   disk burned that contains just the calls that were played.
20       THE COURT:  Fine.
21       MR. GEISE:  That can go back.  The jury has to be
22   told that obviously by the Court.
23       THE COURT:  I would suggest that, if you're going
24   to do such a thing, you do it fairly early.  I don't know
25   what the defense case consists of here.
120

1        Mr. Norris, do you intend to call witnesses?
                            Page 104

20061127 AM

2       MR. NORRIS: Yes, Your Honor.

3       THE COURT: How many?

4       MR. NORRIS: Not many, half a dozen or less.

5       THE COURT: Six?

6       MR. NORRIS: Yes.

7       THE COURT: Mr. McDaniel?

8       MR. McDANIEL: I do plan to call on some, Your

9   Honor. I'm not sure how many at this point in time.

10       THE COURT: Give me your best estimate.

11       MR. McDANIEL: I would guess about five witnesses.

12       THE COURT: Are any of them the same so far?

13       MR. McDANIEL: No.

14       THE COURT: Mr. Acree?

15       MR. ACREE: Maybe about six or seven, Your Honor.

16       THE COURT: Mr. Balarezo?

17       MR. BALAREZO: Probably about the same.

18       THE COURT: So let's say, just hypothetically

19   speaking, 20 witnesses. Won't be that, and they're not going

20   to be all long. That's a guess. But I think that, anything

21   that's been played to the jury, they can have. Then the

22   question, and that has to be all that is going to them. I

23   don't want them hearing things for the first time in the jury

24   room.

25       MS. LIEBER: That's what I was suggesting. We'd
    121

1   have to probably check transcripts, but just to be sure that

2   what they get back is one final burned disk of all the calls

3   that they listened to and the calls of the transcripts from

4   the transcript books. I know there's a call from Mr.

5   McDaniel played a call off a hard disk that we hadn't been
                              Page 105

20061127 AM

6    transcribed. So that one has been played through Mr.

7    McDaniel. But I just want to make sure we get the numbers

8    right. We'll get everything onto one disk so everything

9    they've heard in court --

10              THE COURT: Good job. I think that would be

11   wonderful. Then they have a copy of the disk to listen to,

12   and then the defense counsel before it travels in there.

13              MS. LIEBER: Right, of course.

14              THE COURT: When you, therefore, these transcripts,

15   you are proposing, I take it from what I gather from reading,

16   is that would you take the same transcripts and ask to put

17   them in evidence?

18              MR. GEISE: Yes, Ma'am.

19              THE COURT: Okay. Well, I think the key is the

20   Government has to first of all burn it to a manageable. They

21   have already gotten the transcripts. I have a feeling,

22   without having any objection to the transcripts et cetera, we

23   may well, unless defense counsel has response to the cases

24   they've given me, what will happen is those things that have

25   been played will go back and the transcripts may well go

     122

1    back, too.

2              Not as evidence but they get the same old

3    instruction, but they'll have them available to them.

4    Because at the end of the day, once you have your summary

5    chart and you don't need all these hundreds of calls, it will

6    be a manageable. I think we're talking about something about

7    three inches, instead of two big binders.

8              MR. GEISE: I think that's correct, Your Honor.

9              THE COURT: I don't know how many more we have to

                          Page 106

20061127 AM

10  go.  But if anybody reads the case law to say that's not

11  doable, let us know.  But they will ultimately only be

12  sending back, as a disk, that which has already been played.

13  I don't want them having the ability to just search around.

14          MR. GEISE:  As long as we fashion instruction that

15  explains what's been done so they don't think that they were

16  mislead in some way, I'm fine with that, Judge.

17          THE COURT:  I don't want them to listen to anything

18  they haven't heard.

19          MR. BALAREZO:  Your Honor, I haven't talked to my

20  co-counsel here, but would the Court allow me to present

21  whatever case we put on, if any, after the other defendants?

22  The reason for that is --

23          THE COURT:  I think you should talk to them.

24          MR. BALAREZO:  If they agree, would the Court have

25  any problem with that?
    123


1          THE COURT:  I think you should talk among

2  yourselves.  I just don't want repetition.  You're not going

3  to call the same witnesses.  But if they have no objections,

4  I don't know what the Government put in so far.  I think it's

5  up to them frankly.

6          All right.  As soon as you have figured that out,

7  the Government has made clear what they're going to do with

8  the tapes and the transcripts.  So they will have to make a

9  copy of tapes and a copy of transcripts so that all these

10  volumes that they're hanging around with, we'll just make one

11  book available to the jury.

12          We'll tell them again what they can use them for.

13  These tapes are remarkably clear.  I have seen no problems as
                          Page 107

20061127 AM

14   we went along.  They were all, as far as I could tell,
15   accurate.  There were no objections on accuracy, so I'm not
16   troubled by the procedure, as long as what they get is only
17   what they heard.
18          MR. GEISE:  As I understand it, Your Honor, it's
19   not immensely time consuming because it's computerized.  We
20   simply have to tell it what to burn to the disk.  It will
21   take a day or so I suspect.
22          THE COURT:  You have a day or so.  They have now
23   promised me somewhere in the neighborhood of 20 witnesses.
24   That's more than I expect, but okay.  Thank you.  We'll be
25   back at quarter of.
   124


1              (A luncheon recess was taken.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

20061127 AM

18

19

20

21

22

23

24

25

125

1                          C O N T E N T S

2      WITNESS:           DIRECT   CROSS   REDIRECT   RECROSS

3

4      WILLIAM KELLY

5        By Ms. Lieber        20

6        By Mr. Balarezo              24

7

8      ANTHONY GIVENS

9        By Ms. Lieber        31

10       By Mr. Balarezo              80

11

12

13                          EXHIBITS

14                                              PAGE:

15     Government:

16     ICE 10 and 11                            22

17     MISC 12                                  35

18

19     Defendant:

20     Jones 33                                 94

21

20061127 AM

22

23

24

25
  126


1

2

3                        CERTIFICATE OF REPORTER

4          I, Lisa Walker Griffith, certify that the

5  foregoing is a correct transcript from the record of

6  proceedings in the above-entitled matter.

7

8

9

10

11

12  _____        _____

13  Lisa Walker Griffith, RPR

14

15

16

17

18

19

20

21

22

23

24

25